# EXHIBIT B

1

1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF NEW YORK
2     -------------------------------x
      UNITED STATES OF AMERICA,          :      18-CR-681 (WFK)
3                                        :
                  Plaintiff,             :      United States Courthouse
4                                        :      Brooklyn, New York
             -against-                   :
5                                        :      January 22, 2019
      JEAN BOUSTANI,                     :      12:00 p.m.
6                                        :
                  Defendant.             :
7     -------------------------------x

8          TRANSCRIPT OF CIVIL CAUSE FOR STATUS CONFERENCE
              BEFORE THE HONORABLE WILLIAM F. KUNTZ, II
9                    UNITED STATES DISTRICT JUDGE
      APPEARANCES
10
      For the Plaintiff:     RICHARD P. DONOGHUE
11                           UNITED STATES ATTORNEY
                                 271 Cadman Plaza East
12    .                        Brooklyn, New York 11201

13                           BY:  MATTHEW S. AMATRUDA
                                  MARK E. BINI
14                                Assistants United States Attorney

15                           DEPARTMENT OF JUSTICE-CRIMINAL DIVISION
                                 1400 New York Avenue, NW
16                               Washington, D.C. 20005

17                           BY:  DAVID M. FUHR, ESQ.
                                  MARGARET MOESER, ESQ.
18
      For the Defendant:     WILLKIE FARR & GALLAGHER LLP
19                               787 Seventh Avenue
                                 New York, New York 10019
20
                             BY:  CASEY E. DONNELLY, ESQ.
21                                RANDALL W. JACKSON, ESQ.
                                  MICHAEL S. SCHACHTER, ESQ.
22
      Court Reporter:        LINDA A. MARINO, Official Court Reporter
23                           225 Cadman Plaza East
                             Brooklyn, NY 10021
24                           (718) 613-2484
      Proceedings recorded by mechanical stenography.  Transcript
25    produced by computer-aided transcription.

2
Proceedings

1        THE COURTROOM DEPUTY:  The Honorable William F.

2   Kuntz, II, now presiding.  Criminal cause for status

3   conference, Docket No. 18-CR-681, USA v. Jean Boustani.

4        Counsel, will you please state your appearances for

5   the record and spell your first and last names for the court

6   reporter?

7        MR. AMATRUDA:  Matthew Amatruda, A-M-A-T-R-U-D-A,

8   for the United States, Eastern District of New York.

9        Good afternoon, your Honor.

10        THE COURT:  Good afternoon, Mr. Amatruda.  Please be

11   seated.

12        Everyone please be seated, just use the microphone.

13        MR. BINI:  Mark Bini for the United States, B-I-N-I.

14        THE COURT:  Thank you.

15        MS. MOESER:  Good afternoon, your Honor.  Margaret

16   Moeser, M-O-E-S-E-R, for the United States.

17        THE COURT:  Good afternoon.

18        MR. FUHR:  Good afternoon, your Honor.  David Fuhr,

19   F-U-H-R, with the Criminal Division of DOJ.

20        THE COURT:  Good afternoon, counsel.

21        MR. BINI:  Your Honor, at the end of the table we

22   have Special Agent Angela Tassone from the FBI, T-A-S-S-O-N-E.

23        THE COURT:  Good afternoon, Special Agent.

24        For the Defense?

25        MR. JACKSON:  Good afternoon, your Honor.  Randall

LAM     OCR     RPR

3

Proceedings

1    Jackson on behalf of Mr. Boustani.

2              THE COURT:  Good afternoon.

3              MR. SCHACHTER:  Good afternoon.  Michael Schachter

4    on behalf of Mr. Boustani.

5              THE COURT:  Good afternoon.

6              And your firm is?

7              MR. JACKSON:  Willkie Farr & Gallagher, your Honor.

8              THE COURT:  And your firm, sir?

9              MR. SCHACHTER:  Willkie Farr.

10             THE COURT:  Thank you.

11             MS. DONNELLY:  My name is Casey Donnelly, also from

12   Willkie Farr, on behalf of Mr. Boustani.

13             THE COURT:  And would you spell your name, counsel?

14             MS. DONNELLY:  Of course.  Donnelly is

15   D-O-N-N-E-L-L-Y.

16             THE COURT:  Thank you.

17             And with you at counsel table is also?

18             MR. JACKSON:  Mr. Boustani is also present, your

19   Honor.

20             THE COURT:  Would you spell his name for the record,

21   please.

22             MR. JACKSON:  Yes, your Honor.  His first name is

23   Jean, J-E-A-N, last name Boustani, B-O-U-S-T-A-N-I.

24             THE COURT:  Thank you.

25             Are there any other counsel who wish to make their

LAM      OCR      RPR

4

Proceedings

1    appearances known for the record today?

2           Hearing none, I will start with the status

3    conference and then we will proceed to the argument on the

4    bail bond application.

5           And I will hear from prosecution first and then from

6    defense counsel.

7           MR. AMATRUDA:  Sure, your Honor.  Thank you.

8           Your Honor, as you indicated, this is the first

9    status conference in this case.  In between the time when the

10   Defendant was arrested and today, we have met with counsel and

11   reviewed some of the documents that were quoted in the

12   indictment, provided counsel with copies of those, explained

13   further our theories of the case.

14          In addition, today we turned over a million pages of

15   discovery, which constitute a wide range of documentation from

16   banks and, also, communications from -- related to some of the

17   transactions that I know your Honor is familiar with at this

18   point that are at issue in the case.

19          And then we've also turned over a large number of

20   bank records; specifically, a large number of bank records

21   that show a number of the illegal payments that the Defendant

22   made in furtherance of the fraud scheme as charged in the

23   indictment.

24          What remains in discovery is the contents of a

25   number of e-mail accounts that we've done search warrants on,

5

Proceedings

1    and we are preparing that for discovery as we speak.  And I

2    expect that probably before then but certainly by the end of

3    not this week but next week we will have that turned over to

4    the defense.  And at that point, the bulk of our discovery

5    will have been completed.

6              And, so, that's sort of the status with respect to

7    discovery in the case.  I think your Honor, one, there's sort

8    of two matters, at least on my list, that I would have left to

9    raise with the Court.

10             One is, your Honor, our view, the Government's view,

11   is that this case should be designated as a complex case given

12   the number of financial transactions, the number of

13   financings -- they are international in nature -- there's

14   allegations of bribery in an African nation as well as two

15   Credit Suisse bankers in furtherance of the scheme.  And,

16   also, just given the volume of discovery material in this

17   case, we would move for the case to be designated complex.

18             THE COURT:  Let me stop you right there.

19             Defense counsel, what is your response to the motion

20   to have this case declared a complex case?

21             MR. JACKSON:  Your Honor, we oppose that

22   application.

23             THE COURT:  On what basis?

24             MR. JACKSON:  Your Honor, even though the case does

25   involve some allegations of international matters, it's our

6

Proceedings

1    position this is a case that is not extraordinarily complex.

2    The number of documents that the prosecution is talking about

3    producing is a number that's well within manageable limits.

4    It's an amount of discovery that we can review in a short

5    amount of time.

6              The actual allegations of the indictment, even

7    though they are legally flawed in ways that we think are quite

8    significant, are quite simple:  They are wire fraud

9    allegations, they're securities fraud allegations of the type

10   that are litigated over and over again in the Southern and

11   Eastern Districts of New York.

12             So, for the purposes of the analysis of the Speedy

13   Trial Act, they can't establish that this is a complex case

14   that would justify extending the time period of the Speedy

15   Trial Act.

16             THE COURT:  Thank you.  The objection is overruled.

17             Next point?

18             MR. AMATRUDA:  Your Honor, the only thing left on my

19   list would be a date for the next status conference, and I

20   don't know whether your Honor would prefer to address that

21   now.

22             THE COURT:  We can address that in a bit.

23             I think the issues now with respect to discovery,

24   the only item that I don't believe we touched on is the

25   parties have submitted on ECF a proposed stipulation and order

7

                              Proceedings

1    with respect to confidentiality.  I approved that order, I

2    signed it, I believe I had entered it on ECF.  But, in any

3    event, if I haven't, it will certainly be entered within an

4    hour.

5              Did you get notice that I approved that order?

6              MR. AMATRUDA:  Your Honor, we did see over the

7    weekend that you approved the order.

