UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------- X

                                     :

UNITED STATES OF AMERICA,               :       No. 18-cr-681 (WFK)

    - against -                           :       ECF Case

JEAN BOUSTANI, et al.,                 :       **ORAL ARGUMENT**
                   Defendants.                        **REQUESTED**

                                       :       Dated:  June 21, 2019

                                         :

-------------------------------------------------------------- X

# DEFENDANT JEAN BOUSTANI'S
## MEMORANDUM OF LAW IN SUPPORT OF HIS
## <u>AMENDED MOTION TO DISMISS THE INDICTMENT</u>

**WILLKIE FARR & GALLAGHER LLP**
Michael S. Schachter
Randall W. Jackson
Casey E. Donnelly
Philip F. DiSanto
787 Seventh Avenue
New York, New York 10019-6099
Phone:  (212) 728-8000
Email: mschachter@willkie.com

*Attorneys for Defendant Jean Boustani*

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT .................................................................................1

FACTUAL BACKGROUND .....................................................................................4

    A.    Jean Boustani And Privinvest ....................................................................4

    B.    Mozambique Seeks To Assert Sovereignty Over Its Territorial Waters
           Through Three Maritime Initiatives........................................................5

    C.    The Government's Theory of Fraud ..........................................................7

           1.    The Proindicus Coastal Surveillance Project And Alleged
                 Misrepresentations in the Proindicus Loan Agreement:  2013 ...................7

           2.    The EMATUM National Fishing Fleet Project And Alleged
                 Misrepresentations in the EMATUM Loan Agreement:  2013 ................10

           3.    The MAM National Shipyards Project And Alleged
                 Misrepresentations in the MAM Loan Agreement:  2014 ........................13

           4.    The EMATUM Eurobond Exchange:  2016 ............................................14

LEGAL STANDARD................................................................................................16

ARGUMENT .............................................................................................................18

I.     THE COURT SHOULD DISMISS THE SECURITIES FRAUD CONSPIRACY
     CHARGED IN COUNT TWO BECAUSE THE INDICTMENT'S
     ALLEGATIONS, EVEN IF ACCEPTED AS TRUE, FAIL TO STATE AN
     OFFENSE PUNISHABLE UNDER U.S. LAW. ..........................................18

    A.    Count Two Should Be Dismissed Because the Charges Fail to Identify the
           Security At Issue. ....................................................................................18

    B.    Count Two Should Be Dismissed Because U.S. Law Does Not Reach the
           Foreign Securities Transactions Described in the Indictment. .............19

           1.    The Indictment Fails To Allege a Domestic Securities Transaction. ........19

           2.    The Government May Not Bring Charges Based on the
                 Extraterritorial Securities Transactions Described in the
                 Indictment. .............................................................................................24

II.     THE COURT SHOULD DISMISS THE WIRE FRAUD CONSPIRACY
        CHARGED IN COUNT ONE BECAUSE THE INDICTMENT'S
        ALLEGATIONS, EVEN IF ACCEPTED AS TRUE, FAIL TO STATE AN
        OFFENSE PUNISHABLE UNDER U.S. LAW. ............................................................25

        A.      Count One Must be Dismissed Because the Indictment Does Not Allege
                That the Conspirators Entered Into Their Agreement on U.S. Soil. ....................25

        B.      Dismissal of Count One Is Also Required Under the *Bascuñan* Test
                Because the Correspondent Banking Wires Described in the Indictment
                Were Not a Core Component of the Alleged Scheme. ..........................................27

III.    ALTERNATIVELY, THE COURT SHOULD REQUIRE THE GOVERNMENT
        TO DECOUPLE COUNT ONE BECAUSE, IN AN ATTEMPT TO SWEEP IN
        TIME-BARRED CONDUCT, IT IS IMPERMISSIBLY DUPLICITOUS. ....................32

IV.     THE COURT SHOULD DISMISS THE MONEY LAUNDERING
        CONSPIRACY CHARGED IN COUNT FOUR BECAUSE THE
        INDICTMENT'S ALLEGATIONS, EVEN IF ACCEPTED AS TRUE, FAIL TO
        STATE AN OFFENSE PUNISHABLE UNDER U.S. LAW. ........................................35

CONCLUSION..................................................................................................................40

## TABLE OF AUTHORITIES

**Cases**                                                                      **Page(s)**

*Absolute Activist Value Master Fund Ltd. v. Ficeto*,
   677 F.3d 60 (2d Cir. 2012).................................................................20

*Bascuñan. v. Elsaca*,
   No. 1:15-cv-02009, ECF No. 76 (S.D.N.Y. Dec. 13, 2017)........................29

*Bascuñan v. Elsaca*,
   No. 18-2731, 2019 WL 2455168 (2d Cir. June 13, 2019)..................26, 28

*Basis Yield Alpha Fund (Master) v. Goldman Sachs Grp.*,
   798 F. Supp. 2d 533 (S.D.N.Y. July 21, 2011).....................................22

*Calgarth Invs. Ltd. v. Bank Saderat Iran*,
   No. 95-cv-5332 (MBM), 1996 WL 204470 (S.D.N.Y. Apr. 26, 1996), *aff'd*,
   108 F.3d 329 (2d Cir. 1997)............................................................38

*Cascade Fund LLP v. Absolute Capital Mgmt. Holdings Ltd*,
   No. 08-cv-1381 (MSK) (CBS), 2011 WL 1211511 (Mar. 31, 2011)..............23

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
   752 F.3d 173 (2d Cir. 2014)...........................................................20

*Cornwell v. Credit Suisse Grp.*,
   729 F. Supp. 2d 620 (S.D.N.Y. 2010)....................................3, 19, 21

*European Cmty v. RJR Nabisco, Inc.*,
   764 F.3d 129 (2d Cir. 2014), *aff'd in part, rev'd in part on other grounds*, 136
   S. Ct. 2090 (2016)................................................................17, 25

*Gucci Am., Inc. v. Weixing Li*,
   768 F.3d 122 (2d Cir. 2014)............................................................38

*In Re Hijazi*,
   589 F.3d 401 (7th Cir. 2009)...........................................................39

*Horvath v. Banco Comercial Portuguese, S.A.*,
   No. 10 Civ. 4697 (S.D.N.Y. Feb. 15, 2011), *aff'd* 461 Fed. Appx. 61 (2d Cir.
   2012)....................................................................................21

*Kotteakos v. United States*,
   328 U.S. 750 (1946)....................................................................33

*Morrison v. Nat'l Australia Bank Ltd.*,
   547 F.3d 167 (2d Cir. 2008)............................................................25

*Morrison v. National Australia Bank Ltd.* ............................................................................16, 19

*Parkcentral Global HUB Ltd. v. Porsche Auto. Holdings,*
    763 F.3d 198 (2d Cir 2012)....................................................................................25

*Petroleos Mexicanos v. SK Eng'g & Constr. Co.,*
    572 F. App'x 60 (2d Cir. 2014) .............................................................................31

*Petroleos Mexicanos v. SK Eng'g & Constr. Co.,*
    Case No. 12-cv-09070 (LLS), 2013 WL 3936191 (S.D.N.Y. July 30, 2013) .......31

*Plumbers' Union Local No. 12 Pension Fund v. Swiss Reinsurance Co.,*
    753 F. Supp. 2d 166 (S.D.N.Y. 2010) (Koeltl, J.) ...............................................20

*Reves v. Ernst & Young,*
    507 U.S. 170 (1993)...............................................................................................35

*RJR Nabisco, Inc. v. European Cmty.,*
    136 S. Ct. 2090 (2016) ...............................................................................16, 26, 27

*SEC v. Tourre,*
    No. 10 Civ. 3229 (KBF), 2012 WL 5838794 (S.D.N.Y. Nov. 19, 2012)........22, 23

*Securities and Exchange Commission v. Goldman Sachs & Co.,*
    790 F. Supp. 2d 147 (S.D.N.Y. 2011)..............................................................21, 22

*Sullivan v. Stroop,*
    496 U.S. 478 (1990)...............................................................................................36

*Sussman v. Bank of Israel,*
    801 F. Supp. 1068, 1074 (S.D.N.Y. 1992)............................................................30

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
    551 U.S. 308 (2007).................................................................................................4

*United States v. Abakporo,*
    959 F.Supp.2d 382 (S.D.N.Y. 2013)......................................................................33

*United States v. Al Kassar,*
    660 F.3d 108 (2d Cir. 2011)..............................................................................17, 39

*United States v. Aleynikov,*
    676 F.3d 71 (2d Cir. 2012).....................................................................................16

*United States v. Beacham,*
    774 F.3d 267 (5th Cir. 2014) .................................................................................26

*United States v. Boffa,*
    513 F. Supp. 444 (D. Del. 1980).......................................................................33, 35

iv

*United States v. Boustani*,
   Case No. 19-1018 (2d Cir. April 29, 2019), ECF No. 38 .....................................24

*United States v. Burfoot*,
   899 F.3d 326 (4th Cir. 2018) ...........................................................................33

*United States v. Garcia*,
   533 F. App'x. 967 (11th Cir. 2013) ..................................................................37

*United States v. Harper*,
   737 F. App'x 17 (2d Cir. 2018) ..........................................................................4

*United States v. Harrison*,
   663 F. App'x 460, 464 (6th Cir. 2016) .............................................................27

*United States v. Hawit*,
   No. 15-CR-252 (PKC), 2017 WL 663542 (E.D.N.Y. Feb. 17, 2017) .........................17, 36, 38

*United States v. Hennings*,
   No. 18-CR-028, 2018 WL 4221575 (W.D.N.Y. Sept. 5, 2018) .............................34

*United States v. Hoskins*,
   902 F.3d 69 (2d Cir. 2018).............................................................................9, 16

*United States v. Lloyds TSB Bank PLC*,
   639 F. Supp. 2d 314 (S.D.N.Y. 2009)...........................................................37, 39

*United States v. Margiotta*,
   646 F.2d 729 (2d Cir. 1981)...............................................................................33

*United States v. McFadden*,
   689 F. App'x 76 (2d Cir. 2017) .........................................................................27

*United States v. McFadden*,
   689 F. App'x 76 (2d Cir. 2017) .........................................................................26

*United States v. Murray*,
   618 F.2d 892 (2d Cir. 1980)...............................................................................33

*United States v. Prevezon Holdings Ltd.*,
   122 F. Supp. 3d 57 (S.D.N.Y. 2015)...........................................................16, 24, 29, 31

*United States v. Roy*,
   783 F.3d 418 (2d Cir. 2015)...............................................................................27

*United States v. Sturdivant*,
   244 F.3d 71 (2d Cir. 2001).................................................................................32

*United States v. Turner*,
    624 F. Supp. 2d 206 (E.D.N.Y. 2009) ...................................................................29

*United States v. Vilar*,
    729 F.3d 62 (2d Cir. 2013).............................................................17, 19, 20

*United States v. Wirsing*,
    719 F.2d 859 (6th Cir. 1983) (Porter, J., dissenting) ..............................33

*United States v. Zaslavskiy*,
    No. 17 CR 647 (RJD), 2018 WL 4346339 (E.D.N.Y. Sept. 11, 2018) ................18

*Universal Trading & Inv. Co. v. Tymoshenko*,
    No. 11-cv-7877 (PAC), 2012 WL 6186471 (S.D.N.Y. Dec. 12, 2012)...................36

**Statutes & Rules**

17 C.F.R. §§ 230.901-230.905...................................................................12

18 U.S.C. § 371 .........................................................................16, 17

18 U.S.C. § 1343 .....................................................................26, 28, 29

18 U.S.C. § 1349 ......................................................................*passim*

18 U.S.C. § 1956(c)(2)...............................................................35

18 U.S.C. § 1956(f) ...................................................................*passim*

18 U.S.C. § 1956(h) ...................................................................17

18 U.S.C. § 3282 .......................................................................32

Fed. R. Crim. P. 12(b)(3) ...........................................................1, 16

Fed. R. Evid. 201(b)(2) ..............................................................4

Fed. R. Evid. 201(d)...................................................................4

**Other Authorities**

The American Heritage Dictionary (5th ed. 2011) ..........................28

Euroclear, Investopedia https://www.investopedia.com/terms/e/euroclear.asp (last
    visited June 17, 2019) ...............................................................23

Random House Dictionary (1st ed. 1987)......................................28

Restatement (Third) of Foreign Relations Law § 403(2)(a) ...........17, 38, 39

S. Rep. No. 99-433 (1986) .................................................................................................37, 38, 39

Defendant Jean Boustani respectfully submits this memorandum of law in support of his amended motion to dismiss the Indictment, pursuant to Federal Rule of Criminal Procedure 12(b)(3).

