FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E D N.Y.

★ AUG 1 6 2019 ★

BROOKLYN OFFICE

AES:MEB/HDM/MAM/SOD/KN
F. #2016R00695

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

  - against -

JEAN BOUSTANI,
      also known as "Jean Boustany,"
NAJIB ALLAM,
      also known as "Naji Allam,"
MANUEL CHANG,
ANTONIO DO ROSARIO,
TEOFILO NHANGUMELE and
SURJAN SINGH,

                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

S U P E R S E D I N G
I N D I C T M E N T

Cr. No. 18-681 (S-1) (WFK)
(T. 18, U.S.C., §§ 371, 981(a)(1)(C),
982(a)(1), 982(b)(1), 1349, 1956(h) and
3551 et seq.; T. 21, U.S.C., § 853(p); T.
28, U.S.C., § 2461(c))

THE GRAND JURY CHARGES:

## INTRODUCTION

At all times relevant to this Superseding Indictment, unless otherwise indicated:

I.    The Defendants and Relevant Entities and Individuals

        1.      The Republic of Mozambique was a sub-Saharan African nation.

        2.      Proindicus S.A. ("Proindicus"), Empresa Moçambicana de Atum, S.A.

("EMATUM") and Mozambique Asset Management ("MAM") were companies owned,

controlled and overseen by the Government of Mozambique that performed functions that

the Government of Mozambique treated as its own, and were thus "instrumentalities" of a

foreign government within the meaning of the Foreign Corrupt Practices Act ("FCPA"), Title

15, United States Code, Section 78dd-1(f)(1)(A). The companies were created to undertake

three maritime projects in Mozambique for and on behalf of Mozambique. Proindicus was to perform coastal surveillance, EMATUM was to engage in tuna fishing and MAM was to build and maintain shipyards.

3.     The defendant MANUEL CHANG was a citizen of Mozambique and Mozambique's Minister of Finance. CHANG was thus a "foreign official" within the meaning of the FCPA, Title 15, United States Code, Section 78dd-1(f)(1)(A).

4.     The defendant ANTONIO DO ROSARIO was a citizen of Mozambique and an official in Mozambique's governmental state intelligence and security service, known as Servico de Informacoes e Seguranca do Estado ("SISE"), which, together with other Mozambican government agencies, was an owner of Proindicus, EMATUM and MAM. DO ROSARIO was thus a "foreign official" within the meaning of the FCPA, Title 15, United States Code, Section 78dd-1(f)(1)(A).

5.     The defendant TEOFILO NHANGUMELE was a citizen of Mozambique acting in an official capacity for and on behalf of the Office of the President of Mozambique. NHANGUMELE was thus a "foreign official" within the meaning of the FCPA, Title 15, United States Code, Section 78dd-1(f)(1)(A).

6.     Mozambican Co-Conspirator 1, an individual whose identity is known to the Grand Jury, was involved in obtaining the Mozambican government's approval of the Proindicus project.

7.     Mozambican Co-Conspirator 2, an individual whose identity is known to the Grand Jury, was a relative of a senior official of Mozambique.

8.     Mozambican Co-Conspirator 3, an individual whose identity is known to the Grand Jury, was a senior official in Mozambique's Ministry of Finance and a director

2

of EMATUM.   Mozambican Co-Conspirator 3 was thus a "foreign official" within the

meaning of the FCPA, Title 15, United States Code, Section 78dd-1(f)(1)(A).

9.     Privinvest Group was an Abu Dhabi, United Arab Emirates ("UAE")-

based holding company consisting of numerous subsidiaries (collectively, "Privinvest"),

including Privinvest Shipbuilding S.A.L., Abu Dhabi MAR ("ADM"), Logistics

International and Palomar Capital Advisors and Palomar Holdings Ltd. (collectively,

"Palomar").   On its website, Privinvest described itself as "one of the largest global

shipbuilding groups for naval vessels, fuel-cell submarines, superyachts, offshore

constructions and associated services."

10.     The defendant JEAN BOUSTANI, also known as "Jean Boustany,"

("BOUSTANI") was a citizen of Lebanon and was the lead salesman and negotiator for

Privinvest.   BOUSTANI also participated in the management of Palomar.

11.     The defendant NAJIB ALLAM, also known as "Naji Allam,"

("ALLAM") was a citizen of Lebanon and the Chief Financial Officer of Privinvest.

12.     Privinvest Co-Conspirator 1, an individual whose identity is known to

the Grand Jury, was hired by Privinvest to develop business with African nations through

connections with African government officials.

13.     Privinvest Co-Conspirator 2, an individual whose identity is known to

the Grand Jury, was a principal executive of Privinvest.   Through other entities, Privinvest

Co-Conspirator 2 controlled an approximate two-thirds interest in Palomar.

14.     Investment Bank 1, the identity of which is known to the Grand Jury,

was a global investment banking, securities and investment management firm incorporated

and headquartered in Europe.   It conducted its activities primarily through various

3

subsidiaries and affiliates (collectively, "Investment Bank 1"). Investment Bank 1 had a

class of securities registered pursuant to Section 12 of the Securities and Exchange Act of

1934 (Title 15, United States Code, Section 78) (the "Exchange Act") and was required to

file reports with the U.S. Securities and Exchange Commission ("SEC") under Section 15(d)

of the Exchange Act (Title 15, United States Code, Section 78o(d)). As such, Investment

Bank 1 was an "issuer" as that term is used in the FCPA, Title 15, United States Code,

Sections 78dd-l(a) and 78m(b).

15.    Andrew Pearse was a citizen of New Zealand and was, until

approximately September 13, 2013, a managing director of Investment Bank 1 and the head

of Investment Bank 1's Global Financing Group. While employed by Investment Bank 1,

Pearse was an "employee" and "agent" of an "issuer" within the meaning of the FCPA, Title

15, United States Code, Section 78dd-1(a). In or about April 2013, Pearse also began

working for the benefit of Privinvest. Pearse also controlled a one-third interest in Palomar.

16.    The defendant SURJAN SINGH was a citizen of the United Kingdom

and was, until approximately February 16, 2017, a managing director in Investment Bank 1's

Global Financing Group. While employed by Investment Bank 1, SINGH was an

"employee" and "agent" of an "issuer" within the meaning of the FCPA, Title 15, United

States Code, Section 78dd-1(a).

17.    Detelina Subeva was a citizen of Bulgaria and was, until approximately

August 21, 2013, a vice president in Investment Bank 1's Global Financing Group. While

employed by Investment Bank 1, Subeva was an "employee" and "agent" of an "issuer"

within the meaning of the FCPA, Title 15, United States Code, Section 78dd-1(a). In or

4

about April 2013, Subeva also began working for the benefit of Privinvest, and later worked as an employee for Palomar.

18.     Investment Bank 2, the identity of which is known to the Grand Jury, was an international investment bank owned by a foreign government, and had offices in New York, London and elsewhere.

19.     The International Monetary Fund ("IMF") was an inter-governmental institution that, until in or about March 2016, provided financial assistance and advice to Mozambique.   To receive such assistance, Mozambique agreed, among other things, to limit its borrowing from private lenders.   Mozambique was also required to make certain disclosures to the IMF, including disclosures related to loans and indebtedness.

II.     Terms and Definitions

20.     A "security" was, among other things, any note, stock, bond, debenture, evidence of indebtedness, investment contract or participation in any profit-sharing agreement.

21.     A "syndicated loan" was a loan arranged by one or more banks on behalf of a group of lenders, referred to as a syndicate, who work together to provide funds for a single borrower.

22.     A "loan participation note" or "LPN" was a fixed-income security that provided the holder with a pro-rata interest in the borrower's payment of interest and principal.

23.     A "Eurobond" was an international bond sold in a currency other than the currency of the borrower.

III.    The Fraudulent Scheme

    A.    Overview

        24.    Through a series of financial transactions between approximately 2013 and 2016, Proindicus, EMATUM and MAM borrowed in excess of $2 billion through loans guaranteed by the Mozambican government.   These loans were arranged by Investment Bank 1 and Investment Bank 2 and sold to investors worldwide.   Investors irrevocably committed themselves in the United States to invest more than $100 million in the loans. Over the course of the transactions, the co-conspirators, among other things, conspired to defraud investors and potential investors in the Proindicus, EMATUM and MAM financings through numerous material misrepresentations and omissions relating to, among other things: (i) the use of loan proceeds; (ii) bribe and kickback payments to Mozambican government officials and bankers; (iii) the amount and maturity dates of debt owed by Mozambique, including the existence of the Proindicus and MAM loans; and (iv) Mozambique's ability and intention to pay back the investors.

