UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------- X
                                             :

UNITED STATES OF AMERICA,
                                             :

    - against -                            :     No. 18-cr-681 (WFK)

JEAN BOUSTANI, et al.,                :     ECF Case
                         Defendants.
                                             :     Dated:  August 30, 2019

                                               :

                                               :

------------------------------------------------------------- X


## DEFENDANT JEAN BOUSTANI'S
## SUPPLEMENTAL MEMORANDUM OF LAW IN SUPPORT OF HIS
## AMENDED MOTION TO DISMISS THE SUPERSEDING INDICTMENT


**WILLKIE FARR & GALLAGHER LLP**
Michael S. Schachter
Randall W. Jackson
Casey E. Donnelly
Philip F. DiSanto
787 Seventh Avenue
New York, New York 10019-6099
Phone:  (212) 728-8000
Email: mschachter@willkie.com

*Attorneys for Defendant Jean Boustani*

30952697.3

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................1

ARGUMENT .........................................................................................................................2

I.     COUNT TWO OF THE SUPERSEDING INDICTMENT MUST BE
DISMISSED BECAUSE THE GOVERNMENT HAS FAILED TO ALLEGE A
SECURITIES FRAUD CONSPIRACY ACTIONABLE UNDER U.S. LAW. ................2

       A.     The Superseding Indictment Fails to Allege a Domestic Securities
Transaction...........................................................................................................4

       B.     Because the Evidence the Government Promises to Elicit at Trial Is
Insufficient, as a Matter of Law, to Prove a Domestic Securities
Transaction, Count Two Can and Should Be Dismissed........................................7

II.    COUNT ONE OF THE SUPERSEDING INDICTMENT MUST BE
DISMISSED BECAUSE THE GOVERNMENT HAS FAILED TO ALLEGE A
WIRE FRAUD CONSPIRACY ACTIONABLE UNDER U.S. LAW............................13

III.   COUNT ONE OF THE SUPERSEDING INDICTMENT IS AN IMPROPER
EFFORT TO INTRODUCE TIME-BARRED CONDUCT TO THE JURY. ................14

IV.   COUNT FOUR OF THE SUPERSEDING INDICTMENT SHOULD BE
DISMISSED AS UNCONSTITUTIONALLY OVERBROAD AND VAGUE..............16

CONCLUSION....................................................................................................................19

30952697.3

# **TABLE OF AUTHORITIES**

**Cases**                                                                                   **Page(s)**

*Absolute Activist Value Master Fund Ltd. v. Ficeto,*
  677 F.3d 60 (2d Cir. 2012)..................................................................................1, 3, 10

*Aptheker v. Secretary of State,*
  378 U.S. 500 (1964)..........................................................................................................14

*Banco Safra S.A. v. Samarco Mineracao S.A.,*
  2019 WL 2514056 (S.D.N.Y. June 18, 2019) ...........................................................8

*Bascuñan v. Elsaca,*
  927 F.3d 108 (2d Cir. 2019)..........................................................................................12

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG,*
  752 F.3d 173 (2d Cir. 2014)........................................................................................4, 5

*Clay v. United States,*
  218 F.2d 483 (5th Cir. 1955) .........................................................................................3

*Kolender v. Lawson,*
  461 U.S. 352 (1983)..........................................................................................................14

*Morrison v. National Australia Bank Ltd.,*
  561 U.S. 247 (2010)....................................................................................................4, 7, 8

*In re Petrobras Sec. Litig.,*
  150 F. Supp. 3d 337 (S.D.N.Y. 2015)......................................................................3

*Plumbers' Union Local No. 12 Pension Fund v. Swiss Reinsurance Co.,*
  753 F. Supp. 2d 166 (S.D.N.Y. 2010) (Koeltl, J.) ...............................................4

*RJR Nabisco, Inc. v. European Community,*
  136 S. Ct. 2090 (2016).....................................................................................................12

*SEC v. Tourre,*
  No. 10 Civ. 3229 (KBF), 2012 WL 5838794 (S.D.N.Y. Nov. 19, 2012)...............10

*United States v. Beacham,*
  774 F.3d 267 (5th Cir. 2014) .......................................................................................12

*United States v. Farinas,*
  299 F. Supp. 852 (S.D.N.Y. 1969)..............................................................................3

*United States v. Harrison,*
   663 F. App'x 460 (6th Cir. 2016) ...........................................................12

*United States v. Lamont,*
   236 F.2d 312 (2d Cir. 1956)...............................................................3, 6

*United States v. McFadden,*
   689 F. App'x 76 (2d Cir. 2017) ...........................................................12

*United States v. Roy,*
   783 F.3d 418 (2d Cir. 2015)................................................................12

*United States v. Seher,*
   562 F.3d 1344 (11th Cir. 2009) .....................................................12, 13

*United States v. Stewart,*
   744 F.3d 17 (1st Cir. 2014) ..................................................................13

