UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------- X
                                               :

UNITED STATES OF AMERICA,
                                               :       No. 18-cr-681 (S-1) (WFK)

    - against –
                                               :       ECF Case

JEAN BOUSTANI, et al.,
                           :
                 Defendants.
                                                 :       Dated:  September 13, 2019

                                               :

------------------------------------------------------------- X

### DEFENDANT JEAN BOUSTANI'S MEMORANDUM OF LAW IN SUPPORT OF HIS MOTION *IN LIMINE* TO PRECLUDE CERTAIN EVIDENCE RELATING TO TEOFILO NHANGUMELE

**WILLKIE FARR & GALLAGHER LLP**
Michael S. Schachter
Randall W. Jackson
Casey E. Donnelly
Philip F. DiSanto
787 Seventh Avenue
New York, New York 10019-6099
Phone:  (212) 728-8000
Email:  mschachter@willkie.com

*Attorneys for Defendant Jean Boustani*

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ....................................................................................................1

FACTUAL BACKGROUND ......................................................................................................3

ARGUMENT ................................................................................................................................6

     I.     THE GOVERNMENT'S EGREGIOUS BRADY VIOLATIONS MERIT
          THE SUPPRESSION OF MR. NHANGUMELE'S
          COMMUNICATIONS AT TRIAL ..........................................................................6

     II.    THE COURT SHOULD PRECLUDE THE GOVERNMENT FROM
          INTRODUCING INTO EVIDENCE COMMUNICATIONS BETWEEN
          MR. BOUSTANI AND MR. NHANGUMELE FROM 2011-2012,
          BECAUSE THEY ARE NOT IN FURTHERANCE OF THE CHARGED
          CONSPIRACIES. ...................................................................................................12

     III.   THE COURT SHOULD PRECLUDE THE GOVERNMENT AND ITS
          WITNESSES FROM REFERRING TO MR. NHANGUMELE AS A
          "FOREIGN OFFICIAL," "GOVERNMENT OFFICIAL," OR "PUBLIC
          OFFICIAL." ...........................................................................................................14

CONCLUSION ............................................................................................................................16

# TABLE OF AUTHORITIES

**Cases**                                                                                      Page(s)

*Brady v. Maryland,*
373 U.S. 83 (1963).................................................................................................1, 7

*St. Germain v. United States,*
2004 WL 1171403 (S.D.N.Y. May 11, 2004) ....................................................7, 8

*United States v. Asaro,*
No. 14-CR-26 (AR), 2015 WL 5841804 (E.D.N.Y. Oct. 7, 2015)........................13

*United States v. Binday,*
908 F. Supp. 2d 485 (S.D.N.Y. 2012)....................................................................8

*United States v. Certified Env't Servs., Inc.,*
753 F.3d 72 (2d Cir. 2014).......................................................................................7

*United States v. D'Amico,*
734 F. Supp. 2d 321 (S.D.N.Y. 2010)....................................................................7

*United States v. Espinal,*
96 F. Supp. 3d 53 (S.D.N.Y. 2015)........................................................................8

*United States v. Gigante,*
166 F.3d 75 (2d Cir. 1999).....................................................................................13

*United States v. Gil,*
297 F.3d 93 (2d Cir. 2002)......................................................................................8

*United States v. Mahaffy,*
693 F.3d 113 (2d Cir. 2012)........................................................................7, 10, 11

*United States v. Pierce*
224 F.3d 158 (2d Cir. 2000)..............................................................................14, 15

*United States v. Rittweger,*
524 F.3d 171 (2d Cir. 2008)....................................................................................8

*United States v. Tellier,*
83 F.3d 578 (2d Cir. 1996).....................................................................................13

*United States v. Tracy,*
12 F.3d 1186 (2d Cir. 1993)..............................................................................13, 14

*United States v. Vilar,*
No. 05 VR.621, 2008 WL 2531195 (S.D.N.Y. June 22, 2008)...............................8

Defendant Jean Boustani respectfully submits this memorandum of law in support of his motion *in limine* to preclude the Government from: (1) introducing into evidence Mr. Boustani's communications with alleged co-conspirator Teofilo Nhangumele; and (2) referring at trial to Mr. Nhangumele as a "foreign official," "government official," or "public official" of the Republic of Mozambique.

