# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | Crim. Action No.: 15-CR-00611 (AJN) |
| BENJAMIN WEY and SEREF DOĞAN ERBEK, | |
| Defendants. | |

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT
OF DEFENDANT BENJAMIN WEY'S MOTION TO SUPPRESS,
TO DISMISS THE INDICTMENT, AND FOR OTHER RELIEF**

**HAYNES AND BOONE, LLP**
**30 Rockefeller Plaza**
**New York, New York 10012**
**(212) 659-7300**
*Attorneys for Defendant Benjamin Wey*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ..................................................................................................1

ARGUMENT ...........................................................................................................................7

    I. THE SEARCH WARRANTS ARE OVERLY BROAD AND UNREASONABLE
       "GENERAL WARRANTS" ................................................................................. 7

        A.   The Search Warrants Are Facially Unconstitutional General Warrants........ 8

        B.   The "All Business Records" Exception Does Not Apply ........................... 16

        C.   The Government Cannot Save Its Unconstitutional Warrants By
            Reference To Items Outside The Warrants .................................................. 21

        D.   The Good Faith Exception Does Not Apply ................................................ 23

    II. THE GOVERNMENT IMPROPERLY CONDUCTED SEARCHES AND
       RETAINED MATERIALS BEYOND THE SCOPE OF THE WARRANT ......... 27

    III. THE CASE AGENT'S SUPPORTING AFFIDAVIT WAS MATERIALLY
        MISLEADING ................................................................................................ 32

        A.   The Search Warrant Affidavits Are Materially Misleading ........................ 42

        B.   At a Minimum, A *Franks* Hearing Is Appropriate ...................................... 42

    IV. THE GOVERNMENT SHOULD BE COMPELLED TO DISCLOSE ITS
       TAINT PROCESS, AND SHOULD BE PROHIBITED FROM REVIEWING
       PRIVILEGED OR POTENTIALLY PRIVILEGED DOCUMENTS ................... 42

    V. THE CHARGES SHOULD BE DISMISSED ............................................... 44

        A.   Counts One, Two, Three, Four, Seven, And Eight Are Duplicitous ........... 44

        B.   Counts Two Through Six Must Be Dismissed ............................................ 47

        C.   Counts One, Seven, And Eight Also Fail ................................................... 52

        D.   The Government's Prejudicial Pre-Indictment Delay Requires
            Dismissal Of The Indictment ..................................................................... 52

    VI. MR. WEY SHOULD BE PERMITTED TO TAKE A PRE-TRIAL
       DEPOSITION OF CO-DEFENDANT SEREF DOĞAN ERBEK PURSUANT
       TO RULE 15 ................................................................................................ 53

VII. THE INDICTMENT SHOULD BE STRIPPED OF ALL REFERENCES TO
MR. WEY'S PURPORTED "A/K/As" ................................................................... 55

CONCLUSION ........................................................................................................................57

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Anti-Monopoly, Inc. v. Hasbro, Inc.*,
   958 F. Supp. 895 (S.D.N.Y. 1997)........................................................................48

*Calderon v. City of New York*,
   14-CV-1082, 2015 WL 5802483 (S.D.N.Y. Oct. 5, 2015)....................................36

*Exodus Partners, LLC v. Cooke*,
   04-CV-10239, U.S. Dist. LEXIS 3544 (S.D.N.Y. Jan. 16, 2007) ..........................48

*Chiarella v. United States*,
   445 U.S. 222 (1980)..............................................................................................47

*GFL Advantage Fund, Ltd. v. Colkitt*,
   272 F.3d 189 (3d Cir. 2001).................................................................................50

*Groh v. Ramirez*,
   540 U.S. 551 (2004)........................................................................................21, 24

*Maryland v. Garrison*,
   480 U.S. 79 (1987)................................................................................................14

*Nat'l City Trading Corp. v. United States*,
   635 F.2d 1020 (2d Cir. 1980)...............................................................................18

*Nanopierce Techs., Inc. v. Southridge Capital Mgmt., LLC*,
   02-CV-767, 2002 U.S. Dist. LEXIS 24049 (S.D.N.Y. Oct. 10, 2002)...................50

*Russell v. United States*,
   369 U.S. 749 (1962)..............................................................................................49

*SEC v. China Energy Savings Technology*,
   No. 06 Cv. 6402 (E.D.N.Y. 2006) ........................................................................34

*SEC v. Masri*,
   523 F. Supp. 2d 361 (2007) .................................................................................50

*Sharette v. Credit Suisse Intern.*,
   127 F. Supp. 3d 60 (S.D.N.Y. 2015)....................................................................48

*United States v. Alfonso*,
143 F.3d 772 (2d Cir. 1998)..................................................................49

*United States v. Barr*,
816 F.2d 94 (2d Cir. 1987)...............................................................49, 50

*United States v. Bongiorno*,
05-CR- 390, 2006 WL 1140864 (S.D.N.Y. May 1, 2006) ....................49

*United States v. Bowen*,
689 F. Supp. 2d 675 (S.D.N.Y. 2010)..................................................18

*United States v. Brennan*,
183 F.3d 139 (2d Cir. 1999)..................................................................51

*United States v. Burke*,
718 F. Supp. 1130 (S.D.N.Y. 1989)...........................................17, 18, 19

*United States v. Calandra*,
414 U.S. 338 (1974)..............................................................................16

*United States v. Clark*,
638 F.3d 89 (2d Cir. 2011)....................................................................27

*United States v. Cohan*,
628 F. Supp. 2d 355 (E.D.N.Y. 2009) ..................................................18

*United States v. D'Amico*,
734 F. Supp. 2d 321 (S.D.N.Y. 2010)..............................................17, 18

*United States v. Dixon*,
536 F.2d 1388 (2d Cir. 1976)................................................................51

*United States v. Finnerty*,
533 F.3d 143 (2d Cir. 2008)............................................................47, 48

*United States v. Galpin*,
720 F.3d 436 (2d Cir. 2013)............................................................ *passim*

*United States v. Ganias (Ganias I)*,
755 F.3d 125 (2d Cir. 2014)............................................................ *passim*

*United States v. Ganias (Ganias II)*,
12-CR-240, 2016 WL 3031285 (2d Cir. May 27, 2016) ................ *passim*

*United States v. George*,
386 F.3d 383 (2d Cir. 2004)..................................................................51

*United States v. George*,
975 F.2d 72 (2d Cir. 1992)..........................................................................*passim*

*United States v. Grant*,
14-CR-391, 2015 WL 321586 (N.D. Tex. Jan. 26, 2015) .......................................56

*United States v. Gross*,
165 F. Supp. 2d 372 (E.D.N.Y. 2001) ..................................................................53

*United States v. Hernandez*,
09-CR-625, 2010 U.S. Dist. LEXIS 719 (S.D.N.Y. Jan. 6, 2010) ................8, 16, 18

*United States v. Hickey*,
16 F. Supp. 2d 223 (E.D.N.Y. 1998) .............................................................17, 19, 20

*United States v. Jacobson*,
4 F. Supp. 3d 515, 519 (E.D.N.Y. 2014) ...............................................................15

*United States v. Johnpull*,
739 F.2d 702 (2d Cir. 1984)...................................................................................54

*United States v. Johns*,
851 F.2d 1131 (9th Cir. 1988) ...............................................................................42

*United States v. Kaiser*,
609 F.3d 556 (2d Cir. 2010)...................................................................................51

*United States v. Kaplan*,
02-CR-883, 2003 U.S. Dist. LEXIS 21825 (S.D.N.Y. Dec. 8, 2003) ...................43

*United States v. Leon*,
468 U.S. 897 (1984)...............................................................................................37

*United States v. Liu*,
12-CR-934, 2014 U.S. Dist. LEXIS 3520 (S.D.N.Y. Jan. 10, 2014) ....................18

*United States v. Levy*,
11-CR-62, 2013 U.S. Dist. LEXIS 25508 (S.D.N.Y. Feb. 25, 2013)....................27

*United States v. Lustyik*,
57 F. Supp. 3d 213 (S.D.N.Y. 2014)......................................................................15

*United States v. Matthews*,
787 F.2d 38 (2d Cir. 1986).....................................................................................51

*United States v. Metter*,
860 F. Supp. 2d 205 (E.D.N.Y. 2012) ...........................................................*passim*

*United States v. Moetamedi,*
92-CR-411, 1993 U.S. Dist. LEXIS 6311 (N.D.N.Y. May 5, 1993) .......................................26

*United States v. Mowad,*
641 F.2d 1067 (2d Cir. 1981) ............................................................................................47

*United States v. Mulheren,*
938 F.2d 364 (2d Cir. 1991) ..............................................................................................50

*United States v. Myers,*
635 F.2d 932 (2d Cir. 1980) ..............................................................................................47

*United States v. Myers,*
692 F.2d 823 (2d Cir. 1982) ..............................................................................................47

*United States v. Oloyede,*
982 F.2d 133 (4th Cir. 1992) .............................................................................................18

*United States v. Pena,*
961 F.2d 333 (2d Cir. 1992) .........................................................................................23, 25

*United States v. Pirro,*
212 F.3d 86 (2d Cir. 2000) .................................................................................................49

*United States v. Riley,*
906 F.2d 841 (2d Cir. 1990) ..............................................................................................15

*United States v. Robilotto,*
828 F.2d 940 (2d Cir. 1987) ..............................................................................................47

*United States v. Roche,*
614 F.2d 6 (1st Cir.1980) ...................................................................................................13

*United States v. Rosa,*
626 F.3d 56 (2d Cir. 2010) ...........................................................................................21, 25

*United States v. Ross,*
98-CR-1174-1, 1999 WL 782749 (S.D.N.Y. Sept. 16, 1999) ..............................................47

*United States v. Ryan,*
07-CR-35, 2009 U.S. Dist. LEXIS 53644 (D. Vt. May 26, 2009) ...................................24, 25

*United States v. Schlisser,*
168 Fed. App'x 483 (2d Cir. 2006) .....................................................................................51

*United States v. Starks,*
515 F.2d 112 (3d Cir. 1975) ..............................................................................................46

*United States v. Sturdivant*,
    244 F.3d 71 (2d Cir. 2001)............................................................................46

*United States v. Vilar*,
    05-CR-621, 2007 WL 1075041 (S.D.N.Y. Apr. 4, 2007)................................ *passim*

*United States v. Wagner*,
    989 F.2d 69 (2d Cir. 1993)...........................................................................26

*United States v. Washington*,
    12-CR-146, 2012 U.S. Dist. LEXIS 159863 (S.D.N.Y. Nov. 7, 2012).................................12

*United States v. Westover*,
    812 F. Supp. 38 (D. Vt. 1992).......................................................................42

*United States v. Williams*,
    705 F.2d 603 (2d Cir. 1983).........................................................................47

*United States v. Young*,
    745 F.2d 733 (2d Cir. 1984).........................................................................15

*United States v. Zemlyansky*,
    945 F. Supp. 2d 438 (S.D.N.Y. 2013).............................................. *passim*

*Voss v. Bergsgaard*,
    774 F.2d 402 (10th Cir.1985) .......................................................................13

**Statutes and Rules**

15 U.S.C. § 78ff..........................................................................................51

15 U.S.C. § 78j(b)........................................................................................47

15 U.S.C. § 78s............................................................................................34

18 U.S.C. § 1343..........................................................................................47

18 U.S.C. § 1348..........................................................................................47

17 CR 240.19b4............................................................................................34

**Other Authorities**

R. Colombo, *Effectuating Disclosure Under the Williams Act*,
    60 Cath U. L. Rev. 329 (2011) .......................................................................51

U.S. Const. Amend. IV...................................................................................7, 11

Defendant Benjamin Wey, by his attorneys, Haynes and Boone, LLP, submits this reply memorandum of law in further support of his pretrial motions to: (a) suppress evidence seized pursuant to search warrants executed on or about January 25, 2012 at the offices of NYG Capital, LLC, located at 40 Wall Street, 38th Floor, New York, New York (the "NYGG Office"), and his apartment located at West Street in New York, New York (the "Apartment"); (b) dismiss the Indictment for various grounds including that certain counts are improperly duplicitous or fail to allege a fraud, and for prejudicial pre-indictment delay; (c) compel the Government to disclose its privileged document review taint process; (d) take the deposition of co-defendant Seref Doğan Erbek pursuant to Rule 15; and (e) strike from the Indictment all references to Mr. Wey's purported a/k/as.

## PRELIMINARY STATEMENT

The Government's opposition papers merely serve to make clear that the fruits of the unconstitutional searches of Mr. Wey's home and business must be suppressed. The Government effectively concedes that the search warrants for the NYGG Office and the Apartment were defective on their faces. The warrants identify no crime under investigation, provide no guidance by subject matter or name limitations, and contain no timeframe limit. The warrants sought from the NYGG Office every record of its corporate occupant (NYGG), and from the Apartment every record of the owner-occupants (Mr. and Mrs. Wey). By any fair reading, the warrants granted the FBI the discretion to seize every conceivable form of record from both locations regardless of subject matter – which is exactly what those agents did – despite the fact that the Constitution prohibits fishing expeditions of this sort.

So inescapable is this conclusion that the Government is now compelled to argue that the warrants were permissible because Mr. Wey's business was allegedly "permeated by fraud," thus triggering the "all records exception" to the Constitution's prohibition of general warrants. This

*post hoc* argument fails because (a) the Government never made that argument to Magistrate Judge Dolinger, and (b) the Government did not then (in 2012), nor can it now, make the requisite showing to justify such authority. The Government's description of a handful of transactions conducted over an eight (8) year time span could not conceivably have subjected NYGG to a full sweep of its records in 2012. Moreover, the notion that the Government perceived, in 2012, that NYGG was "permeated by fraud" sufficient to justify an "all records" seizure is belied by the fact that, subsequent to the search, it did absolutely nothing to shut down NYGG: for almost *four years* it did not charge anyone with any crime, it did not sue the business or its owners, and it did not seize bank accounts associated with the business. Quite the contrary, the Government permitted NYGG to operate unimpeded throughout that time. Given the context, the Government's attempt to retroactively grant itself an "all records" warrant it never asked for in the first place (and concedes it never believed it obtained) smacks of bad faith. Further, even if the Government could avail itself now of the benefit of the "all records" warrant it never obtained, that would provide it no cover for the unconstitutional seizure of all the records *from the Apartment,* because that exception applies only to businesses, not homes, and the Government advances no similar argument (nor could it) concerning Apartment.

