```
 1   UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
 2   --------------------------------x
     UNITED STATES OF AMERICA
 3                                        18 CR 681(S-1)(WFK)
             versus
 4                                        United States Courthouse
     JEAN BOUSTANI,                       Brooklyn, New York
 5
             Defendants.                  October 11, 2019
 6   --------------------------------x    10:30 AM

 7       TRANSCRIPT OF CRIMINAL CAUSE FOR PRETRIAL CONFERENCE
               BEFORE THE HONORABLE WILLIAM KUNTZ, II
 8                  UNITED STATES DISTRICT JUDGE

 9                            APPEARANCES

10   For the Government:

11   RICHARD DONOGHUE
     United States Attorney
12   Eastern District of New York
     271 Cadman Plaza East
13   Brooklyn, New York 11201
     BY:  MARK BINI, ESQ.
14        HIRAL MEHTA, ESQ.

15   DEPARTMENT OF JUSTICE-CRIMINAL DIVISION
     Fraud Section
16   1400 New York Avenue NW
     Washington, DC 20530
17   BY:  KATHERINE NIELSEN, ESQ.

18   DEPARTMENT OF JUSTICE-CRIMINAL DIVISION
     Money Laundering and Asset Recovery Section
19   1400 New York Avenue NW, 10th Floor
     Washington, DC 20530
20   BY:  MARGARET MOESER, ESQ.

21   For the Defendant:

22   WILLKIE FARR & GALLAGHER, LLP
     787 Seventh Avenue
23   New York, New York 10019
     BY:  RANDALL JACKSON, ESQ.
24        MICHAEL SCHACHTER, ESQ.
          CASEY DONNELLY, ESQ.
25        PHILIP DISANTO, ESQ.
```

```
1                      CONTINUED APPEARANCES

2

3    For the Defendant:

4    LANKLER SIFFERT & WOHL, LLP
     500 Fifth Avenue, 33 Floor
5    New York, New York 10110
     BY:  DANIEL GITNER, ESQ.
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21   Reported by:

22   LISA SCHMID, CCR, RMR
     OFFICIAL COURT REPORTER
23   225 Cadman Plaza East, Room N377
     Brooklyn, New York 11201
24
     Proceedings recorded by mechanical stenography.  Transcript
25   produced by computer-aided transcription.
```

```
 1                  THE CLERK:  All rise.  Criminal cause for final

 2   Pretrial Conference, Docket Number 18 CR 681, USA versus

 3   Boustani.

 4                  Counsel, please state your appearances for the

 5   record, and spell your first and your last names for the court

 6   reporter.

 7                  MR. BINI:  Mark Bini, Hiral Mehta, Margaret Moeser,

 8   Katherine Nielsen, and Lillian DeNardo for the United States.

 9                  And my first name is spelled, M-A-R-K.  My last name

10   is spelled B-I-N-I.  And good morning, Your Honor.

11                  THE COURT:  Good morning.

12                  MR. MEHTA:  Good morning, Your Honor.  Hiral Mehta.

13   First name, H-I-R-A-L; last name, M-E-H-T-A.

14                  THE COURT:  Good morning, counsel.

15                  MS. MOESER:  Good morning, Your Honor.

16                  Margaret Moeser, M-A-R-G-A-R-E-T, M-O-E-S-E-R.

17                  THE COURT:  Good morning.

18                  MS. NIELSEN:  Good morning, Your Honor.

19                  Katherine Nielsen, K-A-T-H-E-R-I-N-E, N-I-E-L-S-E-N.

20                  THE COURT:  Good morning.

21                  MS. DINARDO:  Good morning, Your Honor.

22                  Lillian DiNardo.  L-I-L-L-I-A-N, last name,

23   D-I-N-A-R-D-O.

24                  THE COURT:  Good morning.

25                  You may be seated.
```

 1             MR. JACKSON:  Good morning, Your Honor.  Randall

 2    Jackson on behalf of Mr. Boustani from the law firm of Willkie

 3    Farr and Gallagher.

 4             THE COURT:  Would you spell your name, sir?

 5             MR. JACKSON:  Yes, Your Honor.  It is R-A-N-D-A-L-L,

 6    J-A-C-K-S-O-N.

 7             THE COURT:  Good morning, sir.  You may be seated.

 8             MR. JACKSON:  Good morning, Your Honor.

 9             MR. SCHACHTER:  Good morning, Your Honor.  Michael

10    Schachter on behalf of Mr. Boustani.  Michael, M-I-C-H-A-E-L,

11    Schachter, S-C-H-A-C-H-T-E-R.

12             THE COURT:  Good morning.  And I see to your right

13    is your client, Mr. Boustani.

14             Good morning to you, gentlemen.  You may be seated.

15             THE DEFENDANT:  Good morning, Your Honor.

16             THE COURT:  Thank you.

17             MR. GITNER:  Good morning, Your Honor.  Dan Gitner,

18    D-A-N, G-I-T-N-E-R, for Mr. Boustani, Lankler Siffert Wohl.

19             THE COURT:  Good morning, sir.  Welcome.

20             And give my regards to my good friend and your

21    partners and colleagues, Frank Wohl and John Siffert.

22             MR. GITNER:  I will, Judge.  They know I'm here, and

23    they said hello as well.

24             THE COURT:  Good.  Excellent.  You may be seated.

25    Thank you.

 1          MR. DiSANTO:  Good morning, Your Honor.  Philip

 2    DiSanto, P-H-I-L-I-P, D-I-S-A-N-T-O, on behalf of Mr.

 3    Boustani, and Willkie Farr and Gallagher.

 4          THE COURT:  Good morning.

 5          You may be seated.

 6          MS. DONNELLY:  Good morning.  Casey Donnelly,

 7    C-A-S-E-Y -- Donnelly is D-O-N-N-E-L-L-Y -- on behalf of Mr.

 8    Boustani.

 9          THE COURT:  And you are with?

10          MS. DONNELLY:  Willkie Farr and Gallagher.

11          THE COURT:  Yes.  Good morning.  Please be seated as

12    well.

13          Ladies and gentlemen of the public, please be seated

14    as well.  Thank you very much.

15          All right.  We're here now for our final Pretrial

16    Conference in this action.  There are a number of issues we

17    have to address, but I thought the first one would be the

18    manner in which this Court will conduct voir dire.  So I

19    thought I would go through it with you now.  We'll go through

20    it again on Tuesday.  Remember, Monday is a holiday and the

21    court is closed, but let me read to you the voir dire

22    introduction that I will, again, be reading on Tuesday and on

23    Tuesday, I will read the following, and so I'm reading it now

24    as a spoiler alert.