8              THE COURT:  Did you as well, defense counsel?

9              MR. JACKSON:  Yes, your Honor.

10             THE COURT:  So, I take it that everyone is

11   comfortable in that sense.  There was a stipulation and

12   proposed order.

13             Dr. King came to help many people be free, but

14   lawyers and judges were not among them.  So, I was certainly

15   here working this weekend, as you have seen.

16             We'll talk about the next status conference after I

17   hear from defense counsel with respect to any items that the

18   prosecution did not raise in its opening status report, and

19   then we'll turn to the appeal from Magistrate Judge Kuo's

20   order.

21             Defense counsel?

22             MR. JACKSON:  Your Honor, the only item that we

23   would raise is that we would like to seek a trial date as

24   early as possible.

25             THE COURT:  I'll give you a trial date as early as

8

Proceedings

1    possible.

2              MR. JACKSON:  Thank you, your Honor.

3              THE COURT:  You're welcome.

4              Anything else?

5              MR. JACKSON:  No, Judge.

6              THE COURT:  We're here on an appeal from Magistrate

7    Judge Kuo's order.  What I typically say to lawyers is usually

8    the Appellant would go first, so I'll hear from defense

9    counsel as to the basis on which you're appealing the

10   magistrate judge's order.

11             MR. JACKSON:  Thank you, your Honor.

12             Should I remain seated?

13             THE COURT:  Whatever you wish.  You can remain

14   seated, you can go to the podium, just don't make the court

15   reporter crazy going back and forth.  Pick a location and have

16   at it from there.

17             MR. JACKSON:  I think I'll go to the podium.

18             THE COURT:  Absolutely you may do that, sir.  Just

19   make sure the microphone is on there.  We've lost Mr. Jackson,

20   at least momentarily.

21             (Pause in proceedings.)

22             THE COURT:  Why don't you start from the table?

23   Then, when we have our techmeister return, unless we have our

24   junior techmeister, associate techmeister -- hang on.

25             Want to try it again?

9

Proceedings

1          MR. JACKSON:  Sure.

2          THE COURT:  Do you think you've got it, counsel?

3          MR. JACKSON:  I'm not getting anything, Judge.

4          THE COURT:  Sorry.

5          MR. JACKSON:  No worries, Judge.

6          THE COURT:  There's only one person here who can

7    speak without one, and that's not you.

8          Please be seated.  When Mr. Jackson returns, we will

9    hook you up.

10         MR. JACKSON:  Thank you, your Honor.

11         Your Honor, I'm glad that your Honor mentioned the

12   Dr. King holiday a moment ago.  I hope that the Court and all

13   the parties had a good opportunity over the weekend to at

14   least have some break with the holiday.

15         I began yesterday, the holiday, with an e-mail that

16   went out to all defense counsel, indicating that both the MDC

17   and MCC prisons will be closed again.  As we've described in

18   our papers, there have been several days where the MDC has

19   been closed to attorney visitation.  And we began the day

20   discussing the fact that apparently the MDC and the MCC will

21   be closed again to attorney visitation.  I understand that the

22   MCC remained closed throughout the day; at some point, the MDC

23   may have reopened.

24         But what that ultimately led to is instead of the

25   opportunity to visit any of our clients that morning, I did

LAM     OCR     RPR

10

Proceedings

1   reflect a little bit on some of the words of Dr. King in one

2   of his famous letters.  And I think it frames, your Honor,

3   what we're talking about today, just one aspect of it, which

4   is he said that there are some instances when a law is just on

5   its face and unjust in its application.

6           Your Honor, I would submit to you that what the

7   Government has described in their papers responding to our

8   bail application is a proposal to the Court for an unjust

9   application of the laws that relate to the detention of

10  Mr. Boustani.  There is nowhere in the Government's submission

11  where they address the two key issues that are for the Court

12  to determine whether or not detention in this case is

13  appropriate.

14          And they are simply:  One, what is the specific

15  evidence that demonstrates that Mr. Boustani is a risk of

16  flight; and, two, then, and only then, if it can demonstrate

17  that Mr. Boustani is a risk of flight on the basis of

18  appropriate evidence, can they demonstrate, can they meet

19  their burden of demonstrating that there are no conditions or

20  combination of conditions that can be set that would

21  reasonably assure Mr. Boustani's presence in court?

22          With all the briefing that was submitted by the

23  Government, those two questions are almost entirely ignored,

24  your Honor.  And instead, what the Government does is it goes

25  through the factors that have been set out by the courts in

Proceedings

1   terms of the determination of whether or not detention is

2   appropriate, what the Court should consider.  I just want to

3   respond a little bit, your Honor, to what the Government has

4   said and talk about why it's inadequate.

5           With regard to the first factor, the nature and

6   circumstances of the offense, the first and most important

7   aspect of that, your Honor, is that the almost entire focus in

8   terms of the nature and circumstances of the offense to the

9   Government is on the loss amount in this case.  Now, we

10  dispute that the loss amount in this case is actually high for

11  a number of reasons.

12          THE COURT:  Your papers say it's zero.

13          MR. JACKSON:  We believe it will be demonstrated to

14  be zero, your Honor.

15          THE COURT:  Right.

16          MR. JACKSON:  And the Government has failed to set

17  out any actual specific evidence that can help us to

18  understand why the loss amount would be as high as they are

19  suggesting.

20          But putting that aside, your Honor, even if the loss

21  amount is high, that is not what the courts are talking about

22  in terms of the nature and circumstances of the offense.  If

23  it were, it would not be the case that in almost all of the

24  white collar cases and almost all of the bribery cases that

25  are brought in the Southern and Eastern Districts of New York

Proceedings

1    the courts have determined that conditions can be set that

2    will allow the Defendant to remain out on bail and, in fact,

3    that the Government can't meet its burden of establishing that

4    the Defendant is a risk of flight.

5          For example, the *Madoff* case, which we talk about

6    significantly in our brief.  In the *Madoff* case, Judge Ellis'

7    point in rejecting the Government's motion for detention, one

8    of his points that he was making is the significance of the

9    evidence against Mr. Madoff didn't matter, the nature of the

10   circumstances of the offense didn't indicate -- the fact that

11   it was a very significant fraud with a lot of money wasn't the

12   type of nature and circumstances of offense that can militate

13   in favor of detention.

14         THE COURT:  Wasn't Bernie Madoff -- and I recall

15   Magistrate Judge Ellis' decision being affirmed by then

16   district court judge and, ultimately, by the Circuit Court of

17   Appeals, wasn't Bernie Madoff a United States citizen with a

18   wife who lives in New York?

19         At the time, he had two adult sons; one of them, of

20   course, very tragically committed suicide.  But he was an

21   American citizen, a New York resident, with a New York spouse

22   who lived in New York and had a residence in New York, and,

23   obviously, the home detention monitors and the FBI and other

24   agents had eyeballs on him.

25         I think that when you talk about Bernie Madoff,

Proceedings

1    you're talking about a different factual premise in terms of

2    determining the risk of flight.  I hear you with respect to

3    the dangerousness argument, which I know you're going to get

4    to, but just to show you, A, that I did read and consider your

5    papers very carefully.

6              Not to short circuit your argument, but it seems to

7    me you have here a Lebanese national.  As I understand it, his

8    wife and his five-year-old are not here in the United States.

9    As I understand it, he has no property in the United States.

10   As I understand it, he may or may not have had a Lebanese

11   passport.  There was mention of an Antigua passport.  I'm not

12   exactly clear as to how many passports he had from what

13   nations or what the situation is.

14             And I had the first two FIFA cases before Judge

15   Dearie kindly agreed to take them off my hands.  So, bottom

16   line -- and I say that with all due respect to the former

17   Chief Judge, who's on the FISA Court.  Don't rat me out to my

18   good friend Judge Ray Dearie.

19             Bottom line is this:  I understand when people get

20   out and when people stay in.  And I read the references to my

21   *Gennaro* case and I read my references to my brother Garaufis'

22   case.  Deal with the facts of this case.

23             You have a Lebanese national who allegedly was

24   accused of being involved in a $2 billion fraud with

25   $50 million or 50 million chickens coming home to roost.  And

14

Proceedings

1   the bottom line is, talk about his case and whether or not he

2   should be, with a nonresident wife, a nonresident

3   five-year-old, whether he should be allowed to be not

4   incarcerated pending trial because of the flight risk or

5   whether you're saying that he can have the alternative to

6   detention and not have the Court be castigated by giving him a

7   Wilson Fisk Daredevil private security force of guards that he

8   pays for.