## PRELIMINARY STATEMENT

What does this case against Mr. Boustani and seven other foreign nationals have to do with the United States?  Although the Indictment runs 46 pages, nowhere does it offer any real answer to this fundamental question.  The Indictment's failure to identify any meaningful nexus between the matters alleged and any domestic concern does not merely implicate important policy issues—it is fatal as a matter of law.  The Indictment against Mr. Boustani must be dismissed for failure to state an offense because the extraterritorial conduct described in its pages falls outside the reach of the U.S. laws that are alleged to have been violated.

Mr. Boustani is Lebanese and works for Privinvest, a shipbuilder headquarted in the Middle East that sold vessels, aircraft, radar, training services, and certain intellectual property to three companies that were established and jointly owned by the Republic of Mozambique's Ministries of National Defense, Interior, Finance, Fisheries, and Mozambique's State Security and Intelligence Service.  The Indictment purports to detail a complicated sequence of events in which these three Mozambican companies borrowed money from two European investment banks—Credit Suisse in London and Russian bank VTB—in order to pay for goods and services commissioned from Privinvest.  After the loans were disbursed and Privinvest was paid, these European investment banks then turned around and sold portions of the Mozambican debt to investment funds, including, allegedly, to purchasers in the United States.  According to the Indictment, these purchasers were induced to buy the debt because of alleged misrepresentations in the underlying loan documents signed earlier by the Mozambican companies, which the European banks sent to the debt purchasers.  None of the money provided

by the debt purchasers went to any of the alleged conspirators, or even to the three Mozambican companies, but instead went to the European investment banks.

In other words, this is a most unusual Indictment.  The Government is attempting to use the courts of the United States to prosecute a *Lebanese* citizen, who works for a shipbuilder headquarted in the *Middle East*, because of allegedly false statements made by three *Mozambican* companies, each of which was owned by various executive ministries in the *Republic of Mozambique,* in order to obtain loans from *European investment banks*, which subsequently, and for their own benefit, sold that debt to purchasers worldwide, in a series of *foreign* transactions.  Further, even though the Indictment alleges wire and securities fraud conspiracies against those debt purchasers, the Indictment contains no allegation that Mr. Boustani even knew about the alleged false statements in the underlying loan documents. Because the Indictment doesn't even allege Mr. Boustani's knowledge of the alleged misrepresentations, it certainly fails to allege that Mr. Boustani tried to disseminate those misrepresentations into the United States with the aim of causing harm to United States citizens or entities.  In fact, the Indictment contains no allegation that Mr. Boustani had any idea which investment funds the European banks would sell the debt to, much less that Mr. Boustani knew or cared where those purchasers were located.  In short, even if every allegation in the Indictment is taken as true, there is simply no nexus between Mr. Boustani's alleged actions and this country.  U.S. law does not govern the world and Mr. Boustani's prosecution here, thousands of miles from his family and the events he is alleged to have participated in, is unlawful.

In our first appearance before Your Honor, the Court, *sua sponte* and without the benefit of briefing, made clear the Court's deep familiarity with this area of the law when it advised the parties of the Court's "*Cornwell* concerns" regarding the securities fraud conspiracy

charged in Count Two of the Indictment.  (Ex. A (Excerpt of Jan. 22, 2019 Tr.) at 36:15.)  To properly charge a securities fraud conspiracy prosecutable under U.S. law, an indictment must allege that the defendant agreed to engage in fraud in connection with either (1) a security listed on a U.S. exchange; or (2) a security purchased or sold in the United States.  *See Cornwell v. Credit Suisse Grp.,* 729 F. Supp. 2d 620, 623 (S.D.N.Y. 2010).  As Your Honor appeared to recognize, this Indictment alleges neither.

The charging language in Count Two does not even identify what the allegedly fraudulent security *is*, much less allege that it was a security listed on a U.S. exchange or a security purchased or sold in the United States.  As Circuit Judge Reena Raggi observed during the argument on Mr. Boustani's appeal of his detention order, "You've got a lengthy indictment here. . . So there's pages and pages about what went on in Mozambique, and you don't tell us what the fraudulent security is.  I don't think you'd satisfy this if this were a civil complaint on what the fraud is in the instrument."  (Ex. B (Excerpt of Mar. 5, 2019 Tr.) at 36:4-11).  Because the Indictment fails to allege a domestic securities transaction, or even what specific security is implicated, Count Two must be dismissed for failure to state an offense under U.S. law.

Count One, which purports to allege a wire fraud conspiracy, suffers from the same defect:  it too fails to allege conduct that falls within the reach of U.S. law.  The U.S. wire fraud conspiracy statute does not reach extraterritorial conduct and a recent opinion by the Second Circuit establishes that such a charge may not be brought in the United States unless its "essential elements" were committed here.  Because the *only* element required to prove a wire fraud conspiracy is the defendant's agreement to commit wire fraud, the Government cannot charge a violation of the statute unless the conspirators came to their "agreement" while on U.S. soil—an allegation that the Indictment does not, and could not, make.  Count One also requires

dismissal because it is impermissibly duplicitous, in that it sweeps four distinct conspiracies into a single conspiracy count.  Count One has been structured in this manner in an effort to improperly introduce time-barred conduct to the jury, which is both prejudicial to Mr. Boustani and contrary to law.

Count Four, which purports to charge Mr. Boustani with participating in a money laundering conspiracy, also requires dismissal because the limited extraterritorial reach of the U.S. money laundering statute does not stretch nearly as far as the Indictment requires.  Non-U.S. citizens may only be charged under the statute when their money laundering conduct "occurs. . . part[ly] in the United States."  *See* 18 U.S.C. § 1956(f).  Count Four, however, is based on transfers of funds abroad, between non-U.S. entities and individuals, in accounts held by non-U.S. citizens, at banks in foreign countries.  While some of these interbank transactions in U.S. dollars were routinely cleared through U.S. correspondent banking accounts, courts have held that such a tenuous connection is insufficient, as a matter of law, to justify the application of the money laundering statute to a non-U.S. citizen.  Accordingly, Count Four must be dismissed.

## FACTUAL BACKGROUND

### A.    Jean Boustani And Privinvest

Privinvest is one of the world's largest shipbuilders.  (*See* Ind. ¶ 9, ECF No. 1 ("Ind."); Ex. D (Confidential Information Memorandum for Proindicus (referenced, and therefore incorporated by reference, at Ind. ¶ 52) at 65).)[1]  It has built and delivered ships and

---

[1] In evaluating a motion to dismiss, the Court may take judicial notice of any "fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b)(2), 201(d); *United States v. Harper*, 737 F. App'x 17, 23 (2d Cir. 2018).  In addition, the Supreme Court has made clear that when considering a motion to dismiss, courts may consider "documents incorporated into the complaint by reference. . . ."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007)

related goods and services for the navies of more than 40 countries, including France, Germany, and Brazil.  (Ex. D at 65.)  Mr. Boustani works in business development for Privinvest and his role is to help Privinvest expand into new markets.  (Ind. ¶ 10.)  Beginning in 2013 and partly as a result of Mr. Boustani's negotiations, Privinvest was hired by the Republic of Mozambique to serve as a contractor on three distinct maritime projects, described below.  (*Id*. ¶ 30.)

**B.** **Mozambique Seeks To Assert Sovereignty Over Its Territorial Waters Through Three Maritime Initiatives.**

In 2010 and 2011, Mozambique—a country in southeastern Africa with more than 1,500 miles of coastline—began to grapple with a problem common to developing countries: many of its most valuable natural resources, particularly offshore, were unprotected and lost to foreigners engaged in piracy, smuggling, and trafficking.  (Ex. D at 40.)  Mozambique, for instance, has some of the richest stocks of tuna in the world but has long suffered from illegal fishing by foreigners, who have made it a practice to offload fish before reporting the quantity caught, thereby decreasing the fees owed to Mozambique's Ministry of Fisheries.  (*Id*.)

In 2011, Mozambique discovered that it has substantial natural gas reserves located just off its coastline.  Major international energy companies, including Anadarko and Eni, quickly began the process of developing these gas fields.  (*Id*. at 12-13.)  Soon after the natural gas reserves were discovered, Mozambique determined that it needed to actively assert sovereignty over its territorial waters so that it could finally reap the benefits of its resources, including the economic benefits that would follow the development of the gas fields and the export of liquid natural gas worldwide.  (*Id*. at 40.)  In addition, in order to do business productively, the international energy companies needed secure waters.  (*Id*.)

In pursuit of these goals, Mozambique's Ministries of National Defense, Finance, Interior, Fisheries, and State Security and Intelligence Service ("SISE," the equivalent of a

combined U.S. CIA/FBI) established three state-owned Mozambican companies:  Proindicus S.A. ("Proindicus"), Empresa Moçambicana de Atum S.A. ("EMATUM"), and Mozambique Asset Management S.A. ("MAM," and with Proindicus and EMATUM, the "Mozambican Companies").  In short, Proindicus was established with the intention of developing a coastal surveillance system that would monitor and protect Mozambique's coastline and ward against the piracy and other dangers that had long plagued the country's waters (the "Proindicus Coastal Surveillance Project").  (*Id*. at 4.)  EMATUM was set up to spearhead the development of a national fishing fleet, so that native Mozambicans, rather than foreigners, could reap the benefits of Mozambique's rich tuna stocks (the "EMATUM National Fishing Fleet Project").  (Ex. F (Offering Circular for LPNs, Sept. 10, 2013 (referenced, and therefore incorporated by reference, in Ind. ¶ 71)) at 33, 36 ).)  And finally, MAM was established with a mandate that it begin developing a domestic shipbuilding and repair industry in Mozambique, in which Mozambican citizens would learn to build, maintain, and operate seafaring vessels, either to service the vessels being used in connection with the Proindicus Coastal Surveillance Project and the EMATUM National Fishing Fleet Project or to provide support to private entities, such as the international companies setting up base in Mozambique (the "MAM National Shipyards Project," and with the Proindicus Coastal Surveillance Project and the EMATUM National Fishing Fleet Project, the "Infrastructure Projects").  (Ind. ¶¶ 2, 79.)