        25.    Each of the companies, Proindicus, EMATUM and MAM, entered into contracts with Privinvest to provide equipment and services to complete the maritime projects.   The loan proceeds were supposed to be used exclusively for the maritime projects, and nearly all of the borrowed money was paid directly to Privinvest, the sole contractor for the projects, to benefit Mozambique and its people.   In reality, the defendants JEAN BOUSTANI, NAJIB ALLAM, MANUEL CHANG, ANTONIO DO ROSARIO, TEOFILO NHANGUMELE and SURJAN SINGH, together with Andrew Pearse, Detelina Subeva and others, created the Proindicus, EMATUM and MAM maritime projects as vehicles and fronts to raise as much money as possible to enrich themselves, and intentionally diverted portions

6

of the loan proceeds to pay at least $200 million in bribes and kickbacks to themselves, Mozambican government officials and others.

26.    The co-conspirators applied only a portion of the loan proceeds towards the maritime projects.   In furtherance of the scheme, Privinvest charged inflated prices for the equipment and services it provided, which were then used, at least in part, to pay bribes and kickbacks.   After conducting little or no business activity, Proindicus, EMATUM and MAM each defaulted on their loans.

27.    In connection with their fraudulent scheme, the co-conspirators relied on the U.S. financial system, by, among other things, seeking and securing investors and potential investors physically present in the United States, causing sales of investments in the loans to be made by sellers physically present in the United States and sending and receiving wires that passed through the United States.   The co-conspirators caused material misstatements to be transmitted by wire to investors and potential investors in the United States to induce investment in the Proindicus and EMATUM loans, and in connection with the exchange of the EMATUM loan participation notes in approximately 2016 for a Eurobond (the "Exchange").   Pursuant to the loan agreements, investors funded the loans using New York City-based bank accounts, and Privinvest received loan proceeds raised by the fraudulent scheme from New York City-based bank accounts.   The co-conspirators then diverted these proceeds to make U.S. dollar denominated bribe and kickback payments, which were made using the U.S. financial system through transactions transferred through bank accounts in the United States.

B.     Relevant Internal Accounting Controls of Investment Bank 1

28.     The FCPA, Title 15, United States Code, Sections 78m(b)(2)(B),

78m(b)(4), 78(b)(5) and 78ff(a) required issuers to maintain a system of sufficient internal

accounting controls and made it illegal to knowingly and willfully circumvent such controls.

29.     Investment Bank 1 had internal accounting controls ("internal

controls") that addressed, among other things, the prevention of bribery of and by Investment

Bank 1 employees; the prevention of money laundering and other financial crimes; conflicts

of interests; outside employment; and the use of intermediaries in financial transactions.

Investment Bank 1's compliance department exercised primary responsibility for overseeing

and enforcing Investment Bank 1's internal controls.

30.     Within Investment Bank 1, the group of investment bankers assigned to

a specific transaction was called the "deal team."   Andrew Pearse, Detelina Subeva and the

defendant SURJAN SINGH were part of the deal team on the Proindicus project and SINGH

was a member of the deal team on the EMATUM project.   They received regular training on

Investment Bank 1's internal controls and were also aware of those internal controls through

their involvement in numerous transactions.

C.     The Proindicus Project

31.     On or about January 18, 2013, Privinvest entered into a $366 million

contract with Proindicus to supply materials and training to protect Mozambique's territorial

waters.   On or about February 28, 2013, pursuant to a written loan agreement, Investment

Bank 1 agreed to arrange a $372 million syndicated loan to Proindicus, guaranteed by the

Republic of Mozambique (the "Proindicus Loan").   The defendant SURJAN SINGH signed

the loan agreement on behalf of Investment Bank 1, the defendant ANTONIO DO

ROSARIO co-signed on behalf of Proindicus and the defendant MANUEL CHANG signed the government guarantee for the loan on behalf of Mozambique. Between approximately June and August 2013, Investment Bank 1 increased the Proindicus Loan by approximately $132 million. On or about November 15, 2013, Investment Bank 2 further increased the Proindicus Loan by $118 million, bringing the total loaned amount to $622 million. Proindicus never conducted significant operations or generated significant revenue and defaulted on its loan payment due on or about March 21, 2017.

(1) Bribery of Mozambican Government Officials to Gain Approval for the Proindicus Project

32. Beginning in or about 2011, the defendant JEAN BOUSTANI, through discussions with the defendant TEOFILO NHANGUMELE arranged by Privinvest Co-Conspirator 1, attempted to persuade Mozambican government officials to establish a coastal monitoring system through a contract with Privinvest. Almost immediately, BOUSTANI and NHANGUMELE negotiated the first round of bribe and kickback payments that Privinvest would have to make for the benefit of Mozambican government officials for the project to be approved. For example, in furtherance of the scheme, BOUSTANI, NHANGUMELE and other co-conspirators had the following discussions:

(a) On or about November 11, 2011, NHANGUMELE wrote to BOUSTANI by email, stating: "To secure that the project is granted a go-ahead by the HoS [Head of State], a payment has to be agreed before we get there, so that we know and agree, well in advance, what ought to be paid and when. Whatever advance payments to be paid before the project, they can be built in the project, and recovered."

9

(b)     Later on or about the same day, November 11, 2011,

BOUSTANI wrote to NHANGUMELE by email, stating: "A very important issue which

needs to be clear: we had various negative experiences in Africa.   Especially related to the

'success fees' payments.   Therefore, we have a strict policy in the Group consisting of not

disbursing any 'success fee' before the signature of the Project Contract."

(c)     On or about November 14, 2011, NHANGUMELE responded

by email to BOUSTANI, stating: "Fabulous, I agree with you in principle.   Let us agree and

look at project in two distinct moments.   One moment is to massage the system and get the

political will to go ahead with the project.   The second moment is the project

implementation/execution.   I agree with you that any monies can only be paid after the

project signing.   This has to be treated separately from the project implementation . . .

Because for the project implementation there will be other players whose interest will have to

be looked after e.g. ministry of defense, ministry of interior, air force, etc. . . . in democratic

governments like ours people come and go, and everyone involved will want to have his/her

share of the deal while in office, because once out of the office it will be difficult.   So, it is

important that the contract signing success fee be agreed and paid in once-off, upon the

signing of the contract."

33.     Soon thereafter, during an email exchange on or about December 28,

2011, the defendants JEAN BOUSTANI and TEOFILO NHANGUMELE agreed to $50

million in bribe and kickback payments to Mozambican government officials and $12

million in kickbacks for Privinvest co-conspirators.   For example:

(a)     On or about December 28, 2011, in response to an email from

BOUSTANI requesting a bribe and kickback figure, NHANGUMELE wrote:   "Fine brother.

10

I have consulted and please put 50 million chickens. Whatever numbers you have on your poultry I will add 50 million of my breed."

        (b)     On or about the same day, BOUSTANI forwarded this email to Privinvest personnel, stating, "50M for them and 12M for [Privinvest Co-Conspirator 1] (5%) ==> total of 62M on top."

        34.     After more than a year of negotiations, on or about January 18, 2013, Privinvest and Proindicus signed a $366 million contract for Privinvest to provide a coastal monitoring system to Mozambique. Five days later, on or about January 23, 2013, the defendant JEAN BOUSTANI instructed a bank in the UAE to make payments to the defendant TEOFILO NHANGUMELE and Mozambican Co-Conspirator 1. The instructions ordered the bank, in relevant part: "Upon receipt by Privinvest Shipbuilding of a minimum amount of US$ 317,000,000 . . . to pay immediately: a. Teofilo Nhangumele the sum of US$ 5,100,000 . . . and b. [Mozambican Co-Conspirator 1] the sum of US$ 5,100,000." The instructions also ordered the bank to pay NHANGUMELE and Mozambican Co-Conspirator 1 an additional approximately $3.4 million each at later dates.

        (2)     Bribery to Gain Mozambique's Government Guarantee for the Proindicus Financing

        35.     At the same time as the defendants JEAN BOUSTANI and TEOFILO NHANGUMELE were negotiating bribe payments to cause Mozambican government officials to approve the Proindicus project, BOUSTANI recruited Investment Bank 1 to arrange financing for the project. During negotiations, bankers at Investment Bank 1 made clear that Investment Bank 1 would only arrange a loan that was at or near market interest

rates, with debt that was either directly issued by the Government of Mozambique or guaranteed by the government.

36.    To further negotiations on the Proindicus project, on or about September 13, 2012, Andrew Pearse traveled to the UAE to meet with the defendants JEAN BOUSTANI and TEOFILO NHANGUMELE and a close relative of a senior Mozambican government official, among others.

37.    To help obtain Mozambique's agreement to Investment Bank 1's terms, including that any loan be at or near market rates and guaranteed by the Mozambican government, the defendants JEAN BOUSTANI and TEOFILO NHANGUMELE enlisted the defendant MANUEL CHANG, Mozambique's Minister of Finance.   On or about December 22, 2012, CHANG wrote a letter to Privinvest Co-Conspirator 2, which was forwarded to an employee of Investment Bank 1 ("Investment Bank 1 Employee 1"), an individual whose identity is known to the Grand Jury, explaining that "the financing of this project is still constrained by the IMF imposed limitation on the Government for Mozambique to accept commercial credit for commercial projects.   Therefore, we have devised an alternative solution whereby an SPV [Special Purpose Vehicle] . . . will be formed."