*United States v. Vilar,*
   729 F.3d 62 (2d Cir. 2013).................................................................1, 5

*Virginia v. Hicks,*
   539 U.S. 113 (2003) ...........................................................................14

**Statutes**

18 U.S.C. § 1349 ....................................................................................12

18 U.S.C. § 3282 ...............................................................................12, 13

18 U.S.C. § 3301 ....................................................................................13

**Other Authorities**

17 C.F.R. § 230.901 ..................................................................................6

55 Fed. Reg. 18306 No. 6863 ...................................................................7

30952697.3

## PRELIMINARY STATEMENT

In apparent recognition of the fact that its Indictment against Mr. Boustani was significantly flawed, the Government returned to the Grand Jury on the Friday before the argument on Mr. Boustani's motion to dismiss was to be argued.  Unwilling to defend its Indictment in front of Your Honor, the Government asked the Grand Jury to issue a Superseding Indictment that was ostensibly aimed at fixing the many deficiencies Mr. Boustani identified in the Government's charges.  *See* Dkt. 137 (the "Superseding Indictment").  While the Superseding Indictment added a few sentences, revised a few allegations, and remedied some of the less complicated problems contained in its predecessor—*i.e.*, the Government has now identified the securities at issue in Count Two—the Government did not, because it could not, address the foundational flaws at issue in its prosecution.

Nothing in the Superseding Indictment relieves the fundamental problem at the heart of this case:  the charges against Mr. Boustani are based upon extraterritorial conduct that falls outside the reach of the U.S. laws that Mr. Boustani is charged with violating.  The clearest example of this is the Government's consistent failure to plead facts that plausibly demonstrate that the securities transactions at issue in Count Two—the purchase and sale of the LPNs that were issued in 2013 by the Dutch SPV, or the Exchange of those LPNs for Eurobonds on April 6, 2016—were domestic transactions that fall within the ambit of the securities fraud conspiracy statute.

In fact, even if the Government *were* able to plead a domestic securities transaction, Count Two would still require dismissal because, as the Second Circuit confirmed in an opinion issued yesterday, a domestic transaction is "necessary" but not "sufficient" to allege an offense that falls within the domestic reach of the U.S.'s securities laws.  *Prime Int'l Trading Ltd. v. BP P.L.C.*, No. 17-2233, 2019 WL 4062219, *7-*8 (2d Cir. Aug. 29, 2019).  In *Prime*, the

1

30952697.3

Circuit explained that closing the gap between "necessary" allegations and "sufficient" allegations for purposes of surviving an extraterritoriality challenge requires allegations of "domestic—not extraterritorial—*conduct* by [the d]efendants that is violative of a *substantive* provision" of the statute charged. *Id.* In other words, the Government can no longer avoid dismissal of Count Two by pleading facts that plausibly allege a domestic securities transaction (which it has failed to do anyway) but instead must also aver that Mr. Boustani engaged in the *conduct* that is proscribed under the U.S.'s securities fraud conspiracy statute. The conduct that is proscribed under the securities fraud conspiracy statute, like the wire fraud conspiracy statute alleged in Count One, is the conspirators' "agreement." Accordingly, *Prime* confirms our argument that Count One must be dismissed for failure to allege that Mr. Boustani came to an "agreement" with his alleged co-conspirators to engage in wire fraud while on U.S. soil and in fact, confirms that Count Two must similarly be dismissed because the Superseding Indictment does not allege that Mr. Boustani came to his alleged "agreement" to engage in a securities fraud conspiracy while on U.S. soil.

With respect to any arguments made in our previous briefs regarding Mr. Boustani's motion to dismiss but which are not described below, we stand on the arguments made in our prior briefing, which apply with equal force to the Superseding Indictment.

## ARGUMENT

I. **COUNT TWO OF THE SUPERSEDING INDICTMENT MUST BE DISMISSED BECAUSE THE GOVERNMENT HAS FAILED TO ALLEGE A SECURITIES FRAUD CONSPIRACY ACTIONABLE UNDER U.S. LAW.**

As explained above, the Second Circuit, just yesterday, reaffirmed the central premise of *Morrison v. National Australia Bank Ltd.*, namely that "foreign conduct is generally the domain of foreign law," and that it violates the long-standing presumption against extraterritoriality to utilize U.S. laws anytime some "domestic transaction" has occured. *Prime*

2

30952697.3

*Int'l Trading Ltd. v. BP P.L.C.*, No. 17-2233, 2019 WL 4062219, *7 (2d Cir. Aug. 29, 2019)

(applying *Morrison*, 561 U.S. 247 (2010).)  The Circuit confirmed that under *Morrison*,

allegations of a domestic securities transaction are "necessary," but they are not "sufficient" to

allege conduct that is reached by the U.S.'s securities laws.  *Id*. at *7-*8; *see also United States

v. Vilar*, 729 F.3d 62, 67 (2d Cir. 2013) (the reach of "Section 10(b) and its implementing

regulation, Rule 10b–5" remains the same, regardless of whether the claim is being brought

"criminally or civilly.").