<u>**PRELIMINARY STATEMENT**</u>

The Government's handling of information related to Teofilo Nhangumele represents an egregious violation of the most important ethical rule in our system of justice for the protection of criminal defendants—the rule set out by the U.S. Supreme Court in *Brady v. Maryland*, 373 U.S. 83 (1963). The *Brady* rule is simple: where the Government is in possession of materially exculpatory information, it has an unambiguous obligation to disclose that information to the defense immediately. The Government in this case came into possession of unambiguous *Brady* material in the form of interview statements made by Mr. Nhangumele and it chose to suppress them.

In January of this year, Mr. Nhangumele offered several different exculpatory explanations of critical components of the alleged fraud scheme to interviewing law enforcement agents. First, Mr. Nhangumele stated that he was told by Mozambican Government officials that money being solicited from Mr. Boustani was for the purpose of an undisclosed State Information and Security Service ("SISE") operation, not for bribes. Rather than disclose this information promptly to the defense, as required by the Constitution, the Government sat on this information for the entire period that the defense has been investigating and preparing for trial. Now, only a few weeks before the start of trial, with no time remaining to investigate this information involving actors located thousands of miles away, the Government has elected to disclose this information. With no time available to attempt to interview Mr. Nhangumele, who

- 1 -

currently sits in a jail cell on another continent, the Government has finally chosen to release the exculpatory details of the FBI 302 report of his interview. The suppression of this information is a clear violation of the prosecutors' Constitutional obligations, and requires preclusion from the trial of any communications involving Mr. Nhangumele.

Second, Mr. Nhangumele offered an exculpatory explanation of his professional status during the period at issue in the Government's charges. In the Superseding Indictment, the Government has improperly persisted in alleging that Mr. Nhangumele was a Mozambican "foreign official" within the meaning of the FCPA, *see* Sup. Ind. ¶ 5, but there is no reliable information anywhere indicating that Mr. Nhangumele was a public official during the relevant time period. Despite the centrality of this claim to the charges against Mr. Boustani, the Government suppressed Mr. Nhangumele's exculpatory statements made on this point. Specifically, in January of 2019, Mr. Nhangumele told investigating FBI agents repeatedly that he held no position with the Government of Mozambique and that he was not working for the Government of Mozambique. The suppression of this information was a critical *Brady* violation requiring preclusion from the trial of any communications involving Mr. Nhangumele. Relatedly, the Court should preclude the Government from making any argument to the jury that Mr. Nhangumele is a Mozambican public official, given that the discovery makes evident that this allegation is false and that the Government knows that it is false.

Finally, all of this information underscores that the Government has improperly marked as exhibits a significant number of communications between Mr. Nhangumele and Mr. Boustani from the years 2011 and 2012. None of these communications are admissible because they predate and are entirely unrelated to the charged conspiracies. In fact, as of the date on which the Superseding Indictment alleges that Mr. Boustani and Mr. Nhangumele were

discussing "50 million chickens," namely, December 28, 2011, neither Mr. Boustani, nor any of his co-conspirators, nor even any investment bank, had even *conceived* of engaging in transactions involving investors which could someday be the alleged targets of Count One and Two. There was not the faintest glimmer of contemplation by *anyone* of loans to finance any project, much less the syndication of those loans by investment banks using supposed misrepresentations in loan agreements which had no one had planned. Yet, it is the Government's position that Mr. Boustani and Mr. Nhangumele had nevertheless already agreed to participate in wire fraud and securities fraud schemes against them. Candidly, the defense remains perplexed by the metaphysical impossibility of the Government's theory, as logic dictates that two individuals cannot come to a mutual consensus to defraud certain entities whose existence they have not yet contemplated. In any event, the Government cannot establish admissibility under Federal Rule 801(d)(2)(E) and thus, these communications must be precluded.

## FACTUAL BACKGROUND

Teofilo Nhangumele is a private citizen of Mozambique who was not, during the relevant time period, a foreign official with the Mozambican Government. Mr. Nhangumele's employment background is as follows:

- From 2001 to 2008, Mr. Nhangumele served as a "Government and Public Relations Manager" at British Petroleum ("BP") Mozambique.

- From 2009 to 2011, Mr. Nhangumele was employed by the Government of Mozambique as the Chief Financial Officer of the Mozambique Ministry of Youth Sports. This position concluded prior to any of the allegedly corrupt payments described in the Superseding Indictment.