Tacitly acknowledging these fatal flaws, the Government simultaneously argues that the warrants did not seek all records, but instead were properly particularized and limited in scope. Where the warrants fail to identify the crime(s) under investigation, the Government insists those crimes may be "inferred." But the Government relies on no authority for that position, nor do the lists attached to the warrants – hundreds of names long and with all-encompassing record type descriptions – justify any such inference in any event. Likewise, the Government's argument that the warrants' missing specificity can be found in the supporting affidavits is

contrary to settled law, which prohibits the Court from considering materials outside the warrants themselves. The same is true for the "operation plan" and the alleged pre-search discussions among the FBI agents, neither of which were presented to or blessed by Magistrate Judge Dolinger.

The futility of the Government's effort to mischaracterize these warrants as "limited" is perfectly illustrated by the Government's retorts to the items identified by the defense as improperly seized examples, including infant children's passports, school report cards of their teenage nephew, and personal correspondence between Mrs. Wey and her father, among other irrelevant material. Amazingly, while insisting the warrants were properly limited to a discrete search for evidence of a federal "financial fraud" crime, they claim all these items were properly within the scope of the warrants! While the Government sheepishly concedes that Mrs. Wey's pelvis X-rays are *not* covered by the warrants, that concession too merely serves to cement the defense's point that it is clear that the Government did not properly seek, nor were they granted, the right to take "all records": if that were the case, they would not now be conceding that the X-rays were outside the scope of the warrant.

Nor can the Government save these searches by their self-serving insistence that they acted in good faith. The thin affidavits submitted in opposition to this motion at most raise a factual issue requiring a hearing on this point, and in fact undermine the Government's good faith assertion. The agents cannot describe a single item they supposedly chose to leave behind, and Agent Thomas McGuire, who avers that the Komar Affidavit was made available to him, does not claim to have *read* it. Indeed, the Government submits no affidavit from *any member of the search team* attesting that they read the Komar Affidavit prior to the search. Absent some testimony concerning what the searching agents were told, what questions they asked and how

they proceeded thereafter in executing the searches, there is no basis for this Court to conclude the agents acted in good faith. Simply put, the Court cannot find the agents acted in good faith just because the Government conclusorily asserts it did so.

The Government's indefinite and abusive retention of all the seized electronic evidence, and its admissions concerning how it treated that evidence more than a year subsequent to the searches, precisely illustrates the problem of constitutional scope identified in *United States v. Ganias ("Ganias I")*, 755 F.3d 125 (2d Cir. 2014), and requires suppression as well. Agent McGuire asserts that, when he examined the seized computers and other electronic media, he reviewed only that material permitted by the supposedly limited warrants. But this assertion is contradicted by documents revealed for the first time in response this motion. Fifteen months after the searches were executed and all the computers and electronic media were seized, Agent McGuire executed automated searches across that data using a search term list *twice as long* as the original list from the warrants, including *165 or more* individuals, entities and search terms that were *not included* in the already overbroad search warrant Exhibit B. (This is despite Agent Komar's acknowledgment that the computer searches had to be limited to "the names" on Exhibit B). The Government does not suggest it ever received permission from any judge to run searches using those expanded lists. Rather, the Government simply added entities and search terms to its list – effectively unilaterally expanding the scope of its warrants – on its own initiative. Had the Government timely reviewed the materials gathered in response to the warrants for responsiveness and purged itself of the unresponsive material – *as the law requires* – it would not have had the opportunity, years later, to expand its searches into new subjects and areas in an effort to build a case against Mr. Wey.

Nor does the Government's opposition cleanse the clear indicia of bad faith in the application itself, as identified in the moving brief on this motion. (*See* Doc. No. 45 (the "Moving Brief")). Conceding (as it must) that the listing rule the Government claims was broken – the supposedly "key prerequisite" to NASDAQ listing – *does not exist*, the Government now disingenuously asserts it never claimed that rule existed in the first place. But that assertion was patent from the Komar Affidavit itself.

No more persuasive is the Government's assertion that Agent Komar never alleged certain transactions were structured by Mr. Wey's relatives so as to avoid currency transaction reporting requirements, when quite plainly, that is precisely what he (wrongly) asserted. And the Government can muster no legitimate explanation for Agent Komar's intentionally misleading descriptions of allegedly manipulative trading patterns. There was a plethora of public information to explain the rise in stock prices of Deer and SmartHeat in late 2009, but Agent Komar either *chose* not to inform Magistrate Judge Dolinger of the truth (because their application would have been undermined), or recklessly failed to investigate the truth (which the Government is loathe to now admit). And in fact, no "pump" truly overlapped in time with the alleged "dump," but again, the Government *chose* to manipulate their date ranges to create the illusion of a contemporaneous "pump and dump." Combined with the other Government misstatements and errors that have now come to light, this Court simply cannot accept the Government's conclusory assertions that it acted in good faith.

Next, despite the fact that, as demonstrated in the Moving Brief, the Government's Rule 16 production to date was littered with privileged documents seized and reviewed by the Government's trial team, the Government nevertheless opposes Mr. Wey's request for information concerning the "taint team" process so far, and further insists that it be permitted to

5

proceed unimpeded in reviewing yet another 1,295 documents it has preliminarily identified as privileged. Mr. Wey objects to this further invasion of his Fourth Amendment rights, prior to an examination of how and why the taint team process to date failed. The Government's characterizations of its disclosure of that process are misleading at best, and the Government offers no justification for hiding its processes from the defense or the Court.

The Government's arguments for saving the Indictment from dismissal also fail. The Government's attempt to excuse the duplicitous nature of several of the Indictment's counts by mischaracterizing them as part of one long singular scheme is unpersuasive. Patently, the Government's legal theories and their evidence concerning each of the three issuers in question are distinct, and their desire to bootstrap evidence and arguments concerning one issuer into proof regarding others is improper, and highly likely to lead to juror confusion and an incoherent verdict. Where the Indictment's fraud counts are premised on allegations that fail to identify deceptive conduct, fraudulent intent or harm, they cannot stand, despite the fact that the Indictment parrots the language of the relevant statutes. Additionally, the inexcusable failure of the wire fraud count to identify a subject wire dooms Count Four; the failure of counts Five and Six to allege willfulness renders them unsustainable; and the money laundering counts fail because they are predicated (fatally) on the viability of the flawed fraud counts. And the Government provides no explanation for its unreasonable and abusive pre-indictment delay, which threatens to deprive Mr. Wey of a fair trial.

Further, regarding Mr. Wey's entirely reasonable request to preserve the exculpatory testimony of Mr. Erbek for trial, the Government's offer of "safe passage" to Mr. Erbek is far from sufficient to protect Mr. Wey's right to a fair trial. Mr. Erbek is not subject to this Court's subpoena power, and Mr. Wey is not in a position to require his attendance at trial. This would

be true if Mr. Erbek expressed now a present intention to testify.  Mr. Erbek is thus

"unavailable," and that requirement of Rule 15 is satisfied.  The testimony is directly relevant to

several material issues in this case, and the Government does not contend otherwise.

Accordingly, a Rule 15 deposition of Mr. Erbek should be granted.

Finally, the prejudicial surplusage references to Mr. Wey's supposed "a/k/as" should be

stricken.  The Government's chronology is simply wrong, and thus its justification for including

those references is a baseless attempt to appeal to the jury's basest instincts.

Accordingly, as set forth in the Moving Brief and below, Mr. Wey's motion should be

granted in its entirety.

## ARGUMENT

## I.

## THE SEARCH WARRANTS ARE OVERLY BROAD AND UNREASONABLE "GENERAL WARRANTS"

Notwithstanding the Government's protestations to the contrary, the search warrants at

issue are facially unconstitutional and, in effect, permitted the Government to seize virtually

every type of document covering any and all subject matters at both the NYGG Office[1] and the

Apartment.  The Fourth Amendment expressly forbids the use of general warrants: "no Warrants

shall issue, but upon probable cause, supported by Oath or affirmation, and *particularity*

*describing* the place to be searched, and the persons or *things to be seized*."  U.S. CONST.

AMEND. IV (emphasis added).  To be properly particularized, a warrant must (i) "identify the

---

[1]  In a footnote to the Government's opposition brief (the "Opposition Brief" or "Opp."), the Government confuses
a clarifying point made in the Moving Brief.  (Opp., p. 10 n.3)  The Moving Brief notes, simply for clarification,
that while the search warrant authorizes a search of the "Offices of New York Global Group *Inc.*," in fact, the
entity that occupied that office was NYG Capital, LLC, which did business as "New York Global Group."
(Opposition Declaration of Agent Komar, dated July 8, 2016, Doc. No. 54 (the "Komar Opposition Declaration"
or "Komar Opp. Decl."), Ex. 2; Siegal Decl., Ex. 8)  While it is unclear what the Government is attempting to
argue here, the point remains either way: the Government seized from the office of NYGG all records pertaining
to NYGG.

specific offense for which the police have established probable cause"; (ii) "describe the place to be searched"; and (iii) "specify the items to be seized by their relation to designated crimes." *United States v. Galpin*, 720 F.3d 436, 445 (2d Cir. 2013). A warrant must also be supported by probable cause to support the breadth of the search authorized. *See United States v. Hernandez*, 09-CR-625, 2010 WL 26544, at *8 (S.D.N.Y. Jan. 6, 2010). The search warrants here failed to satisfy both of these requirements.

The Government posits four futile arguments in opposition to the motion to suppress: (i) the search warrants are somehow not general warrants on their face; (ii) the "all records" exception applies; (iii) the FBI agents properly executed the searches by relying on materials outside the search warrant in order to properly limit the scope of the search; and (iv) the good faith exception applies. These arguments all fail, and as a consequence, the Court should suppress the fruits of those warrants.

## A. The Search Warrants Are Facially Unconstitutional General Warrants

The Government has offered no viable argument to challenge Mr. Wey's assertion that, on their faces, the warrants are general warrants that call for the seizure of virtually everything in the NYGG Office and the Apartment. They were not limited by subject matter, time frame, document category, or any other discernible characteristic. The Government cannot deny that the warrants identify no crime or statute under investigation. The warrants purport to rely on attached lists (Exhibits A, B, and C) to provide direction to the searching agents. But as pointed out in the Moving Brief, those blunderbuss lists cover every conceivable record of anything contained in the subject locations. Whether or not every name on those lists could be justified by the sealed application paperwork (and they cannot), the effect of the lists was to cover everything, making the job of the searching agents a simple one – seize *anything and everything*. This is precisely what the Constitution prohibits.

The Government argues unpersuasively that the warrants are not general warrants because (i) they did not utter the magic words "all records relating to the commission of a crime" and (ii) the attached lists were supposedly "exhaustive" rather than "illustrative."[2] (Government's Memorandum of Law in Opposition (Doc. No. 53) ("Opp."), pp. 27, 32, 39)  The two-page single-spaced lists annexed to the warrants as Exhibit A permit the Government to seize virtually every *type* of document that could be found in a person's home or a business office.  (Siegal Decl., Ex. 9 ("Komar Aff.") at Ex. A)  Rather than address the breadth of the categories of documents listed in the search warrants, the Government paraphrases the lists in a disingenuous attempt to minimize their breadth.  (Opp., pp. 11-12)  For example, while the Government states that the warrants sought "telephone bills and other records of communication," the actual passage from the warrant reads "telephone bills, telephone message pads, notes, memoranda and other records of internal and external communications."  (*Compare* Opp., p. 11 *with* Komar Aff., Ex. A at 1)  The Government further avers that the warrants sought "financial records for the business," when the actual warrant lists "financial records . . . banking and brokerage firm account statements, checks, and transaction records, wire transfer instructions, and similar documents. . ."  (*Id*.)  When read in full, the Government would be hard-pressed to identify a type of record *not* covered by the 12 paragraphs of Exhibit A, and indeed, the agents left virtually no format of record behind (including X-rays).

The only purported limit on the items to be seized is a cross reference to the "Exhibit B" list of entity and individual names.  While the Government claims that each of the 200 plus names on that list is justified by the Komar Affidavit, this misses the point.  The *effect* of the list

---

[2]  Even this is not true.  The supposedly "exhaustive" lists at paragraphs 1, 2, 8, 9, 10, 12 of Exhibit A are each prefaced with the word "including."  (Komar Aff., Ex. Ex. A)  Accordingly, these lists are "illustrative" rather than "exhaustive."  In any event, the Government's failed semantic argument misses the point – a reading of the plain language of these warrants reveals that they are general warrants.

is to cover everything, not just because the list is too long (although it is *very* long) but because the list included names that effectively gave the searching agents license to take everything. This is because the list included *the very business entity* whose office the agents were searching, and *the very names of the owners* of the Apartment: NYGG itself, and Mr. and Mrs. Wey, respectively. Had the Exhibit B lists stopped at those three names, the inclusion of NYGG, Mr. and Mrs. Wey would be sufficient to render these warrants "general warrants," especially when combined with the fact that the warrants do not otherwise identify a crime or crimes under investigation, describe every conceivable form of record imaginable, and do not profess a time limitation. The Government fails to even address this key argument – which was highlighted in the Moving Brief no less than four times (Moving Brief, pp. 3, 19, 23, 33) – undoubtedly because it has no good answer.

Further demonstrating the general nature of the search these warrants sanctioned, the Government executed them as such, scooping up everything that was not nailed down. The Government's discussion of illustrative examples provided by the defense of patently irrelevant seized items essentially proves this point. (Opp., p. 40; *see also* Moving Brief., p. 24; Declaration of David Siegal, dated May 27, 2016 (Doc. No. 46) ("Siegal Decl."), Ex. 27) Incredibly, the Government's response is *not* that these items were improperly seized, but rather that these items were *responsive to the warrant* and that probable cause for these items had been established. These items included:

(i)      a highly personal letter from Mr. Wey's United States host family, dated almost twenty-five years ago;

(ii)     Mr. Wey's health insurance card;

(iii)    Mr. Wey's infant children's passports;

(iv)    Mr. Wey's nephew's eleventh grade report card;

(v)    Mr. Wey's wife's diploma from the University of Central Oklahoma, along with her college transcripts from the mid-1990s;

(vi)    Mr. Wey's wife's 1998 GMAT score;

(vii)    Mr. Wey's wife's medical records;

(viii)    Mr. Wey's wife's chest and pelvis X-rays; and

(ix)    a page from a notepad where Mr. Wey's wife had written down the website to register for the PSAT.

(Siegal Decl., Ex. 27) (the "Irrelevant Documents")

To this, the Government responded that, "[t]he *only* documents in the collection *that are difficult to square* with the terms of the Warrants and the NYGG Affidavit *are a collection of x-rays*. These should not have been seized." (Opp., p. 47) (emphasis added)[3]

The Fourth Amendment simply does not provide the Government with the ability to seize documents that are outside the proper scope of the warrant and later attempt to "square" the seizure with the terms of the warrants. To the contrary, the Fourth Amendment provides clear guidelines in order to protect individual's rights: provide probable cause for the seizure; particularize in a warrant the items for which probable cause has been established; secure the warrant; and seize those items provided for by the warrant (and not more). U.S. CONST. AMEND. IV; *see also Galpin*, 720 F.3d at 446. The Government did not follow this process, and any retrospective effort to "square" what it did do at this point is too late to save these impermissibly overly broad and unparticularized warrants.