25          Counsel, before we bring the jury pool into the

1   courtroom, I'm going to instruct you as to how this Court

2   conducts voir dire.  In a few minutes my courtroom deputy and

3   law clerks will bring the potential jurors into the courtroom.

4         The first 14 potential jurors will be seated in the

5   jury box to my right.  The remaining potential jurors will be

6   seated in sequential order in the rows in the back of the

7   courtroom.  Members of the public will be permitted to watch

8   the proceedings in Courtroom 6G North, which is right down the

9   hall, for the duration of jury selection.

10        And so as you look around this courtroom today

11  without any jurors, you see why we will need to have the

12  members of the public move to the adjoining room, 6G North,

13  which has an audio and video hookup.  So they will be able to

14  observe in realtime jury selection, as is certainly their

15  right, but there's not physical space here to have both

16  members of the public and the 130 jurors that we will be

17  having seated in the seats.

18        Once the jurors have been selected, of course, we

19  will have the public come back in.  I anticipate the jury

20  selection will take all of Tuesday, and so we will have

21  opening statements at 9:30 a.m. on Wednesday morning.  So,

22  again, for planning purposes, that's when you should

23  anticipate having your opening statements and we will start

24  and we will complete jury selection on Tuesday.

25        Let me continue with the formal instructions.

1      Prior to entering the courtroom, each potential

2  juror will be given an auctioneer-style paddle with a number

3  on it.

4      Let me stop right there.  Let me assure you that no

5  federal funds were expended in the acquisition of these

6  paddles, and when you see how downmarket they are, you'll

7  believe it.  My wife and I, a number of years ago, went to the

8  Lower East Side and purchased the paddles.

9      Okay.  So each juror will have a paddle.  My law

10  clerk said, "Are you going to take out Paddle Number 1,

11  Judge?"

12      And I said, "Yes, of course. Judicial modesty is

13  something you tell the senators when you want the job."

14      So, okay.  So, prior to entering the courtroom, each

15  potential juror will be given an auctioneer-style paddle with

16  a number on it.  Each paddle states the number of each juror.

17  A potential juror's number never changes during the entire

18  voir dire process.  The Court will also always refer to a

19  potential juror by his or her paddle number and not by the

20  number of his or her seat.  Counsel should do the same.

21      When the potential jurors are all seated, the Court

22  will swear the jurors in and explain the voir dire process

23  before beginning questioning.  Obviously, we will ask the

24  jurors to swear or affirm.  The Court will then ask the

25  potential jurors as a whole questions about their respective

1  backgrounds, relationships, conflicts, prior jury service, and

2  other relevant issues.

3          Let me stop right here.  Obviously, I read your

4  suggested voir dire questions.  Each side is very experienced

5  and distinguished counsel.  The fact that I don't ask your

6  question doesn't mean that I didn't read it and give it

7  careful consideration with my law clerks.  It just means I

8  decided not to ask a question.  Okay.

9          After each question, the Court will ask potential

10  jurors to raise their respective paddles if the question

11  applies to them.  For example, are you related to any of the

12  lawyers or the parties in the case?  If so, please raise your

13  paddle.  I will then say, "I see Paddle Number 1, Paddle

14  Number 80, Paddle Number 33, Paddle Number 34.  Thank you."

15  So, we will then go through the list of questions, and that is

16  how both you and I will know when the paddles have been raised

17  with respect to a given question.

18          And, yes, at the end, another spoiler alert.  I do

19  have the question:  Is there anything that concerns you that

20  was not responsive to a particular question?  Please raise

21  your paddle.  So I have the catch-all question as well at the

22  end.

23          My law clerks will record these responses, that is

24  to say, the paddle raises.  After the Court has finished its

25  questions, each potential juror will be called to the sidebar

1    to my left for questioning outside the hearing of the other

2    potential jurors but on the record with all counsel of record

3    in attendance.  All clients will have access to the sidebar --

4    when I say all clients, I mean your clients and your

5    professionals who are working with you as well -- will have

6    access to the sidebar colloquy from the realtime transcripts

7    available to be seen while seated in counsel table.

8              So, just to show Mr. Jackson, when you put on the

9    white noise -- this is Mr. Andrew Jackson, not Mr. Randall

10   Jackson -- to be clear on the record, would you put on the

11   white noise machine so they can here what it sounds like?

12             THE CLERK:  (Complies.)

13             THE COURT:  All the way up.  Thank you.

14             So, when we have our sidebars, so we don't taint the

15   jury with the questions and answers at the sidebar, that's

16   what you will hear if you're out in the public.  Okay?

17             So the lawyers will come over to the sidebar.  Your

18   colleagues will have access to what is being said at the

19   sidebar, realtime from the transcripts.  The court reporter

20   will need to have a moment to take his or her machine from

21   this location in front of me, over to the sidebar as we

22   question the respective jurors.  So, you don't have to worry

23   about asking the jurors questions because you won't be.  I'll

24   be asking the questions.

25             But that will be the logistics.  So figure out which

1  of your counsel you want to come to the sidebar.  All counsel

2  of record are welcome to come, but again, you see this space

3  over there?  So, think about who needs to come over to

4  actually be present to hear the questions.  Again, you will

5  have access to the Q and A realtime from your desk.  So you

6  will, those of you who are left behind, to use the evangelical

7  term, will actually have access, okay, in realtime.

8          As I said before, all questioning is undertaken by

9  the Court.  I will say it again.  All questioning is

10  undertaken by the Court.  There will be no noses of camels

11  under the tent that is Judge Kuntz.

12          If an attorney believes a potential juror has not

13  mentioned an issue for which the juror previously raised his

14  or her paddle or if an attorney has a concern about a

15  potential juror's response, the attorney should wait until

16  after the potential juror has left the immediate location of

17  the sidebar and returned to his or her seat to raise the issue

18  with the Court outside of the presence of the potential juror.

19          If I agree that there's a need to call the potential

20  juror back, I will call the potential juror back.  If I

21  disagree, I will say I disagree, and that juror will be

22  seated, subject to your peremptory challenges.  All right.  So

23  what I'm telling you upfront is I am making a determination

24  about whether there is a challenge for cause.  So, if I put

25  them in the box, it means I've decided that there is no

1    challenge for cause.  You have an automatic exception.  You

2    can say, Gee, I wanted to argue for 20 minutes about Juror

3    Number 1 or Juror Number 12 or Juror Number 50, but you didn't

4    give my that opportunity.