9           MR. JACKSON:  Your Honor, absolutely.  And I

10  appreciate the Court's distinction --

11          THE COURT:  And you have very good papers and you

12  spent a lot of time on it.  And I read them and think very

13  seriously about this.  So, this is an important issue in an

14  important case.

15          Go ahead.

16          MR. JACKSON:  I appreciate that, your Honor.  Let me

17  focus in on that.  I think what your Honor is talking about

18  ties in to the third factor in terms of the history and

19  characteristics of the Defendant.

20          And just to put aside the first part, I do submit,

21  for the reasons we describe in our paper, the first two

22  factors weigh in favor, according to the case law, of

23  releasing Mr. Boustani because of the reasons that we

24  described.

25          Focusing in on the distinctions between Mr. Boustani

                            Proceedings

1    and someone like Mr. Madoff, I think in terms of the history

2    and characteristics of the Defendant in the ways that have

3    mattered to the courts, Mr. Boustani is actually better

4    situated than someone like a Madoff.  Similarly to a Madoff --

5              THE COURT:  Why?

6              Is he an American citizen?

7              MR. JACKSON:  He's not an American citizen.

8              THE COURT:  Does he hold an American passport?

9              MR. JACKSON:  He does not.

10             THE COURT:  Is his wife here?

11             MR. JACKSON:  His wife is sitting in the courtroom.

12             THE COURT:  Is she an American citizen?

13             MR. JACKSON:  She's not, your Honor.

14             THE COURT:  Is his child an American citizen?

15             MR. JACKSON:  He is not, your Honor.

16             THE COURT:  Is the child enrolled in an American

17   school?

18             MR. JACKSON:  No, your Honor.

19             THE COURT:  All right.  Go ahead.

20             MR. JACKSON:  What I would emphasize is Mr. Boustani

21   has no criminal history whatsoever in this district or any

22   other district.

23             THE COURT:  Right.

24             MR. JACKSON:  In terms of -- the reality of the

25   situation is that Mr. Madoff had a situation of an incredibly

                        LAM      OCR      RPR

Proceedings

1    broken family situation, which was understood at the time.

2    Mr. Boustani is happily married.  He has a young son.  His

3    wife has traveled here to be with him.  She's dedicated to

4    staying here with him throughout this as they fight this

5    prosecution.

6            Mr. Boustani has operated in businesses.  Unlike

7    someone like Mr. Madoff, who admitted at the time of his

8    detention that his business had been entirely fraudulent the

9    entire time he had been operating, Mr. Boustani has been

10   operating in legitimate business throughout the entirety of

11   his career.

12           THE COURT:  But Mr. Madoff's businesses were all --

13   perhaps corrupt, as they proved to be, or nonexistent, as they

14   proved to be -- in the United States of America, at least for

15   the most part, whereas you make a big point of saying that

16   your client not only is not an American citizen but has not

17   been indicted under the Foreign Corrupt Practices Act and,

18   indeed, he's here essentially on wire transfer arguments and

19   on the subsequent sale of securities into the securities

20   markets of the United States after the initial alleged fraud

21   occurred in other jurisdictions.

22           So I think, again, the *Madoff* situation is highly

23   distinguishable in this Court's eyes from the situation that

24   you have here.

25           MR. JACKSON:  Fair enough, Judge.

17

Proceedings

1          THE COURT:  I'm a district court judge.  I just look

2   at the facts.  I'm not talking about what an appellate court

3   might see.

4          But when you focus in on the facts, I don't see this

5   case as analogous to, I see it much more if you're going to

6   make your argument in terms of dealing with some of the FIFA

7   cases, where not only Ray Dearie but also Judge Kuntz granted

8   relief for people who were not U.S. citizens and who were

9   allegedly engaged in international fraud.  But that came

10   against -- spoiler alert -- the context of early guilty pleas

11   for many of those same people who were released pending

12   further litigation in the case.

13          So, the FIFA cases go on, very complicated, civil

14   and criminal.  The Court is well aware of those.  I just think

15   it's important not to get sidetracked by the surface

16   comparisons to the *Madoff* case because the differences are

17   just, in my view, which at least today matters, a showstopper

18   for you.

19          MR. JACKSON:  Understood, your Honor.  I think the

20   Court makes a good point.

21          We would ask the Court to -- we would ask the Court

22   to focus on the FIFA cases.  The Government, in its

23   submission, did not to distinguish this case from the

24   situation of the FIFA cases.

25          THE COURT:  I'm about to ask them about that.

18

Proceedings

1            MR. JACKSON:  Obviously, your Honor, there are some

2    superficial levels or maybe they can point to things, but the

3    bottom line is Mr. Boustani, like the defendants in those

4    cases, is a foreigner, but he's a person who has absolutely no

5    criminal history, he's a person who in all of the important

6    respects is indistinguishable from those defendants.

7            If you look at the *Sabhnani* case that we discuss at

8    length in our brief, your Honor, those were defendants who had

9    significant foreign ties.  And Judge Raggi, in her opinion,

10   focused in on the fact that even given those foreign ties,

11   where you can create conditions that will reasonably assure

12   this person will appear in court, that's not a basis for

13   denying --

14           THE COURT:  You're talking about two people who

15   allegedly employed foreign workers in, to quote Dr. King,

16   slavish conditions in Long Island, as opposed to a businessman

17   who was allegedly in a $2 billion fraud and has pocketed or

18   allegedly pocketed tens of millions, if not more, dollars.

19           So, when you talk about the Raggi case -- and I read

20   Judge Raggi's decision very carefully -- I don't think that

21   factual situation in terms of two people and household

22   employees as horrific as it was to the household employees is

23   comparable to the alleged business fraud which you've got

24   here, with billions of dollars, nonU.S. citizens, nonpresent

25   in New York.

LAM        OCR        RPR

19

Proceedings

1          This is what happens when I have time to read the

2  cases.

3          MR. JACKSON:  Yes, your Honor.

4          THE COURT:  And good briefs.

5          MR. JACKSON:  In the *Sabhnani* case, and this is part

6  of what the Second Circuit is saying:  The Government is also

7  questioned reliably --

8          THE COURT:  One of the things you have to do when

9  you start reading -- and even I do this, you speed up -- slow

10 it down.

11         MR. JACKSON:  Let me slow down.

12         The Court emphasized at Page 5 of the decision

13 that -- actually, of the actual reported decision, Page 67,

14 that the summary that had been submitted in that case of the

15 defendant's assets failed to explain wire transfers in excess

16 of $17 million from countries in the Middle East into

17 defendant's business account.

18         And the point of that, your Honor, is that like in

19 this case, you're dealing with a defendant that the Second

20 Circuit understood to be people of relative means.

21         THE COURT:  But they had a home in New York.  They

22 lived in New York.  They were here.

23         This Defendant is someone who was arrested outside

24 of the United States and someone who does not even hold a U.S.

25 passport, who owns no U.S. property, whose wife is not a U.S.

LAM     OCR     RPR

Proceedings

1   citizen, whose child is not a U.S. citizen.

2           I think that, putting aside the scale of the nature

3   of the infractions in terms of the alleged crimes and as

4   horrific as they were for the individuals who were allegedly

5   enslaved to be household people, you're talking about a

6   different kind of situation:  A foreign national allegedly

7   involved in a $2 billion fraud with millions of dollars in his

8   pocket, allegedly, as opposed to people who are allegedly

9   importing domestic workers on a slave-based bit of behavior.

10          It may not be apples and oranges, but they're

11  certainly oranges and tangerines.  They're different.

12          I hear you.

13          MR. AMATRUDA:  The only point that I'm making, your

14  Honor, in terms of the question of whether or not you were

15  dealing with foreigners who had means and some ties to a

16  foreign country, they're similar in that respect --

17          THE COURT:  I understand the analogy.

18          What else do you have?

19          MR. JACKSON:  Your Honor, I think that that ties

20  into -- that gets us -- we don't think they've met their

21  burden at all in determining -- of proving that the Defendant

22  is a risk of flight.  The courts have said it can't just be

23  that the person is a foreigner, it can't just be that the

24  person has means.  And those are the only two things they've

25  talked about.