Privinvest was hired to build and deliver maritime vessels and other goods and services required for each of the Infrastructure Projects.  (*Id.* ¶¶ 30, 58, 79.)  To fund the Infrastructure Projects, each of the three Mozambican Companies borrowed money from Credit Suisse International and/or its affiliate Credit Suisse Securities (Europe), Ltd., both of which are based in London (together, "Credit Suisse Europe," identified in the Indictment as "Investment

Bank 1") as well as from the London branch of VTB Bank ("VTB," identified in the Indictment as "Investment Bank 2"). (*Id.* ¶¶ 30, 58, 80.) The Government of Mozambique guaranteed repayment of each of the loans. (*Id.*)

## C.     The Government's Theory of Fraud

This is a fraud case and therefore depends upon a theory that the Defendants, with the intention of causing financial harm, agreed to make material misrepresentations to certain investment funds in order to induce them to make certain debt purchases that were beneficial to the Defendants and detrimental to the investors. The Government's specific theory here is that there were misrepresentations in the loan documents signed by the Mozambican Companies. These loan documents were later distributed by Credit Suisse Europe and VTB to hedge funds and other asset managers experienced in the emerging-markets space that might have interest in purchasing, from the banks, portions of the debts owed by the Mozambican Companies. (Ind. ¶¶ 51, 71, 80.) According to the Government, the misrepresentations in the loan documents induced these purchasers to buy portions of the Mozambican debts. (*Id.* ¶¶ 24, 72.) Notably, the Indictment does not (because it cannot) allege that Mr. Boustani or anyone at Privinvest was a party to the loan documents that contained the alleged misrepresentations. The Indictment also does not (because it cannot) allege that Mr. Boustani or anyone at Privinvest ever had a single communication with any of the purchasers that were allegedly defrauded.

> *1.     The Proindicus Coastal Surveillance Project And Alleged Misrepresentations in the Proindicus Loan Agreement:  2013*

On January 18, 2013, Proindicus hired Privinvest to build and deliver an integrated system to monitor Mozambique's territorial waters within 30 nautical miles off the country's coast. (*See* Ind. ¶ 30; Ex. D at 4, 40.) Mozambique hoped to eventually use the Proindicus surveillance system to earn revenue, through fees imposed on fishing boats and on the

international oil and gas companies working offshore, in exchange for the provision of maritime safety and protection services.  (*Id*. at 43-46.)  Furthermore, as a result of its increased surveillance capabilities, Mozambique could more effectively tax ships traveling through Mozambique's waters, charge more accurately for cargo offloaded in Mozambican ports, and impose fines for illegal activities at sea.  (*Id*.)

In order to pay for the patrol vessels and surveillance equipment it commissioned from Privinvest, Proindicus borrowed money from Credit Suisse Europe and, later, VTB.  (Ind. ¶ 30.)  On March 20, 2013, Credit Suisse Europe agreed to arrange a $372 million syndicated loan to Proindicus pursuant to a written agreement (the "Proindicus Loan Agreement") signed by Defendants Surjan Singh, a managing partner at Credit Suisse Europe, and Antonio Do Rosario, a member of Proindicus's Board of Directors and SISE's National Director for Economic Intelligence.  (Ind. ¶ 49; Ex. C (Proindicus Loan Agt., Feb. 28, 2013 (referenced, and thereby incorporated by reference, in Ind. ¶¶ 49-50)) at 96.)  Defendant Manuel Chang, who served as Mozambique's Minister of Finance (the equivalent of the U.S. Treasury Secretary) signed a guarantee of repayment on behalf of the Mozambican Government.  (Ind. ¶ 49.)

The Indictment alleges that the Proindicus Loan Agreement (1) "required Proindicus 'to apply all amounts borrowed by it under the [Loan] Facility towards the financing of the [Coastal Surveillance] Project;'" and (2) "prohibited improper payments in connection with the Proindicus [Coastal Surveillance] [P]roject, including payments that would violate the FCPA, the United Kingdom's Bribery Act ('UK Bribery Act') and the Mozambican Anti-Corruption Law."  (*Id*.)  Presumably, these two clauses constitute the purported misrepresentations referred to in Paragraphs 24, 95, and 97 of the Indictment, because the Indictment elsewhere alleges that Mr. Boustani caused bribes to be paid to Mozambican officials

in exchange for their retention of Privinvest as a contractor for the Infrastructure Projects.[2]  (*See id.* ¶¶ 31-33.)  However, the Indictment does not allege that Mr. Boustani had any role in drafting, or that he even knew about, these representations in the Proindicus Loan Agreement.

The Indictment states that after the Proindicus Loan Agreement was signed, the monies disbursed and Privinvest paid, Credit Suisse Europe "immediately solicited United States-based investors to participate in the loan, in part by sending them electronically, among other things, the Proindicus loan agreement and a confidential information memorandum that summarized its terms."  (*Id.* ¶ 51.)  These potential purchasers, according to the Indictment, received "materially false and fraudulent pretenses, representations, and promises," *see id.* ¶ 95, which appear to be those representations in the Proindicus Loan Agreement that are discussed above, but the Indictment is unclear.  The Indictment does not allege who the "United States-based investors" were, whether any actually purchased the debt, precisely which false statements they received, why they were material, how they were conveyed, when they were conveyed, or who drafted them.  Moreover, the Indictment does not (because it cannot) allege that Mr. Boustani ever worked with anyone in the United States, traveled to the United States, or spoke to anyone in the United States in connection with the Proindicus Coastal Surveillance Project.  All of the conduct alleged with respect to Mr. Boustani's involvement in the Proindicus Coastal Surveillance Project is alleged to have occurred in Mozambique or in the United Arab Emirates.  (*See, e.g.*, *id.* ¶¶ 31-38.)

In June 2013, a few months after the initial loan disbursement, the Indictment alleges that Credit Suisse Europe permitted Proindicus to borrow additional funds.  (*Id.* ¶¶ 52-

---

[2] Although the Indictment refers repeatedly to Mr. Boustani's purported payment of "bribes," noticeably absent from the Indictment are any charges against Mr. Boustani for Foreign Corrupt Practices Act violations—because Mr. Boustani is outside the class of persons to whom the FCPA's proscriptions apply.  *United States v. Hoskins,* 902 F.3d 69 (2d Cir. 2018).

54.)  The Indictment then alleges that Credit Suisse Europe "marketed and sold portions of the [additional] debt to investors, including to *an investor in the United States*."  (*Id*. ¶ 55 (emphasis added).)  The Indictment fails to allege, however, what documents this debt purchaser received and what false representations, if any, were contained in those documents.  In other words, the Indictment does not even allege that the *one purchaser in the United States* even received the loan agreement that is alleged to contain the misrepresentations.  And, the Indictment does not allege that Mr. Boustani had any *knowledge* of this U.S. purchaser, much less knowledge of what documents were sent to this purchaser by Credit Suisse Europe.

2.  *The EMATUM National Fishing Fleet Project And Alleged Misrepresentations in the EMATUM Loan Agreement:  2013*

Apart from the need to monitor its territorial waters, Mozambique identified the need to develop a modern fishing industry as a critical step in the social and economic development of the country.  Toward that end, on August 2, 2013, EMATUM "purchase[d] vessels, equipment and training [services]" from Privinvest.  (*Id*. ¶ 58.)  These goods were to be utilized by EMATUM in its efforts to develop a "state-owned tuna fishing company." (*Id*.)

To pay for the equipment and services it had ordered, EMATUM borrowed money from Credit Suisse Europe and VTB.  (*Id*.)  On or about August 30, 2013, Credit Suisse Europe entered into an $850 million loan agreement with EMATUM, with Credit Suisse Europe loaning approximately $500 million and VTB later loaning approximately $350 million.  (*Id*. ¶¶ 58, 69.)  Defendant Singh, on behalf of Credit Suisse Europe, and Defendant Do Rosario, on behalf of the Board of Directors of EMATUM, signed the loan agreement (the "EMATUM Loan Agreement").  (*Id*. ¶¶ 58, 69; Ex. E (EMATUM Loan Agr., Aug. 30, 2013 (referenced, and thereby incorporated by reference, in Ind. ¶ 58)).)  Defendant Chang signed the Mozambican Government's guarantee of repayment.  (Ind. ¶¶ 58, 69.)

Although the Indictment states that the EMATUM Loan Agreement required EMATUM to "apply all amounts borrowed by it under the [EMATUM Loan Agreement] towards . . . the purchase of fishing infrastructure, comprising of 27 vessels, an operations centre, and related training," *see id.* at ¶ 70, in fact, the actual contractual language is broader and permitted EMATUM to "apply all amounts borrowed by it under the [Loan] Facility towards the financing of the [National Fishing Fleet] Project and the general corporate purposes of [EMATUM]." (Ex. E at 16.) The Indictment also alleges that the EMATUM Loan Agreement "prohibited improper payments in connection with the [EMATUM National Fishing Fleet] [P]roject, including payments that would violate the FCPA, the UK Bribery Act and the Mozambican Anti-Corruption Law." (Ind. ¶ 70.) Presumably, these two clauses constitute the misrepresentations referred to in Paragraphs 24, 95, and 97 of the Indictment. But, the Indictment lacks any allegation that Mr. Boustani drafted, or had any knowledge of, these representations in the EMATUM Loan Agreement.

The Indictment further alleges that Credit Suisse Europe then sought to offload the debt owed to it by EMATUM "by selling loan participation notes [LPNs] to investors in the United States and elsewhere." (*Id.* ¶ 71.) Credit Suisse Europe set up, and then sold EMATUM's debt to, a special-purpose vehicle ("SPV") that was incorporated in the Netherlands. (Ex. F at 34.) The SPV had the ability to issue LPNs, which could be purchased through the Euroclear Bank S.A./N.V. and Clearstream Banking *société anonyme* clearing systems in Europe. (*Id.* at 12, 15.) According to the Indictment, Credit Suisse Europe sent potential LPN purchasers the EMATUM Loan Agreement and an offering circular. (Ind. ¶ 71.) The Indictment does not allege that Mr. Boustani or any of the other Defendants made any misrepresentation directly to any potential purchaser, whether based inside or outside the United

States, but avers that "[i]n reliance on the representations in the [EMATUM] loan agreement and offering circular," these purchasers bought LPNs.  (*Id*. ¶ 72.)