38.    On or about December 26, 2012, the defendant JEAN BOUSTANI sent an email to the defendant TEOFILO NHANGUMELE in preparation for a meeting in Mozambique between employees of Investment Bank 1, Privinvest and Proindicus to negotiate the terms of the transaction.   In the email, BOUSTANI emphasized: "But the only imperative matter for [Investment Bank 1] bro is [the defendant MANUEL CHANG's] signature of the guarantee for the loan."

12

39.     On or about February 28, 2013, the defendant MANUEL CHANG

signed the guarantee for the Proindicus Loan.   In or about and between October 2013 and

December 2013, the defendants JEAN BOUSTANI and NAJIB ALLAM, along with others,

paid at least $5 million in bribe and kickback payments for the benefit of CHANG from a

bank account in the UAE, through the United States, to a bank account in Spain.

> (3)    Conspiracy to Circumvent Investment Bank 1's Internal Controls and
>        Win Business for Investment Bank 1 in Connection with the Proindicus
>        Project, Including Paying Bribes to Mozambican Government Officials

40.     While negotiations over the Proindicus financings proceeded in 2012

and early 2013, the defendant SURJAN SINGH, together with Andrew Pearse, Detelina

Subeva and others, conspired to circumvent Investment Bank 1's internal controls to enrich

themselves and win the Proindicus business for Investment Bank 1, including through the

payment of bribes to Mozambican government officials.   At the time, SINGH, Pearse and

Subeva were agents acting within the scope of their employment on behalf of Investment

Bank 1, with the intent, at least in part, to benefit Investment Bank 1.

41.     Investment Bank 1's internal controls required employees, including

the compliance department and the deal team, to evaluate the potential for corruption related

to the Proindicus project and the Mozambican government officials who would be involved

in running it.   Investment Bank 1's review process identified certain red flags concerning the

proposed Proindicus transaction at an early stage.   For example, on or about March 9, 2012,

in response to a question from Investment Bank 1 Employee 1 as to whether there was a

competitive bidding process that resulted in Privinvest being selected, the defendant JEAN

BOUSTANI replied by email, copying the defendant SURJAN SINGH, that the selection of

Privinvest had not resulted from a competitive bid and that the deal had come about due to "high level connections" between Privinvest and the Mozambican government.

42. In or about March 2012, in anticipation of arranging financing for the Proindicus project, Investment Bank 1 employees began conducting due diligence, or research, on the parties involved in the project. Accordingly, as early as approximately March 12, 2012, Investment Bank 1 employees identified allegations of corruption associated with Privinvest Co-Conspirator 2. On that day, Investment Bank 1 Employee 1 reported to his superior and the defendant SURJAN SINGH that Investment Bank 1 had previously designated Privinvest Co-Conspirator 2 as "an undesirable client." Furthermore, on or about March 13, 2012, Investment Bank 1 Employee 1 began collecting approximately 10 news articles containing potentially derogatory information regarding Privinvest Co-Conspirator 2, and exchanged emails with SINGH regarding the information and articles.

43. Notwithstanding the existence of such red flags, while conducting due diligence on the Proindicus transaction as required by Investment Bank 1's internal controls, the defendant SURJAN SINGH, together with Andrew Pearse, Detelina Subeva and others, withheld information about the likelihood of corruption connected to the Proindicus transaction from Investment Bank 1's compliance department. For instance, in or about November 2012, at the direction of the head of Investment Bank 1's compliance department, members of the Proindicus deal team consulted with a senior executive for Investment Bank 1's Europe, Middle East and Africa ("EMEA") region (the "EMEA Executive"), an individual whose identity is known to the Grand Jury, regarding any legal or reputational concerns that the Proindicus transaction might raise for the bank. On or about November 19, 2012, Pearse summarized those discussions in an email he sent to Investment Bank 1

14

Employee 1, writing that the EMEA Executive "said no to the combination of Moz[ambique] and your friend [Privinvest Co-Conspirator 2], so we need to structure him out of the picture."   Similarly, Investment Bank 1 maintained a report in its due diligence files describing Privinvest Co-Conspirator 2 as a "master of kickbacks."   Despite such information, SINGH, Pearse and Investment Bank 1 Employee 1 all failed to relay the EMEA Executive's concerns to Investment Bank 1's compliance department, and the compliance department failed to pursue its inquiry further.

44.     Furthermore, the defendant SURJAN SINGH, together with Andrew Pearse, Detelina Subeva and others, conspired to withhold from Investment Bank 1's compliance department that Privinvest and Proindicus sought to appoint an individual in Mozambique who had previously been involved in fraudulent conduct to Proindicus's Board of Directors.   Specifically, even though Investment Bank 1 compliance personnel were responsible for choosing an external firm to perform due diligence on Proindicus's officers and directors, in or about February 2013, the defendant SURJAN SINGH, together with Andrew Pearse and Detelina Subeva, secretly selected a due diligence firm ("Due Diligence Firm 1"), the identity of which is known to the Grand Jury, to research the transaction and pre-screen the individuals identified as directors of Proindicus to secure approval by Investment Bank 1 compliance personnel.

45.     In or around February 2013, Due Diligence Firm 1 reported to the defendant SURJAN SINGH, Andrew Pearse and Detelina Subeva that one of the proposed directors of Proindicus had previously been involved in fraudulent conduct while he was an officer of a Mozambican state-owned company.   SINGH, Pearse and Subeva did not share this information with Investment Bank 1's compliance department.   Instead, SINGH, Pearse

15

and Subeva obtained a replacement group of directors, which included the defendant

ANTONIO DO ROSARIO, from Privinvest and Proindicus and asked Due Diligence Firm 1

for a background investigation on them.   Due Diligence Firm 1 reported fewer red flags

related to the second group of directors.

46.     On or about February 26, 2013, having pre-cleared the second group of

Proindicus directors and without revealing that two separate groups of directors had been

researched, Detelina Subeva forwarded the names of the second group of proposed directors

to Investment Bank 1's compliance department for due diligence by the firm that the

compliance department had selected ("Due Diligence Firm 2"), the identity of which is

known to the Grand Jury.   After reviewing a report from Due Diligence Firm 2, the

compliance department approved the new group of directors.

> (4)   Conspiracy to Remove or Modify Conditions on the Proindicus Loan that
> Had Been Consistent with Investment Bank 1's Internal Controls

47.     As part of its system of internal controls, Investment Bank 1 imposed

conditions that Mozambique would have to meet to receive a loan.   Some of those

conditions, however, carried a risk of exposing the existence of the Proindicus project to the

Mozambican public and members of Mozambique's government beyond the circle of

government officials who were part of the fraudulent scheme.   To conceal the fraudulent

scheme, avoid scrutiny and help win business for Investment Bank 1, the defendant SURJAN

SINGH, together with Andrew Pearse, Detelina Subeva and others, removed some of

Investment Bank 1's conditions for the Proindicus Loan.

48.     For example, Investment Bank 1 originally had required Proindicus to

provide an opinion from the Attorney General of Mozambique concerning the validity of the

government guarantee.   On or about February 18, 2013, the defendant JEAN BOUSTANI, on behalf of both Privinvest and Mozambique, strenuously objected, explaining to Detelina Subeva in an email: "[T]he attorney general opinion is not mandatory . . . I believe that this will not be accepted by Proindicus since its owner wanted to bypass public tender and normal bureaucratic procedures from day 1 by creating a private entity!!   So they will never accept to inform the attorney general!!   The [Minister of Finance] guarantee is legally covered by a presidential decree."   On or before February 28, 2013, the defendant SURJAN SINGH, together with Andrew Pearse, Subeva and others, ultimately removed the requirement from the conditions Investment Bank 1 had imposed.

49.     Similarly, on or about February 25, 2013, the defendant SURJAN SINGH, together with Andrew Pearse, Detelina Subeva and others, removed Investment Bank 1's condition that Mozambique inform the IMF of the loan.   SINGH, Pearse and Subeva replaced that condition with the less stringent requirement that Mozambique represent to investors "that they [were] in compliance with their IMF and World Bank obligations."   In fact, the IMF was not informed of the Proindicus Loan at the time of the transaction.   Indeed, the IMF learned of the transaction only in or about 2016, when its exposure contributed to the IMF's decision to cease providing aid and financing to Mozambique and caused a severe financial crisis in Mozambique.

(5)   The Proindicus Loan and Recruiting of Investors in the United States

50.     After Investment Bank 1's compliance department approved the transaction on or about March 20, 2013, Investment Bank 1 agreed to arrange a $372 million syndicated loan to Proindicus, guaranteed by the Republic of Mozambique, pursuant to a written loan agreement.   The defendant SURJAN SINGH signed the loan agreement on

behalf of Investment Bank 1, the defendant ANTONIO DO ROSARIO co-signed on behalf of Proindicus and the defendant MANUEL CHANG signed the government guarantee on behalf of Mozambique.