   *Prime* explains that in addition to alleging a domestic securities transaction, the

Government must also allege domestic "*conduct* by [the d]efendants that is violative of a

*substantive* provision" of the securities fraud conspiracy statute.  2019 WL 4062219, *7.  But,

the Indictment against Mr. Boustani does not allege *any* conduct by Mr. Boustani in the United

States.  Nor could it:  as we have pointed out many times, Mr. Boustani had never once set foot

in the United States until he was forcibly transferred here by the Government on New Year's

Day.

   Moreover, the Superseding Indictment also lacks any allegations that demonstrate

that Mr. Boustani agreed to defraud investors in connection with a security "purchased or sold in

the United States."  The Circuit has explained that a domestic securities transaction has been

sufficiently pled when "facts" are alleged that "lead[] to the plausible inference that either

irrevocable liability was incurred or that title [to the security] passed in the United States."

*Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 62, 69 (2d Cir. 2012) (facts

must be pled that "sufficiently allege that [the] purchases or sales [at issue] took place in the

United States").  Although the Government went back to the Grand Jury to try to fix the

problems with its charges, the charges have not been fixed because they *can't* be fixed.  No

domestic securities transaction took place here.  Given this reality, the Superseding Indictment, like its predecessor, fails to plausibly allege that the purchase and sale of the LPNs that were issued in 2013 by the Dutch SPV, or the Exchange of those LPNs for Eurobonds on April 6, 2016, were domestic transactions.

      A.      **<u>The Superseding Indictment Fails to Allege a Domestic Securities Transaction.</u>**

      In an effort to save Count Two from dismissal, the Government included two new sentences in the Superseding Indictment.  The first, in paragraph 73, states that "certain investors irrevocably committed themselves in the United States to purchase EMATUM [LPNs] and certain sellers irrevocably committed themselves in the United States to sell EMATUM [LPN]s to United States investors."  (Sup. Ind. ¶ 73.)  The second, in paragraph 90, states that on "April 6, 2016, based upon the co-conspirators' false and misleading information, a sufficient percentage of investors in the EMATUM [LPNs], including investors physically present in the United States, consented to the [Eurobond] Exchange, resulting in the exchange of the EMATUM LPNs for Eurobonds on that same day."  (*Id*. at ¶ 90.)

      These additions cannot rescue Count Two from dismissal.  Paragraph 73's pronouncement that "irrevocable" liability was incurred in the United States for certain LPN purchases and sales is a *legal conclusion* and it is unaccompanied by any supporting factual allegations.  As Judge Rakoff of the Southern District has explained, "**conclusory assertions that irrevocable liability has been incurred or that title has passed are insufficient**.  The parties must allege more specific facts, including, but not limited to, facts concerning the formation of the contracts, the placement of purchase orders, the passing of title, or the exchange of money."  *In re Petrobras Sec. Litig.*, 150 F. Supp. 3d 337, 340 (S.D.N.Y. 2015) (internal citations omitted) (emphasis added); *see also Absolute Activist,* 677 F.3d at 62 (conclusions are

insufficient; "facts" must be alleged that "lead[] to the plausible inference that either irrevocable liability was incurred or that title passed in the United States.").

        The law is the same in the criminal context. Indictments that assert bald conclusions, instead of alleging facts to support those conclusions, require dismissal. *United States v. Lamont*, 236 F.2d 312, 314-317 (2d Cir. 1956) (rejecting Government's argument that a court "should [] presume[] for purposes of testing the indictment" that the Government will elicit facts at trial which demonstrate that its case falls within the reach of the statute and explaining that such facts must at least be alleged in the indictment so that "unnecessary trial[s]" can be "averted" in instances in which the alleged facts, even if proven, will not satisfy the statute); *Clay v. United States*, 218 F.2d 483, 486 (5th Cir. 1955) (the "trial court should have granted the [defendant's] motion to dismiss the indictment" because the Government's "addition of mere legal conclusions" to the indictment, "unaided by essential allegations of fact to support them" do not satisfy the criminal pleading rules); *United States v. Farinas*, 299 F. Supp. 852, 854-55 (S.D.N.Y. 1969) (dismissing indictment because the Government did not allege facts, which if assumed true, could "assure[]" the court that the conduct at issue was "in fact, prohibited by law"). Because the only averment in the Superseding Indictment concerning the location of the LPN transactions is the legal conclusion set forth in Paragraph 73, it is impossible to conclude that the Superseding Indictment sufficiently alleges that the LPNs were purchased and sold in domestic transactions.