- From 2012-2014, Mr. Nhangumele was employed as a "Country Manager" with PetroSA (South African National Oil Company) where he was responsible for "facilitat[ing] and manag[ing] government

> relations on behalf of PetroSA in order to get access to gas assets in Mozambique."

- From 2014-2016, Mr. Nhangumele was employed as a "Country Manager" for McDermott Marine Construction where he was responsible for "assisting McDermott have access to valuable market information to complete the bids for two major oil contracts . . . [in] contact[] with local authorities [and] diplomatic consulates . . . ."

*See* <u>Ex. A</u> at 3, Mr. Nhangumele's Curriculum Vitae.  In short, Mr. Nhangumele is a political relations consultant.  He serves as an intermediary between major corporations seeking to do business in Mozambique and the Government of Mozambique.  It is in this capacity that Mr. Boustani engaged Mr. Nhangumele—as a consultant familiar with the local political dynamic who could represent Privinvest in its efforts to secure a contract to supply the equipment necessary for the Infrastructure Projects[1]—or, as Mr. Nhangumele referred to them, the "EEZ" projects (*i.e.*, projects designed to protect the "Exclusive Economic Zone" of the Republic of Mozambique).

As explained in Mr. Nhangumele's Consultancy and Services Agreement, dated January 20, 2012, "Privinvest Shipbuilding want[ed] to bid for [the EEZ] contract as main contractor, and need[ed] a local consultant and service provider in [] Mozambique."[2] Accordingly, Privinvest hired Mr. Nhangumele and Mr. Bruno Langa to, *inter alia*, (i) provide information concerning "the general evolution of the [EEZ] project," "competitors activities," "the organization and changes in personnel of the [government] Ministries involved in the Project," and "the [government] decision-making system related to the Project;" (ii) "assist[] in

---

[1]  Capitalized terms have the same meaning as in Mr. Boustani's Amended Motion to Dismiss, which has been filed at Dkt. 97 (Opening Brief); Dkt. 125 (Reply); Dkt. 146 (Supplemental Submission).
[2]  *See* <u>Ex. B</u> at 1, Mr. Nhangumele's Consultancy and Services Agreement, dated Jan. 20, 2012.

public relations and publicity;" and (iii) and "assist[] in setting up meetings, conferences, presentations, and demonstrations related to the Project."[3]

Mr. Nhangumele himself explained this to the Government during his January 29, 2019 interview in Mozambique with FBI Assistant Legal Attaché (ALAT) Farrell A. Binder and DEA Deputy Country Attaché Matthew Musselwhite.[4]  According to the FBI's report of that interview, Mr. Nhangumele repeatedly told the Government that he had no affiliation with the Mozambican Government, that Mr. Nhangumele was not an official of the Mozambican Government, and that he was instead serving as a facilitator between Mr. Boustani and the Government of Mozambique:



---

[3] *Id.* at 2.
[4] *See* <u>Ex. C</u>, 3500-TN-1.
[5] *Id.* at 3-4.
[6] *Id.* at 7 (emphasis added).
[7] *Id.* (emphasis added).



After experiencing delays in getting the Proindicus Coastal Surveillance Project off the ground, Mr. Nhangumele wrote to Mr. Boustani: "Have you ever asked yourself who do [I] represent in this business? If you think [I] represent the GoM [Government of Mozambique] why is it that you have not received a formal letter from the GoM?"[10] Mr. Boustani responded: **"I know you don't represent GoM [Government of Mozambique] . . . We rely on you as our local partner to secure the project."[11]** At no point after these conversations did Mr. Nhangumele become a public official of Mozambique.