More importantly, the Government's position concerning these items directly contradicts its argument that the warrants are particularized and not overbroad. If the Government maintains that the Irrelevant Documents are covered by the warrants, then it is clear the warrants violated

---

[3]   We not that, to this day, the Government retains the originals of all hard copy materials seized, including the x-rays.

Mr. Wey's Fourth Amendment rights, because they were general warrants that facially permitted the Government to seize virtually every document in the NYGG Office and Apartment. Where did these warrants particularize Mr. Wey's nephew's report card, or a 20-year old personal letter from Mr. Wey's host father, or Ms. Wey's medical records? They did not. Where in the Komar Affidavit is probable cause established to seize these items? Nowhere. While these specific items help to illustrate this point, the stakes are much larger than a single report card and a collection of medical records. The problem is not that these specific items were seized. The problem is that these items perfectly illustrate that the warrants provided no guidance whatsoever regarding what was and was not relevant to the investigation (if any) for which the Government was in a position to establish probable cause. Rather, the warrants left the agents with the discretion to take everything in any form from any time frame relating to anybody or any entity (which is exactly what the agents did).

The Government also argues that "the agents did not simply seize everything at the NYGG Premises or the Wey Apartment" (Opp., p. 40), and Agent Komar avers that some searching agents did show him some materials that he advised were not covered by the warrants. (Komar Opp. Decl., ¶ 9) However, the Government fails to identify a single item that it left behind, and Agent Komar does not describe what the item or items were that he concluded were not covered. Nor do the Government's unsupported factual statements carry any weight: the Court cannot rely on any statement of fact that is unsupported by a sworn statement or documentary evidence. *See, e.g.*, *United States v. Washington*, No. -CR-146, 2012 U.S. Dist. LEXIS 159863, at *24-25 (S.D.N.Y. Nov. 7, 2012) (in a suppression motion, "legal rules require the Court to exclude from its analysis the unsworn statements of fact offered by" counsel because "to create a factual dispute, a [party] must submit sworn factual allegations from a

person with personal knowledge of the underlying facts."). This is not a purely academic exercise, because many of the statements in the Government's opposition are simply false: the Government *did* seize virtually everything. The Government admits that it seized 4,000 hard copy documents from the Apartment and an additional 4,500 hard copy pages from the NYGG Office (Opp., pp. 15-16), which alone suggests that the executing agents were not sifting documents responsive to limited warrants. Contrary to the Government's unsupported statement, it is apparent from the Government's production that they seized or imaged everything, including Mrs. Wey's pelvis X-rays, Post-It notes, scraps of paper from garbage cans, every computer, every thumb drive, and every memory card.

Similarly unpersuasive is the Government's argument that the crimes under investigation can be "inferred" from the Exhibit A and B lists. *First*, even if such an "inference" could be drawn from the lists, a search warrant referring to an investigation into generalized "fraud" would be insufficiently particularized anyway. *See, e.g.*, *Galpin*, 720 F.3d at 445) (citing *United States v. Leary*, 846 F.2d 592, 594 (10th Cir. 1988)); *Voss v. Bergsgaard*, 774 F.2d 402, 405-06 (10th Cir. 1985); *United States v. Roche*, 614 F.2d 6, 8 (1st Cir. 1980). Further, the Government does not cite a single case to support the notion that a facially deficient warrant can be saved because agents might be able to draw an inference of the missing specifics from mere lists of names and categories of documents.

Even assuming the law supported the Government's "inference" theory, these warrants are simply not susceptible to the self-serving, post-hoc interpretation the Government so generously bestows upon them. Contrary to the Government's insistence, *it is entirely unclear* from the face of the warrants that this investigation concerned "financial fraud"; in fact, the word "fraud" appears only once in the warrants, buried in the middle of Paragraph 10 of the 2-page

single-spaced list of items to be seized. (*See* Komar Opp. Decl., Ex. 2 at p. 2) Putting aside the

fact that it would be virtually impossible for an agent to identify whether a given piece of

property was purchased "with the proceeds of fraud," neither Exhibit A, Paragraph 10 nor any

other paragraph make clear that this investigation relates to "financial fraud." There is simply no

way an agent could discern from these warrants that the focus of the investigation was financial

fraud as opposed to any other document-based crime.

Even if the agents could divine that the subject matter was "financial fraud," such a broad

variety of crimes could fall into that category as to render moot the Government's argument.

"Financial fraud" could refer to telemarketing fraud, extortion, bribery, identity theft, credit card

fraud, mortgage fraud, insider trading, and a host of other potential crimes. The Komar

Affidavit, on the other hand, lays out a fairly discrete market manipulation scheme related to a

handful of issuers. But there is nothing *in the warrants themselves* that could possibly inform the

executing agents about the proper focus of the search. Instead, what this amounted to was a

license to the agents to undertake a fishing expedition, for evidence of anyone or anything that

might be later deemed improper. This is what the founders wrote the Fourth Amendment to

avoid. *See Maryland v. Garrison*, 480 U.S. 79, 84 (1987) ("The manifest purpose of this

particularity requirement was to prevent general searches. By limiting the authorization to search

to the specific areas and things for which there is probable cause to search, the requirement

ensures that the search will be carefully tailored to its justifications, and will not take on the

character of the wide-ranging exploratory searches the Framers intended to prohibit.").

For precisely this reason, courts have emphasized the need for the warrant to explicitly

reference the criminal statute and the alleged criminal conduct under investigation. *See, e.g.*,

*Galpin*, 720 F.3d at 445 (citing *United States v. Bianco*, 998 F.2d 1112, 1116 (2d Cir. 1993)

(warrant that contained no particular description of items and made no mention of any criminal statute or criminal conduct was "not supportable"); *United States v. George*, 975 F.2d 72, 76 (2d Cir. 1992) (warrant authorizing search for evidence "relating to the commission of a crime" was overbroad because "[n]othing on the face of the warrant tells the searching officer for what crimes the search is being undertaken"). Indeed, every case cited by the Government reinforces the centrality of the requirement of identifying the crime under investigation. Most involved narcotics investigations, and where those courts denied suppression, the warrants in question identified, *at a minimum*, the crime(s) under investigation and the materials sought related to those crimes. (*See* Opp., pp. 22, 27)[4]

By contrast, the line of authority cited in the Moving Brief, including significantly, *United States v. Galpin*, 720 F.3d 436 (2d Cir. 2013)[5] and *United States v. George*, 975 F.2d 72 (2d Cir. 1992) are simply not undermined by any law cited by the Government. Rather, they are controlling authority on this case. In sum, as set forth in the Moving Brief, the lack of particularity in the search warrants is fatal as they left "to the unguided discretion of the officers

---

[4]   *See, e.g.*, *United States v. Riley*, 906 F.2d 841, 844-45 (2d Cir. 1990) (search not suppressed where warrant explicitly listed "proceeds of drug trafficking," "records of the distribution of cocaine," and "items that constitute evidence of the offenses of conspiracy to distribute controlled substances"; and FBI Agents seized 100 pounds of marijuana and rental agreement to a locker that held cocaine); *United States v. Young*, 745 F.2d 733, 758 (2d Cir. 1984) (warrant sufficiently particularized where it stated "Quantities of heroin and other controlled substances, other chemical substances, equipment, utensils, paraphernalia, containers, money, notes, documents and papers and other evidence of a conspiracy to distribute and of the distribution and possession with intent to distribute of [sic] narcotic drug controlled substance"); *United States v. Lustyik*, 57 F. Supp. 3d 213, 218-21, 227 (S.D.N.Y. 2014) (warrant sufficiently particularized where it explicitly "specified federal crimes" under investigation (a discrete bribery scheme), contained "an illustrative list of items to be seized," identified the two parties involved, and specified the time frame of the alleged criminal conduct); *United States v. Jacobson*, 4 F. Supp. 3d 515, 519 (E.D.N.Y. 2014) (warrants explicitly sought materials related to "violations of Title 18, United States Code, Sections 1956 and 1957, and Title 21, United States Code, Section 841(a)(1)").

[5]   The Government's effort to distinguish or otherwise negate the controlling authority of *Galpin* is unavailing. *Galpin* is both directly on point and completely consistent with the line of cases decided both before and after it, making clear the need for a warrant to identify the crimes under investigation. And the supposedly "perverse result" of the straw-man example suggested by the Government (Opp., p. 31) bears no resemblance to this case, and cannot convert established Second Circuit controlling precedent into *dicta*. If the Government's warrant authorized seizure of "a particularly described firearm," then the warrant would not be a general warrant. Here, in reality, the Government's search warrant facially authorizes the seizure of every type of document imaginable – not "a particularly described firearm."

15

executing the warrant the decision as to what items may be seized." *United States v. Zemlyansky*, 945 F. Supp. 3d at 438, 453 (S.D.N.Y. 2013)[6] (citing *United States v. Riley*, 906 F.2d 841, 844 (2d Cir. 1990)); s*ee also United States v. Vilar*, 05-CR-621, 2007 WL 1075041, at *22 (S.D.N.Y. Apr. 4, 2007). Likewise, the overbreadth of these warrants is fatal because they facially permitted the Government to seize virtually every document in the NYGG Office and the Apartment without any probable cause to support such a broad search. *See Hernandez*, 2010 WL 26544, at *8.

Accordingly, the fruits of these improper searches should be suppressed. *See United States v. Calandra*, 414 U.S. 338, 347 (1974) (The primary purpose of the exclusionary rule "is to deter future unlawful police conduct and thereby effectuate the guarantee of the Fourth Amendment against unreasonable searches and seizures.").

## B. The "All Business Records" Exception Does Not Apply

The Government next attempts to invoke the "all business records" exception to the particularization requirement, asserting that probable cause existed to seize *all* of NYGG's business records. (Opp., pp. 23-24) Putting aside the fact that this contention directly contradicts the Government's primary assertion that the warrants "*contain no blanket permission to seize 'all evidence' of specified crimes under investigation*"[7] (Opp., p. 27 (emphasis added)),

---

[6] The Government's several attempts to distinguish *Zemlyansky* fail. (Opp., pp. 29, 37, 40, 41) The Government is correct that *Zemlyansky* is different from this case in that the *Zemylansky* warrant specifically listed "wire fraud; mail fraud; bank fraud; health care fraud; and/or money laundering" whereas the warrants at issue in this case list no crimes under investigation. *Zemlyansky*, 945 F. Supp. 2d at 454. However, that difference makes suppression even more warranted here. The Government also fails to distinguish *Zemlyansky* on the grounds that Agent McGuire somehow properly used his knowledge of the affidavit to craft his electronic searches (Opp., p. 41), because *we know* that Agent McGuire conducted electronic searches beyond the scope of Exhibit B to the warrants. In any event, the facts and legal reasoning in *Zemlyansky* are more similar and applicable to this case than any case offered by the Government.

[7] Even in opposition to this motion the Government and Agent Komar concede that the search should be limited. For example, the Komar Opposition Declaration states that the Government's search is limited to "documents and records described in items 1 through 6 and 8 through 12 of Exhibit A . . . *as limited by the list of names supplied in Exhibit B*. . . " (Komar Opp. Decl., ¶¶ 10, 14) (emphasis added) The Government similarly states that the search authorized was not an all records search, but instead should be limited to "documents falling

this post hoc justification fails because (a) the Government never sought such permission from Magistrate Judge Dolinger, and (b) because it could not have satisfied the requirements for such permission in 2012 (nor could it now).

As a threshold matter, even if the "all business records" exception did apply – which it does not – it would not save the Government's improper general search of the Apartment, because the exception applies only to *businesses*.  *See United States v. Burke*, 718 F. Supp. 1130, 1139-40 (S.D.N.Y. 1989) (the all records exception applies only "when there is probable cause to believe that *a business* is pervaded with fraud" (emphasis added)); *United States v. Hickey*, 16 F. Supp. 2d 223, 240 (E.D.N.Y. 1998) ("Under that exception, all records *of a business* may be seized if there is probable cause to believe that *the entire operation* is permeated with fraud.") (emphasis added).  But assuming the "all business records" doctrine could conceivably apply to a residence, the Government here does not even argue they could have made a sufficient showing concerning the Apartment.  At a minimum, the warrant for the Apartment cannot be saved under this argument.

*Second*, the "all records" exception does not apply because the Government simply did not establish probable cause to seize all records at the NYGG Office.  "In cases where the all records exception has been applied, the affidavit submitted in support of the warrant contained detailed information that would provide reason to believe that *all or nearly all of the business under investigation was illegal*."  *Zemlyansky*, 945 F. Supp. 2d at 461 (emphasis added); *see also United States v. D'Amico*, 734 F. Supp. 2d 321, 360 (S.D.N.Y. 2010) ("When there is probable cause to believe that an entire business is 'pervaded' or 'permeated' with fraud, seizure of all

---

within one or more of the above categories [Exhibit A and] will be seized *only if they relate to an individual or entity listed in Exhibit B. . . .*"  (Opp., p. 12) (emphasis added)

records of the business is appropriate, and broad language used in a search warrant will not offend the particularity requirement.").  To satisfy the all records exception, the Government must have provided Magistrate Judge Dolinger with sufficient probable cause to believe that the "entire [business] operation is a scam."[8]  *Burke*, 718 F. Supp. at 1139.

Courts have refused to apply the all records exception where there is insufficient reason to believe that an entire business is permeated with fraud.  So, for example, in *Burke*, the court concluded that the exception did not apply where the search warrant affidavit described six allegedly fraudulent transactions involving Salvador Dali prints at Barclay Galleries, described four allegedly fraudulent statements made to a customer with respect to a seventh print, and contained an allegation that the business operated as a boiler room using high pressure sales tactics.  *Id.* at 1140.  In concluding that the Government had failed to demonstrate that Barclay was a "pervasively fraudulent enterprise" so as to support the all records exception, the Court emphasized that there was enough room at Barclay for other, non-fraudulent operations:

> Notably absent from the two affidavits filed by DeMuro on this motion is any  indication  that the government believed -- however incorrectly -- that Barclay's sale of non-Dali artwork was also fraudulent or that Barclay's sale of fraudulent Dali artwork represented just a sample of its pervasively fraudulent sales.