5            Spoiler alert.  Your record's preserved.  So if you

6    think you have a challenge for cause, you can say something

7    after the juror has stepped back, but you don't have to.

8            After the Court has finished its questioning and

9    excused any potential jurors for cause, I will direct my

10   courtroom deputy to refill the jury box with the first 14

11   potential jurors who remain, and, again, we're going to keep

12   everything in numerical order.  That's how we're going to fill

13   the box.  As I mentioned, the Court and counsel will continue

14   to refer to potential jurors by their paddle numbers and not

15   by their seat numbers.

16           So, for example, if Potential Juror Number 23 is

17   placed in Seat Number 8 in the jury box, he or she will be

18   referred to as Juror Number 23 and not as Juror Number 8.  So

19   you won't have to worry about where they're seated.  The

20   paddle always controls.

21           Once the juror box is full with 36 potential jurors

22   not excused for cause by the Court, I will ask all the

23   potential jurors in the courtroom to raise their paddles.  So

24   obviously, in terms of exercising your strikes, you only have

25   to worry about the first 36.  However, I've seen lawyers

1    strike Juror Number 130 who was nowhere near the box.  It's a

2    free country.  I suspect you guys won't make that mistake.

3              And I use "guys" in the gender-neutral term.

4              Once the jury box is full with 36 potential jurors

5    not excused for cause by the Court, I will ask each of the

6    potential jurors in the courtroom to raise their paddles, to

7    hold them up high so you can see them, so the attorney may

8    take note of their juror numbers.  The attorneys will have

9    then several minutes to review their respective notes and

10   confer with their clients, confer with your professionals at

11   the table, seated at the respective counsel tables to

12   determine how you wish to exercise your peremptory challenges.

13             Now, in a case with 12 jurors and 4 alternate

14   jurors, the Government has a total of 6 peremptory challenges;

15   and the defendant has a total of 10 peremptory challenges.

16   Each party will also be given two alternate challenges.  This

17   Court will conduct six rounds of peremptory challenges -- and

18   again, we will do it at the sidebar with the white noise

19   machine on.

20             In the first round, the Government will exercise the

21   first challenge, and the defendant will exercise the next two

22   challenges.  In the second round, the defendant will exercise

23   two challenges, followed by one challenge from the Government.

24   In the third round, the Government will exercise the first

25   challenge, and the defendant will exercise the next two

 1   challenges.  In the fourth round, the defendant will exercise

 2   two challenges, followed by one challenge from the Government.

 3   In the fifth round, the Government will exercise one

 4   challenge, followed by one challenge from the defendant.  In

 5   the sixth round, the defendant will exercise one challenge,

 6   followed by one challenge from the Government.

 7           The Court will then hold two alternate strike

 8   rounds.  In alternate juror round one, the defendant will

 9   issue the first challenge, and the Government will follow with

10   one challenge.  In the second alternate round, the Government

11   will exercise one challenge, followed by one challenge from

12   the defendant.

13           And then I will ask if there are any questions

14   before we bring the jury pool into the courtroom.  That's when

15   you'll get your comfort break.  My law clerks, the courtroom

16   deputy will go down to the second floor to bring the jurors

17   up -- all 130 -- in the elevators that we have here.  They'll

18   be layered in, again, 1 through 130.  We will have the public

19   gracefully but firmly excused and placed in -- have access to

20   Courtroom 6G, as I said, which is just down the hall and

21   they'll be able to watch jury selection from 6G.

22           Since we're just going to be doing jury selection on

23   Tuesday, at the end of that process, we'll adjourn for the day

24   and Wednesday at 9:30, obviously, the public space will be

25   available again for the public and we'll have our opening

1     statements on that Wednesday.

2              So that's how we're going to do the mechanics of

3     jury selection, and I thought I would explain that to you to

4     lower some but not all of your pretrial anxiety about how this

5     is going to work okay.  So that's the first point.

6              The second --

7              MR. JACKSON:  Excuse me, Your Honor?

8              THE COURT:  Yes?

9              MR. JACKSON:  May I ask a question about that?

10             THE COURT:  You may ask your questions.  You can

11    sit.  The first is, may I ask a question?  Yes, you may.  The

12    second is the question.

13             Go ahead, Mr. Jackson.

14             MR. JACKSON:  Yes, Your Honor.

15             Judge, in the alternate strike round, are we limited

16    to striking a subset of the group or can we exercise in the

17    alternate strike rounds?

18             THE COURT:  I'm not sure I follow you question.

19             MR. JACKSON:  Well, does it have to be a strike

20    against one of the last four people seated or can it be

21    against any of the people there during the alternate round?

22             THE COURT:  Anyone who is left in the courtroom as a

23    juror, you are perfectly free to strike.

24             MR. JACKSON:  Thank you.

25             THE COURT:  But if you want to strike Number 130 and

1    there's no way in heck that 130 is going to be one of the

2    surviving 16, knock yourself out.  I don't know why you'd do

3    that, but you could and I've seen lawyers do it.

4              MR. JACKSON:  Thank you, your Honor.

5              THE COURT:  Okay?

6              Any questions from the Government about the process?

7              MR. BINI:  No, Your Honor.

8              THE COURT:  Okay.  All right.  Now, I've received

9    letters today, dealing with the question of what I'll refer to

10   as the batch introduction of business records.  I received a

11   letter from the Government, I received a letter from Willkie

12   Farr, and there's been a request to have briefing on the

13   issue.  I'm always happy to have briefs on the issue.  I have

14   no life.  So, you know, the court may be closed on Monday,

15   but, you know, I'm the troll hanging on the ceiling like a

16   bat.  So I'll be here at least in cyberspace, and you can feel

17   free to brief the issue about batch versus non-batch and 803

18   business records.