LAM      OCR      RPR

21

Proceedings

1          But putting that aside, even if they could

2     determine, even if they could prove that Mr. Boustani was a

3     risk of flight, they still would have to demonstrate that

4     there were no conditions that could be set that would

5     reasonably assure his appearance.

6          THE COURT:  But aren't you concerned the appearance

7     of giving him what I refer to in shorthand as the Wilson Fisk

8     private prison, where he's got guards that he's paying for

9     himself, Upper East Side --

10          I'm assuming he's not going to be housed anywhere by

11     the other gentleman who's being tried nearby in this

12     courthouse.

13          You're talking about having him in a private prison

14     paid for by his money, his guards.  One of the decisions that

15     was decided, the estimate was $144,000 a month to buy the

16     apartment, to pay the guards 24/7.

17          Putting aside the sources and uses of those funds,

18     is that the kind of justice system we have, where because he

19     has means he gets to build his own private prison?

20          MR. JACKSON:  Your Honor, I think that the Second

21     Circuit's decision we talked about a little bit, in *Esposito*,

22     is what really what underscores the appropriateness of what

23     we're talking about here.  And *Esposito* is the decision just

24     last year, just in 2018, where the defendant was literally a

25     Mafia boss.  And the Second Circuit discussed some of those

Proceedings

1    concerns, which we acknowledge are real concerns.

2            No one is more invested, as a person who has

3    operated as a prosecutor and defense attorney in the system,

4    in a system that provides equal justice under the law.  We

5    believe in that as much as the Court does.

6            The point that was made by the Second Circuit in the

7    *Esposito* decision was that while that's a valid concern, you

8    run into a fundamental unfairness if the key basis for

9    detaining the person who the Government is focused in on is

10   the idea that this is a person who has significant means.  And

11   then we say you can't utilize those means in order to create

12   conditions that would allow the person to be detained.

13           THE COURT:  I'm asking you a different question,

14   which is a fundamental question.

15           MR. JACKSON:  Yes.

16           THE COURT:  Suppose you have someone who is an

17   indigent member of an alleged organized crime family, whether

18   it's Mafia, Crips and Bloods, are you saying the person who

19   has funds should always be able to build an alternative to

20   prison?

21           MR. JACKSON:  No, your Honor.

22           THE COURT:  Is that your argument to deal with the

23   risk of flight and dangerous approach?

24           If you have $50 million in pocket and you can build

25   the Wilson Fisk castle down the street -- that's where you get

LAM      OCR      RPR

23

Proceedings

1   to go and pay your employees -- as opposed to going to the MCC

2   or the MDC, putting the shutdown issues aside for the moment

3   because, sooner or later they're going to be resolved, bottom

4   line is aren't you really saying that you have a right to

5   create an alternative because you've got money in your pocket

6   in terms of incarceration?

7          Because if that's what we're going to do, then why

8   don't we just have a means test, forget about cash bail, and

9   say, Do you have assets X?  Build your own prison and have

10  your own guards who are your employees and we'll make sure you

11  show up.

12         Isn't that what you're really asking the Court to

13  do?

14         MR. JACKSON:  That is absolutely not what we're

15  asking the Court to do, your Honor.

16         I think that if we look at Judge Bianco's decision,

17  it really underscores the distinction between a case like that

18  and this case.  In the Judge Bianco decision which the

19  Government cites in their brief, you are dealing with a person

20  who was guilty of some of the most heinous crimes imaginable;

21  child pornography, the production of it, involving very young

22  minors.  And I think that the Court appropriately determined

23  that, look, the circumstances that would have to be created in

24  order for us to avail ourselves, in order for the defendant to

25  avail himself of the private security and able solution, would

LAM        OCR        RPR

Proceedings

24

1  be so onerous that you would essentially have to create a

2  private jail.  And looking at the entirety of the

3  circumstances surrounding that type of Defendant, it simply

4  wasn't fair to anyone, including the community where that

5  level of dangerousness was at issue, to conclude that this was

6  an appropriate solution.

7         That is not the situation with Mr. Boustani.

8  Mr. Boustani, the Government concedes, poses no danger to the

9  community, he's a person who has no criminal history, he's a

10  person who is charged with a type of crime that literally

11  every American who gets charged with it gets bail.

12         So, the only real question is because Mr. Boustani

13  is Lebanese and the Government has decided to pick him up

14  while he was on vacation with his wife in Dominican Republic,

15  should he have to spend the next two years in jail when there

16  is a very clear, definable combination of conditions that can

17  be set that will impose no burden to the Government, either

18  financially or logistically; where there is that set of

19  conditions that can be set, should Mr. Boustani be put in the

20  situation where his health, his life, are going to be

21  compromised, his ability to prepare for trial is going to be

22  severely compromised, he's not going to be able to have

23  contact with his family, and his psychological ability to

24  prepare for trial is going to be compromised?

25         And the answer, your Honor, we submit to that, is

25

Proceedings

1    no.  The whole point of this decision, the *Esposito* decision,

2    where you had a Mafia boss released, as opposed to somebody

3    like Mr. Boustani, who has never been accused of any violence

4    in his life, is not any defendant who has means should be

5    released under private security, it's that we should take that

6    into consideration if it's an option and if looking at the

7    other factors you can say that this is a person who under

8    ordinary circumstances will be entitled to some bail.

9          So, your Honor, we submit it's the Government's

10   burden.  They haven't cited specific evidence that will allow

11   them to meet their burden under any of the factors.

12         And we believe we have set out in our proposal not

13   just private security.  It includes a number of the standard

14   conditions of strict supervision that the Court has in

15   circumstances like this, like GPS monitoring, and it's a set

16   of conditions that will assure that Mr. Boustani appears.

17         And they haven't done anything to explain to your

18   Honor why that's an insufficient condition, other than saying

19   that there's concern about economic inequality, which is what

20   everyone is concerned about but which is addressed squarely in

21   the *Esposito* decision.  And this is the perfect situation that

22   they're talking about.

23         They have to explain, we would submit, your Honor,

24   how Mr. Boustani would flee under these circumstances.  They

25   haven't described any Jedi powers he has to escape New York.

Proceedings

1   They haven't described Mr. Boustani as a person who has ever

2   done anything to demonstrate that he would engage in the type

3   of activity that would lead to flight.

4          So, your Honor, we submit that under the law here

5   and considering all the factors, the just and fair outcome

6   under the statute is for Mr. Boustani to be bailed.

7          THE COURT:  Thank you.

8          I'm going to ask the Government now, Judge Vader is

9   going to ask you, what about this, his lack of Jedi powers to

10  escape?

11         And what about the FIFA situation?

12         Isn't he like the FIFA folks who were not U.S.

13  nationals, from abroad, had lots of money, and your office in

14  particular allowed them to remain free?

15         What's the difference between this defendant and the

16  gentlemen of FIFA-land?

17         MR. BINI:  Your Honor, every bail decision, as

18  you've pointed out, is very fact specific.

19         THE COURT:  I'll ask you to pull the microphone

20  close.

21         MR. BINI:  Every bail decision is always extremely

22  fact specific, as your Honor has pointed out.  With respect to

23  the FIFA defendants, I would note that here we have a

24  defendant who is charged with offenses so serious that if

25  convicted the Government believes his recommended guidelines

27

Proceedings

1    will be 55 years in prison.

2          And the 3553 factors are so significant that a

3    sovereign nation, Mozambique, defaulted on its debt.

4          THE COURT:  I understand that, but you must admit

5    that there's pretty sizeable numbers for the FIFA defendants

6    too.

7          MR. BINI:  It's absolutely a very serious case.

8          Another point of distinction here, your Honor, I

9    would note the facts specific to this case that are troubling

10   and favor that there are no reasonable color of conditions

11   that can reasonably assure his appearance here short of

12   detention, are, as your Honor pointed out, he's a citizen of

13   Lebanon and he also works for a United Arab Emirates company.

14   Those are both countries which do not have extradition

15   treaties with the United States.

16         But more than that and in direct response to defense

17   counsel, Oh, the Defendant doesn't have Jedi mind powers, the

18   Government has put forth evidence that the Defendant has

19   exactly the ability that would be required to escape here.

20   And that's set out on Pages 9 and 10 of our opposition brief

21   in that the Defendant helped procure fraudulent entry

22   documents into the United Arab Emirates for multiple

23   co-conspirators in this case so they could pull off this fraud

24   scheme.