Although the Indictment suggests that the purchasers were induced to buy LPNs because of the representations in the EMATUM Loan Agreement regarding the use of proceeds and compliance with anti-corruption laws, in fact, the offering circular specifically warned purchasers of the risks of "corruption by government officials and misuse of public funds."  (Ex. F at 2.)  And while the Indictment suggests that Credit Suisse Europe sold the LPNs to purchasers in the United States, *see* Ind. ¶ 72, the Indictment omits that the offering circular made clear that the LPNs were being offered pursuant to SEC "Regulation S," *see* 17 C.F.R. §§ 230.901-230.905, and therefore prominently stated that "subject to certain exceptions, [the LPNs] may *not* be offered or sold within the United States or to, or for the account or benefit of, U.S. persons." [3]  (Ex. F at 15 (emphasis added).)

There is no allegation in the Indictment that Mr. Boustani knew which investment funds Credit Suisse Europe was sending promotional materials to or any allegation that Mr. Boustani knew that those materials contained material misstatements.  Certainly the Indictment contains no allegations that Mr. Boustani took any deliberate action to arrange for misstatements to be sent to the United States in connection with the LPN offering.  Indeed, the Indictment does not (because it cannot) allege that Mr. Boustani ever worked with anyone in the United States, traveled to the United States, or spoke to anyone in the United States in connection with the EMATUM National Fishing Fleet Project.  All of the conduct alleged with respect to Mr.

---

[3] Many sophisticated emerging market debt investors have both on-shore and off-shore funds, so the fact that a debt purchaser may be managed by a U.S. management company does not mean that the purchaser was based in the United States or the purchase occurred in the United States.

Boustani's involvement in the EMATUM National Fishing Fleet Project is alleged to have

occurred in Mozambique or in the UAE.  (*See, e.g.,* Ind. ¶¶ 59, 61-63, 65, 74-78.)

        3.      *The MAM National Shipyards Project And Alleged Misrepresentations in the MAM Loan Agreement:  2014*

        On May 1, 2014, MAM hired Privinvest to build and rehabilitate certain

infrastructure that would be necessary for Mozambique to develop a domestic shipbuilding

industry.  (*Id*. ¶ 79.)  Specifically, Privinvest was retained by MAM to build a new shipyard in

Mozambique, upgrade and modernize two existing Mozambican shipyards, build and deliver to

Mozambique additional vessels, and transfer to MAM a license for the intellectual property used

to build vessels that could thereafter be constructed exclusively in the MAM shipyards.  (*Id.*)  In

order to pay Privinvest for the agreed-upon work, MAM borrowed money from VTB.  (*Id*. ¶ 80.)

Defendant Do Rosario signed the loan agreement, dated May 20, 2014 (the "MAM Loan

Agreement"), on behalf of MAM's Board of Directors, and Defendant Chang signed the

guarantee of repayment on behalf of the Mozambican Government.  (Ex. G (MAM Loan

Agreement (referenced, and thereby incorporated by reference, in Ind. ¶ 80)).)  The Indictment

alleges that the MAM Loan Agreement "required that the MAM loan proceeds be used for

project purposes and prohibited illegal and corrupt payments."  (Ind. ¶¶ 80-81.)  Presumably,

these clauses constitute the misrepresentations referred to in Paragraphs 24, 95, and 97.

        Significantly, no debt purchasers bought any of the debt associated with the

MAM National Shipyards Project.  While the Indictment alleges that VTB "solicited investors,

using, among other things, the MAM loan agreement and a confidential information

memorandum," *see id*. ¶ 80, the Indictment does not allege that VTB actually secured any

purchasers for MAM's debt (it did not, other than the participation of a Portuguese bank) and

certainly does not allege the existence of any U.S. purchasers.  It is therefore unclear why the

Indictment even mentions the MAM National Shipyards Project, since the Indictment implicitly concedes that no debt purchaser—whether based in the United States or not—was induced to act as a result of the alleged misrepresentations in the MAM Loan Agreement.

In any event, the Indictment does not allege that Mr. Boustani was involved in communicating false statements to even *potential* purchasers. Furthermore, the Indictment does not (because it cannot) allege that Mr. Boustani ever worked with anyone in the United States, traveled to the United States, or spoke to anyone in the United States in connection with the MAM National Shipyards Project. In fact, Mr. Boustani is not even mentioned in the Indictment's allegations concerning the MAM National Shipyards Project. (*Id.* ¶¶ 79-84.)

4.    *The EMATUM Eurobond Exchange: 2016*

After describing the execution of the MAM Loan Agreement in May 2014, the Indictment is silent as to any activity by any of the Defendants for a period of nearly two years— from May 2014 through March 2016. According to the Indictment, the alleged conspiracy then abruptly ended its lengthy hiatus in March 2016, when EMATUM was having problems making its scheduled loan payments, *see id.* ¶ 85, and the Mozambican Government agreed to issue Eurobonds in exchange for the LPNs (the "EMATUM Eurobond Exchange"). Privinvest had been fully paid by EMATUM back in 2013, *see id.* ¶ 51, so a missed loan payment by EMATUM would not have affected Privinvest or Mr. Boustani. Nonetheless, the Indictment alleges that Mr. Boustani, along with Defendants Andrew Pearse and Detelina Subeva—who were at that point employed at Palomar, a financial advisory firm that was partially owned by Privinvest—as well as unnamed Credit Suisse employees, "organized meetings with Mozambican government officials to convince them" to "exchange the EMATUM loan participation notes for Eurobonds issued directly by the Mozambican government." (*Id.* ¶¶ 86-87.) The Mozambican Government agreed, hiring Credit Suisse Europe and VTB to "conduct

14

the exchange" as well as Palomar to serve as an adviser.  (*Id*. ¶ 87.)  The EMATUM Eurobond

Exchange was announced on March 9, 2016.  (*Id*. ¶ 88; *see* Ex. H (Eurobond Exchange Offer,

Mar. 9, 2016 (referenced, and thereby incorporated by reference, in Ind. ¶ 88)).)

       The Indictment does not allege that Mr. Boustani had any role in drafting—or

even awareness of—any alleged misrepresentation made in connection with the EMATUM

Eurobond Exchange.  It avers that Defendants Pearse and Subeva and bankers at Credit Suisse

and VTB "prepared documents that were sent to investors, including in the United States" on an

unspecified date.  (Ind. ¶ 88.)  According to the Indictment, these "documents failed to

adequately disclose the existence of the Proindicus and MAM Loans or the maturity dates of

those loans."  (*Id*.)  Therefore, the Indictment claims, the documents "contained false and

misleading information about the Eurobonds and Mozambique's creditworthiness."  (*Id*.)

       On March 14, 2016, Defendant Do Rosario, on behalf of EMATUM's Board of

Directors, flew to JFK International Airport in Queens to "attend meetings with investors

regarding the [E]xchange," which would take place in Manhattan.  (*Id*. ¶ 98(p).)  The Indictment

alleges that during a meeting in Manhattan, Defendant Do Rosario "provided false and

misleading information to investors regarding Mozambique's economic prospects, debt level and

its ability and intention to meet its EMATUM debt obligations" in order "to induce [the LPN

holders] to exchange EMATUM loan participation notes for Eurobonds."  (*Id*. ¶ 98(q).)  The

Indictment alleges that on April 6, 2016, based on purportedly "false and misleading

information," the holders of the LPNs "consented to the [EMATUM Eurobond E]xchange."  (*Id*.

¶ 89.)  The Indictment does not allege, however, that Mr. Boustani was at the March meeting, or

even knew it was taking place, and certainly does not allege that Mr. Boustani was aware of any

false or misleading statements made to LPN holders in connection with the 2016 Exchange.

**LEGAL STANDARD**

An indictment must be dismissed if "it fails to allege a crime within the terms of the applicable statute." *United States v. Aleynikov*, 676 F.3d 71, 75-76 (2d Cir. 2012).  Where an indictment charges violations of U.S. statutes that apply only to domestic, not extraterritorial, conduct, the indictment must be dismissed for failure to state an offense if the conduct that makes up the heart of the offense took place abroad, since "[i]t is a basic premise of our legal system that, in general, United States law governs domestically but does not rule the world."[4] *RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090, 2100 (2016); *see Hoskins*, 902 F.3d at 73-74 (affirming district court's dismissal under Fed. R. Crim. Pro. 12 on extraterritoriality grounds); *United States v. Prevezon Holdings Ltd.*, 122 F. Supp. 3d 57, 71-72 (S.D.N.Y. 2015) (allegations of wire fraud as specified unlawful activity under money laundering statute could not survive motion to dismiss because wire fraud was extraterritorial).

The Indictment alleges that Mr. Boustani participated in (1) a wire fraud conspiracy (Count One), (2) a securities fraud conspiracy (Count Two), and (3) a money laundering conspiracy (Count Four).  The respective conspiracy statutes charged in the first two Counts of the Indictment, 18 U.S.C. § 1349 (Count One), and 18 U.S.C. § 371 (Count Two), have a reach that extends no further than the reach of the substantive offense alleged as the object of the conspiracy, *see Hoskins*, 902 F.3d at 96-97, and the wire fraud and securities fraud

---

[4] In *Morrison v. National Australia Bank Ltd.*, the Supreme Court explained that the question of whether a defendant's conduct falls within the reach of a particular U.S. law is a "merits" question, not a question of jurisdiction.  561 U.S. 247, 254 (2010).  Federal courts always have subject matter jurisdiction to hear cases predicated upon alleged violations of federal law.  *Id*. But, an indictment describing foreign, rather than domestic, conduct may be dismissed on the merits for failure to state an offense where the U.S. statute allegedly violated proscribes only domestic conduct.  *Id*.  Prior to *Morrison*, many courts mistakenly referred to this type of challenge as one of "jurisdiction" and for that reason, some of the cases cited herein use that outdated terminology.  The analysis is the same.

statutes are both limited to domestic conduct. *European Cmty v. RJR Nabisco, Inc.*, 764 F.3d 129, 141 (2d Cir. 2014) ("mail fraud, wire fraud and Travel Act" statutes "do not apply extraterritorially."), *aff'd in part, rev'd in part on other grounds*, 136 S. Ct. 2090 (2016); *United States v. Vilar*, 729 F.3d 62, 67 (2d Cir. 2013) ("Section 10(b) and its implementing regulation, Rule 10b–5, do not apply to extraterritorial conduct, regardless of whether liability is sought criminally or civilly").  In other words, an indictment charging a defendant with conspiracy to commit wire fraud under § 1349 or conspiracy to commit securities fraud under § 371 can withstand dismissal only if the indictment describes *domestic activity* that violates those statutes but must be dismissed where the charges are predicated on acts that took place on foreign soil.

   The extraterritorial reach of the money laundering conspiracy statute, 18 U.S.C. § 1956(h), is governed by 18 U.S.C. § 1956(f), which provides that a non-U.S. citizen may be charged under the statute only if his money laundering "conduct occurs in part in the United States."  However, even in such instances, due process applies and charges should not be brought against a non-U.S. citizen unless the offense conduct had a "substantial, direct, and foreseeable effect upon or in the [United States]."  Restatement (Third) of Foreign Relations Law § 403(2)(a); *United States v. Hawit*, No. 15-CR-252 (PKC), 2017 WL 663542, at *9 (E.D.N.Y. Feb. 17, 2017) (Section 403 of the Restatement is the "governing legal test" for due process violations in criminal cases against non-U.S. citizens); *see also United States v. Al Kassar,* 660 F.3d 108, 118 (2d Cir. 2011) ("In order to apply extraterritorially a federal criminal statute to a defendant consistent with due process, there must be a sufficient nexus between the defendant and the United States, so that such application would not be arbitrary or fundamentally unfair.").