51.     The Proindicus loan agreement provided that all payments by the borrower or the lenders would be paid to Investment Bank 1's bank account at a New York City-based financial institution ("New York City Bank 1"), the identity of which is known to the Grand Jury.   The loan agreement also required Proindicus to "apply all amounts borrowed by it under the Facility towards the financing of the Project."   Furthermore, the loan agreement prohibited improper payments in connection with the Proindicus project, including payments that would violate the FCPA, the United Kingdom's Bribery Act ("UK Bribery Act") and the Mozambican Anti-Corruption Law.

52.     On or about March 21, 2013, Investment Bank 1 transferred the entire proceeds of the loan, less fees totaling approximately $44 million, through a bank account at New York City Bank 1, directly to a bank account held by Privinvest at a bank in Abu Dhabi, UAE ("UAE Bank 1"), the identity of which is known to the Grand Jury.   Investment Bank 1 immediately solicited United States-based investors to participate in the loan, in part by sending them electronically, among other things, the Proindicus loan agreement and a confidential information memorandum that summarized its terms.   One investor in the United States purchased a $15 million interest in the loan.

(6)   Proindicus Loan Increase and Bribe and Kickback Payments to Pearse and Subeva

53.    On or about March 28, 2013, Andrew Pearse notified the defendant SURJAN SINGH, Detelina Subeva and others at Investment Bank 1 that Proindicus sought to borrow an additional $250 million from Investment Bank 1.

54.    On or about June 13, 2013, the defendant MANUEL CHANG signed, on behalf of Mozambique, a government guarantee for an additional $250 million in borrowing by Proindicus.   One day later, on or about June 14, 2013, Investment Bank 1 and Proindicus amended their loan agreement to permit Proindicus to borrow up to an additional $250 million from Investment Bank 1.

55.    Even though Proindicus had conducted no operations, on or about June 23, 2013, Investment Bank 1's Credit Risk Management team agreed to loan an additional $100 million to Proindicus based on a memorandum written by the defendant SURJAN SINGH, Andrew Pearse and Detelina Subeva, together with others, representing that Privinvest required additional equipment.

56.    On or about June 25, 2013, Investment Bank 1 wired approximately $100 million, less its fees, through New York City Bank 1 to a Privinvest account at UAE Bank 1.   Investment Bank 1 marketed and sold portions of the debt to investors, including to an investor in the United States.

57.    Throughout 2013 and 2014, using loan proceeds, Privinvest made numerous kickback payments to Andrew Pearse.   On or about April 15, 2013, Pearse opened a bank account at a bank in Abu Dhabi, UAE ("UAE Bank 2"), the identity of which is known to the Grand Jury.   After Pearse opened the account, Privinvest wired bribe and

19

kickback payments of more than $45 million from UAE Bank 1 accounts to Pearse's UAE Bank 2 account.   Each payment was denominated in U.S. dollars and each was routed and completed through the UAE banks' correspondent bank accounts in New York City and passed through the Eastern District of New York, as follows:

| Date | Amount | Wire Instruction |
|---|---|---|
| April 23, 2013 | $2,500,000 | "partial pymt on consultancy agreement" |
| May 26, 2013 | $1,000,000 | "partial pymt on consultancy agreement" |
| June 26, 2013 | $1,000,000 | "partial pymt on consultancy agreement" |
| July 25, 2013 | $1,000,000 | "partial pymt on consultancy agreement" |
| September 1, 2013 | $1,000,000 | "partial pymt on consultancy agreement" |
| September 25, 2013 | $15,600,000 | "dividends payment" |
| September 30, 2013 | $1,000,000 | "partial payment on consultancy agreement" |
| October 23, 2013 | $7,800,000 | "divident pym" |
| October 31, 2013 | $1,000,000 | "partial pmt on consultancy agreement" |
| December 3, 2013 | $1,000,000 | "partial pmt on consultancy agreement" |
| December 23, 2013 | $1,000,000 | "partial pyt on consultancy agreement" |
| January 27, 2014 | $1,000,000 | "partial pyt on consultancy agreement" |
| February 27, 2014 | $250,000 | "partial pyt on consultancy agreement" |
| June 3, 2014 | $10,050,000 | "dividends payment" |

58.   Andrew Pearse shared some of the bribes and kickbacks that he received from the fraudulent loan proceeds with Detelina Subeva.   On or about and between June 12, 2013 and October 27, 2013, Pearse transferred a total of approximately $2.2 million from bank accounts he held at UAE Bank 2 to a bank account Subeva held at UAE Bank 2.

20

D.    EMATUM

59.    On or about August 2, 2013, EMATUM entered into an approximately

$785 million contract with Privinvest to purchase vessels, equipment and training to create a

state-owned tuna fishing company.   On or about August 30, 2013, Investment Bank 1 agreed

to make up to $850 million in loans guaranteed by Mozambique to EMATUM (the

"EMATUM Loan").   The EMATUM loan agreement was signed by, among other people,

the defendant SURJAN SINGH on behalf of Investment Bank 1 and the defendant

ANTONIO DO ROSARIO on behalf of EMATUM.   The defendant MANUEL CHANG

signed the government guarantee on behalf of Mozambique.   On or about September 11,

2013, Investment Bank 1 loaned approximately $500 million to EMATUM to finance the

EMATUM project and, because Investment Bank 1 refused to loan additional funds, on or

about October 11, 2013, Investment Bank 2 loaned an additional approximately $350 million

to EMATUM.

(1)    The Fabricated Size of the EMATUM Loan

60.    In or about May 2013, while Investment Bank 1 was increasing the

Proindicus Loan by approximately $100 million, the defendants JEAN BOUSTANI and

ANTONIO DO ROSARIO, together with Andrew Pearse, Detelina Subeva and others,

agreed to a scheme for Mozambique to borrow another $850 million.   A significant portion

of the additional funds would be funneled to Privinvest and then misappropriated, at least in

part, to make additional bribe and kickback payments, pay inflated profits and make loan

payments on the Proindicus Loan to prevent discovery of the co-conspirators' fraudulent

scheme.

21

61.     In approximately July 2013, Andrew Pearse announced to others at Investment Bank 1 that he intended to leave the bank, but he remained a bank employee on leave until on or about September 13, 2013.   Investment Bank 1 also placed Detelina Subeva on leave on or about July 22, 2013 and terminated her on or about August 21, 2013.

62.     During the summer of 2013, contrary to Investment Bank 1 policies and procedures, Andrew Pearse and Detelina Subeva used their personal email accounts to conspire with Mozambican government officials and Privinvest employees to effectuate a large loan through Investment Bank 1 for the EMATUM project.   For example, on or about July 4, 2013, Pearse used his personal email account to email Subeva and the defendant JEAN BOUSTANI certain questions about a proposal Pearse had drawn up to create a tuna fishing fleet.   In response, on or about July 4, 2013, BOUSTANI replied that the defendant ANTONIO DO ROSARIO would "go ahead in all suggestions needed in order to maximize funding size."

63.     By the end of July 2013, the defendants JEAN BOUSTANI, ANTONIO DO ROSARIO and SURJAN SINGH, together with Andrew Pearse, Detelina Subeva and others, had established the details of the EMATUM project as a pretext to justify the maximum possible loan amount, rather than to meet legitimate fishing needs of the EMATUM project.   For example, on or about July 21, 2013, BOUSTANI emailed DO ROSARIO, copying Pearse and Subeva at their personal email accounts: "[W]e need your Marshall skills to finish by August 19 . . . we will go for 800 million$ so we keep a cushion for Proindicus interest payment next year."   Later in the email conversation, BOUSTANI added: "We can decrease the trawlers to 25 and add two 45 meters OPVs [military-style trimaran boats] with special systems to 'protect' the trawlers.   Is that better Andrew?"

22

Pearse responded on or about July 21, 2013, to BOUSTANI and Subeva, writing, in part: "2 big fisheries makes a lot of sense and ties into Fisheries Master Plan!"

64.    Moreover, to avoid detection of the ongoing fraudulent scheme, the defendants JEAN BOUSTANI and ANTONIO DO ROSARIO, together with Andrew Pearse and Detelina Subeva, also planned to use some of the EMATUM Loan to pay the debt of the earlier Proindicus project.   On or about July 21, 2013, Subeva wrote an email to BOUSTANI, DO ROSARIO and Pearse stating: "[W]e should also keep a cushion for Proindicus of $17mn so that we don't need to go back to MoF [Ministry of Finance] and they are on our side."