        During the oral argument on August 21, 2019, the Court asked the Government to articulate its argument that the LPN transactions were domestic trades. The Government responded that it intended to prove at trial that traders who were "physically" present in the United States logged on to Bloomberg and used Bloomberg's "chat" feature to type "done" to a

30952697.3

broker when they wanted to buy or sell the LPNs.  (Ex. M (Transcript of August 21, 2019 Oral

Argument) at 62-63).  But, a trade does not transform into a domestic securities transaction—

with all the attendant disclosures and liabilities that accompany domestic securities

transactions—simply because some trader types "done" into a Bloomberg chat while sitting in a

chair in the United States.  Indeed, in *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS

AG*, the Second Circuit concluded that the fact that a U.S. investor "placed a buy order in the

United States" for a security does *not* establish that the security was purchased in the United

States.  752 F.3d 173, 181 (2d Cir. 2014); *see also Plumbers' Union Local No. 12 Pension Fund

v. Swiss Reinsurance Co*., 753 F. Supp. 2d 166, 175-76 (S.D.N.Y. 2010) (Koeltl, J.) (rejecting

argument that a "security that is not traded on a domestic stock exchange is purchased in the

United States for purposes of section 10(b) anytime an investor decides to purchase the security

and places a purchase order with a broker while in the United States.").

       The Government's argument, if accepted, would wholly undermine the rationale

behind *Morrison*, in which the Supreme Court explained that countries all over the world have

their own rules regarding "what constitutes fraud, what disclosures must be made. . .what

discovery is available. . .and many other matters."  561 U.S. at 555-556.  Those rules are often

different than the laws of the United States and market participants are entitled to know which

laws will be applied to their conduct.  *Id.*  But under the Government's test, the applicable law

can change with every sale, depending on where the counterparty's trader happened to be

standing when he typed "done" to his broker.  For example, under the Government's rule, if a

Russian national traveled to the United States for a business trip, logged on to Bloomberg from

his hotel, and typed a message to his broker, based in Moscow, confirming that he was willing to

purchase a particular debt instrument issued by a Chinese company, that issuance by the Chinese

firm would then constitute a U.S. securities transaction, subject to U.S. law.  The financial markets would be unfair and unworkable under the Government's rule, which is why the Government's rule is not the law.

The Government's revisions regarding the territoriality of the April 6, 2016 Eurobond Exchange are as ineffectual as its revisions concerning the territoriality of the LPN transactions.  The Government added an allegation that "investors physically present in the United States[] consented to the [Eurobond] Exchange."  (Ind. ¶ 90.)   But, for the reasons just discussed, the fact that an investor who reached a decision to vote in favor of the Exchange while "present" in the United States does not transform the Eurobond Exchange into a domestic securities transaction.  *Vilar*, 729 F.3d at 77 n.10 (the fact that the securities at issue were "sold to customers based in the United States" is "insufficient to demonstrate a purchase or sale of a security in the United States for the purposes of Section 10(b)."); *City of Pontiac,* 752 F.3d at 181 (the fact that a party to the transaction is a "U.S. entity" does "not affect whether the transaction was foreign or domestic.").  The locus of the investor's thought process cannot alter the fact that the vote could only be physically cast in London.  *See infra* at 12.  Thus, the Superseding Indictment comes no closer than its predecessor in alleging a domestic securities transaction.  Dismissal of Count Two is required.

> **B.** **Because the Evidence the Government Promises to Elicit at Trial Is Insufficient, as a Matter of Law, to Prove a Domestic Securities Transaction, Count Two Can and Should Be Dismissed.**

Dismissal is the proper outcome here.  The Government didn't just *forget* to allege facts on this issue.  The Government is doing here exactly what the Second Circuit has held is improper in criminal cases:  it has purposely failed to allege the actual, indisputable facts concerning the LPN and Exchange transactions because it knows that if it were to do so, its "charges could not. . .survive[]."  *Lamont*, 236 F.2d at 316.  The Government appears to be

30952697.3

hoping that this Court will be willing to ignore binding precedents in order to allow the Government to "hang onto and retain for trial" a securities fraud conspiracy charge "which [the Government] cannot support in law." *Id.*  But, as the Second Circuit has explained, permitting the Government to try a defendant on a count that is flawed as a matter of law is an "extensive. . .invasion of the rights of an individual" and is therefore "forbid[den]" by the Supreme Court.  *Id.* at 314, 316 (agreeing that defendants "should not be put to the expense and humiliation of preparing for trial and defending themselves when purely as a matter of law it is clear" that the Government will not be able to prove that its prosecution falls within the ambit of the charged statute).  In fact, as we described in our prior briefing and during the August 21st oral argument, all of the applicable facts demonstrate—as a matter of law—that the purchase, sale, and 2016 exchange of the LPNs were not domestic securities transactions.