## ARGUMENT

### I.      THE GOVERNMENT'S EGREGIOUS *BRADY* VIOLATIONS MERIT THE SUPPRESSION OF MR. NHANGUMELE'S COMMUNICATIONS AT TRIAL

One of the central, and most colorful, allegations in the Superseding Indictment is that Mr. Boustani and Mr. Nhangumele "agreed to $50 million in bribe payments to Mozambican government officials" or "50 million chickens," *see* Sup. Ind. ¶¶ 33, 33(a), in order to approve the Proindicus Coastal Surveillance Project. Another significant allegation in the Superseding Indictment is the charge that Mr. Nhangumele was acting in an official capacity on behalf of the Office of the President of Mozambique. (*Id.* ¶ 5.) Yet the Government has had in its possession, since January of this year, statements from Mr. Nhangumele that directly contradict these

---

[8]  *Id.* at 13 (emphasis added).
[9]  *Id.* at 15 (emphasis added).
[10]  *See* Ex. D, DOJ0001802529.
[11]  *Id.* (emphasis added).

allegations.  The Government has only just disclosed those statements to defense counsel a week

ago.  If defense counsel had known about these exculpatory statements when the Government

first heard them, we could have reached out to Mr. Nhangumele and investigated.  Now, with

trial quickly approaching and Mr. Nhangumele in a jail cell a continent away, such an

investigation is an impossibility.  The Government's tardy disclosure of Mr. Nhangumele's

exculpatory statements has therefore prejudiced Mr. Boustani, and as a result, the Government

should be precluded from introducing Mr. Nhangumle's communications at trial.

   In *Brady v. Maryland*, the Supreme Court held that "the suppression by the

prosecution of evidence favorable to an accused upon request violates due process where the

evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of

the prosecution."  373 U.S. 83, 87 (1963); *United States v. Certified Env't Servs., Inc.*, 753 F.3d

72, 91 (2d Cir. 2014) (citing *Brady* and observing that "the Government has a "constitutional

duty" to "disclose favorable evidence to the accused where such evidence is 'material' either to

guilt or to punishment").  "[M]ateriality" in the *Brady* sense is "not the same thing as materiality

in the evidentiary sense."  *St. Germain v. United States*, 2004 WL 1171403, at *10 (S.D.N.Y.

May 11, 2004).  Evidence is considered "material" or "favorable to the defense" in the context of

a *Brady* analysis whenever the evidence would "harmonize with a defendant's theor[y]" of the

case.  *United States v. Mahaffy*, 693 F.3d 113, 133 (2d Cir. 2012).

   The Government has a pre-trial obligation "to disclose *Brady* material in

sufficient time for the defense to make effective use of it at trial."  *United States v. D'Amico*, 734

F. Supp. 2d 321, 367 (S.D.N.Y. 2010).  "[T]imeliness" with "respect to *Brady* disclosure means

*immediate* disclosure upon discovery."  *United States v. Binday*, 908 F. Supp. 2d 485, 498 (S.D.N.Y. 2012) (emphasis added).[12]

   Moreover, where information—including witness statements—can be classified as both *Brady* material and *Giglio*/3500 material, it is *Brady* that controls.  *See United States v. Rittweger*, 524 F.3d 171, 181 n.4 (2d Cir. 2008) ("Complying with the Jencks Act, of course, does not shield the government from its independent obligation to timely produce exculpatory material under *Brady*—a constitutional requirement that trumps the statutory power of 18 U.S.C. § 3500."); *United States v. Gil*, 297 F.3d 93, 105 (2d Cir. 2002) (reversing conviction where the Government waited to disclose in its 3500 materials *Brady* evidence that "had the potential to subvert" the background assumption on which the Government's theory of the offense was predicated); *United States v. Espinal*, 96 F. Supp. 3d 53, 66 (S.D.N.Y. 2015) ("A witness statement—or parts thereof—may fall within the ambit of both *Brady* and *Giglio*, and thus the government may be required to be produce it in advance of the trial testimony despite the Jencks Act"); *United States v. Vilar*, No. 05 VR.621, 2008 WL 2531195, at *1, *4 (S.D.N.Y. June 22, 2008) (ordering early disclosure of Section 3500 materials "to the extent that such material constitutes *Brady* exculpatory or impeachment material"); *St. Germain*, 2004 WL 1171403 at *1 (setting aside a criminal conviction because the Justice Department had "violated its *Brady* obligations" by waiting to produce *Brady* evidence to the defense under "the guise of Jencks Act material," instead of producing it in a timely fashion.)

---

[12]  *See also* Discovery Policy of the U.S. Attorney's Office for the Eastern District of New York at 44 (2015), available at https://www.justice.gov/sites/default/files/usao/pages/attachments/2015/04/01/nye_discovery_policy.pdf ("The [Eastern District's] practice is to disclose *Brady* information ***immediately*** upon obtaining the information.") (emphasis added).