---

[8]    For example, the all records exception has been applied where government agencies received *250 complaints* about a business's alleged fraudulent activity and interviewed *20 former employees* of that company, which clearly suggested the business was permeated by fraud.  *See Burke*, 718 F. Supp. at 1140; *see also United States v. Oloyede*, 982 F.2d 133, 140 (4th Cir. 1992) (applying all records exception where the affidavit in support of the search warrant presented "[d]ocumentation *in over 50 cases* . . . , two confidential informants outlined in great detail the procedures associated with appellants' operation, and a review of 26 files disclosed that each file contained fraudulent documents" (emphasis added)); *Nat'l City Trading Corp. v. United States*, 635 F.2d 1020, 1021-22 (2d Cir. 1980) (applying all records exception where the affidavit in support of the warrant listed *forty complaints* about the business, *twenty of which had been investigated*, and there was a clear pattern of conduct identified by the investigator).

The "all records" cases cited by the Government (Opp., pp. 23-24) are unpersuasive as they either involve situations in which the warrants explicitly sought all records on its face, *see D'Amico*, 734 F. Supp. 2d at 358, 361-62; *United States v. Liu*, No. 12-CR-934, 2014 U.S. Dist. LEXIS 3520, at *25 (S.D.N.Y. Jan. 10, 2014); *Hernandez*, 2010 U.S. Dist. LEXIS 719, at *35-36; *United States v. Bowen*, 689 F. Supp. 2d 675, 683 (S.D.N.Y.2010), or they did not permit an all records search, *see United States v. Cohan*, 628 F. Supp. 2d 355 (E.D.N.Y. 2009).

> Although fraudulent activities in one line of business may show that others too are fraudulent and, thus, be sufficient to uphold a broadly-written warrant, this is not such a case. To the contrary, as DeMuro's affidavit makes clear, the government long before these searches had limited its investigation of Barclay to the sale of Dali prints: 'Based on the information set forth below, there is probable cause to believe that mail fraud . . . and wire fraud . . ., involving the sale of purported fine art prints by Salvador Dali, has been committed by The Barclay Gallery Ltd.' . . . Therefore, the exception to the particularity requirement for premises that house pervasive fraud is not applicable here.

*Id.* at 1140-41; *see also Hickey*, 16 F. Supp. 2d at 241 (all records exception inapplicable where the affidavit addressed a single overriding scheme and a few acts involving firearms, but did not provide probable cause to believe that the corporations were *permeated* with fraud rather than simply *involved* with fraud); *Vilar*, 2007 WL 1075041, at *21 (all records exception inapplicable where the affidavit made "no explicit allegation that the Amerindo entities were permeated with fraud").

The warrant application for the NYGG Office does not come close to making the requisite showing that NYGG's business is "permeated with fraud."  As an initial matter, there are no explicit allegations to that effect.  To the contrary, the Komar Affidavit focuses on a few specific transactions involving Deer, CleanTech, SmartHeat, and two other companies (which the Government has apparently chosen not to pursue in this case) that is, a total of five transactions during an eight year time span, and a *single aspect* of NYGG's business.  Nor does the Komar Affidavit address what portion of NYGG's business the identified transactions represent.  Indeed, Agent Komar did not purport to describe the entirety of NYGG's business operations.

To the contrary, it is clear that Agent Komar did *not* believe that NYGG was permeated with fraud: the Komar Affidavit requests, in pertinent part, the ability to seize "basic corporate documents [that] primarily *relate to legitimate aspects of NYGG-USA's business*, [because] they

would provide background that is necessary to fully understand the nature and scope of the market manipulation and accounting fraud schemes compared to NYGG-USA's overall business." (Komar Aff., ¶ 35(b)) Agent Komar thus explicitly acknowledges that there are "legitimate" aspects of NYGG's business, defeating the Government's claim that the warrant supported an "all records" search. The Government acknowledges this shortfall, as it must ("Agent Komar candidly acknowledged he could not be sure that all of NYGG's business was laced with fraud (*see* [Komar Aff.] ¶ 35(b))"), but nonetheless posits that Agent Komar "offered Judge Dolinger more than sufficient facts to conclude[9] there was probable cause to believe *that at least most of it was*." (Opp., p. 36 (emphasis added)) Apparently, the Government would have this Court apply some sort of "preponderance of the business" standard in support of the all records exception. However, the case law is clear that in order to support a probable cause finding that meets the "all records" exception – which dispenses with the Fourth Amendment's particularization requirement – "the Government must have provided the magistrate judge with sufficient probable cause to believe that *the entire* [business] operation is a scam." *Zemlyansky*, 945 F. Supp. 2d at 461 (emphasis added); *see also Hickey*, 16 F. Supp. 2d at 241 (all records exception is inapplicable where "there was insufficient information presented to the magistrate judge to permit a determination of whether all of the business activities of" defendants "were permeated with fraud"). No such showing was made to Magistrate Judge Dolinger, and this Court cannot grant such an application retroactively.

Because Agent Komar never sought permission for an "all records" warrant, because his affidavit does not contain sufficient allegations to support one in any event, and because

---

[9]   Of course, Magistrate Judge Dolinger did not actually reach any such conclusion, because nowhere did the Government *ask* him to find that an "all records" search was appropriate.

Magistrate Judge Dolinger never intentionally granted such permission, the all records exception is inapplicable.

## C. The Government Cannot Save Its Unconstitutional Warrants By Reference to Items Outside The Warrants

The Government also implores this Court to consider documents outside the four corners of the warrants – namely the search warrant affidavits, and an "Operations Order Form" ("Ops Form") – to suggest that, despite their non-particularized nature, nevertheless the searches did not violate the Constitution. But these arguments are wholly unavailing, because the Second Circuit has made clear that the Government "may no longer rely on unincorporated, unattached supporting documents to cure an otherwise defective search warrant." *United States v. Rosa*, 626 F.3d 56, 64 (2d Cir. 2010); *see also George*, 975 F.2d at 76 ("A sufficiently specific affidavit will not itself cure an overbroad warrant. Resort to an affidavit to remedy a warrant's lack of particularity is only available when it is incorporated by reference in the warrant itself and attached to it.").

Neither the affidavits nor the Ops Form are attached or incorporated into the search warrants. The Government made these same exact arguments in *Zemlyansky* and the Court rejected them based on well-settled Supreme Court and Second Circuit precedent. *See Zemlyansky*, 945 F. Supp. 2d at 473-74; *see also Groh v. Ramirez*, 540 U.S. 551, 557 (2004) (the Fourth Amendment "by its terms requires particularity *in the warrant*") (emphasis added).

Even if the Court could somehow consider the Komar Affidavit as a "supplement" to save the Government's unconstitutional warrants – which it cannot – the Government cannot credibly contend that the searching agents actually knew what the contents of that Affidavit were when they were participating in the search. At most, the Government asserts that the Komar Affidavit was "made available" to the search team on January 24, 2012 – the day before the

warrants' execution.   The notion that any member of the search team took the time to read the 97-page Komar Affidavit strains credulity, and tellingly, the Government submitted no attestation from any agent that they did read it.[10]

The Government's reliance on the Ops Form is no more persuasive, as it was neither attached to the warrant nor approved by Magistrate Judge Dolinger, and thus has no bearing on the protections of the Fourth Amendment.  (Indeed, that the Government's reliance on the Ops Form – purportedly used to "brief" the search team "on the nature and the scope of the search" (Opp., p. 6), and an "overview of the components of Wey's scheme."  (*Id.*, p. 7) – is itself tacit acknowledgement that the warrants themselves lacked the necessary guidance.)  The Government does not suggest the Ops Form was shown to or blessed in any way by Magistrate Judge Dolinger, and so it provides no basis to save these warrants.

Finally, the agents' indiscriminate seizure of virtually every hard copy document and every electronic device belies the Government's argument that the warrants were somehow "cured" or limited by the Komar Affidavit, the Ops Form or the pre-search discussions.  To the extent those mechanisms were somehow intended to limit the coverage of the written warrants, they certainly failed to do so.  If, as the Government states, the agents "took their time to sift through the materials, seizing only those that appeared relevant to the investigation," (Opp., p. 15), then the agents clearly had no idea what this investigation was about or what was relevant to it.

These points all illustrate why Courts have rejected attempts to incorporate external materials to a search warrant to save it.  *See, e.g.*, *George*, 975 F.2d at 76; *Rosa*, 626 F.3d at 64.  This Court should do the same.

---

[10]   Agent McGuire does not claim to have read the Komar Affidavit, and Agent Komar merely states that he informed the team that it "was available for their review."  (Komar Opp. Decl., ¶ 6)

### D.      The Good Faith Exception Does Not Apply

Recognizing the fatal flaws in the searches, the Government seeks to save them by asserting, *ipse dixit*, that it acted in good faith.  The good faith exception does not apply for several reasons: (i) the warrants are unconstitutional general warrants on their face, which the Government reasonably should have known; (ii) the FBI agents' execution of the warrants demonstrates bad faith; (iii) the agents actually relied on the defective warrant rather than their knowledge of the investigation; and (iv) allowing the Government to rely on warrants that so obviously violate the basic tenets of the Fourth Amendment will fail to deter similar offending conduct in the future.

As the Government acknowledges, it is the Government's burden to make a "good faith" showing (Opp., p. 25), and it simply failed to meet this burden on the current record.[11]  *See Zemlyansky*, 945 F. Supp. 2d at 474, n.16.  At a bare minimum, should the Court wish to entertain the Government's good faith argument, it cannot merely accept those assertions at face value and a hearing should be held to permit the defense to examine the Governments' assertions of good faith.   *See United States v. Pena*, 961 F.2d 333, 339 (2d Cir. 1992) ("[A]n evidentiary hearing on a motion to suppress ordinarily is required if the moving papers are sufficiently definite, specific, detailed and nonconjectural to enable the court to conclude that contested issues of fact going to the validity of the search are in question.").

*First*, the good faith exception does not apply where, as here, it is obvious on the face of the warrants that they are unconstitutional general warrants.  "[L]aw enforcement officers are presumed to know that a warrant which fails to offer particular guidance is unlawful."

---

[11]    The Government's assertion that no hearing is necessary to resolve the good faith question because the facts relating to the agents' conduct in executing the warrants are "sufficiently uncontested" (Opp., p. 25, n.11) is entirely without merit because, as addressed herein, there are numerous outstanding questions concerning the agents' conduct in executing the warrants, including, without limitation, what the searching agents were told, what they understood at the time of the search, and how the search was conducted.

*Zemlyansky*, 945 F. Supp. 2d at 475.  Here, as in *Zemlyansky*, the agents conducting the search

"violated clearly established Fourth Amendment law in two respects, by executing a warrant that

lacked both particularly and overbreadth . . . even though they are presumed to be familiar with

the governing law and even though they acted on the basis of extensive training and experience."

945 F. Supp. 2d at 475; *see also Groh*, 540 U.S. at 561 n.4 (it is not "reasonable for [the

Government] to rely on a warrant" when it is "patently defective").

> These concerns are heightened when evaluating the search of the Apartment:

> > Fourth Amendment jurisprudence recognizes heightened protection for searches of a person's home. A search conducted with a warrant that lacks particularity is considered a warrantless search, and searches and seizures inside a home without a warrant are presumptively unreasonable. With few exceptions, the question whether a warrantless search of a home is reasonable and hence constitutional must be answered no. Given the heightened privacy interests involved in searches of a person's home, law enforcement officers must take great care to ensure that these searches are lawfully authorized and executed.

*United States v. Ryan*, 07-CR-35, 2009 U.S. Dist. LEXIS 53644, at *8-9 (D. Vt. May 26, 2009)

(internal citations omitted).

> *Second*, beyond the FBI agents' reliance on the patently defective warrants, the execution

of the search demonstrates further bad faith.  While the Government makes conclusory

statements concerning the executing officers' purported consultations with Agent Komar during

the searches, as previously noted, *the Government has failed to identify a single document that it

left behind*.  It obviously treated these warrants like general warrants, scooping up nearly

everything in sight.  *See Zemlyansky*, 945 F. Supp. 2d at 475 ("[A]rbitrariness in the execution of

a deficient warrant substantially undermines the case for a finding of good faith . . .").  The

Government has provided no insight into how it applied the warrants to the search or how it

determined whether any particular item was responsive.  At a minimum, the Court should hold a

hearing concerning how (if at all) the agents took steps to limit the scope of their seizures.  *See Pena*, 961 F.2d at 339.

 *Third*, the Second Circuit has ruled that the good faith exception does not apply where the agents "actually relied on the defective warrant, as opposed to their knowledge of the investigation and the contemplated limits of the [issuing magistrate]'s authorization, in executing the search. " *Rosa*, 626 F.3d at 66.  Here, the Government urges the Court to accept that the agents were sufficiently informed by the Komar Affidavit in order to fulfill this requirement of the good faith exception.  However, as previously noted, the Government has offered no evidence that the agents executing the search *actually read* the Komar Affidavit.  Agent McGuire's silence on this point, for example, is deafening.  Further, the Government cannot use "good faith" as a workaround to the well-settled law that any affidavits or other items relied on must be explicitly attached to and incorporated into the warrant.  *See Zemlyansky*, 945 F. Supp. 2d at 473 ("*Groh* prohibits officers from claiming good faith whenever they execute a deficient warrant and insist that they came to learn the contents of the affidavit through some other means.").

 *Fourth*, suppression provides the proper deterrent effect.  If the Government is permitted to rely on the good faith exception to avoid the Fourth Amendment requirements of probable cause and particularity, it will have no incentive to comply with these constitutional requirements.  Instead, especially in the context of particularity, the Government can easily cure the any defects in the warrant prior to its execution.  As the court found in *Ryan*, "suppressing the evidence here will have a significant deterrent effect"  because "[a] warrant lacking particularity will no doubt be brought promptly to the attention of the United States Attorney's Office for correction."  2009 U.S. Dist. LEXIS 53644, at *14.

*Finally*, to the extent the Court is inclined to apply the good faith exception – which it should not – an evidentiary suppression hearing is appropriate. A "good faith" showing is the Government's burden. *See Zemlyansky*, 945 F. Supp. 2d at 474, n.16. Only two of the nearly 20 agents involved in the search provided affidavits, and the affidavits submitted by Agent McGuire and Agent Komar provide only the barest of details concerning the search executions, much less sufficient evidence to prove they somehow acted scrupulously in good faith. Agent Komar states in the vaguest possible terms that he "described the crimes for which Wey was being investigated, summarized the scope of Wey's suspect criminal activity, and summarized the nature of the evidence sought." (Komar Opp. Decl., ¶ 6) Magistrate Judge Dolinger was not presented with, nor did he sanction, whatever these discussions were, and importantly, there is no record of what was said. In short, this is all precisely the type of vague, impermissible data that the Courts have rejected as permissible source material for adjudging the constitutionality of a search warrant.