19              And I will read your briefs and I will consider the

20   arguments from both sides and then I will inform you on

21   Tuesday as to my ruling with respect to the issues that you

22   have briefed.  I'm not going to give you a briefing schedule

23   since it's Friday and the trial starts on Tuesday with jury

24   selection.  So, there are only that many hours in the day,

25   but, you know, I used to go by the hour, too.  So I get it.

```
 1    Knock yourselves out.  No page limits, no time limits.
 2              MR. JACKSON:  Your Honor.
 3              THE COURT:  Get it on ECF -- however you want to do
 4    it -- simultaneous briefing, responsive briefing.  I did
 5    practice law on Wall Street for 33 years.  Spoiler alert:
 6    I've been a judge now for eight years.
 7              So, when I started, there were no legal assistants
 8    except for the one who worked for the head of the litigation
 9    department.  So I not only read all the documents, I actually
10    went and had the stamps made that said "Attorney/Client
11    Communication, Privileged and Confidential" and "Attorney Work
12    Product" and then I did my own reading of the documents and my
13    own Bates stamping.  We didn't have machines.  I would hit
14    Number 1, Number 2.  So I get it.  Okay.
15              MR. JACKSON:  Your Honor, if I may?
16              THE COURT:  Yes?
17              MR. JACKSON:  I just wanted to briefly touch base on
18    this because we do know that the Court has obviously a great
19    deal of wisdom and we think --
20              THE COURT:  I wouldn't say wisdom.  How about
21    experience?
22              MR. JACKSON:  Experience, Your Honor.
23              THE COURT:  Hard knocks in the old days.
24              Go ahead.
25              MR. JACKSON:  And we think the question of what, if
```

1    anything, we should brief, I think the parties will be helped

2    if we can preview a little bit of what I think is the

3    discussion we're having and perhaps get any guidance that the

4    Court may be able to give to us.

5              Just flashing back to one of our earliest Pretrial

6    Conferences, Your Honor will recall that I raised the question

7    of whether the Court would be amenable to the parties

8    discussing the possibility of reaching an agreement whereby

9    the Government would -- both parties would agree to do some

10   disclosure of exhibits in advance on a weekly basis in order

11   to make sure that we're not wasting the Court and the jury's

12   time in court, fighting over every issue.

13             And I do want to just say that, much to the

14   Government's credit, they have been -- we have had a very

15   cooperative relationship in terms of figuring that out, that

16   structural component out.  I think Your Honor saw that we were

17   able to submit a letter that Mr. Bini submitted after we were

18   able to reach an agreement, whereby, as the Court is aware,

19   the Government discloses the exhibits that it anticipates

20   utilizing during the following week in advance of that week

21   and we use the week to meet and confer and this was the first

22   week that we attempted to do that.

23             I think that the Government has attempted to proceed

24   in a manner that they -- in good faith, but I think that they

25   have proceeded in a manner that I think is not conducive to

1    the goals of what we're attempting to do.

2            So, the issue, Your Honor, is that we have spent an

3    enormous amount of time this week, trying to digest the one

4    million pages of documents that the Government has now told us

5    that they want to seek to admit during the first week.

6            There are a number of specific objections that we

7    discussed and conceptual objections that we discussed to

8    categories of documents.  There are a number of things that we

9    told the Government exclusively we're not going to have any

10   issue with -- and I do want to clarify that we also made clear

11   to the Government that we have no interest in unnecessarily

12   burdening the Court with pointless, you know, custodians of

13   record, et cetera.

14           What we do have an interest in, Your Honor, is

15   making sure that, A, we perform our duty in actually

16   understanding what the documents are that the Government is

17   seeking to put into evidence.  We have barely had time to

18   eyeball the thousands of exhibits that they have told us they

19   wanted to introduce during the first week, much less

20   understand what their relevance might be and even understand

21   some of the documents, as we've set out in our letter.  Many

22   of these are incomprehensible even to us who have been deeply

23   immersed in the case.

24           So, just at a conceptual level, I don't want to go

25   through all of -- I know we can save from briefing, if it's

1    necessary, going through more specific objections, but we

2    would like to have a discussion with the Government and the

3    Court just about conceptually the idea that we think it would

4    be more appropriate if the Government identified the actual

5    exhibits that it wishes to utilize during the week and that

6    will give everyone an opportunity to have an intelligent

7    discussion beforehand, where we have told the Government we're

8    confident that we're going to agree to the admissibility of a

9    large number of these documents and we're going to be able to

10   spare the Court the hassle of going through thousands of

11   document objections, but we need to have an understanding of

12   what's actually going to be utilized.

13           The Government has been very forthcoming with us in

14   the discussions and told us that they don't intend to put

15   before the first witness they're going to call -- we expect

16   there's going to be one witness essentially on next week --

17   and they don't intend to utilize all 2,000 of these exhibits,

18   all one million pages of these exhibits with that witness.

19   What they expect is that a kind of subset of those will be

20   introduced, will be the subject of the discussion with that

21   witness.

22           We don't think that at a conceptual level it is fair

23   or appropriate to the process or to the jury to put in that

24   many documents without any explanation, without any foundation

25   being laid, without any relevance.

1          So, before we get to the question of what is

2     relevant, what's not relevance, we're just trying to engage

3     with this idea that from our experience the most, the best-run

4     trials are ones in which the judge has an opportunity to

5     intelligently assess what the parties are trying to say about

6     each one of the documents.

7          We can introduce documents.  We're not saying they

8     need to come in one-by-one.  We can introduce stacks of

9     documents, but they do need to come in, in some fashion

10    whereby there's a witness who can help to at least set the

11    stage for what the relevance is of this document and, with

12    regard to many of these documents, to explain what this

13    document is.

14         I don't think there's any possibility that for a

15    vast majority -- for a vast number of these documents that

16    with just having, for example, if it were a cooperating

17    witness on the stand, there could be any reasonable

18    explanation as to the foundation that could be laid for what

19    the relevance of the document is.

20         And the last thing I will emphasize, Your Honor,

21    that is in our letter, but I do think it's worth a special

22    note of emphasis.  These documents, as they have been

23    identified to us, they have not been appropriately prepared

24    for introduction into the public record.  There are thousands

25    upon thousands of pages of sensitive bank information for

1    people who have nothing to do with this case and for

2    transactions with companies that have nothing to do with this

3    case that have been marked as exhibits.

4            That's not the Government attempting to do anything

5    improper.  That is, I think, a byproduct of us trying to take

6    too big of a shortcut and put the entire case in on the first

7    day, as opposed to doing it in a manner that allows us all to

8    have an intelligent discussion about what each one of these

9    documents is and whether or not it's appropriately admissible

10   in this complex case.

11           So, that's just our sort of big picture on this,

12   Your Honor; and there are a lot of ways that we could go about

13   briefing.  We'd appreciate any guidance, but we would

14   appreciate the Court's -- if the Court has any guidance it

15   could give us in terms of what would be helpful in terms of

16   thinking about that or how it thinks about those issues, we'd

17   deeply appreciate that.

18           THE COURT:  I'm going to let the Government respond

19   to your briefs.  You can respond to their briefs.

20           MR. JACKSON:  Okay.

21           THE COURT:  And then I'm going to rule.  I'm not

22   going to get enmeshed in your negotiations.  Whatever you

23   agree to, you agree to.  Whatever you don't agree to, you

24   don't agree to, and then I will rule.