25         So, pairing up both his apparently unlimited

LAM     OCR     RPR

28

Proceedings

1   resources, based upon his own wealth stolen in this scheme,

2   the wealth of Privinvest, which is apparently paying for this

3   Wilson Fisk-like virtual private jail that he would seek from

4   your Honor, and, as we pointed out, in fact, the billionaire

5   owner of Privinvest appears to be -- he and Privinvest appear

6   to be providing resources to the Defendant.

7           So, with those nearly unlimited resources and the

8   ability and the demonstrated conduct of procuring fraudulent

9   entry documents, we believe the Defendant could create

10  fraudulent documents to leave and leave by private jet or

11  other means under false identity.

12          Your Honor, you've pointed out some of the issues

13  that the private jail solution that Defendant requests raise;

14  first, the very real possibility of disparate treatment under

15  the Bail Reform Act that your Honor addressed in the *Bruno*

16  decision.

17          And while certainly the Second Circuit has permitted

18  virtual private jails in certain situations, as we note in our

19  opposition brief at Page 11, Footnote 5, defense's reliance on

20  *United States v. Esposito* is no aid to him here because that

21  decision recently, from September 11, 2018, was in a situation

22  where the Second Circuit indicated that while district courts

23  are not required to consider private security guards as a

24  condition of release, they are not precluded from doing so

25  when the Defendant has substantial resources and wealth

29

Proceedings

1    contributes to his risk of flight.

2            They noted that the other co-defendants in the

3    case -- excuse me, in that case there was no possibility of

4    disparate treatment among the other co-defendants.  There was

5    no one who was going to have to stay in because they didn't

6    have the unlimited resources to pay for a virtual private

7    jail.

8            In this case, we do not yet know if the other

9    defendants are going to present such a situation where they

10   don't have the backing of a billionaire owner who is willing

11   to pay for a Wilson Fisk-type detention facility, as your

12   Honor has noted.  So, the disparate treatment is a real issue

13   here.

14           Putting that aside, your Honor, a second issue is

15   that a virtual private jail would give this defendant the

16   opportunity to flee because, as your Honor has pointed out,

17   the jailers would, in essence, be his employees.  This is

18   something that's addressed in the *Zarrab* decision by Judge

19   Berman, we noted in our brief.

20           Defense counsel in their briefing also points to a

21   case that raises this issue.  They mention the -- I'm going to

22   mispronounce the name, Mr. Seng, *United States v. Seng*.

23           THE COURT:  Would you spell that for the court

24   reporter?

25           MR. BINI:  Yes, your Honor, S-E-N-G, which is a case

Proceedings

1   out of the Southern District of New York, 15-CR-706, where, as

2   defense counsel notes, a virtual private jail was given to a

3   very wealthy defendant.

4           However, after that happened, your Honor, during the

5   pendency of that action, one day a government employee was at

6   lunch in Chinatown.  The Defendant in that case was permitted

7   to go to visit his attorney; otherwise, he had to stay in his

8   virtual private jail apartment.  And the Government employee

9   happened to be at lunch in Chinatown, and who did they see?

10  They saw the defendant, your Honor.

11          And that is noted in Document 340, where the

12  Government in that case, a copy of which I have and I'll hand

13  up, if I could --

14          THE COURT:  Why don't we mark it as an exhibit and

15  give the number.  We'll take it as Court Exhibit 1 in

16  evidence.

17          (Court Exhibit 1 so marked.)

18          THE COURT:  Just give the citation so your adversary

19  knows what it is.  Read out the case.

20          MR. BINI:  Yes, your Honor.  *United States v.*

21  *Seng* --

22          THE COURT:  Can you spell that again?

23          MR. BINI:  S-E-N-G, 15-CR-706.

24          THE COURT:  And the judge on that case?

25          MR. BINI:  The judge on that was The Honorable

31

Proceedings

1   Vernon S. Broderick.

2           And what I'm handing up is Document 340 from that

3   document, which was a letter from the Government, where the

4   Government pointed out that this had happened.

5           THE COURT:  What did Judge Broderick do?

6           MR. BINI:  Judge Broderick permitted the defendant

7   to remain out.

8           However, the reason why I think it's so serious,

9   what is attached are pictures of the Defendant getting

10  apparently Chinese food, being out for about 20 minutes.

11          THE COURT:  I guess he didn't favor takeout, but go

12  ahead.

13          MR. BINI:  It just points out to a real issue where

14  you have private jailers because they are employees of

15  Defendant and may be influenced to do something which the

16  employer wants him to do even though it's against the Court's

17  restrictions.

18          By the way, that was Guidepost in that case.  That

19  was the private jailer.

20          THE COURT:  The same private jailer that's being

21  proffered in this case; is that what you're saying?

22          MR. BINI:  Yes, your Honor.

23          THE COURT:  Go ahead.

24          MR. BINI:  That's set out at Page 3 of the letter

25  that I asked to be Court Exhibit 1.

32

Proceedings

1          The Government noted that the Defendant while on

2   home detention apparently visited his defense counsel every

3   weekday and was out of his apartment virtually all day every

4   day.  He was visited by a masseuse on 16 occasions, who stayed

5   for a total of 160 hours in the 30 days preceding the filing,

6   and he was observed on unauthorized visit to a Chinatown

7   restaurant.

8          Your Honor, as a third issue with virtual private

9   jail and why the Government believes it's inappropriate here,

10  it raises serious practical issues related to the use of

11  force.  This is something that's pointed out in some of the

12  cases, including the *Zarrab* case.

13         What exactly would Guidepost do if the Defendant

14  sought to flee?

15         Would the armed guard shoot him?

16         Has the Defendant consented to being shot?

17         And can he consent to being shot?

18         Your Honor, the Government submits that the

19  Defendant can't consent to being shot, even if he wished to.

20  Under New York State law, it would be an illegal --

21         THE COURT:  Let me ask you a hypothetical question.

22         Suppose you have Guidepost Security guarding him and

23  on the way back from the Chinese restaurant or the Italian

24  restaurant or the soul food restaurant -- we won't limit the

25  great ethnic foods of New York -- he made a break for it and

33

Proceedings

1    the guard did shoot him or club him or stop him in some way

2    and he was injured.

3              Who would the Defendant have a right to bring an

4    action against?

5              Would he have a right to bring an action against not

6    just the private security company presumably or allegedly

7    engaging in a tort, but would he also have a right to sue the

8    United States of America for having put him in a situation

9    where the guard -- would he have a right to sue the Court that

10   authorized the private security force to take care of him?

11             If you have a situation where an inmate is abused by

12   a prison official, the lines of responsibility are very clear.

13             What are the lines with respect to the private

14   security interest if there is an injury inappropriately

15   inflicted on the Defendant?

16             Have you ever had a case where that's come up?

17             MR. BINI:  I have not, your Honor; however, I think

18   that your Honor raises excellent questions that would have to

19   be resolved by law.  Because whatever they might agree to, I

20   don't think they necessarily would withstand a court of law --

21             THE COURT:  Do you know what the contract agreements

22   in Judge Broderick's case or other cases where you've had

23   these private jail setups, what they deal with in terms of the

24   infliction of intentional torts, in the old Williston Corbin

25   language; do you know?

34

Proceedings

1          MR. BINI:  I do not know.

2          THE COURT:  Maybe the defense counsel knows since

3    they are the ones who are suggesting that the private security

4    force would be appropriate.

5          Let's move on.

6          MR. BINI:  Yes, your Honor.

7          I would just note as another point that tort with a

8    virtual private jail, that it's not at all clear who the

9    United States would have recourse to in the event of the

10   defendant fleeing.

11         Accordingly, many courts in this district and in the

12   Second Circuit have rejected virtual private jail requests,

13   including Judge Johnson in the *Zhong* case, which was affirmed

14   by the Second Circuit.

15         THE COURT:  Can you spell that for the reporter?

16         MR. BINI:  Yes, Z-H-O-N-G.  682 Federal Appendix 71,

17   a 2017 decision from the Second Circuit.

18         Judge Garaufis, who your Honor mentioned, in United

19   *States v. Rainere*, 2018 Westlaw 3057702, a June 20, 2018,

20   decision, where Judge Garaufis detained the defendant based

21   upon flight risks that were similar to here, where the

22   defendant seemed to have access to enormous resources and

23   offered to be guarded by a private security company.