## ARGUMENT

I.   **THE COURT SHOULD DISMISS THE SECURITIES FRAUD CONSPIRACY CHARGED IN COUNT TWO BECAUSE THE INDICTMENT'S ALLEGATIONS, EVEN IF ACCEPTED AS TRUE, FAIL TO STATE AN OFFENSE PUNISHABLE UNDER U.S. LAW.**

There are two separate grounds for the dismissal of Count Two, which purports to charge Mr. Boustani with participating in a securities fraud conspiracy.  First, the Indictment does not specify what security is at issue in Count Two, and thus, fails to allege the "[f]irst and foremost" element of the offense, namely, that the "allegedly fraudulent conduct" agreed upon "involve[d] a 'security.'"  *United States v. Zaslavskiy*, No. 17 CR 647 (RJD), 2018 WL 4346339, at *4 (E.D.N.Y. Sept. 11, 2018).   The second basis for dismissal is the one identified by Your Honor during the January 22, 2019 conference, *see* Ex. A at 36:15-17, and that is the Indictment's failure to allege a *domestic* securities transaction that falls under the auspices of U.S. law.

### A.   <u>Count Two Should Be Dismissed Because the Charges Fail to Identify the Security At Issue.</u>

As Circuit Judge Raggi observed, the Government's "lengthy indictment" includes "pages and pages about what went on in Mozambique," but does not *tell us what the fraudulent security is.*"  (Ex. B at 36:4-11 (emphasis added).)  Judge Raggi was exactly right. The Indictment generically alleges that Mr. Boustani and his co-defendants conspired to defraud "investors and potential investors in EMATUM, in connection with the purchase and sale of investments in EMATUM."  (Ind. ¶ 97.)  This allegation is insufficient because EMATUM is an *entity*, not a security.  (*Id.* ¶ 2; *Zaslavskiy*, 2018 WL 4346339, at *4 (indictment must allege a "security").

As described above, *see supra* at 11, 15, the Indictment elsewhere describes two different investment opportunities that the investment funds alleged to be victims could have

utilized in connection with EMATUM's debt to Credit Suisse Europe and VTB:  the purchase of LPNs in the fall of 2013, *see* Ind. at ¶¶ 71-73, and a separate offering nearly three years later, in April 2016, in which those notes could be exchanged for Eurobonds.  (*Id.* ¶¶ 85-89.)  Which of these securities is the focus of Count Two is anyone's guess.  The Indictment's failure to meet this "[f]irst and foremost" element of securities fraud—to identify the security at issue—requires Count Two's dismissal.

**B.**  **Count Two Should Be Dismissed Because U.S. Law Does Not Reach the Foreign Securities Transactions Described in the Indictment.**

    *1.*    *The Indictment Fails To Allege a Domestic Securities Transaction.*

Even if Count Two's generic reference to "investments in EMATUM" did identify the "security" that is the subject of the charge, Count Two does not allege a ***domestic*** securities transaction and therefore must be dismissed.  *Morrison*, 561 U.S. at 265 (Section 10(b) reaches only domestic, not foreign, securities transactions).  To properly charge a securities fraud conspiracy, an indictment must allege that the defendant agreed to engage in fraud in connection with (1) a security listed on a U.S. exchange; or (2) a security purchased or sold in the United States.  *Cornwell*, 729 F. Supp. 2d at 623; *Vilar*, 729 F.3d at 67.[5]

The Indictment against Mr. Boustani does not allege fraud in connection with a security listed on a U.S. securities exchange.  Accordingly, in order to avoid dismissal, the Indictment must allege facts demonstrating that the security at issue in Count Two was "purchased or sold in the United States."  *Vilar*, 729 F.3d at 67.  The Second Circuit interprets this obligation as requiring allegations either that "title [to the security was] passed within the United States" or that "the parties incur[red] irrevocable liability to carry out the [securities]

---

[5] In *Vilar*, the Second Circuit explained that the reach of Section 10(b) is the same in the criminal and civil contexts and thus we rely on cases from both contexts herein.  729 F.3d at 67.

transaction within the United States." *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677

F.3d 60, 69 (2d Cir. 2012).  The Indictment against Mr. Boustani fails to assert either

proposition.  In fact, the Indictment does not even contain *conclusory allegations* as to these

facts.  Even if one assumes that the "security" at issue in Count Two is either the LPNs or the

Eurobonds, the Indictment is silent as to the manner in which title was passed to, and irrevocable

liability incurred by, the purchasers participating in the LPN offering and/or the Eurobond

Exchange.

   Paragraph 72—which concerns only the LPN offering, not the Eurobond

Exchange—is the Indictment's sole attempt at alleging a domestic securities transaction.  It states

that "investors in the United States purchased EMATUM loan participation notes" in "reliance

on the representations in the [EMATUM] Loan Agreement."  (Ind. ¶ 72.)  This allegation,

however, is not enough to sustain the Indictment.  An allegation that a purchaser in the United

States bought the security at issue is not sufficient to plead a domestic securities transaction.

*Vilar*, 729 F.3d at 77 n.10 (the fact that the securities at issue were "sold to customers based in

the United States" is "insufficient to demonstrate a purchase or sale of a security in the United

States for the purposes of Section 10(b)."); *City of Pontiac Policemen's & Firemen's Ret. Sys. v.

UBS AG*, 752 F.3d 173, 181, n.32 (2d Cir. 2014) (a "purchaser's citizenship or residency does

not affect where a transaction occurs. . .a foreign resident can make a purchase within the United

States, and a United States resident can make a purchase outside the United States."); *Plumbers'

Union Local No. 12 Pension Fund v. Swiss Reinsurance Co.*, 753 F. Supp. 2d 166, 175-76

(S.D.N.Y. 2010) (Koeltl, J.) (rejecting argument that a "security that is not traded on a domestic

stock exchange is purchased in the United States for purposes of section 10(b) anytime an

investor decides to purchase the security and places a purchase order with a broker while in the United States.").

The decision highlighted by Your Honor, *Cornwell v. Credit Suisse Grp.,* underscores this important distinction. *Cornwell* involved stock in a foreign issuer purchased by U.S. investors on the Swiss Stock Exchange. 729 F. Supp. 2d at 626. The purchasers claimed that their securities fraud claims were validly based on domestic securities transactions because the U.S. resident purchasers made their investment decision in the U.S. and initiated their purchase from the U.S. *Id.* at 622. The district court dismissed the purchasers' claims, observing that "the *Morrison* opinion indicates that the [Supreme] Court considered that under its new test § 10(b) would not extend to foreign securities trades executed on foreign exchanges even if purchased or sold by American investors, and even if some aspects of the transaction occurred in the United States." *Id.* at 625-26; *see also Horvath v. Banco Comercial Portuguese, S.A.*, No. 10 Civ. 4697, at *2-3 (S.D.N.Y. Feb. 15, 2011), *aff'd* 461 Fed. Appx. 61 (2d Cir. 2012) (dismissing Section 10(b) claims for failure to state an offense where securities were issued by foreign SPV, did not trade on a U.S. exchange, and were purchased by a U.S. investor through an offshore account).

Likewise, an allegation that U.S. purchasers relied upon a defendant's alleged misrepresentations, *see* Ind. ¶ 72, cannot save an indictment that otherwise fails to allege facts regarding the location in which title was transferred or irrevocable liability incurred. In *SEC v. Goldman Sachs & Co.,* Judge Barbara Jones of the Southern District dismissed several charges against the defendant because the SEC had failed to sufficiently allege facts regarding where the act giving rise to "irrevocable liability" had taken place. 790 F. Supp. 2d 147, 159 (S.D.N.Y. 2011). Relying on U.S-based conduct by the defendant—including allegations that the defendant

caused misrepresentations to be made to purchasers in the United States—the SEC argued that the purchases of the relevant securities were domestic transactions. *Id.* Judge Jones rejected the SEC's argument, holding that the claims were barred under *Morrison*: "In view of the fact that none of the conduct or activities alleged by the SEC, including the closing, constitute facts that demonstrate where any party to the . . . purchases incurred 'irrevocable liability,' the SEC fails to provide sufficient facts that allow the Court to draw the reasonable inference that . . . 'purchases or sales were made in the United States.'" *Id*. at 159 (internal citations omitted); *see also Accord Basis Yield Alpha Fund (Master) v. Goldman Sachs Grp.,* 798 F. Supp. 2d 533, 537 (S.D.N.Y. July 21, 2011) (dismissing securities fraud charges—despite allegations of "numerous instances of U.S.-based conduct that led up to the sale of the [relevant] security, including most notably the alleged fraudulent statements"—because no facts were alleged which, if assumed true, demonstrated that liability in connection with the purchase of the security at issue became "irrevocable" in the United States).

        The reason that the Indictment against Mr. Boustani does not contain any allegations concerning the location in which title to the LPNs and/or the Eurobonds was passed or the location in which liability for these securities became "irrevocable" is because, in fact, these events occurred abroad. As described above, the LPNs were issued by a debt-issuing SPV incorporated in the Netherlands. *Supra* at 11. Purchase orders for the LPNs were settled and cleared through the Euroclear and Clearstream clearing systems in Europe, meaning that title to the LPNs was passed in Europe. *SEC v. Tourre,* No. 10 Civ. 3229 (KBF), 2012 WL 5838794, at *2, 6 (S.D.N.Y. Nov. 19, 2012) (where note transactions settled through Euroclear accounts in Europe, transaction was foreign, not domestic, because there was no "U.S.-based transfer of title"); *see* Ex. I (Excerpts of Euroclear Terms and Conditions, at § 5.2.2.1.1 (citing § 4.1.5.2)

(explaining settlement process, including that purchase instructions must be placed through

Euroclear System and only become "irrevocable" once Euroclear has "received," "validated,"

and "executed" the instructions in its System).)[6]

    With respect to the Eurobond Exchange, the Indictment does not even allege that

any U.S. debt purchasers participated in the Exchange; it merely states that "documents . . . were

sent to investors, including in the United States" in connection with the Exchange.  (Ind. ¶ 88.)

In any event, even if U.S. debt purchasers did participate, the Exchange Offer clearly stated that

"irrevocable" liability would not attach until after a noteholder's voting instructions were sent

through the Euroclear and Clearstream systems in Europe and were received by an Exchange

Agent based in the United Kingdom.  (*See* Ex. H at 4, 8, 40-44; *Cascade Fund LLP v. Absolute*

*Capital Mgmt. Holdings Ltd*, No. 08-cv-1381 (MSK) (CBS), 2011 WL 1211511, at *1, 7 (Mar.

31, 2011) (where purchase offer from U.S. investor was sent abroad for acceptance by seller,

transaction was not domestic and Section 10(b) claims were dismissed)).  Like the LPNs, title to

the Eurobonds was processed through the Euroclear and Clearstream systems, meaning that title

passed in Europe, not in the United States.  *Tourre,* 2012 WL 5838794, at *2.  Since the

Exchange, the Eurobonds have been listed and traded on Euronext Dublin (f/k/a the Irish Stock

Exchange), a foreign exchange.