> (2)    Conspiracy to Circumvent Investment Bank 1's Internal Controls and Win Business for Investment Bank 1 in Connection with the EMATUM Project, Including Paying Bribes to Mozambican Government Officials

65.    The defendant SURJAN SINGH, together with Andrew Pearse, Detelina Subeva and others, conspired to circumvent Investment Bank 1's internal controls to enrich themselves and win business for Investment Bank 1 in connection with the EMATUM project.   Thus, even though still employed by Investment Bank 1, Pearse and Subeva sought to conceal their involvement in setting up the EMATUM project by using personal email accounts and removing all references to themselves from documents they had prepared.   For example:

(a)    On or about July 27, 2013, in response to a request from SINGH for information on the tuna fishing proposal, Pearse used his personal email account to send an email to the defendant JEAN BOUSTANI, copying Subeva on her personal email account, stating: "We are going to send both shortly.   Plse bro don't just forward but rather

create new email and attach the docs, [Investment Bank 1] is very sensitive to seeing our names involved."

(b)     On or about July 27, 2013, Subeva, using her personal email account, sent an email concerning the tuna fishing proposal to the defendant JEAN BOUSTANI and Pearse, addressing the email to Pearse's personal email account, stating: "Hi Jean – sending you a full info package to please send to Surjan [SINGH] in a clean email (without my email details)."   Minutes later, Subeva sent documents she titled "feasibility materials" and "financial model" to BOUSTANI and Pearse.

(c)     In response, on or about July 27, 2013, Pearse used his personal email account to instruct Subeva on her personal email account: "[I]f you go into the properties of each doc, it shows you as the author.   You may want to delete [the metadata] and resend" the documents.   Later the same day, using the same personal email accounts, Subeva sent an email to Pearse stating: "I'm sure Surj [SINGH] can sanitize worst comes to worst and delete the author."

66.     In addition, the defendants JEAN BOUSTANI and SURJAN SINGH, together with Andrew Pearse and Detelina Subeva, created fake competing bids from contractors for the EMATUM project in anticipation of an inquiry from Investment Bank 1 as to why Privinvest would be awarded the project.   For example, on or about July 31, 2013, Pearse sent an email to BOUSTANI and Subeva stating: "Guys, below is the argument that I think we (or rather the Borrower) should present to [Investment Bank 1] next week when in Maputo . . . . The sponsors of the Borrower (ie the various Ministries, but principally SISE) at the behest of the President went out to 4 shipyards [we need to have names] asking for proposals to build a fleet . . . . There was no need legally to have a public tender as

procurement rules don't apply to private companies, but nonetheless they sought a number of bids. [ ]ONLY ADM [a Privinvest entity] responded with the full package and offered an integrated solution with fishing surveillance, command center and boats."   BOUSTANI replied: "Let's say they contacted South African yards and Spanish + Portuguese.   Without naming."

67.   In an effort to ensure that Investment Bank 1 would arrange the EMATUM Loan, the defendant JEAN BOUSTANI, together with Andrew Pearse and Detelina Subeva, caused the defendant SURJAN SINGH to include fake bid information in a memorandum he wrote and submitted to Investment Bank 1 in or about August 2013 to gain approval for the EMATUM Loan, falsely asserting that the Privinvest proposal was deemed the most competitive one in comparison to bids from three other international companies.

68.   Moreover, in or about early August 2013, the defendant SURJAN SINGH travelled to Mozambique to lead Investment Bank 1's due diligence for the EMATUM transaction.   In furtherance of the fraudulent scheme, SINGH, Andrew Pearse and Detelina Subeva provided talking points and suggested answers to Mozambican government officials for due diligence meetings with Investment Bank 1 in an effort to ensure that Investment Bank 1 would arrange the loan.

69.   Andrew Pearse and Detelina Subeva, with the knowledge of the defendant SURJAN SINGH, also continued to hide their own involvement in the due diligence process.   On or about August 4, 2013, Subeva sent an email to the defendant JEAN BOUSTANI, copying Pearse, stating: "Plse remind [the defendant ANTONIO DO ROSARIO] not to mention Andrew [Pearse] and myself to the [Investment Bank 1] team!

They cannot know we are involved in this project!!!!   If there is a slip up, say he knows us from the previous deal."

                (3)   The EMATUM Loan Agreement and Solicitation of United States Investors

70.     On or about August 30, 2013, Investment Bank 1 entered into the $850 million loan agreement with EMATUM.   The EMATUM loan agreement was signed by, among others, the defendant SURJAN SINGH on behalf of Investment Bank 1 and the defendant ANTONIO DO ROSARIO on behalf of EMATUM.   The defendant MANUEL CHANG signed the government guarantee on behalf of Mozambique.

71.     The EMATUM loan agreement provided that all payments by the borrower or the lenders would be paid to Investment Bank 1's bank account at New York City Bank 1.   The agreement also required EMATUM to "apply all amounts borrowed by it under the [EMATUM loan agreement] towards . . . the purchase of fishing infrastructure, comprising of 27 vessels, an operations centre, and related training."   The loan agreement also prohibited improper payments in connection with the project, including payments that would violate the FCPA, the UK Bribery Act and the Mozambican Anti-Corruption Law.

72.     On or about September 11, 2013, Investment Bank 1 sent $500 million in loan proceeds, less its fees, to Privinvest.   Investment Bank 1 funded the EMATUM Loan by selling loan participation notes to investors in the United States and elsewhere.   By email and other electronic means, Investment Bank 1 sent potential investors, including United States investors, materials that included the EMATUM loan agreement and an offering circular.   Like the loan agreement, the offering circular stated: "The proceeds from the Loan will be used by the Borrower towards the financing of the purchase of fishing infrastructure,

comprising of 27 vessels, an operations centre and related training and for the general corporate purposes of the Borrower."

73.     In reliance on the representations in the loan agreement and offering circular, investors purchased EMATUM loan participation notes.   Certain investors irrevocably committed themselves in the United States to purchase EMATUM loan participation notes, and certain sellers irrevocably committed themselves in the United States to sell EMATUM loan participation notes to United States investors.

74.     Despite projections that EMATUM would generate annual fishing revenues of approximately $224 million by December 2016, it generated virtually no revenues and, as of approximately late 2017, conducted no fishing operations.   EMATUM defaulted on its financing payment due on or about January 18, 2017.

(4)     Bribes and Kickbacks to the Defendant SURJAN SINGH and Mozambican Government Officials

75.     The defendant SURJAN SINGH also received bribe and kickback payments directly from Privinvest for his role in the fraudulent scheme.   Specifically, on or about October 20, 2013, Andrew Pearse sent an email to the defendant JEAN BOUSTANI with SINGH's bank account information at UAE Bank 2, referring to SINGH as "Uncle," and adding, "[i]f we can do something this week he would appreciate it."   That same day, on or about October 20, 2013, BOUSTANI forwarded the request to the defendant NAJIB ALLAM, writing, "Uncle . . . Surjan.   Total of 4."

76.     On or about and between October 23, 2013 and February 27, 2014, Privinvest wired approximately five payments totaling at least $3.7 million from its bank account at UAE Bank 1 to the defendant SURJAN SINGH's UAE Bank 2 account.   Each

27

payment was routed through the UAE banks' correspondent bank accounts in New York

City.   Privinvest made the following bribe and kickback payments to SINGH:

| Date | Amount | Wire Instruction |
|------|--------|------------------|
| October 23, 2013 | $800,000 | "pymt on consultancy agreement" |
| November 27, 2013 | $800,000 | "pmt on consultancy agreement" |
| December 23, 2013 | $800,000 | "pyt on consultancy agreement" |
| January 28, 2014 | $799,960 | "pyt on consultancy agreement" |
| February 27, 2014 | $500,000 | "pyt on consultancy agreement." |

77.    The defendants JEAN BOUSTANI and NAJIB ALLAM continued to

coordinate the payment of bribes to Mozambican government officials.   On or about April 8,

2014, BOUSTANI sent an email to ALLAM, providing an accounting of bribes through the

Proindicus and EMATUM projects and stating that Privinvest had paid "125 [million U.S.

dollars] for all for everything …."   BOUSTANI summarized the distribution of the bribes,

including $8.5 million to the defendant TEOFILO NHANGUMELE, $8.5 million to

Mozambican Co-Conspirator 1, $15 million to the defendant ANTONIO DO ROSARIO,

$7 million to the defendant MANUEL CHANG and $3 million to Mozambican Co-

Conspirator 3, among others.

78.    In an effort to conceal the unlawful nature of these payments, the

defendants JEAN BOUSTANI, NAJIB ALLAM and ANTONIO DO ROSARIO used third-

party entities and fabricated invoices to distribute money to the Mozambican government

officials.   For example, on or about October 17, 2013, BOUSTANI wrote an email to DO

ROSARIO, stating: "I need asap invoices in the name of:   Logistics International Abu Dhabi

[a Privinvest-related company].   Invoices for everything my brother. Each one mentioning

the subject (real estate purchase…etc….). Even for Pantero [the defendant MANUEL CHANG], a small paper say 'consultancy fees.'"

79.     Accordingly, on or about and between October 20, 2013 and December 4, 2013, the defendant JEAN BOUSTANI caused Privinvest to make bribe payments of approximately $5 million, from Privinvest's UAE-based bank account, through the Eastern District of New York, to a bank account in the name of a company controlled by the defendant MANUEL CHANG.