In the Government's Opposition to Mr. Boustani's motion to dismiss, which was briefed prior to the issuance of the Superseding Indictment, the Government represented to the Court that it was prosecuting Mr. Boustani for participating in a securities fraud conspiracy in connection with the Eurobond Exchange and the "original security offering" of the LPNs.  *See* Gov. Opp. at 13.   The "original security offering" of the LPNs is the transaction described in the LPN Offering Circular, which we attached as Ex. F to our Motion.  (Dkt. 98-6.)  As the Offering Circular makes clear, the LPNs were offered and sold to investors in a "Regulation S" transaction.  *See* Ex. F (the LPN Offering Circular) at 1 (stating that the LPNs were being offered and sold "pursuant to Regulation S").  When securities are sold ***outside*** the United States, they do not need to be registered with the SEC, as described in Regulation S.  *See* 17 C.F.R. § 230.901 (exempting from registration any offer or sale "that occurs outside the United States"); *see also* Offshore Offers and Sales, Securities Act Release No. 6863, 55 Fed. Reg. 18306

(promulgating Regulation S) (sales of securities pursuant to Regulation S are "deemed to be outside the United States").  Indeed, the investors who participated in the LPN offering each signed a "Big Boy" letter in which they confirmed that they had acquired the LPNs in an "**offshore transaction**."  *See* Exs. J(1)-J(20), at ¶ 12 ("Big Boy" letters) (emphasis added).

It appears that in the period between July 22, 2019, when the Government filed its Opposition brief, and August 16, 2019, when it asked the Grand Jury to return the Superseding Indictment, the Government *finally* recognized that the "original security offering" of the LPNs was, indisputably, an "offshore transaction," *see id*., and that the Government would never be able to prove that those LPN purchases were "made in the United States," as required under *Morrison*.  Thus, the Superseding Indictment now appears to allege a different theory, in which Mr. Boustani's criminal liability is predicated upon purchases and sales of the LPNs by investors in the *secondary* market.  (Super. Ind. at ¶ 73.)  Although the LPNs were offered and sold to investors in an offshore Regulation S transaction, those investors could (and did) later resell the unregistered LPNs to other investors, including to certain "qualified institutional buyers"— corporate entities with investment assets of more than $100 million.  Those resales are generally referred to as "secondary" market or "aftermarket" trades.

The reason why the secondary market trades were not originally alleged in the Government's charges is because it makes no sense to argue that Mr. Boustani conspired in a plot to fraudulently induce hedge funds to trade the LPNs on the secondary market.  The monies exchanged in those secondary trades remain in the hands of the various market participants who engaged in those transactions and the trades themselves have absolutely no impact—good or

30952697.3

bad—on any of the people or events otherwise described in the Superseding Indictment.[1]  But, having recognized that the purchases in connection with the "original security offering" of the LPNs were indisputably extraterritorial, the Government was faced with cutting the LPN allegations from its case or amending its theory to focus on secondary market trades.  It chose the latter.

In fact, however, the secondary market trades of the LPNs do not render Count Two viable, because those transactions were not domestic either.  In June of this year, Judge Berman of the Southern District concluded that allegations of aftermarket trades of securities that were initially offered through a Regulation S offshore transaction are "insufficient to plead a domestic transaction under *Morrison*."  *Banco Safra S.A. v. Samarco Mineracao S.A.*, *See* No. 16 CIV. 8800 (RMB), 2019 WL 2514056, at *1, *4 (S.D.N.Y. June 18, 2019) (explaining that debt securities at issue were "initially offered only outside the United States" although the plaintiff had "acquired" them in the "secondary market.").  Judge Berman explained that even if he accepted as true the plaintiff's claim that it had purchased the debt securities in the secondary market from "counterparties" who were "located in the United States," that fact did "not establish that the [plaintiff's] purchases and sales of [the debt securities at issue] were domestic transactions."  *Id*. at *4-*5.

Judge Berman got it right.  The fact that the LPNs were purchased and sold in secondary market transactions by investors located in the United States is insufficient to establish a domestic securities transaction.  In fact, as we explained in our prior briefing and during the

---

[1] In fact, the Government's theory that Mr. Boustani plotted to fraudulently induce investors to participate in the initial offering of the LPNs isn't all that persuasive either, given that Mr. Boustani and his alleged co-conspirators got nothing from those trades.  All of the monies incurred from the initial offering of the LPNs went to Credit Suisse Europe and VTB, who used it to benefit their own books.

August 21st oral argument, these aftermarket transactions, like the purchase of the LPNs in the initial offering, were extraterritorial.  *See* Ex. M at Tr. 30-39.  After being issued by the Dutch SPV, the LPNs were transferred to Credit Suisse Europe, which deposited them into accounts it held at the Euroclear and Clearstream clearing systems in Europe.  *See* Ex. N (Instruction Ltr. from the Dutch SPV to the Common Depositary); Ex. O (Instruction Ltr. from Credit Suisse Europe to deposit the LPNs into Euroclear).