For the avoidance of any doubt as to what would constitute *Brady* material, on July 1, 2019, Mr. Boustani provided to the Government descriptions of evidence—in particular, witness statements—which were "(i) material to preparing Mr. Boustani's defense, (ii) material to the elements of the crimes charged in the Indictment, or (iii) will play a significant role in uncovering admissible evidence, aiding witness preparation, corroborating testimony" including statements "which are in any way inconsistent with the allegations in the Indictment."[13]  On August 19, 2019, the Government sent a letter to the defense claiming that: "[t]he government does not currently have any material under *Brady v. Maryland*, 373 U.S. 83 (1963) . . . to the extent that your letter requested early production of § 3500 material, the government will produce such material by September 6, 2019."[14]

Several weeks later, on September 6, 2019, the Court-ordered deadline for the production of 3500 material, the Government produced three FBI Form 302s recounting the Government's *January 29, 2019, February 4, 2019, and February 5, 2019* interviews with Mr. Boustani's alleged co-conspirator, Mr. Nhangumele.[15]  As described above, during these interviews, Mr. Nhangumele repeatedly told the Government that, contrary to the Government's allegations, he had *not* been working for the Government of Mozambique during the time period at issue.[16]  Mr. Nhangumele also provided an alternative explanation for the email in which the Government claims Mr. Boustani and Mr. Nhangumele "agreed to $50 million in bribe and kickback payments to Mozabican Government officials."[17]  Specifically, the FBI report reveals that:

---

[13] *See* <u>Ex. E</u> at 2, Letter from Defense Counsel to the Government, dated July 1, 2019.

[14] *See* <u>Ex. F</u> at 1, Letter from the Government to Defense Counsel, dated Aug. 19, 2019.

[15] *See* <u>Exs. C</u>, <u>G</u> (3500-TN-2), and <u>H</u> (3500-TN-3).

[16] *See supra* at 4-5.

[17] *See* Sup. Ind. ¶ 33; <u>Ex. I</u> (GX 2013).



In addition to these materially exculpatory statements by Mr. Nhangumele, the Government also withheld, until September 6, 2019, certain highly exculpatory documents provided by Mr. Nhangumele to the Government during his February 4, 2019 interview.  For example, the Government withheld Mr. Nhangumele's Consultancy and Services Agreement with Privinvest, which demonstrated that Mr. Nhangumele was an independent consultant engaged by Privinvest to provide legitimate consulting and government relations services.[19]

Each of the identified categories of information withheld by the Government unquestionably fell within the ambit of *Brady*.  The Second Circuit has confirmed that when the Government possesses statements from witnesses or documents that relate to a "central question at trial" and which may "undercut the government's argument[s]" *Brady* mandates the disclosure of such material to the defense.  *Mahaffy*, 693 F.3d at 127, 130 (where law required Government to prove "confidentiality" of information transmitted to tippee, it was *Brady* violation to withhold

---

[18]  *See* <u>Ex. C</u> at 5-6, 14.
[19]  *See supra* at 3-4.

statements by relevant individuals asserting that "information was not confidential" since these statements "squarely contradicted" the Government's allegations).

The portions of the FBI reports containing Mr. Nhangumele's statements that the "$50 million" upon which the Government has attempted to build its case were in fact funds earmarked for a confidential SISE operation were more critical *Brady* material. Where evidence "could lead to admissible evidence," including to witnesses that the defense might wish to "interview and possibly subpoena" at trial, it constitutes material *Brady* information. *Mahaffy*, 693 F.3d at 131. This information went right to the heart of the most important allegations in the Government's case. Had the Government produced this material promptly after receiving it, Mr. Boustani would have had seven months to investigate this claim, including by interviewing Mr. Nhangumele, Mr. Mutota, or other individuals who may have information related to Mr. Nhangumele's statement that a Mozambican official requested that the $50 million would be ██████████████████████ and ████████████████[20] Particularly in a case where all of the relevant events took place on the other side of the world, the Government's withholding of an exculpatory interview of a key alleged coconspirator was inexplicable and served no other purpose than to hamper Mr. Boustani's defense.