If the Court believes the Government has carried its burden on these statements, Mr. Wey's counsel must be allowed to question Agent Komar and other Agents present to determine precisely what was said and whether that saves the Government's general warrants. Further, while the Government's opposition brief makes various factual assertions, the "unsworn statements of counsel do not constitute evidence sufficient for the Government to meet its burden of demonstrating good faith." *Zemlyansky*, 945 F. Supp. 2d at 474, n.16. Accordingly, at a bare minimum, the defense should be afforded the opportunity to examine the agents that purportedly exhibited "good faith" in securing and executing these warrants. *See, e.g.*, *United States v. Wagner*, 989 F.2d 69, 76 (2d Cir. 1993) (government may raise claims of good faith at a suppression hearing); *United States v. Moetamedi*, 92-CR-411, 1993 U.S. Dist. LEXIS 6311, at

*1-*7 (N.D.N.Y. May 5, 1993) (summarizing suppression hearing held to determine good faith of officers executing a search warrant).[12]

## II.

### THE GOVERNMENT IMPROPERLY CONDUCTED SEARCHES AND RETAINED MATERIALS BEYOND THE SCOPE OF THE WARRANT

In response to this motion, Mr. Wey learned, for the first time, that the Government not only (i) retained a copy of every single electronic file seized during the January 2012 search and purged nothing, but also (ii) continued searching those materials into at least May 2013 (and possibly later[13]) and (iii) expanded its list of search terms beyond those authorized by Magistrate Judge Dolinger in Exhibit B to the search warrants. While Mr. Wey was not aware of the extent of the Government's unconstitutional conduct when he filed this motion, this is exactly the type of conduct that he feared when the Government notified the defense that it had failed to purged any of the seized electronic data. This is also exactly the type of conduct that warrants suppression pursuant to the Fourth Amendment and applicable case law, including *Ganias I*, *United States v. Ganias* ("*Ganias II"*), 12-240-CR, 2016 WL 3031285 (2d Cir. May 27, 2016) and *United States v. Metter*, 860 F. Supp. 2d 205, 216 (E.D.N.Y. 2012).

Mr. Wey's suppression motion alleges that, among other things, the Government unconstitutionally failed to purge electronic files that are nonresponsive to the search warrants. (Moving Brief, pp. 53-59) The Government admits that, to date, it has failed to purge a single

---

[12] The cases on which the Government relies to support its good faith argument are unpersuasive, as in those cases, unlike here, the warrants were not facially defective. *See United States v. Clark*, 638 F.3d 89, 103 n.12, 104-05 (2d Cir. 2011); *United States v. Levy*, 11-CR-62, 2013 U.S. Dist. LEXIS 25508, at *29-30 (S.D.N.Y. Feb. 25, 2013)).

[13] The Government has notified Mr. Wey's counsel that in 2015 it conducted an additional search of an iPhone that it seized during the January 2012 searches. As fruit of the unconstitutional 2012 search, the 2015 iPhone search should be suppressed for the reasons stated in these moving papers. In addition, there may be independent grounds upon which the 2015 iPhone search is subject to suppression, but, to date, it does not appear the Government has produced the results of the 2015 iPhone search, and therefore, the defense reserves its rights to challenge that search on any additional independent grounds at a later date.

electronic document seized from the NYGG Office or the Apartment.  (Opp., p. 51)  In response to Mr. Wey's motion, Agent McGuire submitted a declaration (Doc. No. 55, the "McGuire Declaration" or "McGuire Decl.") in which he states, "[i]n or about the spring of 2013, I began to review the electronic data for material responsive to the warrants."  (McGuire Decl., ¶ 7) Agent McGuire also provided the search term list he used to identify "material responsive to the warrants" as of "May 3, 2013."  (McGuire Decl., Ex. 2)  The McGuire Declaration confirms that the Government was not only continuing its electronic searches *more than 15-months after the search warrants were executed*, but that it was continuing to formulate *new search terms* at that time as well.

In *Metter*, which was decided in May 2012, the Court found that the Government's 15-month delay in reviewing electronic data seized during a search required suppression of all evidence seized during the search.  860 F. Supp. 2d at 216.  The *Metter* court held, in pertinent part: "the Court cannot, in the interest of justice and fairness, permit the government to ignore its obligations.  Otherwise, the Fourth Amendment would lose all force and meaning in the digital era and citizens will have no recourse as to the unlawful seizure of information that falls outside the scope of a search warrant."  *Id.* at 216.[14]

The *Metter* ruling, which was issued less than five months after the January 2012 searches here, put the Government on clear and unequivocal notice that it could not indiscriminately maintain unresponsive electronic search materials.  The Government attempts to distinguish *Metter* by arguing that there, "the Government had (in the court's view) delayed too long in developing and implementing a plan 'to begin review' of the electronic evidence." (Opp., p. 50)  However, here Agent McGuire admits that he "*began* reviewing the electronic data

---

[14]  Agent McGuire was also the agent who submitted the search warrant in *Metter*, and Agent McGuire submitted the key affidavit in opposition to the suppression motion in *Metter*.  *Id.* at 208.

for responsive material . . . in or about the spring of 2013." (McGuire Decl., ¶ 7) (emphasis

added) In other words, Agent McGuire began his review *15 months after the search*, *exactly* as

he did in *Metter*. *See Metter*, 860 F. Supp. 2d at 216. Agent Komar also admits that, despite the

fact that the search warrants were executed in January 2012, the Government did not begin its

search for relevant materials until late-2012. (Komar Opp. Decl., ¶ 21)

      More importantly, the McGuire Affidavit reveals that 15 months after the electronic files

were seized, the Government was formulating entirely *new search terms*, many of which *are not

included in Exhibit B to the search warrants*. (*Compare* McGuire Decl., Ex. 2 *with* Komar Opp.

Decl. at Ex. 2, Ex. B) For example, while neither Exhibit B to the search warrant nor the Komar

Affidavit mention Dogan Erbek, Agent McGuire searched the seized electronic materials for

"Dogan Erbek," "erbek@estgeneva.ch," "EST S.A.," and other terms relating to Mr. Erbek.

(McGuire Decl., Ex. B) This is despite the fact that the Government repeatedly *concedes* (as it

must) that it understood all along that, in its review of those computer files, it was "*limited by the

list of names supplied in the Exhibit B."* (Komar Opp. Decl., ¶¶ 10, 14 (emphasis added); *see

also id*. ¶ 21, Opp. p. 12). To the extent there was any limit on the search warrant at all – and

there must be if the Court finds that it was not an improper general warrant – it certainly

restricted the Government to searching the computer files for documents relating only to the

names contained on Exhibit B. Importantly, neither Magistrate Judge Dolinger nor any other

court, authorized searches relating to individuals or entities beyond those listed on Exhibit B.[15]

      The Government's conduct in searching the electronic evidence here is exactly the type

of conduct that is clearly prohibited by *Metter*, *Ganias I*, and *Ganias II*: the Government failed to

purge non-responsive documents and then chose to make repeated trips to the well whenever it

---

[15] Given these facts, it strains credulity for the Government now to make the assertion that "after initially
determining which electronic files fell within the Warrants' scope, the Government did not attempt to review
electronic evidence deemed outside this scope." (Opp., p. 47)

saw fit. Here, not only did the Government continue to search the seized materials for at least 15 months after the warrants were executed, but they further took the unwarranted step of unilaterally expanding its search list beyond the individuals identified in Exhibit B to the warrant. The fruits of these searches must be suppressed. *Ganias I*, 755 F.3d at 128 ("Without some independent basis for its retention of those documents in the interim, the Government clearly violated Ganias's Fourth Amendment rights by retaining the files for a prolonged period of time and then using them in a future criminal investigation.").

The Government states that "though *Ganias II* did not decide the issue, it favorably discussed powerful reasons why the Government's retention of the electronic evidence seized here was reasonable." (Opp., p. 50) To the contrary, *Ganias II* compels the conclusion that the Government's searches of the electronic materials must be suppressed. 2016 WL 3031285, at *5 & n.17. In *Ganias II*, the Government failed to purge non-responsive data, but sought a second search warrant before it ran any new electronic searches. *Id*. Based on this second warrant, the Second Circuit found that the subsequent searches were made in good faith. *Id*. at *7-8. Importantly, in *Ganias II*, the Second Circuit's good faith finding was predicated on the fact that the Government "sought authorization in 2003 to seize the hard drives and search them off-site; they minimized the disruption to Ganias's business by taking full forensic mirrors; they searched the mirrors only to the extent authorized by, first, the 2003 warrant, and then the warrant issued in 2006." *Id*.

Here, by contrast, the Government conducted a second round of searches beyond those terms authorized by Magistrate Judge Dolinger *without obtaining a new warrant*. The Government certainly could have obtained a new warrant to search for documents relating to Dogan Erbek or any of the several other terms that are not contained on Exhibit B. Applying the

reasoning of *Ganias II*, obtaining new warrants for these searches might have allowed the Government to argue good faith. However, the Government chose to retain all of the electronic search materials and conduct searches beyond the scope of the original warrant *without* obtaining a new warrant. *Ganias I* and Judge Chin's dissent in *Ganias II* offer the clearest picture of Second Circuit law when the Government retains electronic documents and *does not* obtain a second warrant to continue searching beyond the scope of the first warrant:

> Once responsive files are segregated or extracted, the retention of non-responsive documents is no longer reasonable, and the Government is obliged, in my view, to return or dispose of the non-responsive files within a reasonable period of time. At that point, the Government's overseizure of files and continued retention of non-responsive documents becomes the equivalent of an unlawful general warrant.

*Id.* at *25 (Chin, J., dissenting). Here, not only did the Government improperly retain these non-responsive files, it also ran new searches through these materials without a new warrant, and is attempting to use these files in its case against Mr. Wey.[16]

The Government's actions are a clear contravention of Mr. Wey's Fourth Amendment rights, and *Metter*, *Ganias I*, and *Ganias II* clearly compel suppression of the fruits of these searches. *See Metter*, 860 F. Supp. 2d at 216 ("The lack of good faith by the government can be inferred from its conduct in this case. In the affidavits in support of the search warrants issued in this case, the government promised to review the evidence seized offsite to determine whether any evidence fell outside the scope of the warrants."). At a bare minimum, the Court should

---

[16]  The Government's reliance on *dicta* in *Ganias II* concerning potentially acceptable justifications for indefinitely retaining full mirror images of seized computers simply provides no justification for conducting new or expanded searches without a further court order permitting such expansion.

suppress all documents that hit on search terms not found in Exhibit B to the search warrants (*e.g.*, "Dogan Erbek," "J.P. Morgan," "P.O. Box 663").[17]

## III.

## THE CASE AGENT'S SUPPORTING AFFIDAVIT WAS MATERIALLY MISLEADING

### A.    The Search Warrant Affidavits Are Materially Misleading

As the Moving Brief made clear, the Government cannot satisfy its burden of proof by substituting adjectives for facts, particularly with respect to proof of fraudulent intent or deceptive conduct.  Agent Komar's repeated assertions that certain issuers' NASDAQ listing applications were "deceptive" and "misleading" ring hollow, in light of the *fact* – now admitted by the Government – that the "rule" the Government accused those issuers of evading does not exist, and considering that the "facts" about which the NASDAQ was supposedly "deceived" were openly discussed between issuers' counsel and the relevant NASDAQ officials in real time. Similarly, in opposition to this motion, the Government repeatedly resorts to hyperbolic adjectives and adverbs rather than facts to buttress its otherwise bereft proof.  The Government's characterizations of the Komar Affidavit as "highly particularized" and "robust" with probable cause, its descriptions of price stock movement as "whopping," and its characterizations of money transfers as "back-door" payoffs, do nothing to ameliorate the absence of actual proof of wrongdoing.[18]  (Opp., pp. 1, 7, 8)

Further, the Government continues to rely on misleading statements in the Komar Affidavit,[19] and even supplements those with *new* misleading assertions.  For example, the

---

[17]    Agent McGuire's search term list, with highlighting to indicate the more than 165 search terms that were not authorized by Exhibit B to the search warrants is annexed as Exhibit 47 to the Siegal Reply Declaration.

[18]    Similarly, the Government's repeated touting of the fact that the Komar Affidavit spans 97 pages cannot bridge the gaps in actual proof therein, especially once the false and misleading passages are stripped away.

[19]    The Government concedes now that Agent Komar falsely made the highly prejudicial and inflammatory assertion that Mr. Wey's sister and "Bei Lu," the CEO of CleanTech, were co-signers on a China-based bank

Government now asserts that "Oklahoma barred Mr. Wey from securities dealing *in 2002* (*after which* he changed his name from one of the aliases listed on the Indictment)."[20]  (Opp., pp. 2-3) (emphasis added).  This statement is false and misleading in two respects: Mr. Wey, who was not a registered person at the time, did agree not to request registration or act as a as a securities broker-dealer in Oklahoma; he did so on consent, while admitting no wrongdoing.  More to the point however, that agreement was entered in *July 2005*, that is, *four years after* Mr. Wey had already moved to New York and *after* he had legally changed his name (in 2004) to avoid the xenophobic stereotyping and discrimination he had faced in Oklahoma.  (Siegal Decl., Ex. 1; Reply Declaration of David Siegal, dated August 12, 2016 ("Siegal Reply Decl."), Ex. 48)

The Government's opposition simply does not refute that several core allegations of the Komar Affidavit were and remain highly misleading.  As each of these items is stripped away, the Court is left with a warrant application severely lacking in probable cause.

    1.    *The Alleged Gifting of Shares Does Not Support Probable Cause*

The Komar Affidavit devotes 20 pages to allegations that Mr. Wey illegally gifted SmartHeat and Deer shares to individuals known to him so that those issuers could satisfy NASDAQ's 300 round-lot shareholder requirement.  Nowhere, however, did Agent Komar apprise Magistrate Judge Dolinger of the Agent's own actual awareness (apparently) that in fact, *no rule against satisfying this requirement through the gifting of shares existed*.  Given that Agent Komar's assertion of the impermissibility of the gifting of shares forms the lynchpin of his fraud theory (and, indeed, of the Government's whole fraud theory in this case), the Government's concession is simply fatal to its probable cause argument.

---

    account and somehow worked in concert to send money to Mrs. Wey.  (Komar Aff., ¶ 29(h)).  In point of fact, no such joint bank account existed, and no such conspiratorial activity took place.  Bei Lu is a Beijing street address, not a person, in this context.

[20]  While this allegation has no bearing on this motion – and is clearly just a gratuitous shot at Mr. Wey – it is important to set the record straight.

The Government's response to the revelation of this *apparently intentional* sleight of hand in its warrant application is denial and defiance. First the Government defends Agent Komar by insisting he never *actually* lied. (*See* Opp., p. 42 (proffering that Komar's Affidavit "nowhere contains [] a representation" that a "rule prohibiting counting of shareholders who received their shares in the form of a gift" existed)). Then it insists, despite its concession that no rule existed, that the violation of that "rule" was nevertheless deceptive because it was designed to circumvent the non-existent rule! (*Id.*) This is all doublespeak.