25           And as I have often said in cases involving issues

1    large and small, sometimes the Government goes home unhappy.

2    Sometimes the defense goes home unhappy.  Sometimes the

3    plaintiffs in civil cases go home unhappy.  Sometimes the

4    defense in civil cases go home unhappy.  But I always go home

5    happy.

6              MR. JACKSON:  That's excellent, Your Honor.  Thank

7    you.

8              THE COURT:  You're very welcome.

9              Okay.  Any other issue we need to address today?

10             MR. BINI:  Your Honor, I just wanted to, if I could,

11   hand up specific responses that were referenced in our letter

12   we've prepared -- and we'll file this on ECF as well -- but I

13   would like to, without arguing it to Your Honor, just hand up

14   the Government's specific responses to the objections that

15   defense counsel had raised.

16             THE COURT:  You can hand it to my law clerks, and

17   they'll hand it to Mr. Jackson.

18             MR. BINI:  I'm going to hand a copy, if I could, to

19   defense counsel.

20             THE COURT:  Okay.  Of course to your adversary, but

21   you're going to file it on ECF.  So that's fine.

22             MR. BINI:  Okay.  And then the second document is

23   responses or -- excuse me -- the Government's objections to

24   the defendant's exhibits for non-impeachment that they have

25   noticed, they wish to put in through the Government's

```
1    witnesses.  That, I would hand up to defense counsel and to
2    the Court as well and file on ECF, if I could.
3              THE COURT:  Okay.
4              MR. BINI:  May I mark those as Court Exhibits 1 and
5    2 for purposes --
6              THE COURT:  You can mark them as Government exhibits
7    rather than Court exhibits because I haven't seen them.
8              MR. BINI:  Okay.
9              THE COURT:  What numbers do you wish to assign them?
10             MR. BINI:  May I assign the first one with our
11   responses to the defendant's objections as Government's
12   Exhibit 1, and the exhibit with our responses to the
13   defendant's or our objections, rather, to the defendant's
14   exhibits as Government's Exhibit 2?
15             THE COURT:  Yes, you may.  Show them to your
16   adversary and if there is no objection, I'll take them in
17   evidence.
18             Any objection to the Government's Exhibit 1?
19             MR. JACKSON:  No, Your Honor.
20             THE COURT:  It's admitted.
21             Any objection to Government's Exhibit 2?
22             MR. JACKSON:  No, Your Honor.
23             THE COURT:  It's admitted.
24             MR. BINI:  Thank you, Your Honor.
25             THE COURT:  You're welcome.
```

```
 1              What else can I help you with?

 2              MR. BINI:  The only other thing the Government

 3   wanted to raise is for telling the jury the length of trial.

 4   The Government has always estimated its case as three weeks

 5   based upon the witnesses the Government intends to call and

 6   the anticipated cross-examination.

 7              The Government just wishes to note, so that the

 8   Court is aware in advising the jury during voir dire -- we

 9   don't want to overpromise and under-deliver -- based upon the

10   volume of exhibits that defense counsel has noticed that they

11   wish to put in during the Government's case and the witnesses

12   that they intend to call, the Government thinks the

13   Government -- for the Government's case, not including the

14   defendant's case, may be closer to four weeks.  We will do

15   everything we can to be as efficient has possible, but I did

16   want to notice the Court of that.

17              THE COURT:  I notice that.

18              Anything else?

19              MR. BINI:  Not from the Government.

20              THE COURT:  From the defense, anything?

21              MR. JACKSON:  We have a few issues, Your Honor.

22              First, I did want to respond to that issue on the

23   length of trial.  We have identified a number of exhibits.

24   They are a tiny -- they are a small fraction of what the

25   Government has identified in this case and I don't think that
```

```
 1    that is the major issue, respectfully, in terms of the length

 2    of the case.

 3              We have believed and we have raised with the

 4    Government now on more than one occasion that the three-week

 5    estimate that the Government has offered the Court is not a

 6    realistic estimate of the length of the Government's case.

 7              THE COURT:  What is your estimate?

 8              MR. JACKSON:  My estimate, Your Honor, is that the

 9    Government's case --

10              THE COURT:  No.  What is your estimate for the total

11    length of the trial?  I'm not asking you whether you're going

12    to put on a case or not.  That's obviously up to you.  I'm

13    certainly not asking whether the defendant's going to take the

14    stand.  He has every right not to take the stand.  I'll

15    emphasize that repeatedly to the jury.  What is your estimate

16    of the length of trial, all in?

17              MR. JACKSON:  I think six weeks is more realistic,

18    Your Honor.

19              THE COURT:  How many weeks?

20              MR. JACKSON:  Six --

21              THE COURT:  Okay.

22              MR. JACKSON:  -- is more realistic.

23              THE COURT:  That's your estimate.  I've heard the

24    Government's estimate.  Then I'll tell the jury how long I

25    think it's going to take.
```

1          MR. JACKSON:  Thank you, Your Honor.

2          I do want to note that estimate is largely based on

3    our understanding of who the Government is going to call and

4    what cross they're going to have, but it's very difficult for

5    us, because we don't have an estimate as to how long their

6    directs are going to be.

7          THE COURT:  Mr. Jackson, I have tried cases since

8    1978 as a lawyer; and I've tried cases since 2011 as a judge.

9    I have won plenty of cases.  I've lost plenty of cases.

10         The one thing I know is that the only person I ever

11   practiced law with who was a certifiable and occasionally

12   certified genius was a gentlemen name Roger Milgrim, who wrote

13   *Milgrim on Trade Secrets*. He was a little bit excentric about

14   some things, but a great lawyer -- and Roger would be asked by

15   a client or an adversary in civil litigation how long will

16   this deposition take, how long will this hearing take, how

17   long will this trial be.

18         Roger Milgrim and I practiced law and had judicial

19   colleagues who were incredibly bright, but he was the only

20   true genius for sure.  He would look at his client or his

21   adversary with a witness and he would say, "How long is a

22   piece of string?  That is how long the trial will be."

23         You don't know.  The Government doesn't know.  Even,

24   spoiler alert, the Court doesn't know how long the trial will

25   really be.  And even Roger Milgrim, the genius who as a

1    fourth-year associate wrote *Milgrim on Trade Secrets* when he

2    was at the old Mudge Rose firm, even Roger Milgrim didn't know

3    how long any proceeding would be.

4            So, I will tell the jury what I think the length is,

5    and we'll see how long the trial takes.