24         *United States v. Patrick Ho*, and this is a case that

25   was related to the *Seng* case.  Seng was permitted to have the

LAM     OCR     RPR

Proceedings

1   virtual private jail and he was going to lunch at a Chinese

2   restaurant.  Patrick Ho, however, was detained.  That was by

3   Judge Forrest in the Southern District of New York, and that

4   was at 17-CR-779.  Docket Entry 49 is a transcript of the

5   hearing on February 5, 2018, where Judge Forrest detained the

6   defendant.  The relevant pages are 66 to 76.

7              The *Zarrab* decision, Z-A-R-R-A-B, cited in our

8   papers.  And, also, *United States v. Kassim Tajideen*,

9   T-A-J-I-D-E-E-N, 17-CR-46, which is a District of D.C.

10   decision from March 15 of 2018.

11              THE COURT:  Decided by?

12              MR. BINI:  Judge Walton of that district, your

13   Honor.

14              He detained defendant based upon flight risk and

15   rejecting the virtual private jail solution from Guidepost,

16   your Honor.

17              Your Honor, here there is great incentive for

18   Defendant to flee because of the seriousness of the case, the

19   potential sentence, the overwhelming evidence as set out in

20   our bail letter, which I will not repeat here, but, in short,

21   he and Privinvest are the quarterback of the scheme where they

22   received $2 billion in funds and he and Privinvest pay out

23   50 million on one side to the investment bankers who were key

24   to getting this deal approved --

25              THE COURT:  Including Credit Suisse?

36

Proceedings

1           MR. BINI:  Yes, your Honor.

2           -- and 150 million to Mozambique and public

3    officials, including key signatories to the loan agreements,

4    including a guarantee for Mozambique signed by Finance

5    Minister Manuel Chang, who remains detained in South Africa.

6           THE COURT:  Not to get out over our skis in terms of

7    the legal theories of the case, but I take it that the

8    payments to Credit Suisse occurred outside of the United

9    States, within the United States.  I understand that you're

10   attacking the alleged sale of the securities in the, quote,

11   aftermarket or secondary market that went to investors here in

12   the Eastern District of New York and elsewhere in the U.S.

13          But with respect to the wire transfers involving the

14   banks, did that occur exclusively outside of the United

15   States -- because I have some *Cornwell* concerns floating

16   around about that -- or did it occur with transfers that

17   occurred within the United States, or are you not in position

18   to respond to that at this point in the case?

19          MR. BINI:  No, your Honor, I am in a position to

20   respond, and the answer is that almost all of the bribe and

21   kickback payments were in U.S. dollars.

22          THE COURT:  I'm not asking a currency question --

23          MR. BINI:  Right.

24          THE COURT:  -- I'm asking a venue question.

25          MR. BINI:  No, no, no.

37

Proceedings

1          THE COURT:  I'm an old bank lawyer.  You can't get

2  away with that.

3          In what venues did the wire transfers occur?

4          Did they occur within the United States, were they

5  all offshore, or you're not in a position to respond?

6          MR. BINI:  While they were offshore, they passed

7  through correspondent bank accounts, including through the

8  Eastern District of New York.

9          THE COURT:  The correspondent banks located within

10  the United States of America.  That's your position.

11          MR. BINI:  In New York City.

12          THE COURT:  And here in the Eastern District of New

13  York as well.

14          MR. BINI:  Yes.

15          And I would just point out that the reason why this

16  case is here, your Honor, is that many of the investors are in

17  the United States, including an investor in New York City with

18  $124 million, approximately, invested in EMATUM bonds --

19          THE COURT:  Would you spell that for the court

20  reporter?

21          MR. BINI:  EMATUM is E-M-A-T-U-M, which was the tuna

22  boat portion of the loans.

23          The loan funding wires ran through New York City,

24  including correspondent transfers through New York City, but,

25  also, actual wires into and out of New York City for the

38

Proceedings

1   funding wires that related to the loans.  The loan agreements

2   themselves that are at issue caused for the payments related

3   to the loans to be made to New York City bank accounts that

4   were specified.

5          THE COURT:  And the time period roughly beginning

6   when and ending when, roughly, according to your indictment?

7          MR. BINI:  Yes, your Honor.  The conduct is from

8   2011 to present.  The loans are primarily 2013 through 2016,

9   when there was an exchange of the EMATUM loan participation

10  note for a Eurobond.

11         And during that exchange, your Honor -- and this was

12  the key to part of the scheme and continuing the scheme -- in

13  fact, Mozambique and co-conspirators flew to John F. Kennedy

14  Airport, in our district, so that they could do a roadshow

15  with New York City investors because they needed to get their

16  consent to extend the loans because they couldn't pay for the

17  loans.

18         And they continued, as part of that, to make false

19  statements regarding their ability, intent to pay back the

20  loans, and all of the underlying conduct which we're

21  discussing.  In fact, this was all built on misuse of

22  proceeds, that the loans instead of going to the boats, as

23  they were supposed to exclusively, were being used for bribes

24  and kickbacks, which were actually specifically prohibited in

25  the loan agreements which are at the centerpiece of the case.

Proceedings

1          Your Honor, in the face of this overwhelming

2    evidence and based upon the risk of flight, the nature and

3    seriousness of the case, the Defendant's bad character as

4    defined by this scheme that went on for years, beginning in

5    2011, starting with those e-mails your Honor referenced

6    regarding the 50 million chickens, as the Defendant e-mailed

7    with a co-conspirator in Mozambique to plan the first

8    $50 million in bribes, based upon the Defendant's vast

9    financial resources and his extensive ties to countries that

10   do not extradite to United States, the Government believes

11   that Magistrate Judge Kuo appropriately found Defendant should

12   be detained and that there are no conditions of release that

13   can reasonably assure his appearance before your Honor.

14          THE COURT:  Thank you, counsel.

15          Just to be clear, the legal standard by which I am

16   to determine whether you have met your burden is what?

17          MR. BINI:  Preponderance of the evidence, your

18   Honor.

19          THE COURT:  Preponderance of the evidence.  Okay.

20          Let me hear from defense counsel in response.

21          MR. JACKSON:  Thank you, your Honor.  So, a few

22   things I wanted to respond to, your Honor.

23          First of all, the Government still has not

24   articulated any meaningful distinction between Mr. Boustani

25   and the FIFA defendants for whom the Government agreed in

Proceedings

1    multiple instances conditions could be set up that were

2    similar to the conditions that are proposed here.  They still

3    have not articulated any meaningful difference between

4    Mr. Boustani and those defendants, and we believe that's fatal

5    to the argument that no conditions can be set which will

6    reasonably assure Mr. Boustani's presence.

7             Now, they talked about the idea that they have some

8    theory that he has the ability to get entry into the UAE.

9    That has nothing to do with his risk of flight from the United

10   States because they have not proffered even to the Court any

11   explanation as to how Mr. Boustani, here in the United States,

12   with travel documents surrendered, with GPS monitoring, with

13   his movements monitored 24 hours a day by Guidepost, will be

14   able to even leave the United States.

15            THE COURT:  Just so we're clear, he has surrendered

16   all of his travel documents?

17            MR. JACKSON:  Yes, your Honor.

18            THE DEFENDANT:  Yes.

19            THE COURT:  What about this Antigua passport, he's

20   surrendered that; is that right?

21            THE DEFENDANT:  Yes, your Honor.

22            MR. JACKSON:  Yes.

23            THE COURT:  Just so we're clear.  I just want to

24   know what the facts are.

25            How many passports did he have from how many

41

Proceedings

1   countries, as far as you know?

2           MR. JACKSON:  He had three passports, your Honor.

3           THE COURT:  One from Antigua --

4           MR. JACKSON:  I'm sorry, two.

5           THE COURT:  One from Lebanon and one from Antigua

6   and Barbuda; is that right?

7           MR. JACKSON:  That's it.

8           THE COURT:  So, two passports, both of which have

9   been surrendered.

10          MR. JACKSON:  Yes, your Honor.

11          THE COURT:  Go ahead.

12          MR. JACKSON:  Just to circle back to the Guidepost,

13  the Government has raised questions with reference to the same

14  case in which Judge Broderick appropriately determined that

15  conditions could be set, including Guidepost monitoring, for

16  that defendant.  And I want to underscore that defendant

17  reported as was required at every occasion and ultimately

18  reported to jail.  There was no failure on Guidepost's part,

19  but the Government is casting dispersions on Guidepost.