    Because the Indictment does not allege that under the LPN offering and/or the

Eurobond Exchange, title was passed or irrevocable liability incurred in the United States, Count

---

[6] Euroclear, Investopedia https://www.investopedia.com/terms/e/euroclear.asp (last visited June
17, 2019) ("Transactions between Euroclear participants are settled in the manner described
above"—that is, "a transaction is settled once the buyer's account has been credited with the
purchased shares and debited the agreed cash amount, and the seller's account has been debited
the shares and credited the sales amount. The credit and debit movements occur simultaneously
through a process known as delivery versus payment (DVP)"—"on a DVP basis on the books of
Euroclear. *Securities and cash transfers between buyer and seller accounts are final and
irrevocable upon settlement.*") (emphasis added.)

Two of the Indictment fails to allege a securities transaction that falls under the ambit of U.S. law.  Dismissal of Count Two is therefore required.[7]

> 2.    *The Government May Not Bring Charges Based on the Extraterritorial Securities Transactions Described in the Indictment.*

Notwithstanding the clear edict in both *Morrison* and *Vilar* that Section 10(b)'s reach is limited to domestic securities transactions, we anticipate the Government may argue that it has appropriately charged an extraterritorial violation of the statute, because the Dodd-Frank Wall Street Reform and Consumer Protection Act, passed in 2010, states that federal courts have "extraterritorial jurisdiction" with respect to securities fraud violations where "significant conduct, or foreseeable effects, occur in the United States."  *See* Section 929(P), Pub. L. No. 111-203, 124 Stat. 1376 (2010).  If it did so, the Government would be changing its tune.  The Government has repeatedly confirmed to the Court that it is asserting a *domestic* violation of the securities fraud conspiracy statute, not any extraterritorial extension purportedly permitted by Dodd-Frank.  *See* Mar. 26, 2019 Gov't Ltr. at 5, ECF No. 60 (the "Government's application of both [wire fraud and securities fraud conspiracy] statutes is domestic."); *see also* Gov't Br. at 17, n.4, *United States v. Boustani*, Case No. 19-1018 (2d Cir. April 29, 2019), ECF No. 38 ("the securities fraud conspiracy charged by the [G]overnment qualifies as domestic").

Regardless, any such argument from the Government would be based on a faulty statutory interpretation.  Dodd-Frank addressed the "jurisdiction" of federal courts.  But, as discussed above, *see supra* at 16, n.4, a defendant's challenge to charges that are premised on extraterritorial conduct does not implicate a court's "jurisdiction," but rather the merits of the

---

[7] This failure to allege a domestic securities transaction also means that the alleged securities fraud cannot qualify as a Specified Unlawful Activity ("SUA") for purposes of Count Four and should be stricken from that portion of the Indictment.  *See Prevezon*, 122 F. Supp. 3d at 70 ("the wire fraud alleged here cannot qualify as the relevant SUA [under Section 1956], because the alleged scheme is not sufficiently domestic and is therefore not actionable under U.S. law.").

claim.  In other words, Dodd-Frank did not amend Section 10(b)'s ambit, which remains limited to domestic securities transactions.  *Parkcentral Global HUB Ltd. v. Porsche Auto. Holdings*, 763 F.3d 198, 211 n.11 (2d Cir 2012) (explaining that the Dodd-Frank amendment concerning federal court "jurisdiction" is of questionable import since the Supreme Court, in *Morrison*, explicitly held that the extraterritorial reach of U.S. laws is not a "jurisdictional" question).

Even if the Government was correct that the conduct and effects test governed this issue, which it does not, the Indictment does not allege that Mr. Boustani or any of his co-conspirators engaged in significant conduct, or foresaw the substantial effects of any fraud, in the United States.  *See Morrison v. Nat'l Australia Bank Ltd*., 547 F.3d 167, 176 (2d Cir. 2008) ("lengthy chain of causation" between falsifying financial statements in U.S. and foreign securities transactions in Australia insufficient under conduct and effects test to implicate Section 10(b)).  The Indictment would therefore be insufficient under the conduct and effects test as well and dismissal would be required.

## II.   THE COURT SHOULD DISMISS THE WIRE FRAUD CONSPIRACY CHARGED IN COUNT ONE BECAUSE THE INDICTMENT'S ALLEGATIONS, EVEN IF ACCEPTED AS TRUE, FAIL TO STATE AN OFFENSE PUNISHABLE UNDER U.S. LAW.

### A.   Count One Must be Dismissed Because the Indictment Does Not Allege That the Conspirators Entered Into Their Agreement on U.S. Soil.

Neither the wire fraud nor the wire fraud conspiracy statute applies extraterritorially, *see RJR Nabisco, Inc*., 764 F.3d at 141, and thus, to avoid dismissal, an indictment charging wire fraud or wire fraud conspiracy must allege that the criminal conduct took place in the United States.  The Supreme Court has explained that where the conduct "relevant to the focus" of the charged statute "occurred in a foreign country," the case "involves an impermissible extraterritorial application, regardless of any other conduct that occurred in

U.S. territory." *RJR Nabisco Inc.*, 136 S. Ct. at 2101.  Thus, in determining whether a defendant

may be prosecuted in the United States, a court must first determine the "focus" of the statute at

issue.  In a recent opinion, *Bascuñan v. Elsaca*, the Second Circuit confirmed that a court should

look to the "essential elements" of the offense in order to determine a statute's "focus."  *See* No.

18-2731, 2019 WL 2455168 at *10 (2d Cir. June 13, 2019).  In *Bascuñan*, the Circuit was tasked

with determining the "focus" of 18 U.S.C. § 1343, the substantive wire fraud statute.  The Circuit

explained that because the "essential elements" of a Section 1343 offense are "(1) a scheme to

defraud, (2) money or property as the object of the scheme, and (3) use of the mails or wires to

further the scheme," Section 1343's "focus" is the "use of the mail or wires in furtherance of a

scheme to defraud."  *Id*.  (internal citations and emphasis omitted.)  Accordingly, a Section 1343

charge may be brought when "(1) the defendant used domestic mail or wires in furtherance of a

scheme to defraud; and (2) the use of the mail and wires was a core component of the scheme to

defraud."  *Id*.

   Mr. Boustani has not been charged with violating Section 1343.  Instead, Count

One of the Indictment alleges a wire fraud conspiracy in violation of 18 U.S.C. § 1349.  The

Second Circuit has not yet determined Section 1349's "focus," but its holding in *Bascuñan* is

instructive.  *Bascuñan* requires a court to look to the "essential elements" of the offense in order

to determine a statute's "focus."  Section 1349's only element is "an agreement to commit [wire]

fraud;" it does not require the actual use of a wire or even any overt act.  *See United States v.*

*McFadden*, 689 F. App'x 76, 79 (2d Cir. 2017) (Section 1349 requires the Government to prove

"only an agreement to commit mail fraud" and does not require the Government to prove "use of

the mails in furtherance of the conspiracy"); *United States v. Beacham*, 774 F.3d 267, 272 (5th

Cir. 2014) ("[t]o be convicted of conspiracy under § 1349, the jury must find: (1) two or more

persons agreed to commit fraud; (2) the defendant knew the unlawful purpose of the agreement; and (3) the defendant joined the agreement with the intent to further the unlawful purpose"); *United States v. Harrison*, 663 F. App'x 460, 464 (6th Cir. 2016) ("[t]o establish conspiracy to commit wire fraud under 18 U.S.C. § 1349, the government must demonstrate that two or more persons conspired, or agreed, to commit the crime of wire fraud and that the defendant knowingly and voluntarily joined the conspiracy"); *see also United States v. Roy*, 783 F.3d 418, 420 (2d Cir. 2015) ("[a] conspiracy conviction under § 1349 does not require proof of an overt act."). Given its elements, Section 1349's "focus" *must be* the "agreement to commit [wire] fraud," *McFadden*, 689 F. App'x. at 79, because Section 1349 requires no other conduct. To prosecute a violation of Section 1349, the Government must therefore allege (and ultimately show) that the conspirators reached their "agreement" on U.S. soil. If the conspirators came to their "agreement" in a place other than the United States, "the case involves an impermissible extraterritorial application, regardless of any other conduct that occurred in U.S. territory." *See RJR Nabisco Inc.*, 136 S. Ct. at 2101.

　　　　　The Indictment against Mr. Boustani does not allege that the conspirators reached their "agreement" while in the United States, nor could it. All of the alleged conspirators are foreign citizens and except for one short trip to New York City made by Defendant Do Rosario in 2016—five years after the alleged "agreement" was made—none are even alleged to have ever stepped foot on U.S. soil. Accordingly, the Government has failed to allege domestic conduct within Section 1349's reach and Count One must be dismissed for failure to state an offense.

### B.　Dismissal of Count One Is Also Required Under the *Bascuñan* Test Because the Correspondent Banking Wires Described in the Indictment Were Not a Core Component of the Alleged Scheme.

　　　　　Given that the elements of the wire fraud conspiracy statute, 18 U.S.C § 1349, do not include the actual use of a wire, the "focus" of Section 1349 cannot be the same as the

"focus" of Section 1343 and therefore the same test for sufficient domestic conduct should not apply.  But, even if *Bascuñan*'s test did govern here, dismissal of Count One would still be required.

In *Bascuñan*, the Circuit made clear that the use of U.S. wires—even wires that "further" the fraudulent scheme—is not enough to bring a defendant's conduct within the reach of U.S. law.  2019 WL 2455168 at *10.  Instead, a defendant may only be charged with violations of the wire fraud statute when the wires utilized in the U.S. were a "core component" of the fraudulent scheme.  *Id*.  "Core," of course, means the "central" or "*most essential* part" of something.  *See* Random House Dictionary (1st ed. 1987) ("core" means "the central, innermost, or most essential part of anything"); The American Heritage Dictionary (5th ed. 2011) ("core" means "the basic or most important part; the crucial element or essence.").  For that reason, in *Bascuñan*, the Circuit excluded "incidental" wires from the extraterritorial analysis and explicitly held that a defendant's "use of [U.S.] mail or wires must be *essential*" to the fraudulent scheme before U.S. law can be applied.  2019 WL 2455168 at *10 (emphasis added).

*Bascuñan* itself provides a helpful illustration of an "essential" U.S. wire.  There, the defendant allegedly schemed to misappropriate millions of dollars from his family's trust account, which was located in New York.  *Id*. at *1-2.  There could be no question that a "core component" of the alleged fraud was the defendant's repeated use of U.S. wires "to fraudulently order *a domestic bank* to transfer millions of dollars out of *a domestic account*" belonging to the family trust, monies that the defendant then kept for himself.  *Id*. at 11 (emphasis added).  The Circuit therefore held that application of the U.S. wire fraud statute was appropriate.  *Id*.  In fact, the Complaint in *Bascuñan* explicitly alleged that the "fraud ***would not have been possible*** had [the defendant] not used the mails and wires to send and receive the [wire transfer] [i]nstructions

in and out of New York."  Second Am. Compl., *Bascuñan. v. Elsaca*, No. 1:15-cv-02009, ECF No. 76, at ¶ 188 (S.D.N.Y. Dec. 13, 2017) (emphasis added).  The same cannot be said of the U.S. wires alleged in the Indictment against Mr. Boustani.  Three categories of U.S. wires are described and none were essential to the alleged scheme to defraud the purchasers of the Mozambican debt.