E.     MAM

(1)     MAM Loan Agreement

80.     In early 2014, Privinvest Co-Conspirator 2 and the defendant JEAN BOUSTANI devised a shipyard project for Mozambique to further enrich themselves and their co-conspirators.   On or about May 1, 2014, MAM and Privinvest executed an approximately $500 million contract for Privinvest to, among other things, build a shipyard, provide additional naval vessels and upgrade two existing facilities to service Proindicus and EMATUM vessels.

81.     On or about May 20, 2014, Investment Bank 2 and the Privinvest entity Palomar, acting through Andrew Pearse and Detelina Subeva, together with others, arranged a syndicated loan of up to $540 million to MAM, guaranteed by the Republic of Mozambique (the "MAM Loan").   Investment Bank 2 solicited investors, using, among other things, the MAM loan agreement and a confidential information memorandum that summarized its terms.   As with the Proindicus and the EMATUM loans, the loan agreement required that the MAM loan proceeds be used for project purposes and prohibited illegal and corrupt payments.   The defendant ANTONIO DO ROSARIO signed the loan agreement on

29

behalf of MAM, and the defendant MANUEL CHANG signed the government guarantee on behalf of Mozambique.

82.     The MAM loan agreement also provided that all payments required under the agreement were to be made through a bank account in New York City at a New York City-based financial institution ("New York City Bank 2"), the identity of which is known to the Grand Jury.   On or about and between approximately May 23, 2014 and June 11, 2014, MAM borrowed approximately $535 million from Investment Bank 2, guaranteed by the Republic of Mozambique, which Investment Bank 2 sent directly to Privinvest through correspondent bank accounts at New York City Bank 2.

        (2)   <u>MAM Bribe and Kickback Payments</u>

83.     An accounting spreadsheet maintained by the defendant NAJIB ALLAM reflected that Privinvest made bribe and kickback payments to obtain the MAM contract.   Such payments included approximately $13 million to the defendant ANTONIO DO ROSARIO, approximately $5 million to the defendant MANUEL CHANG, approximately $918,000 to Mozambican Co-Conspirator 2 and approximately $1.8 million to Mozambican Co-Conspirator 3.

84.     Despite projecting approximately $63 million in operating revenues by the end of its first year of operations, MAM generated virtually no revenues and defaulted on its loan payment due on or about May 23, 2016.

        F.     <u>EMATUM Exchange</u>

85.     In or about 2015, Proindicus, EMATUM, MAM and Mozambique encountered problems servicing the approximately $2 billion in debt they had amassed in 2013 and 2014, including as a result of the Proindicus, EMATUM and MAM Loans.

Furthermore, at around the same time, Mozambican government officials, including the defendant ANTONIO DO ROSARIO, received inquiries from the IMF concerning the use of some of the loan proceeds.

86.    To hide from the public and the IMF the near bankruptcy of the project companies resulting from loan proceeds being diverted as part of the fraudulent scheme, avoid inquiry from the IMF and conceal discovery of the scheme, several of the co-conspirators, including the defendant JEAN BOUSTANI, Andrew Pearse and Detelina Subeva, proposed the Exchange, which would exchange the EMATUM loan participation notes, which were to mature in 2020, for Eurobonds issued directly by the Mozambican government that would mature in 2023.

87.    In furtherance of the fraudulent scheme, in or about and between March 2015 and May 2015, Investment Bank 1 employees, together with the defendant JEAN BOUSTANI, Andrew Pearse and Detelina Subeva, organized meetings with Mozambican government officials to convince them to restructure the existing loans by converting them into Eurobonds.   The Mozambican government accepted the co-conspirators' recommendation and hired Investment Bank 1 and Investment Bank 2 to conduct the Exchange and Palomar, which employed Pearse and Subeva, as an adviser for the Exchange.

88.    On or about March 9, 2016, Investment Bank 1 and Investment Bank 2 announced the Exchange.   To convince investors to exchange their EMATUM loan participation notes for Eurobonds, Andrew Pearse and Detelina Subeva, together with bankers at Investment Bank 1 and Investment Bank 2, prepared documents that were sent to investors, including in the United States.   The Exchange documents failed to adequately disclose the existence of the Proindicus and MAM Loans or the maturity dates of those loans.

31

The Exchange documents also included false and misleading statements regarding the use of proceeds of the original EMATUM loan participation notes and risks of corruption and money laundering in Mozambique.   For example, the Exchange documents did not disclose information Investment Bank 1 had about a significant shortfall between the price Privinvest charged EMATUM for the 27 boats in that project and the fair market value of those boats. The documents therefore contained false and misleading information about the Eurobonds and Mozambique's creditworthiness.

89.     Ratification of the Exchange required approval of 81 percent of the loan participation note holders.   Around the time of the Exchange, Investment Bank 1 personnel estimated that 39 percent of the EMATUM loan participation notes were held in the United States.   Thus, to gain approval for the Exchange, Investment Banks 1 and 2 and Palomar arranged two road shows promoting the Exchange, including one in New York City.

90.     By on or about April 6, 2016, based upon the co-conspirators' false and misleading information, a sufficient percentage of investors in the EMATUM loan participation notes, including investors physically present in the United States, consented to the Exchange, resulting in the exchange of the EMATUM LPNs for Eurobonds on that same day.   Collectively, the EMATUM loan participation notes and the Exchange are referred to as the "EMATUM Securities."

G.     Proindicus, EMATUM and MAM Loan Defaults

91.     Following the Exchange, in or about and between May 2016 and March 2017, Proindicus, EMATUM and MAM each defaulted on their loans, and Proindicus, EMATUM and MAM proceeded to miss more than $700 million in loan payments.

H.    Summary of Bribe and Kickback Payments

92.    In furtherance of the fraudulent scheme, numerous Mozambican government officials received bribe and kickback payments from Privinvest in connection with the Mozambican projects.    Specifically:

(a)    The defendant MANUEL CHANG received at least $5 million in bribe and kickback payments from Privinvest.

(b)    The defendant ANTONIO DO ROSARIO received at least $12 million in bribe and kickback payments from Privinvest.

(c)    The defendant TEOFILO NHANGUMELE received at least $8.5 million in bribe and kickback payments from Privinvest.

(d)    Mozambican Co-Conspirator 1 received at least $8.5 million in bribe and kickback payments from Privinvest.

(e)    Mozambican Co-Conspirator 2 received at least $9.7 million in bribe and kickback payments from Privinvest.

(f)    Mozambican Co-Conspirator 3 received at least $2 million in bribe and kickback payments from Privinvest.

93.    The defendant JEAN BOUSTANI received approximately $15 million from the proceeds of Privinvest's fraudulent scheme.    In or about and between May 2013 and July 2014, Privinvest paid BOUSTANI these funds in a series of wire transfers, many of which were paid through a correspondent bank account in New York City and passed through the Eastern District of New York.

94.     Also in furtherance of the scheme, Andrew Pearse, Detelina Subeva and the defendant SURJAN SINGH received bribe and kickback payments in connection with the Mozambican projects.   Specifically:

(a)     Andrew Pearse received over $45 million in bribe and kickback payments from Privinvest in connection with the Mozambican maritime projects.   Many of these bribe and kickback payments were paid through a correspondent bank account in New York City and passed through the Eastern District of New York.

(b)     The defendant SURJAN SINGH received bribe and kickback payments totaling at least $3.7 million from Privinvest.   At least one bribe and kickback payment from Privinvest was paid through a correspondent account in New York City and passed through the Eastern District of New York.

(c)     Detelina Subeva received bribe and kickback payments of at least $2.2 million from Andrew Pearse.

<u>COUNT ONE</u>
(Conspiracy to Commit Wire Fraud)

95.     The allegations contained in paragraphs one through 94 are realleged and incorporated as if fully set forth in this paragraph.

96.     In or about and between January 2011 and December 2018, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants JEAN BOUSTANI, NAJIB ALLAM, MANUEL CHANG, ANTONIO DO ROSARIO, TEOFILO NHANGUMELE and SURJAN SINGH, together with Andrew Pearse, Detelina Subeva and others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud one or more investors and potential investors in Proindicus,

34

MAM and the EMATUM Securities, and to obtain money and property from them by means

of one or more materially false and fraudulent pretenses, representations and promises, and

for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted

by means of wire communication in interstate and foreign commerce writings, signs, signals,

pictures and sounds, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

## COUNT TWO
### (Conspiracy to Commit Securities Fraud)

97.     The allegations contained in paragraphs one through 94 are realleged

and incorporated as if fully set forth in this paragraph.