In order to engage in any transaction concerning the LPNs, an investor had to utilize either Euroclear or Clearstream.  Investors seeking to purchase and investors seeking to sell the LPNs were "matched" via these European clearing houses and it was exclusively through these clearing houses that payment was rendered and title transferred from a seller to a buyer.  *See* Ex. I (Excerpts of Euroclear Terms and Conditions, at § 5.2.2.1.1 (citing § 4.1.5.2).)  Further, as Euroclear's Terms and Conditions make clear, a purchase or sale instruction from a market participant remains revocable and capable of cancellation at any time prior to "execut[ion]" of that instruction by Euroclear.  *Id*.  "Execution" of an instruction takes place via simultaneous book entries that are recorded in the Euroclear accounts of the two trading counterparties, in which cash is credited and the securities are debited from the seller's account at the exact moment in which cash is debited and the securities are credited to the purchaser's account.  *Id.*; *see also* Ex. K (trading confirmation concerning LPN resale in the secondary market to U.S. based investment advisor, demonstrating that the LPNs purchased by the advisor were paid for and delivered in Brussels via Euroclear); Ex. L (same, except that purchaser was foreign investment fund).

In other words, liability for all purchases and sales of the LPNs, regardless of whether those trades were made in connection with the initial Regulation S offering or in the

30952697.3

secondary market, became "irrevocable" only at the moment of execution of those trades by Euroclear, in Brussels. *Absolute Activist*, 677 F.3d at 69 (a securities transaction is situated in the location in which "irrevocable liability to carry out the transaction" is incurred). Title to the LPNs passed between trading counterparties in that same moment of execution and in the parties' respective Euroclear accounts in Brussels. *SEC v. Tourre*, No. 10 Civ. 3229 (KBF), 2012 WL 5838794, at *2, 6 (S.D.N.Y. Nov. 19, 2012) (where note transactions settled through Euroclear accounts in Europe, transaction was foreign, not domestic, because there was no "U.S.-based transfer of title"). Given these facts, it is clear why the Government has struggled so mightily to come up with an argument that the LPNs were purchased and sold in domestic securities transactions.

The same is true with respect to the April 6, 2016 Exchange of the LPNs for Eurobonds issued by the Republic of Mozambique. This transaction was limited to the 39 entities who held LPNs on the day of the Exchange. In order for these investors to exchange their LPNs for Eurobonds, they were required to use Euroclear or Clearstream to deliver a "valid Exchange and Voting Instruction" to a third party agent in England, Lucid Issuer Services Limited, indicating whether they wished for the Exchange to proceed. *See* Ex. H (Eurobond Exchange Offer), at 25 (defining "Exchange and Information Agent), 40 (describing "procedures" for participating in the Exchange transaction). However, approval of the Exchange by a majority of the LPN holders, as determined by a vote held at the London offices of Latham and Watkins LLP was required before the LPNs could be relinquished and the Eurobonds provided in their place. (*Id*. at 26.) And, once the Exchange was approved via the London vote, the actual relinquishment of the LPNs and the delivery of the Eurobonds were effectuated exclusively through the Euroclear and Clearstream systems in Europe. (*Id.* at 32, 43, 97, 117.)

12

30952697.3

Thus, there is no plausible argument that the Exchange was a domestic securities transaction. The fact that employees of some of the LPN holders came to decision, in their own minds, concerning whether they would vote for or against the Exchange while they were sitting in a U.S. territory, does not transform the Exchange into a domestic securities transaction actionable under U.S. securities laws, especially since the actual votes were cast, in person or via a human proxy, in a live vote in *London*.

There is no dispute between the parties about these underlying events: everyone agrees that these were unregistered securities transactions, involving junk bond debt instruments of a foreign issuer, that did not trade on any public exchange and which could only be bought and sold via European clearing houses. The Government does not contend that it will be able to prove at trial that these facts are wrong. Instead, it argues that it will be able to prove that a few investors made the decision to buy or sell or exchange these foreign securities while standing on U.S. soil. There is no reason to give the Government an opportunity to present this evidence at trial. Even if the Government does so, Count Two will still require dismissal, as courts have held, again and again and again, that the evidence the Government intends to offer is insufficient as a matter of law to demonstrate the existence of a domestic securities transaction. *See supra* at 6-7. The stubborn fact that these transactions occurred abroad is not going to change.

## II.     COUNT ONE OF THE SUPERSEDING INDICTMENT MUST BE DISMISSED BECAUSE THE GOVERNMENT HAS FAILED TO ALLEGE A WIRE FRAUD CONSPIRACY ACTIONABLE UNDER U.S. LAW.

As we described in our previous briefing, the Government must allege a "domestic" violation of Section 1349 in order to prosecute Mr. Boustani in the United States. The Government has never disputed that in order to do so, the Government must allege that the conduct "relevant to [Section 1349's] focus occurred in the United States." *RJR Nabisco, Inc.*,

13

30952697.3

136 S. Ct. at 2101.  As the Second Circuit has explained, a statute's "focus" is based upon the "essential elements" of the offense.  *Bascuñan v. Elsaca*, 927 F.3d 108, 122 (2d Cir. 2019).