Another central question at trial for all three Counts will be whether the Superseding Indictment's allegation that Mr. Nhangumele was a government official can be supported by any evidence. With respect to Counts One and Two, in particular, which involve alleged misrepresentations concerning compliance with anti-corruption laws and the use of loan proceeds, the fact that Mr. Nhangumele is not a government official is critical evidence to proving that the alleged misrepresentations were not false. With respect to Count Four, as

---

[20] *See* <u>Ex. C</u> at 5-6, 14.

discussed in greater detail below, the fact that Mr. Nhangumele is not a government official is crucial to proving that there was no conspiracy to launder money to promote or conceal the proceeds of the SUAs described in the Superseding Indictment.  Accordingly, the portions of the FBI reports containing Mr. Nhangumele's repeated statements that he was not a government official were unquestionably *Brady* material.  Similarly, Mr. Nhangumele's Consultancy and Services Agreement with Privinvest was unambiguous *Brady* material.

  We are now only weeks away from Mr. Boustani's trial, which he has been eagerly awaiting for nearly the entirety of this year.  The only appropriate sanction at this juncture is for the Court to preclude the admission of Mr. Nhangumele's communications at Mr. Boustani's trial.

## II. THE COURT SHOULD PRECLUDE THE GOVERNMENT FROM INTRODUCING INTO EVIDENCE COMMUNICATIONS BETWEEN MR. BOUSTANI AND MR. NHANGUMELE FROM 2011-2012, BECAUSE THEY ARE NOT IN FURTHERANCE OF THE CHARGED CONSPIRACIES.

  The Government should also be precluded from offering into evidence discussions between Mr. Boustani and Mr. Nhangumele because those communications were not made in furtherance of the charged conspiracy.  Communications between Mr. Nhangumele and Mr. Boustani about the supposed bribe payments allegedly occurred in 2011, well before any of the alleged co-conspirators had even conceived of any investors to buy Mozambique's debt, let alone schemed to defraud them.  Because these communications were not made in order to further the charged conspiracies, they are irrelevant and hearsay, and the Government should be precluded from offering them into evidence.

  To admit an alleged co-conspirator's statement pursuant to Rule 801(d)(2)(E), the Court must "find (1) that there was a conspiracy, (2) that its members included the declarant and the party against whom the statement is offered, and (3) that the statement was made both (a)

during the course of and (b) in furtherance of the conspiracy.'" *United States v. Tracy*, 12 F.3d 1186, 1196 (2d Cir. 1993) (citing *Bourjaily v. United States*, 483 U.S. 171, 175 (1987)).  The conspiracy cannot just be any conspiracy, but rather needs to be the conspiracy charged in the indictment.  *United States v. Asaro*, No. 14-CR-26 (AR), 2015 WL 5841804, at *5 (E.D.N.Y. Oct. 7, 2015) (declining to admit statements of an alleged co-conspirator because, although those statements may have been in furtherance of some separate conspiracy, they were not in furtherance of the conspiracy charged against the defendant).  In other words, the Government must show that the declarant and the defendant had a "unity of interests stemming from a specific shared criminal task that justifies Rule 801(d)(2)(E)."  *United States v. Gigante*, 166 F.3d 75, 83 (2d Cir. 1999).  Moreover, the Court must find "some independent corroborating evidence" that the declarant and the defendant were engaged together in the charged conspiracy before relying on hearsay statements pursuant to Rule 801(d)(2)(E).  *United States v. Tellier*, 83 F.3d 578, 580 (2d Cir. 1996).

However, there is not one modicum of proof, anywhere in the mountains of discovery produced by the Government, that communications between Mr. Nhangumele and Mr. Boustani, occurring between 2011-2012, were made in furtherance of the fraud conspiracies alleged in the Superseding Indictment.  There is no evidence that Mr. Boustani, or even any of his alleged co-conspirators, had even conceived of the *existence* of any investors during the time of Mr. Boustani's communications with Mr. Nhangumele in 2011 and 2012.

Likewise, the communications from Mr. Nhangumele to Mr. Boustani are also inadmissible as co-conspirator statements in furtherance of the money laundering conspiracy.  The Superseding Indictment alleges that the money laundering conspiracy occurred from approximately "***January 2013 to December 2018***."  (Sup. Ind. ¶ 104 (emphasis added).)