First, the Komar Affidavit most certainly misled Magistrate Judge Dolinger to believe that a rule *does* exists. No reasonable reading could conclude otherwise. The Komar Affidavit states clearly that "the relevant NASDAQ listing rules in effect in 2008 and 2009" prohibit the gifting of shares to meet "NASDAQ's 300 round-lot shareholder listing requirement," because the requirement "is intended to ensure that an issuer has sufficient bona fide investor interest to sustain trading on the NASDAQ."[21] (Komar Aff., ¶ 18(b)) Agent Komar even cites *SEC v. China Energy Savings Technology*, No. 06 Cv. 6402 (E.D.N.Y.) for the proposition that the round-lot rule requires shareholders to make an "independent economic decision."[22] (Komar Aff., ¶ 18(i); *see also id.* ¶ 19(j)) Yet despite this insistence, in fact *there is no rule anywhere* that requires "independent economic decisions" or "bona fide investor interest." The conclusion is plain: Agent Komar misled Magistrate Judge Dolinger. There is simply no way to read the 20 pages of the Komar Affidavit devoted to this topic and take any impression other than that a rule

---

[21] Not only does the Komar Affidavit contain no citation to a rule (because there is none), it contains no citation for the asserted motive behind the rule. Indeed, *to this day* the Government has provided no citation to this asserted legislative history.

[22] The Government asserts that the defense somehow "only grudgingly" acknowledged that case, but this entirely misses the point. While the SEC did once *assert* that position in a court filing, that case never progressed beyond the pleading stage before settling on a non-admit, non-deny basis. In any event, it is axiomatic that a plaintiff's unsupported and unblessed legal theory is not remotely tantamount to the passage of a law, a rule, or regulation, or the issuance of a precedential court ruling (much less a binding one). Nor can it substitute for the required rulemaking process. 17 CFR 240.19b4; 15 U.S.C. § 78s.

existed prohibiting counting gifted shares toward the NASDAQ round-lot shareholder requirement.

Second, the Government insists, even now, that gifting shares to meet the round-lot shareholder requirement is not only a violation of that rule, but *criminal fraud*. Given the Government's concession that no rule exists and that Agent Komar's references to "independent economic decisions" and "bona fide investor interest" have no basis on any rule of law, this insistence defies logic. The Government attempts to finesse this logical leap by claiming that Mr. Wey misled (or had others mislead) the NASDAQ about the issuers' compliance with the non-existent rule. But as set forth in certain emails attached to Mr. Wey's moving papers, SmartHeat's lawyer *notified NASDAQ that shareholders received shares as gifts*, and NASDAQ *nonetheless approved the listing*. (Siegal Decl., Ex. 10) The Government's retort to this *additional* revelation (of facts to which the Government surely had access, if they were not actually aware of, in 2012) is to insist that those communications do not complete the picture.[23] The Government's focus on parsing words of that attorney in his communication with NASDAQ about that lawyer's own personal shares say nothing whatever about Benjamin Wey or any effort *by Mr. Wey* to deceive NASDAQ about anything. Moreover, to the extent NASDAQ officials were left with an incomplete picture of the circumstances behind the issuers' satisfaction of the 300 round-lot shareholder requirement, NASDAQ's willingness to approve the listings belies the Government's insistence here that the round-lot requirement was somehow a "key prerequisite" to NASDAQ's listing process.

---

[23] The Government claims these emails are "select," but fails to offer any evidence of its own to refute them, and denies neither the existence of the communications nor the accuracy of the defense's citation of them. The fact remains that the relevant NASDAQ officials knew that many round-lot holders had received their shares as gifts prior to approving the listings, but approved them nevertheless.

In sum, the Government's effort to downplay the falsehoods supporting Agent Komar's central theory of deception, or their significance to the warrant application as a whole, fails. Agent Komar devoted twenty pages to this theory and his belief that the share certificates would be found at the NYGG Office (or later the Apartment).[24]  Magistrate Judge Dolinger was undoubtedly misled by Agent Komar's selective attestations to bless the searches.  Had Magistrate Judge Dolinger been fully apprised of the true state of affairs (not to mention the Agent's duplicitous account), there is every reason to doubt he would have at least paused before signing off on the warrants.  *See Calderon v. City of New York*, 14-CV-1082, 2015 WL 5802483, at *12 (S.D.N.Y. Oct. 5, 2015).

> 2.    *No Probable Cause Was Shown That Mr. Wey "Arranged" a Bribe of Brokers*

To buttress its probable cause claim, the Government points now to a supposed "back-door $350,000 commission *that Wey arranged* to funnel to the Retail Brokerage."  (Opp., p. 8 (emphasis added))  This assertion is, however, brand new.  The Komar Affidavit simply does not assert that *Mr. Wey* "arranged" any $350,000 payment.  (*See* Komar Aff., ¶ 26) (alleging that "an undisclosed $350,000 payment . . . that was disguised as a consulting payment" was made *by Deer*).  Nothing in the Komar Affidavit alleges that Mr. Wey had any involvement in this payment, let alone "arranged" for it.  The Government's feeble attempt now to tie Mr. Wey to this payment – without any evidence whatsoever – provides no support for a finding of probable cause.

---

[24]    The Government continues to rely heavily on the contention that Mr. Wey supposedly kept and stored share certificates of issuers at the Apartment and the NYGG Office, rather than providing them to the shareholders.  (Opp., pp. 6, 42)  However, the Government's continued insistence on the persuasiveness of this "fact" must at some point begin to lose its power, given that despite exhaustive, surprise searches of both Mr. Wey's business and home, the FBI *never found* any such share certificates at either location.

3.    *The Komar Affidavit Intentionally Manipulated the Trading Data Evidence to Falsely Suggest a Pump and Dump Scheme*

Agent Komar in his affidavit painted a portrait of an alleged "pump and dump" scheme, but to do so, he strategically selected expanded timeframes to make his misleading case to Magistrate Judge Dolinger.  By selecting a one-year period (in and of itself, an absurdly large window for maintenance of a supposed market manipulation), Agent Komar avoided the hazards of having to actually match buying activity with selling activity.  Discovering that his selected window *still* did not support his claim, Agent Komar cheated yet again, selecting two different 1-year windows in order to claim that buying and selling were occurring "at the same time."  But when examined, the actual data belies that assertion, because most of the selling activity from the so-called nominees took place *before* the alleged corrupt-broker-induced buying.  So much for the agent's pump and dump theory.  Indeed, the Government cannot and does not contest that the trading records prove that York Capital Management Inc. completed virtually all of its sales of SmartHeat and Deer stock prior to the alleged "pump."  And Agent Komar no doubt *knew* this when he submitted his affidavit.  *See United States v. Leon*, 468 U.S. 897, 923 (1984).

Rather than explain or justify Agent Komar's chicanery, the Government ignores it, and instead advances yet another of Komar's misleading "statistics" to salvage his pump and dump theory: "on 36 separate trading days in 2009, there were both (a) sales of Deer and/or SmartHeat by [alleged nominees York and Strong Growth] and (b) purchases of Deer and/or SmartHeat by" the alleged Corrupt Brokers.  (Opp., p. 9, citing Komar Aff. ¶ 27(c)).

First, it is hardly surprising, given that those brokers were market makers in both Deer and SmartHeat, that there would be a number of trading days in 2009 when their customers would be actively trading.  Indeed, during 2009, those brokers' non-(alleged)-Nominee

customers purchased either Deer or SmartHeat on almost 200 "separate trading days."[25] Accordingly, the fact that 36 of those 200 days were instances where alleged Nominees sold is neither surprising nor indicative of criminal behavior.

Second, although the Government fails to specify which 36 days they are counting, the actual trading data[26] shows that on at least 20 of those days, the brokers' non-(alleged)-Nominee customers' buying amounted to 20% or less (by dollar amount) of the volume sold on those same days by the alleged Nominees. For example, on August 12, 2009, the alleged Nominees sold $37,560 of SmartHeat stock, while customers of the allegedly Corrupt Brokers purchased just $3,459 of SmartHeat Stock. Similarly, on July 20, 2009, the alleged Nominees sold $41,370 of Deer stock, while customers of the allegedly Corrupt Brokers purchased just $1,220 of Deer Stock. This means that, even on the overlap days, the so-called Nominees selling was overwhelmingly purchased by *the market at large* – *i.e.,* the demand actually existed naturally in the market, separate and apart from any alleged "pumping" activity by the allegedly "corrupt" brokers. So much for the Government's "other" pump and dump evidence – the fact of these 36 days cannot support probable cause because it is not evidence of anything.

But this is beside the point. For purposes of this motion, as demonstrated in the Moving Brief, it is clear that Agent Komar intentionally manipulated the data to paint a phony picture of a manipulation in order to support probable cause for the warrants. That surely demonstrates bad faith, or at the very least requires a hearing to ascertain that issue. The Government has failed to cure this concern.

---

[25] Because the Government phrases their statistics in terms of trading days of Deer "and/or" SmartHeat, as we understand it, there would have been approximately 375 eligible "separate trading days" for these two stocks in 2009. And as market makers, the brokers' non-(alleged)-Nominee customers traded on 245 of those days.

[26] The data supporting these assertions – blue sheet and account data produced by the Government – is too voluminous to attach to these papers. However, the defense can supply this supporting data to the Court upon request.

4.    *The Government Has Failed to Explain Agent Komar's Misleading Statement Regarding the Price Increases in Deer and SmartHeat Stock*

The Moving Brief also addresses several pieces of information that were available to Agent Komar that would have explained price increases in Deer and SmartHeat stock in the second half of 2009, but which Agent Komar either intentionally suppressed or recklessly ignored when he submitted his affidavit and claimed boldly that he was "aware of no public information that could explain such a significant rise in the marketplace valuation of these stocks." (Komar Aff., ¶ 25) Agent Komar then posits that the only possible explanation for the rises in these stocks' prices was alleged market manipulation by Mr. Wey. (*Id*.) Agent Komar's failure to supply Magistrate Judge Dolinger with clearly relevant, publicly-available information directly related to the movement of the price of these stocks was materially misleading.

The Government does not deny the publicly available information identified by the defense to explain the price movement: the publicly disclosed, large and successful secondary offering financings by both issuers; the positive research coverage by multiple, independent market analysts, some of which *predicted the prices to rise to precisely where they did rise to*; and the simultaneous gains made across the Asian markets and the China market in particular – among the best performing markets in the world at the time. (Moving Brief, pp. 44-45) Nor does the Government contend that Agent Komar was not *actually aware of all of it at the time he swore the affidavit.* (Indeed, at this point the Court must assume Agent Komar was aware of it, but chose to omit it as a matter of strategy). Instead, the Government plays a word game, asserting that Agent Komar's point was merely that public information could not explain "*such*" a price rise. (Opp., p. 43) Again, this linguistic hair-splitting ignores the clear implication of the Agent's full attestation, which plainly asserted that the stocks quickly rose without explanation, and could only have occurred as a result of a manipulation. Surely had Magistrate Judge

Dolinger been provided with full, known (and certainly knowable, with any diligence) facts, he might reasonably have concluded that there was plenty of innocuous, market based explanations for the behavior of those stocks.

     5.    *New York Global Group's Electronic Data Policies Do Not Support a Finding of Probable Cause*

The Government also highlights several unremarkable business practices as "unconventional and highly suspicious." (Opp., p. 5) For example, the Government states that Mr. Wey communicated with employees over Skype (a service that offered *free* unlimited international videoconferencing capabilities) and instituted a 30-day email purge policy. Given the vulnerability of corporate email servers and the current state of document retention policies, these practices are not nearly as "highly suspicious" as the Government suggests. For example, in a 2014 Wall Street Journal article regarding corporate email policies, Steve Blank, a Stanford professor, stated that a corporate "retention policy should be 30 days." (Siegal Reply Decl., Ex. 46)

The Government further emphasizes that Mr. Wey allegedly instructed his employees to back up important files to thumb drives rather than maintain such files on hard drives or on a server that could potentially be accessed by hackers. Again, the Government's argument on this score rings hollow. There is no reason to believe that these corporate practices are indicative of criminal behavior. In any event, once the other falsehoods identified above are stripped from Agent Komar's application, this fact alone could hardly justify the issuance of search warrants (especially one for Mr. Wey's home), much less warrants of this unbridled scope.

     6.    *Agent Komar's Reliance on Non-existent Currency Reporting Requirements Cannot Support Probable Cause*

Agent Komar also misleadingly asserted that certain wire transfers "were deliberately broken into increments less than $10,000 to avoid raising suspicion, given United States

currency transaction reporting requirements with respect to cash transactions over $10,000."
(Komar Aff., ¶ 29(i))  As demonstrated in the Moving Brief, this allegation is misleading
because there is no currency transaction reporting requirement for wire transfers.  (Moving Brief,
p. 48)  In other words, there is no "suspicion" to avoid and no law to skirt.  In response, the
Government once again latches onto a single word in Agent Komar's 97-page affidavit – this
time the word "cash" – in an attempt to absolve itself of this misrepresentation.  (Opp., p. 44)

     The Government now admits (as it must) that "the *actual rule* relates to 'cash
transactions.'"  (*Id*.)  The Government argues, however, that because the Komar Affidavit
includes the word "cash," Agent Komar made clear that he was not referring to the "actual rule."
(*Id*.)  This begs the question: to what rule is Agent Komar referring if not the "actual rule"?  The
Government essentially argues that Agent Komar did not mislead Magistrate Judge Dolinger
because he effectively put the Judge on notice that he was not referring to any "actual rule."
Putting aside the absurdity of this post hoc interpretation, the plain implication of the affidavit is
clear: wires were structured in such a way so as to avoid currency transaction reporting
requirements *that do not exist*.

     Even if the Court were to accept the Government's insistence that Magistrate Judge
Dolinger was not misled, if in fact Agent Komar *knew* that there was no law against this
behavior, then how can he be positing these transfers as suspicious, or as justification to search?
The Government's argument -- that a person would purposefully "structure" these wires to
"avoid suspicion" ring hollow.  (Opp., p. 44)  Perhaps Agent Komar simply did not understand
the law.  Either way, the amounts of those wire transfers proves nothing, and must at least now
be considered nullities.

## B.    At A Minimum, A *Franks* Hearing Is Appropriate

Given the significance and number of false and misleading passages of Agent Komar's Affidavit, the Government is entitled to no presumption of good faith.  It cannot be that the mere assertion of good faith can satisfy the Government's burden here, especially in light of the misstatements already identified in this motion.  At a minimum, the Government's reliance on a good faith pass requires further scrutiny of that assertion via a *Franks* hearing. *See, e.g.*, *United States v. Westover*, 812 F. Supp. 38, 40 (D. Vt. 1992); *United States v. Johns*, 851 F.2d 1131, 1134 (9th Cir. 1988).