6            MR. JACKSON:  Absolutely, Your Honor.

7            Just one last thing I do want to make clear on the

8    record, if it's okay, Your Honor.  There are 37 witnesses

9    identified on the Government's witness list.  I just wanted to

10   be clear on that, but, Your Honor, we understand the Court's

11   point there.

12           I did also want to reference -- Your Honor met

13   Mr. Gitner. I wanted to note that Mr. Gitner is not going to

14   be actually sitting during trial, but he is here.  He

15   represents Mr. Boustani.  He may be dealing with some issues

16   before the magistrate judge that Your Honor has assigned to

17   the magistrate judge.

18           THE COURT:  I thought it would be appropriate to

19   have my colleague, Magistrate Judge Tiscione, deal with the

20   issues that have arisen from nonparties who have received

21   subpoenas and are responding.

22           Just as I said, I used to be in that world of

23   representing financial services institutions who would receive

24   subpoena duces tecum ad testificandum, and I understand what

25   it's like to be a senior vice-president of a bank who gets a

1  subpoena duces tecum ad testificandum two days before a

2  three-day weekend and doesn't know anything about the case.

3  He calls his outside counsel and says, "What the hell is this

4  about?"  And the outside counsel says, "I don't know."

5          And they try to intervene and they can't intervene

6  because it's a criminal case and so -- unless they want to

7  intervene and make themselves co-defendants.  Usually when you

8  explain that to your bank client, they say, "Well, never mind,

9  but we'd still like to be heard."  And that's why God made

10 magistrate judges.

11         So, you will put your teams together to review those

12 documents with Magistrate Judge Tiscione, and I alerted him in

13 advance of this development that, as an old commercial

14 litigator, I anticipated this would probably come up -- and he

15 lives to serve the district court judges.  He's very, very

16 good, very smart, very experienced, and he's very much on

17 notice.

18         So I don't know how many motions to quash or modify

19 or vacate the subpoenas.  I don't know how many subpoenas were

20 served, but we have internal court rules.  When a criminal

21 case comes in, a magistrate judge is designated to handle any

22 matters that the district court judge feels appropriate to

23 refer to him or her.

24         From the very beginning, your guardian angel, though

25 you haven't known it, has been Magistrate Judge Tiscione who

1    has not had to do anything until now, but that's why we have

2    guardian angels, because they're there to save you when you to

3    need to be saved.  So there he is.

4            And I tell you this because in the course of the

5    trial, there may be other subpoenas that have been served or

6    motions to quash or vacate that come in, and the reason I put

7    the order in is so that my courtroom deputy, my law clerks,

8    and you folks can say, when you get calls, what are we

9    supposed to do with XYZ financial institution -- whether it's

10   NWI or something else, you know, perhaps Morgan, just to pick

11   names at random -- the answer is Magistrate Judge Tiscione

12   will review and do an R and R to the Court with respect to the

13   proposed modification or quashing or anything else.

14           So, I'm sure you'll have your respective teams ready

15   to meet with Magistrate Judge Tiscione and he'll make whatever

16   R and R he wants to make with the Court with respect to any

17   motions to quash and I will obviously review them, not on the

18   standard 14-day time period, because we're in the middle of a

19   criminal trial.

20           So if there are any appeals or objections to his R

21   and R, I will review them in realtime.  I will also tell you

22   in realtime, he's really good and he's really smart.  I'm not

23   saying I wouldn't disagree with him, but I'm going to be

24   trying this case.  I'll look at any appeal from any adverse

25   rulings, but you know --

```
 1              MR. JACKSON:  That's excellent, Your Honor.

 2              And we just wanted to let the Court know Mr. Gitner

 3   won't need to be introduced to the jury because he won't be at

 4   the trial, but he will be before the magistrate judge in this

 5   case.

 6              THE COURT:  Okay.  And he's welcome to appear.  If

 7   you need him or want him to sit at counsel table, he's

 8   welcome.

 9              MR. JACKSON:  Thank you, Your Honor.

10              A few other issues, Your Honor.  One, we did want to

11   note that we've reached a couple of agreements with the

12   prosecutors that relate to things that the Court is aware of

13   and we just wanted to make sure that the Court is aware of.

14              For one, as the Court knows, we subpoenaed for

15   testimony three Government witnesses, Ms. Subeva, Mr. Singh,

16   and -- I'm sorry.  Let me -- can I confer with the Government?

17              THE COURT:  It might be a good idea to do that,

18   since I think this is an issue.  We can put the white noise

19   machine on.

20              Why don't you do that, Mr. Jackson?

21              THE CLERK:  (Complies.)

22              MR. JACKSON:  (Confers with Mr. Bini.)

23              THE COURT:  Yes, sir?

24              MR. JACKSON:  So, Your Honor, I don't think there's

25   any sensitivity, but I'm going to just proceed without making
```

1    any specific reference, but there are certain witnesses in

2    this case who -- there are certain witnesses in this case who

3    are -- who we have agreed that the Government will make

4    available in the defense case to the extent that they are not

5    called in the Government's case.  I just wanted to make sure

6    the Court is aware of that.

7           We know that with regard to the document components

8    of those subpoenas, the Court has addressed those in its

9    findings, but as to their testimony, the Government has agreed

10   that to the extent they're not called in the Government's

11   case, they will make all those witnesses available.  They're

12   all critical witnesses for us, and we just wanted the Court to

13   know that we had had that discussion and reached that

14   agreement.

15           THE COURT:  Is that your understanding, Mr. Bini?

16           MR. BINI:  Yes, Your Honor.

17           THE COURT:  Okay.

18           MR. JACKSON:  Then, Your Honor, there's an

19   additional witness who I don't need to reference specifically

20   who it is, but we did want the Court to know it may come up

21   later on in the case.  We made a *Touhy* demand to the

22   Government, and so I just wanted to memorialize that, that for

23   a particular agent we made a *Touhy* demand.  We will see how

24   that progresses in terms of our discussions with the

25   Government, but that's also something that we're working

1  through, Your Honor.

2          THE COURT:  Any response to that comment?

3          MR. BINI:  Your Honor, not at this point.

4          THE COURT:  Okay.  Next?

5          MR. JACKSON:  Your Honor, we did also want to make a

6  record of the fact that we have received approximately -- by

7  our count -- somewhere between upwards of 60,000 new documents

8  in the last week.  Certain of those documents, the Government

9  has agreed that they're not going to use in their

10  case-in-chief.  I think it's a result of their recent

11  production.  Some of them have they have not.  We haven't

12  engaged in a discussion yet about what their use would be.

13          But we did want to say it's difficult for us, with

14  the volume of new materials that are coming in -- we are

15  completely prepared for trial.  We're ready to go ahead.