20          Guidepost is a firm with an unimpeachable

21  reputation.  It is run by, as your Honor saw in the affidavit,

22  a former Assistant United States Attorney, former federal

23  officer.  The two other principals -- two of the other

24  principals of Guidepost include a former EDNY AUSA.  And

25  Mr. Andy O'Connell, Mr. Andrew O'Connell, who submitted the

42

Proceedings

1    affidavit, is here today prepared to testify to answer any

2    questions the Court has, if the Court has any questions, about

3    the same situation, which we believe, we submit, your Honor,

4    is being greatly overplayed.

5         All that happened in that situation was that on the

6    way back from court -- as the Court is aware, Chinatown is

7    directly next to the Southern District of New York.  On the

8    way back from court, they stopped and got Chinese food.  And

9    the Defendant, as we understand it, came in to explain part of

10   what his order was, et cetera, to a person who didn't speak

11   English.  It was not some grand violation of the terms of

12   release.  And the important thing is, again, the Defendant

13   reported as he was supposed to and is now in jail.

14        In fact, your Honor, Guidepost has done this a

15   number of times and has never failed to secure a defendant's

16   appearance on multiple occasions.  The idea that there is some

17   question of legal liability in terms of what will happen with

18   the private security, we would submit, your Honor, is a red

19   herring.

20        THE COURT:  I hope not, because I raised the

21   question.

22        I'm just curious because we do have instances where

23   deliberate torts are alleged with respect to defendants and

24   the line of responsibility is clear, decisional law, we can

25   have someone who's in the custody of the Attorney General of

LAM     OCR     RPR

Proceedings

1    the United States, whereas in this situation, I'm just curious

2    because there is this alternative to incarceration that

3    involves private, distinct facility, whether or not, and I'll

4    ask you the same question I asked the Government, whether or

5    not there is clear authority as to who bears the liability

6    should there be, for example, someone who's injured while

7    preventing an escape, either with a firearm or other less

8    deadly force.

9            Do you have any cases where that has occurred and

10   the defendant has brought an action against, to use the

11   old-fashioned term, his jailers?

12           And who does that action lie against?

13           MR. JACKSON:  Your Honor, we would note that in the

14   *Sabhnani* case, it was specifically made a condition -- and the

15   Second Circuit approved of this -- that the defendants and

16   their daughters also consent to the use of reasonable force by

17   the security agency to temporarily detain them if the security

18   agency employees determine that the defendants and their

19   daughters are attempting to flee.

20           THE COURT:  I'm asking a different question, law

21   school-type question.

22           Assume that there's an attempted escape or what is

23   perceived to be an attempted escape and the private security

24   jailer uses force and the defendant then says the force was

25   excessive.  If that happened at the MDC or MCC, it's clear how

Proceedings

1    that case plays out.

2              How does it play out against private security

3    forces, if you know?

4              And if you don't know -- the Government says they

5    don't have any cases.  You may not have any cases either.

6    Hopefully, it will never come to pass, but sooner or later

7    these things do tend to happen.  I was just wondering if there

8    was known authority with respect to that situation, not the

9    waiver of the release forms.  I get that.

10             MR. JACKSON:  I understand, your Honor.  I don't

11   have a specific case where that occurred, but we have thought

12   through and talked through this issue.

13             First of all, Guidepost has insurance to deal with

14   that.  Guidepost could itself face legal liability,

15   theoretically.

16             I would submit, your Honor, that the liability of

17   the Court is no different from any situation where the

18   defendant would be released.  A defendant could be released on

19   home confinement in any case and commit a tort, and the

20   question then is:  Does the Court have some liability if the

21   defendant who is released commits a crime against a third

22   person?  That's been, I'm sure, addressed in a number of

23   situations.

24             I think it's very fact-specific, but the bottom line

25   is I think that the Government, to try to answer your Honor's

45

Proceedings

1   appropriate question, suggesting that this militates against

2   the use of this condition is just wrong.  And it's in conflict

3   with what the Second Circuit said in *Sabhnani* and it's in

4   conflict with the way that the Court every day grants bail.

5          I would just, your Honor, emphasize some of the

6   language that Judge Scheindlin used in the *Bodmer* case, which

7   is another case --

8          THE COURT:  Spell that for the reporter, please.

9          MR. JACKSON:  Yes, Judge.  *United States v. Bodmer*,

10  B-O-D-M-E-R, 2004 Westlaw 169790.

11         And what Judge Scheindlin said is whenever a court

12  grants bail to the defendant, there is a risk that the

13  defendant will flee; yet, our judicial system favors bail and

14  requires the Government to prove by a preponderance of the

15  evidence that there are no conditions or combination of

16  conditions that will reasonably assure the presence of the

17  defendant at trial.  And the Court determined that where this

18  person was a Swiss national.

19         Even though the Government could identify some

20  theoretical risk of flight, the Government failed to meet its

21  burden because its argument was based, in large part, on

22  speculation, without any evidence to support the Government's

23  claim.

24         So, here, your Honor, we think it's directly

25  analogous.  There is nothing but the fact that Mr. Boustani is

LAM          OCR          RPR

46

Proceedings

1    from Lebanon and that he has means that the Government is

2    pointing to in terms of his potential for escape, risk of

3    flight.  And there's nothing that they said that explain the

4    distinction between the FIFA defendants and the other

5    defendants for whom courts have determined the conditions

6    could be set that were like this.

7            And, in fact, Mr. Boustani is an infinitely less

8    dangerous person than many of the people who the courts have

9    determined could be released.  The Government concedes he

10   poses absolutely no danger to the community.

11           We would suggest, your Honor, just a couple other

12   notes.

13           The *Zarrab* case that the Government is focused on is

14   a very different case in that in the *Zarrab* case, there were

15   grave issues of national security that were at issue that were

16   part of the focus of the district court in that case.  That is

17   not an issue in this case.  There is no allegation that

18   there's a threat to national security that is posed by the

19   potential release on bail for Mr. Boustani.

20           And with regard to the investors in the U.S. which

21   the Government is pointing to under the idea that the weight

22   of the evidence is significant, nowhere in the indictment and

23   nowhere in their arguments, in their briefs, and nowhere today

24   has the Government been able to explain how that connects to

25   Mr. Boustani.

47

Proceedings

1          And the fact of the matter is even if the Government

2   can demonstrate that Mr. Boustani was guilty of bribery in

3   Mozambique, he is not charged with bribery in Mozambique.  He

4   is charged with a scheme to defraud investors using wires in

5   the United States and securities fraud.

6          And the fact of the matter is they haven't

7   identified any communications with investors, they haven't

8   described any communications about investors.  They don't have

9   any evidence that actually relates to the charges in this

10  case, just evidence that relates to an overall theory of

11  wrongdoing that is disconnected from their actual burden that

12  they will have to establish at trial.

13         So, your Honor, the thing that the Government has

14  failed to answer is why where the Second Circuit has said it

15  can be appropriate to utilize private security, in this

16  situation why is it that Mr. Boustani is different from the

17  defendants for whom they have consented to this in the past

18  and for whom the Second Circuit has said it's okay?

19         I would just note, your Honor, that with regard to

20  Mr. Boustani's putative co-defendants, they have been

21  bailed -- the ones that have been arrested have been bailed in

22  the United Kingdom.  And apparently, that's a -- the issue

23  that they're talking about in terms of disparity, at least as

24  it is now, is certainly not in Mr. Boustani's favor.

25         And moreover, your Honor, there's not even a

Proceedings                                    48

1    timetable that the Government can reasonably set as to when

2    those co-defendants will be in the United States.  It's our

3    understanding the extradition from the United Kingdom can take

4    a period of years.

5              So, what the Government is potentially suggesting or

6    they are suggesting that there's a co-defendant disparity

7    issue, that Mr. Boustani should be required to sit in jail for

8    what could be a very extended period in connection with this

9    without any justification for the distinction they are drawing

10   between him and the FIFA defendants or the *Sabhnani*

11   defendants, your Honor, we simply submit they have not met

12   their burden.