First, the Indictment describes payments, made from Privinvest to Mozambican officials, and among the alleged conspirators, that were sent from *foreign* bank accounts to other *foreign* bank accounts, but which were briefly routed, by foreign banks, through U.S. correspondent accounts for processing.  *Id*. at ¶¶ 38, 56, 75, 78, 92, 93, 98 (h)-(n); 98(a), 98(c), 98(d), 98(g), 98(i), 98(k), 98(m); 98(n); 101(e); 101(l).  The involvement of correspondent banks was entirely incidental to the alleged scheme.  On this point, the observation of Judge Denis R. Hurley of the Eastern District, in *United States v. Turner*, is particularly apt:

> [T]here is nothing to my knowledge to suggest that the Congress in enacting § 1343, and amending the statute in 1956 to explicitly cover foreign commerce, intended for its application to situations in which the sole domestic contact consists of a transfer between two foreign countries essentially ricocheting off the United States via the happenstance of a domestic correspondent bank being involved. Given that literally thousands, if not millions of such domestic correspondent bank contacts occur daily, a determination that such use, alone, if coupled with a foreign scheme to defraud, could constitute a predicate for a § 1343 prosecution, would extend the extraterritorial reach of the statute exponentially without any corresponding interest of the United States being advanced.

624 F. Supp. 2d 206, 228-29 (E.D.N.Y. 2009).  Correspondent banking transactions that momentarily touch the U.S. are simply too tangential to constitute core domestic conduct sufficient to implicate Section 1349.  *Prevezon,* 122 F. Supp. 3d at 71 (where "kickback" payment to Russian tax official was executed via "wire transfer [that was] directed from a shell company with a Moldovan bank account. . .to a shell company with a Latvian bank

account…with the transfer routed through New York," the use of U.S. wires was too "minimal" to constitute sufficient domestic conduct).

Second, the Indictment alleges that the Loan Agreements required the Mozambican Companies to repay their loans by sending funds to Credit Suisse Europe and VTB at correspondent accounts held by those banks in Manhattan.  (Ind. ¶¶ 50, 70, 81.)  Repaying the loans, however, would not in any way have defrauded the debt purchasers.  Thus, any wires associated with loan repayments could not have been a "core component" of the alleged scheme, given that repayment of the loans was explicitly contrary to the scheme's alleged objectives.

Finally, the Indictment alleges that Credit Suisse and VTB disbursed the monies borrowed by the Mozambican Companies to Privinvest, and that those funds traveled through correspondent accounts in the U.S. before being deposited into Privinvest's account in the UAE. (Ind. ¶¶ 51, 55, 82, 98(e), 98(f); 101(k).)  Given that neither bank is alleged to have been defrauded, this incidental involvement of correspondent banks cannot even be said to have been in furtherance of any fraudulent scheme.  Furthermore, these correspondent banking transactions took place *before* the banks turned to offload portions of the debt to the allegedly victimized debt purchasers.  For this reason too, these wires are far too ancillary to constitute a "core component" of the alleged scheme against the debt purchasers.  *Sussman v. Bank of Israel*, 801 F. Supp. 1068, 1074 (S.D.N.Y. 1992) ("it was in Israel that the defendant's hatched their illegal scheme.  It was in Israel that the defendants misled [the American plaintiff] with respect to their intentions. . .[i]t was in Israel that NAB's Israeli managers made use of the proceeds of the loan, allegedly in violation of Israeli law. . .[T]he use of its New York Branch. . .to route the loan proceeds from Israel to NAB Holding Corp. in Luxembourg and then back to the NAB managers in Israel cannot be regarded. . .as anything other than peripheral.").

30

The Second Circuit's decision in *Petroleos Mexicanos v. SK Eng'g & Constr. Co.*, 572 F. App'x 60, 61 (2d Cir. 2014), is instructive.  There, the defendant, a subsidiary of German manufacturer Siemens, was alleged to have participated in a wire fraud scheme predicated upon bribes paid to Mexican government officials in exchange for a contract to modernize a refinery owned by Pemex, the Mexican state-owned oil company.  *See Petroleos Mexicanos v. SK Eng'g & Constr. Co.*, Case No. 12-cv-09070 (LLS), 2013 WL 3936191, at *7 (S.D.N.Y. July 30, 2013).  Pemex alleged that it had obtained U.S. financing to pay the defendant and it was alleged that the defendant's false and inflated invoices were paid through New York-based bank accounts.  *Id*.  Numerous U.S. wires were alleged to have been utilized in connection with these activities.  *See* Am. Compl., *Petroleos Mexicanos*, Case No. 12-cv-09070 (LLS), ECF No. 34, at ¶¶ 8, 18-19, 36-37, 41-45 (S.D.N.Y. May 8, 2013).  The district court dismissed the case however, on the basis that the wire fraud alleged as a RICO predicate offense was extraterritorial.  *Id*.

The Second Circuit affirmed.  572 F. App'x at 61.  The Circuit explained that "[t]he activities involved in the alleged scheme—falsifying the invoices, the bribes, the approval of the false invoices—took place outside of the United States."  *Id*.  Even though numerous U.S. wires were alleged in connection with the financing of the project and the payments to the defendant, the Second Circuit held that the alleged connections to the United States were simply too "minimal" and "insufficient" to implicate the U.S.'s wire fraud statute.  *Id*.  Here, the correspondent banking wires alleged in the Indictment are even *more* incidental than the wires allegedly utilized in *Petroleos Mexicanos*, and thus, dismissal of the wire fraud conspiracy charged in Count One is also mandated here.[8]

---

[8] This failure to allege a domestic wire fraud conspiracy also means that the alleged wire fraud cannot qualify as a SUA for purposes of Count Four and should be stricken from that portion of the Indictment.  *See Prevezon*, 122 F. Supp. 3d at 70.

**III.    ALTERNATIVELY, THE COURT SHOULD REQUIRE THE GOVERNMENT TO DECOUPLE COUNT ONE BECAUSE, IN AN ATTEMPT TO SWEEP IN TIME-BARRED CONDUCT, IT IS IMPERMISSIBLY DUPLICITOUS.**

The statute of limitations for a wire fraud conspiracy is five years.  18 U.S.C. § 3282.  Because the Grand Jury returned the Indictment on December 18, 2018, Count One should be limited to conduct that took place after December 18, 2013.  But, the debt incurred by Proindicus in March of 2013 was sold to purchasers that same summer.  EMATUM's debt was sold to the Netherlands-based SPV in early September 2013, and that entity issued LPNs to purchasers in September and October 2013.  The only significant events that took place after December 2013, and thus fall within the statute of limitations, are (1) MAM's decision in the spring of 2014 to borrow money from VTB, which did not offload that debt on any debt purchasers; and (2) the Eurobond Exchange in 2016.  The Government, however, does not want to try Mr. Boustani on the basis of these two transactions alone, because it is near impossible to articulate how Mr. Boustani could have defrauded purchasers that don't exist (in the case of MAM) or LPN holders who were supposedly induced to participate in the Exchange based on oral representations made by Defendant Do Rosario at a meeting where Mr. Boustani was not present.  Accordingly, the Government has attempted, in Count One, to jam four different conspiracies into a single count alleging one conspiracy that purportedly ran from 2011 through 2018, with years-long breaks in between.  This approach permits the Government to seek a conviction based on time-barred conduct but also renders Count One impermissibly duplicitous.

An indictment is "impermissibly duplicitous where: 1) it combines two or more distinct crimes into one count in contravention of [Federal Rule of Criminal Procedure] 8(a)'s requirement that there be a separate count for each offense, and 2) the defendant is prejudiced thereby." *United States v. Sturdivant,* 244 F.3d 71, 75 (2d Cir. 2001).  The allegation in a single count of a conspiracy to commit several crimes is not duplicitous, because the conspiracy is the

32

crime even if its objects are diverse. *United States v. Murray*, 618 F.2d 892, 896 (2d Cir. 1980). But a single conspiracy count may be duplicitous where it in fact alleges disparate conspiracies that risk unfairness to the defendant. *Id.; see also Kotteakos v. United States,* 328 U.S. 750, 773 (1946).

        "An indictment which charges multiple conspiracies in a single count creates the risk that one defendant, against whom the government's proof is quite weak, will suffer from an evidentiary 'spill-over effect' or transference of guilt from another defendant." *United States v. Boffa*, 513 F. Supp. 444, 472 (D. Del. 1980). An indictment charging multiple conspiracies in a single conspiracy count also carries with it several other potential dangers to the defendant that a Court must consider, including: (1) "whether a general verdict of guilty [would] conceal[] a finding of guilty as to one crime and a finding of not guilty as to another," and (2) "the risk that the jurors may not have been unanimous as to any one of the crimes charged." *United States v. Margiotta*, 646 F.2d 729, 732-33 (2d Cir. 1981). A defendant who is forced to defend himself against allegations that he participated in a conspiracy for which the limitations period has run is also prejudiced by a impermissibly duplicitous count that improperly seeks to insert such time-barred conduct into the case. *United States v. Burfoot*, 899 F.3d 326, 337 (4th Cir. 2018) ("when an indictment impermissibly joins separate offenses that occurred at different times, prosecution of the earlier acts may be barred by the statute of limitations"); *see also United States v. Wirsing*, 719 F.2d 859, 871 (6th Cir. 1983) (Porter, J., dissenting) (recognizing that a defendant may be prejudiced if one of separate conspiracies ended "prior to the onset of the limitations period"). "[B]ecause duplicity is a pleading rule . . . the appropriate remedy is to decouple . . . and reformulate the . . . Indictment by separating the . . . conspiracies into . . . separate counts." *United States v. Abakporo*, 959 F.Supp.2d 382, 391 (S.D.N.Y. 2013). Alternatively, the Court

may direct the Government to elect which single alleged conspiracy it will prove at trial.  *See,*

*United States v. Hennings*, No. 18-CR-028, 2018 WL 4221575, at *6 (W.D.N.Y. Sept. 5, 2018).

        Count One impermissibly sweeps four different alleged conspiracies into a single

count, when in fact the Indictment actually describes different alleged agreements to defraud

(1) the purchasers who bought Credit Suisse Europe's and VTB's holdings of Proindicus's debt

in the summer of 2013; (2) separate purchasers who, in the fall of 2013, bought the LPNs

associated with EMATUM's debt and issued by the Netherlands-based SPV; (3) potential

purchasers who could have bought VTB's holding of MAM's debt in 2014; and (4) LPN holders

who agreed to participate in the Eurobond Exchange on April 6, 2016.  As described, each of

these alleged conspiracies involved separate debts owed by three different Mozambican

corporations, which were incurred at different times, in relation to different Infrastructure

Projects.  Moreover, each of the conspiracies, as alleged, was intended to target different sets of

purchasers (to the extent there even were any) and at least with respect to the Exchange, the

fraudulent scheme was alleged to have been accomplished through misrepresentations that had

nothing to do with loan proceeds or compliance with anti-corruption laws.  (*See* Ind. ¶¶ 50-51,

70-71, 80, 88, 98(q).)