98.     In or about and between January 2013 and December 2018, both dates

being approximate and inclusive, within the Eastern District of New York and elsewhere, the

defendants JEAN BOUSTANI, NAJIB ALLAM, MANUEL CHANG, ANTONIO DO

ROSARIO and SURJAN SINGH, together with Andrew Pearse, Detelina Subeva and others,

did knowingly and willfully conspire to use and employ one or more manipulative and

deceptive devices and contrivances, contrary to Rule 10b-5 of the Rules and Regulations of

the United States Securities and Exchange Commission, Title 17, Code of Federal

Regulations, Section 240.10b-5, by: (i) employing one or more devices, schemes and

artifices to defraud; (ii) making one or more untrue statements of material fact and omitting

to state material facts necessary in order to make the statements made, in light of the

circumstances under which they were made, not misleading; and (iii) engaging in one or

more acts, practices and courses of business which would and did operate as a fraud and

deceit upon investors and potential investors in the EMATUM Securities, in connection with

the purchase and sale of investments in the EMATUM Securities, directly and indirectly, by use of means and instrumentalities of interstate commerce and the mails, contrary to Title 15, United States Code, Sections 78j(b) and 78ff.

99.     In furtherance of the conspiracy and to effect its objects, within the Eastern District of New York and elsewhere, the defendants JEAN BOUSTANI, NAJIB ALLAM, MANUEL CHANG, ANTONIO DO ROSARIO and SURJAN SINGH, together with Andrew Pearse, Detelina Subeva and others, did commit and cause to be committed, among others, the following:

OVERT ACTS

(a)     On or about June 26, 2013, Privinvest sent approximately $1 million from the Proindicus loan proceeds to a bank account that Pearse held at UAE Bank 2, which payment passed through a correspondent bank account in the United States and the Eastern District of New York.

(b)     On or about July 5, 2013, Pearse sent BOUSTANI a PowerPoint presentation regarding the project that would become EMATUM that stated that the project would be funded through "the international bond markets."

(c)     On or about July 21, 2013, Subeva wrote an email to BOUSTANI, Pearse and DO ROSARIO, stating: "[W]e should also keep a cushion for Proindicus of $17mn so that we don't need to go back to MoF and they are on our side."

(d)     On or about July 25, 2013, Privinvest sent approximately $1 million from the Proindicus loan proceeds to a bank account that Pearse held at UAE Bank 2, which payment passed through a correspondent bank account in the United States and the Eastern District of New York.

36

(e)     On or about September 1, 2013, Privinvest sent approximately $1 million from the Proindicus loan proceeds to a bank account that Pearse held at UAE Bank 2, which payment passed through a correspondent bank account in the United States and the Eastern District of New York.

(f)     On or about October 11, 2013, Investment Bank 2 sent $350 million in EMATUM loan proceeds, less its fees of more than $37 million, to Investment Bank 1's bank account at New York City Bank 1, which payment passed through the Eastern District of New York.

(g)     On or about October 11, 2013, Investment Bank 1 sent approximately $312 million in EMATUM loan proceeds from New York City Bank 1 to Privinvest, which payment passed through the Eastern District of New York.

(h)     On or about October 23, 2013, a Privinvest entity with a bank account in the UAE sent approximately $800,000 to SINGH's bank account at UAE Bank 2, which passed through a correspondent bank account in the United States and through the Eastern District of New York.

(i)     On or about November 24, 2013, DO ROSARIO sent BOUSTANI an invoice for $400,000 for a "Real Estate Project Purchase in Mozambique Project," to be paid to the UAE-based bank account of a third party.

(j)     On or about November 26, 2013, Privinvest wired $400,000 from its UAE-based bank through a bank in New York City to the UAE-based bank account specified in the invoice referenced in subparagraph (i) above, which payment passed through the Eastern District of New York.

37

(k)     On or about March 31, 2014, DO ROSARIO sent BOUSTANI an invoice for $1 million from a UAE-based third-party entity for "CONSTRUCTION WORK IN THE MOZAMBICAN EXCLUSIVE ECONOMIC ZONE (EEZ)."

(l)     On or about April 2, 2014, Privinvest wired $1 million from its UAE-based bank through a bank in New York City and through the Eastern District of New York to the UAE-based bank account specified in the invoice referenced in subparagraph (k) above.

(m)     On or about April 8, 2014, DO ROSARIO sent BOUSTANI an invoice for $1.75 million for a "Real Estate Project Purchase in Mozambique."

(n)     On or about April 9, 2014, Privinvest wired $1 million from its UAE-based bank through a bank in New York City and through the Eastern District of New York to the UAE-based bank account specified in the invoice referenced in subparagraph (m) above.

(o)     On or about May 28, 2014, Privinvest wired $976,000 from its UAE-based bank account through a bank in New York City and through the Eastern District of New York to the UAE-based bank account specified in the invoice referenced in subparagraph (m) above.

(p)     On or about April 8, 2014, BOUSTANI sent an email to ALLAM detailing bribes and kickbacks Privinvest paid or intended to be paid in connection with the Proindicus and EMATUM projects.

(q)     On or about March 2, 2015, a Palomar employee sent an email to Pearse and Subeva, in which the employee summarized a meeting with Mozambican Co-Conspirator 3, and stated that Mozambique's Minister of Finance who had replaced CHANG

was "now aware of Proindicus and MAM" and that transactions associated with those entities "were not disclosed to the IMF." The Palomar employee further stated that while the new Minister of Finance disagreed with the failure to disclose the loans to the IMF, he nonetheless accepted that those "transactions now need to remain undisclosed."

(r)     On or about February 19, 2016, an employee of Investment Bank 1 emailed SINGH two valuation reports regarding the value of the 27 boats sold to EMATUM by Privinvest. Those reports indicated that the boats were valued at approximately $265 million to $394 million less than the EMATUM Loan.

(s)     On or about March 4, 2016, Pearse forwarded to BOUSTANI an email and PowerPoint presentation regarding the Exchange. The email described briefing Mozambican officials from the Ministry of Finance regarding potential default of the EMATUM Loan and related EMATUM Securities in connection with a March 11, 2016 loan interest payment. The email also described briefing Mozambique's Minister of Finance on the road show schedule to promote the Exchange. The presentation set out a proposed road show travel timetable including "Investor meetings in London & New York."

(t)     On or about March 5, 2016, BOUSTANI replied to Pearse's March 4, 2016 email stating, "Please let's keep [DO ROSARIO] updated. Because the option of a 'default' is a position that the President must be aware or take."

(u)     On or about March 14, 2016, Pearse sent an email to Subeva and BOUSTANI regarding a potential downgrading of Mozambique's credit rating, stating "It's a tactic to get the terms improved for US investors."

(v)     On or about March 14, 2016, DO ROSARIO and other co-conspirators flew from London, England to John F. Kennedy International Airport in Queens, New York to attend meetings with investors regarding the Exchange.

(w)     On or about March 15, 2016, during a meeting in New York City, DO ROSARIO, together with others, provided false and misleading information to investors regarding Mozambique's economic prospects, debt level and its ability and intention to meet its EMATUM debt obligations to induce them to exchange EMATUM loan participation notes for Eurobonds.

(Title 18, United States Code, Sections 371 and 3551 et seq.)

<u>COUNT THREE</u>
(Conspiracy to Violate the FCPA Anti-Bribery and Internal Controls Provisions)

100.    The allegations contained in paragraphs one through 94 are realleged and incorporated as if fully set forth in this paragraph.

101.    In or about and between January 2012 and February 2017, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant SURJAN SINGH, together with Andrew Pearse, Detelina Subeva and others, did knowingly and willfully conspire to commit offenses against the United States, namely:

(a)     Being an employee and agent of an issuer, to corruptly make use of the mails and means of instrumentalities of interstate commerce in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, offer, gift, promise to give, and authorization of the giving of anything of value, to one or more foreign officials, and to one or more persons, while knowing that all or a portion of such money and thing of value would be and had been offered, given, and promised to one or more foreign officials,

for purposes of: (i) influencing acts and decisions of such foreign official in his or her official capacity; (ii) inducing such foreign official to do and omit to do acts in violation of the lawful duty of such official; (iii) securing any improper advantage; and (iv) inducing such foreign official to use his or her influence with a foreign government and agencies and instrumentalities thereof to affect and influence acts and decisions of such government and agencies and instrumentalities, in order to assist Investment Bank 1 and others in obtaining and retaining business, for and with, and directing business to, Privinvest, Investment Bank 1, SINGH, Pearse, Subeva and others, contrary to the FCPA, Title 15, United States Code, Sections 78dd-1 and 78ff; and

(b)     To circumvent and cause to be circumvented a system of internal controls at Investment Bank 1, contrary to Title 15, United States Code, Sections 78m(b)(2)(B), 78m(b)(4), 78m(b)(5) and 78ff(a).

102.    In furtherance of the conspiracy and to effect its objects, within the Eastern District of New York and elsewhere, the defendant SURJAN SINGH, together with Andrew Pearse, Detelina Subeva and others, did commit and cause to be committed, among others, the following:

OVERT ACTS

(a)     On or about November 19, 2012, Pearse sent an email to Investment Bank 1 Employee 1, stating that the EMEA Executive "said no to the combination of Moz[ambique] and your friend [Privinvest Co-Conspirator 2], so we need to structure him out of the picture."