Section 1349 has only two elements: "an agreement to commit [wire] fraud," and *mens rea*.  *United States v. McFadden*, 689 F. App'x 76, 79 (2d Cir. 2017) (Section 1349 requires proving "only an agreement to commit mail fraud," not "use of the mails"); *see also United States v. Beacham*, 774 F.3d 267, 272 (5th Cir. 2014) (same); *United States v. Harrison*, 663 F. App'x 460, 464 (6th Cir. 2016) (same); *see also United States v. Roy*, 783 F.3d 418, 420 (2d Cir. 2015) ("A conspiracy conviction under § 1349 does not require proof of an overt act.").

Thus, logic dictates that in order to charge a domestic violation of Section 1349, the Government must allege that the conspirators came to their "agreement" on U.S. soil, since an "agreement" is the only element (beyond mens rea) of the offense.  *Prime*, No. 17-2233, 2019 WL 4062219, *7 (2d Cir. Aug. 2019) (explaining that in order to apply a domestic U.S. statute that lacks any extraterritorial reach to a defendant, the defendant's "conduct" in the United States must be "violative of a substantive provision" of the charged statute).  The Superseding Indictment does not contain any such allegation.  Accordingly, the Superseding Indictment fails to allege a domestic violation of Section 1349 and must be dismissed for failure to state an offense.

III.     **COUNT ONE OF THE SUPERSEDING INDICTMENT IS AN IMPROPER EFFORT TO INTRODUCE TIME-BARRED CONDUCT TO THE JURY.**

In our prior briefing we explained that the wire fraud conspiracy charged in Count One improperly attempts to sweep in time-barred conduct.  During the August 21st oral argument, Your Honor asked the parties to provide the Court with the relevant limitations periods for the offenses charged.

14

30952697.3

The statute of limitations for a wire fraud conspiracy under 18 U.S.C. § 1349 (Count One) is five years.  *See* 18 U.S.C. § 3282.  Section 1349 is a conspiracy statute that does not require proof of an overt act and thus, the Government can satisfy the statute of limitations only if it proves that the conspiracy continued into the limitations period.  *United States v. Seher*, 562 F.3d 1344, 1364 (11th Cir. 2009).[2]  If the Government decoupled Count One into four separate conspiracies, as would be proper to avoid prejudice to Mr. Boustani from a duplicitous charge, the Government would be time-barred from introducing evidence concerning the alleged conspiracy to defraud those investors who purchased portions of Proindicus's debts from the European Investment Banks and from introducing evidence concerning the alleged conspiracy to defraud those investors who purchased LPNs in the initial offering in the fall of 2013.

Because the Grand Jury returned the Indictment on December 18, 2018, any wire fraud conspiracy claims should be limited to conduct that took place after **December 18, 2013**. Proindicus borrowed $372 million from Credit Suisse Europe and Credit Suisse disbursed those monies to Privinvest on March 21, 2013.  Proindicus then borrowed another $100 million from Credit Suisse Europe and those monies were disbursed to Privinvest on June 25, 2013. Proindicus then borrowed an additional $32 million from Credit Suisse and these monies were disbursed to Privinvest on August 14, 2013.  And finally Proindicus borrowed $118 million from VTB and these monies were disbursed to Privinvest on November 10, 2013.  The European

---

[2] The statute of limitations for a securities fraud conspiracy under 18 U.S.C. § 371 (Count Two) is six years.  *See* 18 U.S.C. § 3301.  Because Section 371 contains an overt act requirement, the statute of limitations begins to run from the date of last overt act in furtherance of the conspiracy. *United States v. Stewart*, 744 F.3d 17, 21 (1st Cir. 2014).  The statute of limitations for a money laundering conspiracy under 18 U.S.C. § 1956(h) (Count Four) is five years.  *See* 18 U.S.C. § 3282.  Like Section 1349, Section 1956(h) is a conspiracy statute that does not require proof of an overt act and thus, the Government must prove that the money laundering conspiracy remained in effect into the limitations period.  *Seher*, 562 F.3d at 1364

30952697.3

Investment Banks then sold pieces of the debt owed by Proindicus to certain institutional investors, but none of these sales took place after December 18, 2013.

If the Government was required to decouple Count One into separate counts, a count based on an alleged wire fraud against those investors who participated in the initial LPN offering would be time-barred.  On August 30, 2013, EMATUM borrowed $500 million from Credit Suisse Europe and these funds were disbursed to Privinvest on September 11, 2013 in order to pay for the equipment ordered by EMATUM in connection with the EMATUM National Fishing Fleet Project.  EMATUM then borrowed $350 million from VTB and VTB disbursed those monies to Privinvest on October 11, 2013.  Both Credit Suisse and VTB then sold the debt owed to them by EMATUM to the Dutch SPV which then issued LPNs which were offered for sale pursuant to Regulation S.  This initial offering of the LPNs was completed before December 18, 2013.