Accordingly, the 2011-2012 statements by Mr. Nhangumele to Mr. Boustani plainly could not have been in furtherance of the conspiracy to commit money laundering because they did not occur during the alleged conspiracy.  *Tracy*, 12 F.3d at 1196.  This is black letter law.  Accordingly, these communications are hearsay not subject to admission pursuant to Rule 801(d)(2)(E).

## III.  THE COURT SHOULD PRECLUDE THE GOVERNMENT AND ITS WITNESSES FROM REFERRING TO MR. NHANGUMELE AS A "FOREIGN OFFICIAL," "GOVERNMENT OFFICIAL," OR "PUBLIC OFFICIAL."

During the relevant time periods of the charged schemes, Mr. Nhangumele was not an official of the Government of Mozambique.  (*See supra* at 3-4.)  Mr. Nhangumele explained this repeatedly to the Government during his January 29, 2019 interview in Mozambique with U.S. law enforcement agents, including the FBI.  Nevertheless, on August 16, 2019, more than six months after Mr. Nhangumele's interview, the Government filed its Superseding Indictment *maintaining* its allegation Mr. Nhangumele was "acting in an official capacity for and on behalf of the Office of the President of Mozambique" and "was thus a 'foreign official.'"  (Sup. Ind. ¶ 5.)

At trial, to sustain a money laundering conviction, the Government must establish that the "unlawful activity" with which Mr. Boustani is alleged to have "intended to promote" was *actually* an "offense[] against a foreign nation involving the bribery of a public official or misappropriation, theft, and embezzlement of public funds by and for the benefit of a public official, in violation of Mozambican law."  *See, e.g.*, *United States v. Pierce* 224 F.3d 158, 165 (2d Cir. 2000) (reversing money laundering conspiracy conviction and holding that "[u]nder § 1956(a)(2)(A), . . . [i]t was [] *necessary for the government to show* that the scheme of which the [defendants] used the proceeds or intended to promote *actually was*" a specified unlawful activity.) (emphasis added).

- 14 -

Based on the Government's preliminary exhibit list, the Government ostensibly intends to demonstrate that Mr. Nhangumele was "acting in an official capacity for and on behalf of the Office of the President of Mozambique" by offering: (1) an email in which Mr. Boustani told representatives of Credit Suisse, including Surjan Singh, that "the Mozambicans requested a letter of interest from CS addressed to either myself or Mr. Teofilo Nhangumele (Office of HE President) expressing the interest of CS to lend the Government of Mozambique," (*see* Ex. G (GX 2022), and (2) a subsequent email from Mr. Singh to Mr. Pearse describing Mr. Nhangumele as "from the Office of HE President" and "team leader of the EEZ project"  (*see* Ex. H (GX 2025)).  But, to the extent that the Government's theory relies on its allegations of Mr. Nhangumele's status as a public office, the Government needs to demonstrate that Mr. Nhangumele was *actually* a public official.  Because the evidence that Mr. Nhangumele was *actually* a public official is "not only insufficient but non-existent," *see Pierce*, 224 F.3d at 166-6, any reference to Mr. Nhangumele as a foreign public official would be extremely prejudicial to Mr. Boustani and would serve no purpose other than to mislead the jury.  *See* American Bar Association Criminal Justice Standards for the Prosecution Function, Standard 3-1.4(b) ("The prosecutor should not . . . offer evidence, that the prosecutor does not reasonably believe to be true, to a court, lawyer, witness, or third party, except for lawfully authorized investigative purposes.")

Accordingly, the Court should preclude the Government and its witnesses from referring to Mr. Nhangumele as a government official at trial.

## CONCLUSION

The Court should grant Mr. Boustani's motion to preclude the Government from:
(1) introducing into evidence Mr. Boustani's communications with Mr. Nhangumele; and (2)
referring to Mr. Nhangumele as a "foreign official," "government official," or "public official"
of the Republic of Mozambique at trial.


Dated:    New York, New York
          September 13, 2019


**WILLKIE FARR & GALLAGHER LLP**

By: /s/ Michael S. Schachter
Michael S. Schachter
Randall W. Jackson
Casey E. Donnelly
Philip F. DiSanto
787 Seventh Avenue
New York, New York 10019
Phone:  (212) 728-8000
Email:  mschachter@willkie.com

*Attorneys for Defendant Jean Boustani*