**IV.**

**THE GOVERNMENT SHOULD BE COMPELLED TO DISCLOSE
ITS TAINT PROCESS, AND SHOULD BE PROHIBITED FROM REVIEWING
PRIVILEGED OR POTENTIALLY PRIVILEGED DOCUMENTS**

Mr. Wey has sought information from the Government concerning (i) how it identified potentially privileged materials to avoid invading the attorney client privilege, and (ii) the process by which it marked and/or excluded such files from review by the prosecution team. Contrary to the Government's assertion, it has yet to provide Mr. Wey with "all relevant information about the 'taint procedure' used thus far."  (Opp., p. 53)  To date, the only information the Government has provided to Mr. Wey concerning its privilege review is that it somehow used the list of counsel supplied by NYGG attorneys in 2012[27] to "guide the initial identification of the potentially privileged documents," and that a "taint team [will] review the

---

[27]    The Government states that this list was "plainly over-inclusive, and resulted in the identification of 1,295 electronic documents as potentially privilege."  (Opp., p. 52)  This is illogical.  First, the Government seized every electronic device from the NYGG Office and from Mr. Wey's home, where he lives with his wife (who is an attorney).  Frankly, it is surprising that the Government was only able to segregate 1,295 electronic documents as potentially privileged.  Second, the list, on its face, includes reputable law firms and the attorneys at those firms.  If the Government's search turned up communications with those attorneys, such communications are likely privileged.  In fact, despite its protests that the list provided was "over-inclusive," the Government nonetheless failed to segregate privileged documents related to lawyers that were named on the list. In any event, the Government concedes that it "agreed to be guided" by this list.  (Opp., p. 52)

1,295 potentially privileged documents." (*Id*.) This explanation falls woefully short of a description of the Government's review and taint processes that would enable Mr. Wey and the Court to sufficiently evaluate the propriety of the Government's privilege review process.

The Government has entirely failed to provide Mr. Wey with the necessary details regarding the process it used to identify these "potentially privileged" documents. For example, Mr. Wey does not know what search terms the Government used to cull the potentially privileged material, or how those terms were applied, to which data set they were applied, when they were applied, or whether the Government conducted any privilege review beyond the application of the search terms.

Further, the need for this information is compelling, because the Government's production is littered with privileged materials. (Siegal Decl., Ex. 43) The Government admits that it used "imperfect search terms," which allowed privileged materials to get past its taint team and into the possession of the prosecution team. (Opp., p. 53) In an attempt to avoid blame for this misstep, the Government curiously states that its search terms were "developed in consultation with the defense." (Opp., p. 53) The defense does not know to what this refers, but apart from having provided lists of attorney names to the Government in 2012, the defense recalls no "consultation" with the Government on its taint process or its search-term development. (Siegal Reply Decl., ¶ 6)

To determine whether the taint process was proper, prior to reviewing any privileged or potentially privileged documents, the Government should be required to disclose to Mr. Wey and the Court the parameters and processes of its privilege review process. *See United States v. Kaplan*, 02-CR-883, 2003 U.S. Dist. LEXIS 21825, at *9 n.4, *37 (S.D.N.Y. Dec. 8, 2003) (challenges to the Government's taint process must be brought by the defense and evaluated by

the Court before "potentially privileged materials are turned over to the trial team"). Accordingly, the Government should be directed to immediately and fully describe its taint process, including its search terms used, how it applied those terms to the search materials, and the method used to review the search materials.

**V.**

**THE CHARGES SHOULD BE DISMISSED**

**A.      Counts One, Two, Three, Four, Seven, And Eight Are Duplicitous**

Counts One, Two, Three, Four, Seven, and Eight of the Indictment are duplicitous, because they impermissibly combine two or more distinct crimes into one count in contravention of Fed. R. Crim. P. 8(a)'s requirement that there be "a separate count for each offense."

The Government does not dispute that these counts combine multiple crimes into one count.  Instead, the Government argues that it is permissible to combine these crimes because they are part of "a single continuing scheme" based on the following allegations:

- Mr. Wey allegedly used "Nominees" that held shares he controlled;

- Deer, SmartHeat, and Cleantech were each China-based companies that accessed the United States financial markets through reverse mergers;

- Mr. Wey failed to file SEC Form 13D reporting his ownership of greater than 5% share ownership;

- Mr. Wey allegedly used "deceptive means to artificially increase the number if round-lot shareholders" to gain listing on NASDAQ;

- "Retail brokers. . . " solicited their customers to buy shares of common stock of the Issuers, often on margin, while those brokers simultaneously actively discouraged the sale of these stocks by their customers";

- Mr. Wey allegedly instructed "Erbek, to maintain the share prices" of Issuers;

- Mr. Wey allegedly orchestrated "match trades";

- Mr. Wey allegedly "'caused millions of dollars' worth of the Issuers' stock and cash" proceeds to be transferred "from U.S. accounts to overseas accounts, and then caused the proceeds to be funneled back to the United States."

(Opp., p. 56-58)

These allegations reveal that the Government has alleged three discrete crimes that it has attempted to bind together with superficial similarities or innocuous or vague features. For example, the fact that these Issuers are all China-based operations and were brought to market through reverse mergers has no legitimate bearing on the legality of conduct and is not part of some "scheme." Similarly, the allegations relating to use of "Nominees," retail brokers, and money laundering are far too vague to make out a "continuing scheme" or to provide some string of commonality.

Moreover, these allegations are plainly *not* uniformly applicable to all three Issuers. For example, the Government alleges a 13D violation related to Deer and CleanTech, but not with respect to SmartHeat. With regard to "match trades" (sic), in point of fact, the Indictment alleges only one, pertaining only to CleanTech. Regarding the allegation that Mr. Wey somehow misled NASDAQ relating to compliance with its listing requirements, that assertion applies only to Deer and SmartHeat, *not* CleanTech. (*See* Komar Aff., ¶¶ 18-19)

Differences in the trading of securities further confirm that there is no single "scheme" that can be reasonably presented to the jury: while Deer and SmartHeat traded on NASDAQ for several years, CleanTech traded only briefly on NASDAQ, and the timing and volume of the Issuers' trading activity differ significantly.

More fundamentally, the substantive counts will require the Government to prove actual market manipulation with respect to each of the Issuers. This will require analysis of alleged wrongful conduct in comparison to stock price movement and other market factors. This

analysis cannot be done across the three Issuers indiscriminately. To the extent any "scheme" is charged, they are three separate "schemes" relating to the manipulation in the market price of three separate securities. The Government's "scheme" theory suggests that it can somehow prove market manipulation of CleanTech stock through failure to file a Form 13D for Deer, or that a single alleged 1,000 share match trade in CleanTech in 2010 can somehow prove manipulation of the market price of SmartHeat in 2009. That is not the case. Put simply, these are separate offenses which require discrete proof and individual jury findings.[28]

The Government's argument that its duplicitous charging "benefits" Mr. Wey (Opp., p. 59) does not relieve the Government from complying with the Sixth Amendment and the Rules of Criminal Procedure. In any event, for the reasons stated in the Moving Brief (and in Mr. Wey's bill of particulars motion, Doc. No. 40), allowing the Government to proceed on a vague and amorphous theory through trial benefits the Government alone. The prejudice to Mr. Wey will be profound should the Government be permitted to proceed on the Indictment as currently charged. *See United States v. Sturdivant*, 244 F.3d 71, 77-79 (2d Cir. 2001) (duplicity in charging will prevent defendant from having fair notice of the charges, will disturb defendant's protection against double jeopardy, and will create uncertainty in the verdict and sentencing). Accordingly, the duplicitous counts should be dismissed, or the Government should be ordered to choose a single distinct crime for each count. *Id*. at 79; *see also United States v. Starks*, 515 F.2d 112, 117 (3d Cir. 1975) (dismissal of duplicitous counts is the appropriate remedy).

---

[28] The Government's citation to *United States v. Vilar* is not to the contrary. (Opp., p. 55) *Vilar* was a clear case of a single scheme – a Ponzi scheme – which the court properly characterized as "(1) lying about the nature of their investments and (2) continuing to mislead them into believing that their money was safe and invested in accordance with the representations they had received from Vilar." *Vilar*, 729 F.3d at 80. A Ponzi scheme necessarily requires a series of fraudulent acts that each build off each other. Here, by contrast, any allegedly fraudulent acts with respect to CleanTech, would have no impact on an alleged manipulation of market for Deer stock, or vice versa. They are necessarily two independent alleged set of circumstances.

### B. Counts Two Through Six Must Be Dismissed

The Government's broad contention that Mr. Wey's dismissal motion fails because the Indictment "tracks the language" of the charging statute misses the point of Mr. Wey's argument. Where, as here, an indictment is challenged on the grounds that the facts alleged fail to state an offense as matter of law, courts routinely determine whether those facts, if true, are sufficient to support criminal liability.[29] Here, they do not. Accordingly, Counts Two through Six of the Indictment, which allege securities fraud pursuant to 15 U.S.C. § 78j(b) and 18 U.S.C. § 1348, wire fraud pursuant to 18 U.S.C. § 1343, and failure to disclose ownership interests in excess of five percent of Deer and CleanTech stock, respectively, must be dismissed because each of these counts fails to state an offense.

#### 1. Count Two Fails to Allege any Deceptive Act

"Section 10(b) is aptly described as a catchall provision, but what it catches must be fraud." *Chiarella v. United States*, 445 U.S. 222, 234-35 (1980). As set forth in the Moving Brief, the Indictment fails to state a securities law violation because, in part, the Government's allegation that Mr. Wey failed to a file a 13D disclosure does not constitute a deceptive act as required by Section 10(b) and Rule 10b-5. (Moving Brief, pp. 68-69)

Contrary to the government's assertion, *United States v. Finnerty,* 533 F.3d 143 (2d Cir. 2008) is directly on point. In *Finnerty*, the Second Circuit explained that securities fraud under Section 10(b) and Rule 10b-5 requires "some proof of manipulation or a false statement, breach of a duty to disclose, or deceptive communicative conduct." *Id. at 150.* As set forth in the Moving Brief, "[t]he mere failure to file a Schedule 13D does not equate to fraud"— that is, Mr.

---

[29] *See*, *e.g.*, *United States v. Robilotto*, 828 F.2d 940, 945 (2d Cir. 1987); *United States v. Williams*, 705 F.2d 603, 622 (2d Cir. 1983); *United States v. Myers*, 692 F.2d 823, 850 (2d Cir. 1982); *United States v. Mowad*, 641 F.2d 1067, 1074 (2d Cir. 1981); *United States v. Myers*, 635 F.2d 932, 940 (2d Cir. 1980); *United States v. Ross*, 98-CR-1174-1, 1999 WL 782749, at *3-7 (S.D.N.Y. Sept. 16, 1999).

Wey's alleged failure to file a Schedule 13D does not constitute a deceptive or fraudulent act because there is nothing inherently deceptive or fraudulent about failing to file a Schedule 13D.[30] (Moving Brief, p. 70).

Rather than explaining how failure to file a Schedule 13D could somehow constitute a deceptive *act*, the Government lists a plethora of incorporated allegations it contends amount to deceptive acts. (Opp., pp. 61-62). By failing to address Mr. Wey's argument, the Government concedes the point. *Exodus Partners, LLC v. Cooke*, 04-CV-10239, 2007 U.S. Dist. LEXIS 3544, at *45 (S.D.N.Y. 2007) ("Defendants implicitly concede this point by failing to argue in their opposition brief."); *Anti-Monopoly, Inc. v. Hasbro, Inc.*, 958 F. Supp. 895, 907 (S.D.N.Y. 1997) ("[T]he failure to provide argument on a point at issue constitutes abandonment of the issue."). Moreover, the incorporated allegations to which the Government alludes *do not* constitute "deceptive acts" or were addressed — and refuted — in the Moving Brief. (*See* Moving Brief, pp. 71-72 & nn.49-50).

For example, the Government contends that:

> Count Two alleges (by incorporation) that '[a]lthough records associated with the Nominee Entities . . . identify certain of the Nominee Owners as the sole shareholders, directors, and/or signatories of the Nominee Entities, in truth and in fact, and unbeknownst to the investing public, the Nominee Entities were actually controlled by' Wey

(Opp., p. 62). This allegation, however, fails to allege a deceptive act — or more importantly, any act by Mr. Wey whatsoever. Remarkably, this allegation does not allege that Mr. Wey caused these records to be documented in a certain way, nor does it allege how the investing public was deceived. "Broad as the concept of "deception" may be, it irreducibly entails some *act* that gives the victim a false impression." *Finnerty*, 533 F.3d at 148 (emphasis added); *see*

---

[30]  Moreover, in the civil context, allegations of misrepresentations or omissions alone cannot support a claim of market manipulation. *See Sharette v. Credit Suisse Intern.*, 127 F. Supp. 3d 60, 77 (S.D.N.Y. 2015).

*also United States v. Bongiorno*, 05-CR- 390, 2006 WL 1140864, at *7 (S.D.N.Y. May 1, 2006)

(dismissing indictment alleging securities fraud under section 10(b) and Rule 10b-5 because the

government failed to identify any deceptive act by the defendant). Accordingly, since the

alleged criminal conduct in Count Two fails to allege any deceptive act, Count Two fails to state

an offense and must be dismissed.

>  2. *Count Three Fails to State an Offense*

The Government contends that "Mr. Wey ignores well-established law" by suggesting

that "more is required" of an indictment than language that "does little more than . . . track the

language of the statute charged and state the time and place (in approximate terms) of the alleged

crime." (Opp., pp. 63-64) This is false. The Second Circuit and the United States Supreme

Court have each concluded that where the definition of an offense "includes generic terms, it is

not sufficient that the indictment shall charge the offense in the same generic terms as in the

definition . . . it must descend to particulars." *Russell v. United States*, 369 U.S. 749, 765 (1962);

*United States v. Pirro*, 212 F.3d 86, 93 (2d Cir. 2000). Moreover, in addition to containing the

elements of the charged offense, the Indictment must "fairly inform[] a defendant of the charge

against which he must defend" and "enable[] [the defendant to plead an acquittal or conviction in

bar of future prosecutions for the same offense." *United States v. Alfonso*, 143 F.3d 772, 776 (2d

Cir. 1998).