16          What we would ask is that the Court instruct the

17  Government that, as we are reaching the trial at least, the

18  discovery phase of the trial has to be coming to a conclusion.

19  I mean, we can't be getting hundreds of thousands of

20  documents, as we already started the trial, on top of the many

21  millions of pages of documents we already have.  So that's one

22  thing, Your Honor.

23          THE COURT:  Well, I'm sure they're complying with

24  their obligations under *Brady* and *Giglio* and 3500 and Rule 16.

25          Are you telling me, in your view, they're not?

1        MR. JACKSON:  No, this is not with regard to any

2   3500 material, and I take the Government at their word in

3   terms of subject to the exception that we have taken with

4   regard to *Brady* and *Giglio* material.  What we're talking about

5   is in terms of core Rule 16 discovery --

6        THE COURT:  Right.

7        MR. JACKSON:  -- it's our position that the

8   Government -- typically these are materials that are given to

9   us many months ahead of trial.  We haven't raised an objection

10  to, you know, many, many pages of documents.

11       THE COURT:  Mr. Jackson, if you have an objection,

12  if you believe the Government has not complied with its

13  obligations, make the objection and I will rule.  If you're

14  still working with them, continue to do that and try to do it

15  consensually.

16       But if what you're saying is this is a complicated

17  international business frauds case with millions of pieces of

18  paper -- spoiler alert.  I knew that from the very beginning

19  when I got this case, and I was told by some people they were

20  ready to try it months ago.

21       So, with all due respect, if you have an objection

22  to how the Government is presenting its documents, let me know

23  and I'll rule on that, but I understood that people were ready

24  to try this case months ago and we're now going to try it.

25  So, I don't know what else to tell you.

1          MR. JACKSON:  And we are ready, Your Honor.  Our

2     objection is only future-looking.  We're asking the Court --

3          THE COURT:  Well, I don't make rulings on future

4     objections.  I make ruling on objections.  So if you have an

5     objection, make it, and I'll rule.

6          MR. JACKSON:  That's fair, Your Honor.  Our

7     objection --

8          THE COURT:  I'm glad it's fair.

9          MR. JACKSON:  -- we just -- we understand, Your

10    Honor.

11         THE COURT:  Okay.  Anything else?

12         MR. JACKSON:  Yes, Your Honor.

13         We wanted to note for the Court that before the

14    opening statements, the Court has said, on Wednesday, we

15    discussed timing with the prosecutors.  We also wanted to note

16    that we anticipate using some explanatory slides, and we would

17    request the opportunity to -- consistent with what Judge Cogan

18    did in this last trial with the Eastern District -- we request

19    permission to show our slides to the Government just after

20    their opening to verify that they don't have any objections to

21    them at that time before we go forward.

22         THE COURT:  You're talking about El Chapo or another

23    case?

24         MR. JACKSON:  Oh, sorry.  I'm talking about the

25    Platinum Partners case.

1          THE COURT:  Well, I mean, my view -- and I have a

2     lot of respect for my colleague, Judge Brian Cogan -- but the

3     way I do it is I urge counsel to show their respective

4     demonstratives for opening to opposing counsel in advance.

5          I assume at this point you know pretty much what the

6     universe that you might be using consists of.  And if there's

7     an objection, I will take the objection either on Tuesday at

8     the end of jury selection and before the openings on Wednesday

9     or you can come in earlier on Wednesday morning if you want to

10    think about it, and define the universe of exhibits where

11    there are objections, and I will rule with respect to the

12    demonstratives that you intend to use at the opening

13    statements as well.

14         So, again, if you agree, great.  If you have

15    disagreements, you'll make the record as to what your problem

16    is with the proposed demonstrative on either side, and I will

17    rule obviously outside the presence of the jury and, of

18    course, before the defendant.

19         MR. JACKSON:  Thank you, Your Honor.

20         And we also just wanted to make the Court aware we

21    anticipate opening statement on our side will be about an

22    hour.

23         THE COURT:  I never -- the length of string again,

24    you know.  Once you get up there, you may decide half an hour

25    works for you.  You may decide two hours work for you.  I'm an

1    old trial lawyer.  I hated it when judges put me on a crusty

2    bed and either stretched me or chopped me up.

3              You're the lawyers.  Here's the jury.  Opening

4    statements.  It's just argument.  It's not evidence.  You'll

5    hear that expression repeatedly.  It's just argument.  It's

6    not evidence.

7              And take as long as you need to take and then we'll

8    start with the evidence, and the burden of proof beyond a

9    reasonable doubt is and remains with the Government throughout

10   the entirety of the trial.  It never, ever shifts.  You'll

11   hear that about 50 times, too.  Maybe 150 times for my friends

12   on the 17th floor, just to make sure.

13             MR. JACKSON:  Excellent, Your Honor.

14             Also, at some point during the open statements, Your

15   Honor, we anticipate that we'd like the opportunity to

16   introduce Mr. Boustani to the jury.

17             THE COURT:  We'll do that in jury selection.  There

18   won't be any need for you to do that in your opening statement

19   because that will have been done by the Court, and I usually

20   do a double direct on that because sometimes people zone out.

21             Like at a cocktail party, the first time you meet

22   someone, "This is Joe Jones"; and then five seconds later, you

23   go, "What was his name again?"  So it's always good to,

24   reintroduce the person -- not that I ever do that at cocktail

25   parties, but I'm sure other people do.

1          But, no.  I make sure that the parties are known.

2     As you know, at trial the defendant will be on the far wall

3     for the jury, for counsel table; and the Government will be

4     here at the near table.  We obviously make arrangements to

5     make certain that there's no untoward prejudice by the

6     entrance and egress and regress of the defendant.  So, that

7     will be taken care of.  That involves a bit of stage

8     management with respect to when we have the defendant entering

9     and exiting the courtroom.

10          MR. JACKSON:  That makes perfect sense, Your Honor.

11          During the open statements, to the extent that we do

12     take the opportunity to remind the jury of who Mr. Boustani

13     is, is it okay just for that moment if we step just a bit away

14     from the podium?

15          THE COURT:  No.

16          MR. JACKSON:  No?  Okay.

17          THE COURT:  The late Judge Carter in the Southern

18     District had what he referred to as the "Mother, may I" rules.

19     Mother, may I leave the podium?  The answer is, you may not.

20          MR. JACKSON:  Thank you.

21          THE COURT:  No one may leave the podium.  You're

22     rooted to the podium.  The podium will stay there.