13             This notion that Mr. Boustani could somehow get a

14   private jet is completely disconnected from the reality of the

15   application as set out, it's disconnected from the sworn

16   declaration of Mr. O'Connell, who described the fact that no

17   one is going to be allowed to enter the premises without being

18   subject to search, that there will be people monitoring him at

19   all times who are former law enforcement officers who are

20   trained to deal with the situation, and the fact that

21   Mr. Boustani is not a Mafia chieftain or someone connected to

22   organized crime, he's a man who worked at Deloitte and he's a

23   man who's worked at a company that deals with some of the most

24   sophisticated navies in the world and has operated

25   legitimately in numerous jurisdictions throughout the course

49

Proceedings

1    of his entire life.

2            I just want to underscore, your Honor, this notion

3    that everything that was involved, that the money -- that the

4    Government is going to be able to establish that the money

5    that was to be used for buying boats was instead used for

6    bribes and kickbacks is a complete distortion of what actually

7    happened in terms of the transaction that occurred here.

8            I think your Honor has seen in our submission our

9    attachments, the exhibits that we attach, which we would offer

10   in connection with this hearing, which detail the significant

11   amount of infrastructure that was supplied by Privinvest to

12   the Government of Mozambique.  We are talking about numerous

13   ships that are in Exhibits 1, 2, 3, that were exactly what the

14   investors bargained for to be delivered here.

15           So, the Government has failed to explain how they're

16   going to demonstrate that Mr. Boustani is actually guilty of

17   the crimes charged here, the weight of the evidence doesn't

18   weigh in favor of detention, and, even getting past that,

19   there is no demonstration that no conditions could be set

20   which would allow Mr. Boustani to be released with the

21   reasonable assurance that he will be here.

22           THE COURT:  Thank you.

23           Anything in response?

24           MR. BINI:  Your Honor, just in summary, the

25   Defendant has access to near limitless resources, including

LAM     OCR     RPR

Proceedings

1   the $2 billion from this fraud scheme that went to Privinvest;

2   second, the Defendant has, set out in Pages 9 and 10 of our

3   opposition, procured fake travel documents for

4   co-conspirators; third, the Defendant has no ties to the U.S.

5   other than this fraud scheme; and, fourth, he's closely tied

6   to countries that do not extradite to the United States.

7              For all of these reasons, the Government believes

8   that Magistrate Judge Kuo correctly detained him.

9              THE COURT:  Thank you.

10             I want to thank both sides for an excellent

11  argument.  The Court will reserve decision and issue its

12  decision promptly.  I want to thank you.  We are adjourned

13  until then.

14             I would expect in the next status conference -- I

15  think we should probably set one now.  I've declared the case

16  a complex case.  Why don't we look at our respective

17  calendars, and we will set a status conference.

18             MR. BINI:  Your Honor, one other thing, if I could.

19             THE COURT:  Of course.

20             MR. BINI:  The Government would ask to hand up -- we

21  had produced to Defendant's counsel some of the fake travel

22  documents.

23             THE COURT:  What I'm going to allow is a

24  one-week-from-today period for both sides to submit proposed

25  findings of fact and conclusions of law in addition to

LAM     OCR     RPR

Proceedings

1    everything that you have submitted; you don't have to submit

2    again, you are free to submit it again.  But, obviously, I've

3    got the world's best law clerks, and they have advised me

4    extensively in terms of what the law is.  So, a week from

5    today by 5 p.m.

6              What's the exact date on that, Mr. Jackson?

7              THE COURTROOM DEPUTY:  Week from today, Judge, will

8    be January 28.

9              THE COURT:  January 28, 5 p.m. on ECF, you will

10   submit your proposed findings of fact and conclusions of law.

11             Is that right, the 28th?  Does that work?

12             MR. AMATRUDA:  Seven days from now would be the

13   29th.

14             THE COURT:  Off by one.  That's why I have people

15   check me on the math.

16             The 29th, 5 p.m. on ECF, proposed findings of fact

17   and conclusions of law, including the documents that I decide

18   which is to specifically offer, and then I will render

19   decision promptly thereafter.

20             Fair enough?

21             MR. AMATRUDA:  Thank you, your Honor.

22             MR. JACKSON:  Yes, thank you very much.

23             THE COURT:  With respect to the next status

24   conference, would you consult your calendars and suggest a

25   date that makes sense, and we will try to accommodate you.

52

                              Proceedings

 1                    (Pause in proceedings.)

 2                    MR. JACKSON:  Your Honor, we would propose

 3     February 7, if it's acceptable.

 4                    THE COURT:  Does February 7 work for the Government?

 5                    MR. AMATRUDA:  That's fine, your Honor.

 6                    THE COURT:  What day of the week is that?

 7                    THE COURTROOM DEPUTY:  It's a Thursday, Judge.

 8                    THE COURT:  Do we have something else on that day?

 9                    THE COURTROOM DEPUTY:  We have a jury trial

10     scheduled and a status conference set for 12 o'clock noon.

11                    THE COURT:  Civil or criminal jury trial?

12                    THE COURTROOM DEPUTY:  It's a jury civil trial,

13     Judge.

14                    THE COURT:  Civil.  All right.

15                    Why don't we say does 11 a.m. work for the parties

16     on that date for the status conference?

17                    MR. JACKSON:  Yes, your Honor.

18                    MR. AMATRUDA:  That's fine, your Honor.  Thank you.

19                    THE COURT:  So, we will see you --

20                    Mr. Jackson, would you proffer the blurb extending

21     time in the interest of justice excluding time for the parties

22     to sign if they're amenable.  I've already declared it a

23     complex case, so I think it's appropriate at this time.

24                    MR. JACKSON:  Yes, your Honor.

25                    Your Honor, may I raise one additional issue?

                         LAM     OCR     RPR

Proceedings

1          THE COURT:  Yes, of course.

2          MR. JACKSON:  We wanted to circle back, your Honor,

3    to the question of trial date.

4          THE COURT:  I assure you I will address that at the

5    next conference.  And, indeed, you can make that part of your

6    written submission to the Court.

7          And the Government can reply to it, they can put in

8    their estimate as a trial date as well, and then we will

9    certainly address it at the status conference.

10          So, you can address it in your papers, you've

11    already addressed it here today, you can address it in

12    post-argument papers, and we will certainly address it at the

13    time of our next status conference.

14          Fair enough?

15          MR. JACKSON:  Thank you, your Honor.

16          MR. AMATRUDA:  Thank you.

17          THE COURT:  I'm sorry, we're not quite adjourned

18    yet.  We have to have the proposed exclusion of time signed by

19    the Defendant and defense counsel.

20          And I also want to admit Court 1 and Court 2; Court

21    1 being the proffered authority, and Court 2 being the

22    exclusion of time.

23          (Pause in proceedings.)

24          THE COURTROOM DEPUTY:  This is Court 1, Court 2.

25          THE COURT:  Court 1 has previously been admitted

LAM       OCR       RPR

Proceedings

1   into evidence.

2           I have a waiver of speedy trial and order of

3   excludable delay in this action, excluding time in the

4   interest of justice from today's date, January 22, 2019, to

5   and including February 7, 2019.  The proposed order excluding

6   time has been signed by the Defendant, by defense counsel, and

7   by the Assistant United States Attorney.  I'm signing it as

8   the United States District Judge.

9           May I have a motion from the Government to have

10  Court 2 admitted into evidence, please?

11          MR. AMATRUDA:  So moved, your Honor.

12          THE COURT:  Any objection?

13          MR. JACKSON:  No, your Honor.

14          THE COURT:  It's admitted.  Thank you.

15          (Court Exhibit 2 so marked.)

16          THE COURT:  Here you are, Mr. Jackson.

17          Is there anything else?

18          MR. AMATRUDA:  No.  Thank you very much, your Honor.

19          MR. JACKSON:  No.  Thank you.

20          THE COURT:  Thank you very much.  We're adjourned.

21          Thank you, ladies and gentlemen, we're adjourned.

22          THE DEFENDANT:  Thank you, your Honor.

23          THE COURT:  Thank you, sir.

24          THE DEFENDANT:  Have a good day.

25          (Matter concluded.)

55

1                            E X H I B I T S

2

3              Court Exhibit 1        Page 30

4              Court Exhibit 2        Page 54

5

6

7

8

9

10                              *  *  *  *  *

11

12

13

14

15

16  I certify that the foregoing is a correct transcript from the

17  record of proceedings in the above-entitled matter.

18

19      /s/ Linda A. Marino               January 25, 2019

20  _____          _____

21      LINDA A. MARINO                     DATE

22

23

24

25

                    LAM        OCR        RPR