        The consolidation of what are actually four distinct conspiracies into a single

count exposes Mr. Boustani to significant harm at trial.  As charged, Count One creates the risk

of a guilty verdict without unanimity on any particular misconduct.  It mashes together four

distinct events and allows different jurors to reach a verdict by potentially answering completely

different questions on four different issues.  There exists an intolerable danger that three jurors

could find guilt with respect to the purchase of Proindicus's debt, three others could find guilt

with respect to the LPN offering, three others could find guilt in connection with MAM's debt,

and three others with respect to the Eurobond Exchange, but all 12 may agree on nothing.  In

addition, Mr. Boustani "will suffer from an evidentiary 'spill-over effect,'" see *Boffa*, 513 F.

Supp. at 472, as the Indictment not only fails to allege ***his*** agreement to defraud any U.S.

purchasers in any of the four financings, but also it fails to allege ***his*** involvement in any such

fraud at all.  *Id.*  Because Count One fuses together four separate alleged conspiracies, each of

which involved different transactions at different times, with different debt purchasers, and in

different contexts, it is duplicitous and should be dismissed and decoupled into four different

counts or, alternatively, the Government should elect a single conspiracy that it will seek to

prove as Count One at trial.

IV.    **THE COURT SHOULD DISMISS THE MONEY LAUNDERING CONSPIRACY CHARGED IN COUNT FOUR BECAUSE THE INDICTMENT'S ALLEGATIONS, EVEN IF ACCEPTED AS TRUE, FAIL TO STATE AN OFFENSE PUNISHABLE UNDER U.S. LAW.**

Like Counts One and Two, Count Four of the Indictment should be dismissed for

failure to state an offense because it alleges extraterritorial conduct that falls outside the reach of

the U.S. money laundering statute.  Moreover, even if the money laundering statute did reach the

alleged conduct, due process would bar Mr. Boustani's prosecution in the United States.

In enacting the money laundering statute, Congress explicitly delineated its

extraterritorial reach by mandating that non-U.S. citizens could be charged under the statute only

where their money laundering "conduct occurs in part in the United States."  18 U.S.C. §

1956(f).  The statute defines what it means by a non-citizen's money laundering "conduct":

"initiating, concluding or participating in initiating or concluding a transaction."  18 U.S.C. §

1956(c)(2).[9]  Accordingly, in order to invoke Section 1956(f)'s limited extraterritorial reach, the

---

[9] Under established statutory canons of construction, when the same word is used in the same statute, even in different grammatical forms, it must be interpreted consistently.  *Reves v. Ernst & Young*, 507 U.S. 170, 178 (1993) (where "conduct" is used as a both a "noun and a verb" in a

Indictment must contain allegations that Mr. Boustani participated in "initiating" a transaction (*e.g.*, sending funds) or "concluding" a transaction (*e.g.*, receiving funds) in the United States. *Hawit*, 2017 WL 663542 at *8, n.12 ("where, as here, the government seeks to charge a Section 1956(a)(2) money laundering offense against a foreign defendant, the application of the statute is extraterritorial and the charging instrument must include allegations that meet all of the elements of the charged offense under the section [allegedly violated], as well as subsection (f).")

        The Indictment, however, does not allege that Mr. Boustani, or any of his alleged co-conspirators, ever "initiat[ed]" a transaction from an account in the United States or "conclud[ed]" a transaction in an account in the United States. The only U.S. conduct alleged is incidental clearing transactions by various foreign banks in *their* correspondent accounts in Manhattan. (Ind. at ¶¶ 38, 51, 55, 56, 75, 78, 82, 92, 93, 98(a), 98(c), 98(d), 98(e), 98(f), 98(g), 98(i), 98(k), 98(m); 98(n); 101(e); 101(k); 101(l)); *see also Universal Trading & Inv. Co. v. Tymoshenko*, No. 11-cv-7877 (PAC), 2012 WL 6186471, at *3 (S.D.N.Y. Dec. 12, 2012) (dismissing claims against defendant because New York's long-arm jurisdiction statute does not reach "foreign individuals holding foreign accounts" simply because "[the defendant's] bank moved money through New York via a correspondent account."). Accounting interactions between foreign banks and their clearing banks in the U.S. does not constitute domestic conduct of *Mr. Boustani* (or of his co-conspirators), as Section 1956(f) requires.

        The question of whether a foreign defendant's money laundering "conduct" has been alleged to have occurred "in part" in the United States, as required by Section 1956(f), when the Government has described only a transfer of funds from one foreign country to another

_____

statute, the word must be given a similar meaning); *see also Sullivan v. Stroop*, 496 U.S. 478, 484 (1990) ("identical words used in different parts of the same act are intended to have the same meaning.").

foreign country, but where processing occurred through correspondent bank accounts in the United States, has already been answered in this Circuit.  In *United States v. Lloyds TSB Bank PLC*, the court determined that the statute's limited extraterritorial reach simply does not stretch that far.  639 F. Supp. 2d 314, 318 (S.D.N.Y. 2009).[10]  In *Lloyds,* the Government sought civil penalties under the criminal money laundering statute for alleged fund transfers that were sent to and from Switzerland from other European countries.  However, because these European-to-European transfers were dollar-denominated, they also "pass[ed] electronically through the New York banking system."  *Id.* at 324, n.4.  The court concluded that allegations of such "peripheral and transitory contact with the United States" were not enough to satisfy Section 1956(f)'s requirements and dismissed the Government's charges as beyond the extraterritorial reach of the money laundering statute.  *Id.*; *compare with United States v. Garcia*, 533 F. App'x. 967, 982 (11th Cir. 2013) (where money originated in the United States and was transferred from here to Mexico, and then transferred again to Columbia, Section 1956(f)'s requirement that the money laundering conduct occur "in part" in the United States was satisfied.)

The decisions in *Lloyds* and *Garcia* are consistent with the legislative history of Section 1956(f).  In drafting the statute's limited extraterritorial provision, the Senate provided two examples of what it would mean for a foreign citizen's money laundering conduct to occur, "in part," in the United States.  In the first example, the foreign citizen, *while present in the United States*, "telephones instructions from the United States to one foreign bank to transfer such proceeds to another foreign bank."  S. Rep. No. 99-433, at 14 (1986).  The Indictment against Mr. Boustani contains no analogous allegation, because Mr. Boustani had never set foot

---

[10] *Lloyds* was decided before the Supreme Court's decision in *Morrison* and thus, the defendant's challenge to the charges was framed as a lack of subject matter jurisdiction, rather than as a failure to state an offense.  *See supra* at 16, n. 4.  The analysis, however, is the same.

on American soil before he was arrested abroad and forcibly transferred to this District.  In the

Senate's second example, the foreign citizen "transfers by wire the proceeds of a drug

transaction *from a bank in the United States* to a bank in a foreign country."  *Id*. (emphasis

added).  As explained above, the Indictment against Mr. Boustani does not allege that he gave

such a directive; it alleges only that Privinvest transferred funds from its account at a bank in the

UAE to accounts at other foreign banks.  *See supra* at 36.  The fact that the foreign banks

processed the transfers by means of debits and credits in the ledgers of their U.S. correspondent

accounts does not constitute personal "conduct" within the United States sufficient to bring Mr.

Boustani within the statute's limited extraterritorial reach.  *See* S. Rep. 99-433 at 14 ("it is not

the [Senate's] intention to impose a duty on foreign citizens operating wholly outside of the

United States to become aware of U.S. laws.  Section (f) avoids this by limiting extraterritorial

jurisdiction…to situations in which the interests of the United States are involved, either because

the defendant is a U.S citizen or because the transaction occurred in whole or in part in the

United States."); *Calgarth Invs. Ltd. v. Bank Saderat Iran*, No. 95-cv-5332 (MBM), 1996 WL

204470, at *6 (S.D.N.Y. Apr. 26, 1996) ("debits and credits at New York bank accounts, without

more, do not give New York or the United States an interest in transactions that otherwise are

entirely foreign"), *aff'd*, 108 F.3d 329 (2d Cir. 1997).

Furthermore, even if the U.S.'s money laundering statute could reach Mr.

Boustani's conduct, application of the statute to Mr. Boustani would be unreasonable under the

Constitution's due process clause.  In *Hawit*, Judge Chen indicated that the "governing legal test"

for unreasonableness is set forth in *Gucci Am., Inc. v. Weixing Li*, 768 F.3d 122, 140 (2d Cir.

2014), in which the Circuit explained that a due process analysis should utilize the framework

provided by Section 403 of the Restatement (Third) of Foreign Relations Law.  *Hawit,* 2017 WL

38

663542 at *9; *In Re Hijazi*, 589 F.3d 401, 412 (7th Cir. 2009) (criminal charges against Lebanese citizen should be evaluated under Section 403).  Section 403 requires an assessment of the link between the offense and the U.S. and calls for consideration of "the extent to which the [offense] activity takes place within the [U.S.]" or has a "substantial, direct, and foreseeable effect upon or in the [U.S.]."  *See* § 403(2)(a).  Similarly, in *Al Kassar,* the Second Circuit asked whether there was a "sufficient nexus between the [foreign] defendant and the United States, so that . . . application [of U.S. law] would not be arbitrary or fundamentally unfair."  660 F.3d at 118.

The nexus between the United States and Mr. Boustani's alleged money laundering conduct is basically non-existent.  The Indictment does not allege that Mr. Boustani "directed" his money laundering conduct towards this country.  Instead, the Indictment admits that the defendants' intention was to transfer funds exclusively between foreign accounts.  No harmful "effect" was felt in the U.S. from the bookkeeping entries recorded in the ledgers of the correspondent banks.  Indeed, the concerns that spurred Congress to draft the Section 1956(a)(2) offenses are *entirely absent* here.  Legislative history reveals that these provisions were enacted to prevent "foreign drug traffickers" from "keep[ing]" their earnings in the U.S. or "invest[ing] their earnings" in the U.S.  *See* S. Rep. No. 99-433, at 11.  Neither scenario is at issue here.  The transfers that are alleged to have touched the U.S. did so for only a *second,* en route elsewhere.  Thus, to the extent that the money laundering statute's limited extraterritorial reach could be read to encompass Mr. Boustani's alleged conduct, application of the statute in this case, on these facts, violates due process.  *Lloyds*, 639 F. Supp. 2d at 318 (even if Section 1956(f) could reach defendant's conduct, Government's claim would still require dismissal as "unreasonable and therefore impermissible" under due process law).  Count Four must be dismissed.

## CONCLUSION

For the foregoing reasons, this Court should order the dismissal of Count One,

Count Two and Count Four of the Indictment against Mr. Boustani.


Dated:   New York, New York
         June 21, 2019


**WILLKIE FARR & GALLAGHER LLP**

By: /s/ Michael S. Schachter
Michael S. Schachter
Randall W. Jackson
Casey E. Donnelly
Philip F. DiSanto
787 Seventh Avenue
New York, New York 10019
(212) 728-8000

*Attorneys for Defendant Jean Boustani*