(b)     In or about February 2013, SINGH, Pearse and Subeva commissioned Due Diligence Firm 1 to advise on potential corruption and bribery risks

involving members of the Mozambican government in the contemplated Privinvest transaction, which diligence SINGH, Pearse and Subeva then purposefully concealed from Investment Bank 1's compliance department.

(c)     On or about February 15, 2013, SINGH and Subeva provided a list of Proindicus's intended directors to Due Diligence Firm 1 to pre-screen the potential directors.

(d)     On or about June 21, 2013, SINGH, Pearse and Subeva submitted a memorandum to Investment Bank 1's Credit Risk Management team that falsely described why the Proindicus Loan was being increased and failed to inform Investment Bank 1 that the proposed loan increase was being used to make bribe and kickback payments to the co-conspirators, including Mozambican government officials.

(e)     On or about July 8, 2013, Privinvest made a payment of $1 million from its bank account in the UAE to a bank account in Portugal for the benefit of the defendant ANTONIO DO ROSARIO, which passed through a correspondent bank account at New York City Bank 1 and the Eastern District of New York.

(f)     On or about July 27, 2013, Pearse sent an email from his personal email account to Subeva at her personal email account, stating: "[I]f you go into the properties of each doc, it shows you as the author.   You may want to delete and resend" the documents.

(g)     On or about August 4, 2013, Subeva, using her personal email account, sent an email to Pearse at his personal email account that stated: "[A]s promised, below is suggested 'script' for the DD [due diligence] meeting with the lady from Ministry

of Fisheries.   These questions have been answered very well before so should ensure a very productive low risk meeting.   It overlaps well with the [Investment Bank 1] list."

       (h)     On or about August 4, 2013, Subeva sent an email to DO ROSARIO providing information for a due diligence meeting with Investment Bank 1 scheduled for the next day.

       (i)     On or about August 5, 2013, Subeva used her personal email account to send Pearse at his personal email account another due diligence script, which, she explained, "[M]ay be helpful to go to S as it has gone to [DO ROSARIO] so he should be prepared to handle the DD [due diligence] questions on competition, export plans and why ADM [Abu Dhabi MAR] that are part of the list."

       (j)     On or about August 5, 2013, SINGH traveled to Mozambique and led the Investment Bank 1 deal team conducting due diligence for the EMATUM transaction.

       (k)     On or about September 11, 2013, Investment Bank 1 sent approximately $500 million in EMATUM loan proceeds, less its fees, to Privinvest, which payment passed through a correspondent bank account at New York City Bank 1 and the Eastern District of New York.

       (l)     On or about October 23, 2013, Logistics International sent a wire transfer of $1.175 million to a Mozambican bank account for the benefit of DO ROSARIO, which payment passed through a correspondent bank account at New York City Bank 1 and the Eastern District of New York.

       (m)     On or about May 15, 2014, after receiving an email from a member of the Investment Bank 1 deal team asking him to provide verification of

43

EMATUM's bank account details, DO ROSARIO forwarded the request to Pearse, who responded: "I am trying to get hold of uncle [SINGH]. Don't have a call plse until I have spoken with him and conformed wot the [expletive] this is about."

(n)     On or about the same day, May 15, 2014, after speaking with SINGH, Pearse wrote an email to DO ROSARIO and the defendant JEAN BOUSTANI, stating: "Uncle is sorting it out. There is some stupid UK regulatory requirement . . . . In any event I told him to tell [an Investment Bank 1 employee who made the initial request], that she is fired if she doesn't behave in the future!"

(Title 18, United States Code, Sections 371 and 3551 et seq.)

## COUNT FOUR
(Conspiracy to Commit Money Laundering)

103.    The allegations contained in paragraphs one through 94 are realleged and incorporated as if fully set forth in this paragraph.

104.    In or about and between January 2013 and December 2018, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants JEAN BOUSTANI, NAJIB ALLAM, MANUEL CHANG, ANTONIO DO ROSARIO, TEOFILO NHANGUMELE and SURJAN SINGH, together with Andrew Pearse, Detelina Subeva and others, did knowingly and intentionally conspire to transport, transmit and transfer monetary instruments and funds to one or more places outside the United States from one or more places inside the United States, and to one or more places inside the United States from one or more places outside the United States, (a) with the intent to promote the carrying on of one or more specified unlawful activities, to wit: (i) a violation of the FCPA, Title 15, United States Code, Sections 78dd-1, 78m(b)(2)(B), 78m(b)(5) and

44

78ff(a); (ii) offenses against a foreign nation involving the bribery of a public official, in violation of Mozambican law, as defined in Title 18, United States Code, Section 1956(c)(7)(B)(iv); (iii) wire fraud, in violation of Title 18, United States Code, Section 1343; and (iv) fraud in the sale of securities, in violation of Title 15, United States Code, Sections 78j(b) and 78ff (collectively, the "Specified Unlawful Activities"), contrary to Title 18, United States Code, Section 1956(a)(2)(A); and (b) knowing that the monetary instruments and funds involved in the transportation, transmission and transfer represented the proceeds of some form of unlawful activity, and knowing that such transportation, transmission and transfer was designed in whole and in part to conceal and disguise the nature, location, source, ownership and control of the proceeds of one or more specified unlawful activities, to wit: the Specified Unlawful Activities, contrary to Title 18, United States Code, Section 1956(a)(2)(B)(i).

(Title 18, United States Code, Sections 1956(h) and 3551 et seq.)

## CRIMINAL FORFEITURE ALLEGATION
## AS TO COUNTS ONE THROUGH THREE

105.    The United States hereby gives notice to the defendants charged in

Counts One through Three that, upon their conviction of any such offense, the governnment

will seek forfeiture in accordance with Title 18, United States Code, Section 981(a)(1)(C)

and Title 28, United States Code, Section 2461(c), which require any person convicted of

such offenses to forfeit any property, real or personal, constituting, or derived from, proceeds

obtained directly or indirectly as a result of such offenses.

106.    If any of the above-described forfeitable property, as a result of any act

or omission of the defendants:

(a)    cannot be located upon the exercise of due diligence;

(b)    has been transferred or sold to, or deposited with, a third party;

(c)    has been placed beyond the jurisdiction of the court;

(d)    has been substantially diminished in value; or

(e)    has been commingled with other property which cannot be

divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p),

to seek forfeiture of any other property of the defendants up to the value of the forfeitable

property described in this forfeiture allegation.

(Title 18, United States Code, Section 981(a)(1)(C); Title 21, United States

Code, Section 853(p); Title 28, United States Code, Section 2461(c))

## CRIMINAL FORFEITURE ALLEGATION
## AS TO COUNT FOUR

107.   The United States hereby gives notice to the defendants charged in Count Four that, upon their conviction of such offense, the government will seek forfeiture in accordance with Title 18, United States Code, Section 982(a)(1), which requires any person convicted of such offense to forfeit any property, real or personal, involved in such offense, or any property traceable to such property.

108.   If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

    (a)   cannot be located upon the exercise of due diligence;

    (b)   has been transferred or sold to, or deposited with, a third party;

    (c)   has been placed beyond the jurisdiction of the court;

    (d)   has been substantially diminished in value; or

    (e)   has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1), to seek forfeiture of any other property of the defendants up to the value of the forfeitable property described in this forfeiture allegation.

(Title 18, United States Code, Sections 982(a)(1) and 982(b)(1); Title 21, United States Code, Section 853(p))

A TRUE BILL

_____
FOREPERSON

RICHARD P. DONOGHUE
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

DEBORAH L. CONNOR
CHIEF, MONEY LAUNDERING AND
ASSET RECOVERY SECTION,
CRIMINAL DIVISION,
U.S. DEPARTMENT OF JUSTICE

ROBERT A. ZINK
CHIEF, FRAUD SECTION,
CRIMINAL DIVISION,
U.S. DEPARTMENT OF JUSTICE

F. #2016R00695
FORM DBD-34
JUN. 85

No.

UNITED STATES DISTRICT COURT
EASTERN District of NEW YORK
CRIMINAL DIVISION

THE UNITED STATES OF AMERICA

vs.

JEAN BOUSTANI, NAJIB ALLAM, MANUEL CHANG, ANTONIO DO ROSARIO, TEOFILO
NHANGUMELE, and SURJAN SINGH,

Defendants.

SUPERSEDING INDICTMENT

(T. 18, U.S.C., §§ 371, 981(a)(1)(C), 982(a)(1), 982(a)(2)(B), 982(b)(1), 1343, 1349, 1956(h) and 3551 et
seq.; T. 21, U.S.C., § 853(p); T. 28, U.S.C., § 2461(c).)

A true bill.

_____
                                                     Foreperson

Filed in open court this _____ day of
A.D. 20 _____

_____
                                                          Clerk

Bail, $ _____

Mark E. Bini and Hiral D. Mehta, Assistant U.S. Attorneys (718) 254-
8761, Margaret A. Moeser, Sean O'Donnell, Katherine Nielsen, U.S.
Department of Justice Trial Attorneys, (202) 353-2467

49