Because all of the relevant conduct concerning the wire fraud scheme ostensibly alleged with respect to investors in Proindicus's and EMATUM's debt took place prior to December 18, 2013, the Government does not want to decouple Count One into four separate counts, as it would be unable to bring charges in connection with Proindicus or EMATUM. However, the risk of prejudice to Mr. Boustani from Count One is real and for that reason, the Government should be required to decouple Count One's allegations into four distinct counts.

IV.     **COUNT FOUR OF THE SUPERSEDING INDICTMENT SHOULD BE DISMISSED AS UNCONSTITUTIONALLY OVERBROAD AND VAGUE.**

The Superseding Indictment also brought into focus serious constitutional defects in Count Four, which charges Mr. Boustani with participating in a conspiracy to commit money laundering.  (Superseding Indictment ¶¶ 103-04).  Specifically, the relevant portion of Count Four charges Mr. Boustani with:

16

30952697.3

> knowingly and intentionally conspir[ing] to transport, transmit and transfer monetary instruments and funds to one or more places outside the United States from one or more places inside of the United States . . . (a) **with the intent to promote** the carrying on of one or more specified unlawful activities, to wit: (i) a violation unlawful activities, to wit: (i) a violation of the FCPA, Title 15, United States Code, Sections 78dd-1, 78m(b)(2)(B), 78m(b)(5) and 78ff(a); (ii) offenses against a foreign nation involving the bribery of a public official, in violation of Mozambican law, as defined in Title 18, United States Code, Section 1956(c)(7)(B)(iv); (iii) wire fraud, in violation of Title 18, United States Code, Section 1343; and (iv) fraud in the sale of securities, in violation of Title 15, United States Code, Sections 78j(b) and 78ff (collectively, the "Specified Unlawful Activities"), contrary to Title 18, United States Code, Section 1956(a)(2)(A) . . .

(*Id*. ¶ 104) (emphasis added).[3]

The essence of the charged crime in the language quoted above is the intent to "promote" the "carrying on" of one of the specified unlawful activities referenced in the Superseding Indictment.  What "promoting" a violation of the FCPA, or Mozambican law, or wire or securities fraud in this context means, however, is entirely impossible to discern.

"As generally stated, the void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement."  *Kolender v. Lawson*, 461 U.S. 352, 357-61 (1983) (finding unconstitutionally vague a California loitering statute that "contain[ed] no standard for determining what a suspect has to do in order to satisfy the requirement to provide a 'credible and reliable' identification" and observing that  "the statute vests virtually complete discretion in the hands of the police to determine whether the suspect has satisfied the statute and must be permitted to go on his way in the absence of probable cause to arrest).  A law is unconstitutionally overbroad if it "punishes a

---

[3] Count Four also charges Mr. Boustani with violation of a separate aspect of Section 1956 that is not relevant to this application.

30952697.3

substantial amount of protected free speech, judged in relation to [its] plainly legitimate sweep."
*Virginia v. Hicks*, 539 U.S. 113, 118–19 (2003) (internal quotation marks omitted); *see also*
*Aptheker v. Secretary of State*, 378 U.S. 500, 511 (1964) (finding section of Subversive Activities
Control Act unconstitutional because it too broadly and indiscriminately infringed upon
constitutionally protected rights).

Here, the promotion prong of the money laundering statute suffers from vagueness
and overbreadth deficiencies. As a general matter, it is unclear what it means to "promote" the
violation of the statutes that constitute the Specified Unlawful Activities.  A person who purchases
a book written by a Mozambican political dissident, using an international money transfer, might
be said to have "promoted" one of the SUAs, to the extent that the book advances the notion that
bribery of public officials is a necessary tactic given the political situation in that country.  This
example underscores both the vagueness and the overbreadth problem raised by this prong of the
statute, because it demonstrates to extent to which a significant amount constitutionally protected
speech could easily fall within the scope of the prohibited conduct under the statute.

The Superseding Indictment is a case study in both of these problems as it provides
no meaningful guidance as to what exactly Mr. Boustani supposedly did that constituted promotion
of the crimes at issue. Count Four includes every prior substantive paragraph of the complaint and
offers no details whatsoever – it is merely a recitation of the statutory language. None of this
comports with our Constitution.

For all of these reasons, the Court should dismiss Count Four of the Superseding
Indictment.

30952697.3

## CONCLUSION

For the reasons set forth above and in our prior briefing, this Court should order the dismissal of Count One, Count Two and Count Four of the Superseding Indictment against Mr. Boustani.

Dated:   New York, New York
         August 30, 2019

**WILLKIE FARR & GALLAGHER LLP**

By: /s/ Michael S. Schachter
Michael S. Schachter
Randall W. Jackson
Casey E. Donnelly
Philip F. DiSanto
787 Seventh Avenue
New York, New York 10019-6099
Phone:  (212) 728-8000
Email: mschachter@willkie.com

*Attorneys for Defendant Jean Boustani*

19