Here, while the Government's allegations in Count Three may "track the language of the

statute," the facts as set forth in the allegations do not, as alleged, set forth an essential element

in the charged offense: a scheme to defraud. With regards to this essential element, *United

States v. Barr*, 816 F.2d 94 (2d Cir. 1987) is squarely on point: *Barr* sets forth clearly that in

order to plead a scheme to defraud, the defendant must possess *fraudulent intent* – or in other

words, that the defendant "contemplated some actual harm or injury to their victims." *Id.* at 98.

49

As stated in the Moving Brief, the Indictment is devoid of any allegations concerning how Mr. Wey intended to cause harm to the investing public. Tellingly, in response, the Government fails to offer any argument that the Indictment alleges fraudulent intent besides a flawed assertion that "Wey's material omissions and manipulative conduct were designed to generate an economic benefit for Wey at the expense of other market actors." (Opp., p. 64) This is simply insufficient to allege fraudulent intent. Accordingly, Count Three thus must be dismissed.[31]

### 3. Count Four Should Be Dismissed for Failure to Allege Wire Fraud

Count Four (charging wire fraud) should also be dismissed, because, as addressed above and in the Moving Brief, the Indictment does not adequately allege that Mr. Wey intentionally deceived or contemplated some actual harm or injury to his alleged victims. *See Barr*, 816 F.2d at 98. As discussed in more detail in Mr. Wey's motion for a bill of particulars (Doc. Nos. 41, 49), the Government has failed to identify the alleged wire that serves as the basis for this Count.

In response to this motion, the Government has instead identified vague references to "certain emails [*sic*] communications between New York, New York, and, among other places, Switzerland. . . ." (Opp., p. 65 (quoting Indictment, ¶32)) The Government cites two e-mails that are referenced elsewhere in the Indictment. Notwithstanding these vague allegations, the Government has simply not identified a wire as the basis for its claim, as clearly required by the applicable statute. *See* 18 U.S.C. § 1343. Accordingly, the Count Four should be dismissed.

---

[31] The Government's citation of *S.E.C. v. Masri*, 523 F. Supp. 361 (S.D.N.Y. 2007) for the dubious proposition that non-deceptive open market trading activity can constitute criminal securities fraud demonstrates the sheer emptiness of its fraud theory. The Second Circuit has never affirmed a criminal conviction on that theory, and other courts have outright rejected it. *See, e.g., GFL Advantage Fund, Ltd. v. Colkitt*, 272 F.3d 189, 205 (3d Cir. 2001) (discussed in *Masri*, at 367-68); *United States v. Mulheren*, 938 F.2d 364, 371 (2d Cir. 1991) (reversing convictions based on evidence of open market trading that was "at least as consistent with innocence as with guilt," and dismissing securities fraud counts); *Nanopierce Techs., Inc. v. Southridge Capital Mgmt. LLC*, 02-CV-767, 2002 U.S. Dist. LEXIS 24049, at *21 (S.D.N.Y. Oct. 10, 2002) ("the law of the Second Circuit on so-called open-market manipulation . . . is not yet fully settled.").

4.     *Counts Five and Six Should Be Dismissed Because the Indictment Fails to Allege Willfulness*

The charges in Counts Five and Six constitute an impermissible expansion of criminal liability under 15 U.S.C. § 78ff and SEC Rule 13D. Indeed, the Government fails to cite a single case with facts analogous to the allegations set forth in the Indictment. That is because the Government's theory of liability in this case is *unprecedented*. As far as the defense can tell, Counts Five and Six are premised on a theory of criminal liability that *has never been prosecuted as a crime*. *See* R. Colombo, *Effectuating Disclosure Under the Williams Act*, 60 Cath U. L. Rev. 329, 351 n.278 (2011) (stating that there is no single documented case of criminal liability for failure to file a Schedule 13D). Where "the government has pointed to no precedent for criminal liability," the Second Circuit has cautioned that courts should refrain from ratifying theories of criminality in such circumstances. *United States v. Brennan*, 183 F.3d 139, 150 (2d Cir. 1999); *see also United States v. Matthews*, 787 F.2d 38, 49 (2d Cir. 1986) (rejecting prosecution theory because of a "lack of any precedent for the government's theory of liability").

Rather than lend support for its unprecedented theory of criminality, the Government relies on two cases in support of its contention that a willful violation under 15 U.S.C. § 78ff requires only general intent – that is, the defendant need only "have been aware of the generally unlawful nature of his act – rather than specific intent, in which the Government must prove that the defendant intended to violate a specific law.[32] *See United States v. George*, 386 F.3d 383, 390 (2d Cir. 2004). However, neither case involved a criminal charge for failing to file a Schedule 13D. *See generally United States v. Kaiser*, 609 F.3d 556 (2d Cir. 2010) (involving false filings); *United States v. Dixon*, 536 F.2d 1388 (2d Cir. 1976) (involving misleading

---

[32] As discussed in the Moving Brief, the Government must prove specific intent "when those activities classified as illegal do not on their own provide notice of their criminality, either because of the difficulty of comprehending the legally acceptable parameters of the activity or because the criminal actus reus can be undertaken with a lawful purpose." *United States v. Schlisser*, 168 Fed. App'x 483, 486 (2d Cir. 2006).

representations to shareholders).  In sum, the Government cites no precedent applying general intent to a criminal charge for failing to file a 13D and, in any event, the facts as alleged in the Indictment are insufficient to allege that Mr. Wey willfully failed to file a Schedule 13D, warranting dismissal of Counts Five and Six.

## C.    Counts One, Seven, And Eight Also Fail

For the reasons explained in the Moving Brief and for the additional reasons discussed above, Count One (charging conspiracy to commit wire and securities fraud) must also be dismissed because the Indictment's allegations were insufficient to allege essential elements of the substantive crimes forming the conspiracy.  In addition, Counts Seven and Eight (charging money laundering) must be dismissed because they are predicated on substantive charges (*i.e.*, Counts Two through Four) that similarly fail to state an offense.

## D.    The Government's Prejudicial Pre-Indictment Delay Requires Dismissal Of The Indictment

The Government does not argue that it timely indicted Mr. Wey, nor does it provide any justification for its lengthy delay.  Instead, the Government argues that its delay should be excused because (i) the prejudice to Mr. Wey is speculative and (ii) the Government did not act with improper purpose.[33]  (Opp., pp. 68-69)

The Government argues that any prejudice to Mr. Wey is speculative because the two potential witnesses identified by Mr. Wey (one of which recently suffered a stroke) are not currently precluded from testifying.  (Opp., p. 69)  As a practical matter this is correct, however, the Government's undue delay has put the ability of these witnesses to testify in grave doubt. Accordingly, Mr. Wey reserves his right to renew this motion should either of these witnesses be

---

[33]    Conspicuously absent from the Government's opposition is any discussion of any investigative activity during this lengthy delay – likely because there was none.  The Government has known about these important witnesses for years and chose not to indict.

unable to testify at trial as a result.  *See United States v. Gross*, 165 F. Supp. 2d 372 (E.D.N.Y.

2001) (finding actual prejudice where delay led to loss of witness testimony).

## VI.

### MR. WEY SHOULD BE PERMITTED TO TAKE A PRE-TRIAL DEPOSITION OF CO-DEFENDANT SEREF DOĞAN ERBEK PURSUANT TO RULE 15

A Rule 15 deposition of Mr. Erbek is proper because (1) Mr. Erbek will offer material,

exculpatory testimony that is not obtainable from any other source; (2) Mr. Erbek is unavailable

to testify in the United States; and (3) Mr. Erbek's testimony is necessary to prevent a failure of

justice.  Mr. Wey has satisfied each of these prongs.  (Wey Mem., pp. 82-88 (citing *United States

v. Vilar*, 568 F. Supp. 2d 429, 437 (S.D.N.Y. 2008)))  The Government does not contest that Mr.

Wey has satisfied the first and third of these requirements:  Mr. Erbek's testimony is material,

exculpatory, and irreplaceable, and accordingly, necessary to ensure a fair trial.  The

Government posits, however, that a Rule 15 deposition is unwarranted because it is prepared to

grant Mr. Erbek "safe passage" to testify at the trial in this matter.  While Mr. Wey appreciates

the Government's willingness to provide Mr. Erbek with safe passage, this is an effectively

hollow offer, as there is no guarantee that Mr. Erbek will be willing to travel to the United States

to testify at the trial.  Without this guarantee, Mr. Wey may be foreclosed from introducing at

trial key testimony in his defense.

The Government itself acknowledges that Mr. Erbek's appearance is uncertain even with

the benefit of "safe passage" assurances.  (Opp., p. 72 ("[i]t *may* be that in light of this safe

passage, Erbek is willing to testify at the trial."))[34]  Indeed, there are several understandable

---

[34]  To the extent that the Government's argument is that Mr. Erbek is not truly "unavailable" because there is a
chance that he "may" testify, this is entirely without merit: Mr. Erbek has indicated his unwillingness to commit
to testify at the trial of this action, and he is outside the Court's subpoena power.  This is the very definition of

reasons why Mr. Erbek may be unwilling to travel to the United States to testify at trial despite

the Government's "safe passage" offer, while he might nevertheless be agreeable to providing

testimony through a Rule 15 deposition abroad.  First, given the procedural history of this case,

Mr. Erbek has reason to distrust the Government: Mr. Erbek was indicted entirely by surprise

and charged with a criminal conspiracy without any prior attempted contact from the

Government during its four year investigation.

      Second, following his indictment, Mr. Erbek made efforts to provide information to the

Government to exonerate himself and dispel the Government's case theories.  Mr. Erbek retained

counsel in the United States, who met with the Government and provided them with a detailed

summary of the facts, and Mr. Erbek himself met with the Government face-to-face in London

thereafter to provide further details and show documents to the Government that corroborated his

account of events.[35]  (Siegal Decl., Exs. 43-44)  Following these meetings, the Government filed

papers in this Court wherein they stated that they "did not find Erbek's account credible."  (Doc.

No. 47, p. 10)  No explanation was given for the Government's distrust of Mr. Erbek's

statements, and presumably none has been provided to Mr. Erbek.

      Third, as a result of his indictment, Mr. Erbek may also harbor legitimate fears of being

served with one or more civil lawsuits should he enter the United States to testify in this case.

These are all genuine and reasonable fears that may very well dissuade Mr. Erbek from accepting

the Government's offer of "safe passage."

      Finally, even were Mr. Erbek to indicate now a willingness to testify voluntarily at Mr.

Wey's trial, the defense cannot require him to appear, and no process exists that would ensure his

---

unavailability.  *See United States v. Johnpull*, 739 F.2d 702, 709 (2d Cir. 1984); *see also* Moving Brief, p. 87; Siegal Decl., ¶ 61.

[35]  A detailed recitation of the meetings between Mr. Erbek's counsel and the Government, along with the information provided by Mr. Erbek to the Government, is set forth in the Moving Brief and supporting papers. (*See, e.g.,* Moving Brief, pp. 84-87)

live testimony should he change his mind just prior to trial. This testimony is too important to leave to chance.

Given that the Government does not dispute that Mr. Erbek will offer material, exculpatory testimony, or that his testimony is "necessary to prevent a failure of justice," *Vilar*, 568 F. Supp. 2d at 442-43, Mr. Wey's request for a Rule 15 deposition of Mr. Erbek should be granted.

### VII.

### THE INDICTMENT SHOULD BE STRIPPED
### OF ALL REFERENCES TO MR. WEY'S PURPORTED "A/K/AS"

The Government's continued insistence on the reference to Mr. Wey's alleged "a/k/as" is unsupportable given that (i) the Government has entirely failed to identify the relevance of these a/k/as and (ii) the Government's argument that these references are not harmful is unpersuasive; whether intended or not, the "a/k/as" plainly present a risk of improper prejudicial effect.

First, the Government refers to these names as "aliases," but they are not. Mr. Wey, as the Government concedes, legally changed his name. (Siegal Decl., Ex. 1) Mr. Wey does not go by several names; the purpose of his legal name change was to avoid the all too common and regrettable anti-Asian discrimination he experienced in the United States business community.

Second, the Government argues that "[t]he alias 'Benjamin Wei' is highly relevant" because "in 2002, Wey was permanently barred by Oklahoma from securities dealing in that state," and "[i]mportantly, *after* this sanction, and around the time he founded NYGG, Wey changed his name from 'Benjamin Wei,' which he had been using at the time of the sanction, to "Benjamin Wey." (Opp., p. 73) (emphasis added) This argument fails, because the Government has this "important" timeline *wrong*. Mr. Wey changed his name on January 8, *2004*.[36] (Siegal

---

[36] Mr. Wey did so after he became a naturalized U.S. citizen.

Decl., Ex. 1)  Mr. Wey entered in the "no fault" agreement with the Oklahoma Department of

Securities on July 13, *2005* – more than a year *after* he legally changed his name.  (Siegal Reply

Decl., Ex. 48)

Third, the Government offers no justification at all for referencing the name "Tianbing

Wei."  Instead, the Government states that it should be allowed, because "there is nothing

inflammatory or prejudicial about this name."  (Opp., p. 73)  With all due respect, that claim is

either naïve or disingenuous.  In any event, it begs the question: if this name (which predates the

Government's allegations) is not relevant to the case, then why would the Government include it

in the Indictment except for its inflammatory and prejudicial effect?

In sum, there is no reason to include any of these "aliases" in the Indictment other than to

paint Mr. Wey as a criminal who goes by several names, and to stoke anti-Asian biases.  The

Court should strike this irrelevant and prejudicial surplusage from the Indictment.[37]  *See United

States v. Grant*, 14-CR-391, 2015 WL 321586, at *5-6 (N.D. Tex. Jan. 26, 2015).

---

[37]   The additional surplusage identified in the Moving Brief should also be stricken from the Indictment (Moving
Brief, p. 90 n.57) as the Government has offered no argument in opposition to Mr. Wey's request for such relief.

## CONCLUSION

Based on the foregoing, Mr. Wey respectfully requests an Order, (1) suppressing the fruits of the searches of both the NYGG Office and the Apartment, (2) dismissing the Indictment, or (3) if it does not dismiss the Indictment, to strike the surplusage from the Indictment, and (4) compel the Government to disclose its taint process and prohibit the Government from reviewing privileged or potentially privileged documents and (5) permit the defense to take the deposition of Mr. Erbek pursuant to Rule 15, together with such other and further relief as it deems just and proper.

Dated:    August 12, 2016

HAYNES and BOONE, LLP
*Attorneys for Defendant Benjamin Wey*

By: s/David Siegal_____
David Siegal
Sarah Jacobson
Joseph Lawlor
30 Rockefeller Plaza
26th Floor
New York, New York 10112
Telephone: (212) 659-4995
david.siegal@haynesboone.com

Barry F. McNeil
2323 Victory Avenue, Suite 700
Dallas, Texas 75219-7672
Telephone: (214)-651-5580
barry.mcneil@haynesboone.com