23          One of Mr. Bini's colleagues once very cleverly

24     tried to -- In fact, did move the podium on wheels right to

25     the front of the jury box and I said, Gee, that's very nice,"

1    and I told Mr. Andrew Jackson to tell Mr. Bini's colleague to

2    roll that sucker back to where it belongs, which is right

3    where it is.

4            So, no, no moving around.  You're all rooted to the

5    podium.  I will tell the jurors that you're all wonderful

6    ladies and gentlemen and you'd love to get into their personal

7    space and wander around, but that's not allowed.

8            I will also tell the jurors as part of my standard

9    instructions that in the event you come across them in the

10   corridor, elsewhere, the fact that you scurry away and bow

11   your heads and don't talk to them is not because you're mean

12   or dissing them or being unfriendly, but rather because it's

13   inappropriate to have the interactions outside of the

14   courtroom and they're not to take any umbrage that the lawyer

15   dissed them by not engaging them in a good-morning colloquy or

16   eye contact or anything like that.  So, I will put that in the

17   standard instructions.

18           MR. JACKSON:  We appreciate that, Your Honor.

19           THE COURT:  Yes.

20           MR. JACKSON:  And related to that, I only have a

21   couple more quick issues.

22           THE COURT:  Oh, that's okay.  Go ahead.

23           MR. JACKSON:  There's one component of the

24   Government's voir dire request that we did want to just raise

25   with the Court.  The Government requested that Mr. Boustani be

```
 1   identified as Jean Boustani a/k/a "Jean Boustany," and they
 2   had the spelling with a "Y" in the second one.
 3            We'd just respectfully submit, Your Honor, that
 4   there's no need for Mr. Boustani to be referred to with an
 5   a/k/a/, that it's just an occasional misspelling of his name.
 6            THE COURT:  What is your response to the not wanting
 7   him to be referred to as an a/k/a?
 8            MR. BINI:  Your Honor, the Government noticed
 9   approximately 600 emails that it plans to put in with our
10   first two witness, and Mr. Boustani's name is spelled with a
11   "Y" in every single --
12            THE COURT:  I don't think there's a problem with his
13   being identified as Mr. Boustani's name as spelled both with
14   an "I" and with a "Y."  I think -- gee, I don't know why it
15   comes up in the Eastern District so much, but the three
16   letters a/k/a usually are followed by something like "Boot
17   Nose" or whatever.  That's actually the Southern District.
18   It's a reference to a case that I tried back in the mid-1970s,
19   but I digress.
20            You get the idea, it could be deemed as prejudicial,
21   but don't worry.  Since I'm the one who's going to be
22   introducing the parties, you don't have to worry about there
23   being any a/k/a's floating around.
24            MR. JACKSON:  Thank you, Your Honor.
25            THE COURT:  Or AKs floating around, for that matter.
```

```
 1              MR. JACKSON:  Thank you, Your Honor.

 2              We wanted to confirm that the Court intends to sit

 3    five days a week.

 4              THE COURT:  Five days a week including Fridays.  We

 5    start at 9:30.  We end.  We have a hard stop at 5:00, no

 6    matter how brilliant your examination is and how you were

 7    ready to just nail it.

 8              You see that clock?  I promise my jurors at 5:00

 9    o'clock we stop every day; and about three minutes to 5:00,

10    they all look at me with, "You're going to keep your promise,

11    Your Honor?"  And I never let them down.  Juries love me

12    because 5:00 o'clock hits, and we're done for the day.  So,

13    that's only one of the many reasons jurors love me, but

14    anyway.

15              MR. JACKSON:  Your Honor, related to that, we did

16    want to just ask if the Court is aware now of any days during

17    the anticipated time of the trial that it will have to deal

18    with other matters, that we won't be sitting.

19              THE COURT:  Oh, I've cleared the decks for you,

20    ladies and gentlemen.

21              MR. JACKSON:  Thank you, Your Honor.

22              And then I think my last issues, Your Honor, are,

23    one, we have a number of banker's boxes.  I think actually

24    this issue has largely been addressed because, Your Honor, we

25    did deeply appreciate arranging for a room for us.
```

```
 1                THE COURT:  Yes.

 2                MR. JACKSON:  During the actual trial, is it okay if

 3    we have some of our banker's boxes in empty space?

 4                THE COURT:  Yes.  The front row, if you want to use

 5    that, obviously, after we get through the process of jury

 6    selection, if it's appropriate for you to have boxes there,

 7    that's fine.  And obviously, the Government can have their

 8    portion as well.

 9                But the only thing I would just make the obvious

10    point and that is that we don't have want to have any

11    inadvertent publication of documents not in evidence to the

12    jury.  I tend to take a dim view of that happening either by

13    accident or by planning; and on occasion, lawyers have either

14    by accident or by planning attempted to or inadvertently had

15    something present that ought not be viewed by the jury.  I

16    won't say I know all the tricks, but I know most of them.  So

17    just be very careful.

18                It's more of an issue when you have things like guns

19    and knives and nunchucks.  "Oh, gee, I didn't know I couldn't

20    put it there, even though the jury could see, even though it's

21    not coming into evidence."  It looked liked shears, that sort

22    of thing.

23                So, just be mindful of the fact that jurors have

24    very good eyes and they tend to look around.  Since the

25    Government's boxes may be closer to the jury, that isn't
```

1    necessarily aimed primarily at you, Mr. Jackson.

2              MR. JACKSON:  Thank you.

3              THE COURT:  Not that they would ever do it

4    deliberately, but you know things can sometimes happen.

5              MR. JACKSON:  Your Honor, I think that was my last

6    issue, but may I just confer briefly with Mr. Schachter?

7              THE COURT:  Yes.  Of course.

8              MR. JACKSON:  (Confers with Mr. Schachter.)

9              MR. BINI:  Fortunately, Your Honor, the exhibits in

10   this case include loan documents and things like that.  So,

11   hopefully there's nothing like a nunchuck that's going to be

12   seen by the jury.

13             THE COURT:  Well, you know, that's why I let the

14   cases proceed, because sometimes things crop up.

15             MR. JACKSON:  So, we have nothing else.  Thank you

16   very much, Your Honor.

17             THE COURT:  Thank you.

18             Anything else from the Government?

19             MR. BINI:  No, Your Honor.

20             THE COURT:  Anything else from anyone else?

21             All right.  Well, have a nice relaxing three-day

22   weekend.  I know my law clerks and courtroom deputy and I

23   will.  We're adjourned.  Thank you.

24             MR. JACKSON:  Thank you, Your Honor.

25             THE COURT:  Thank you.