**WILLKIE FARR & GALLAGHER LLP**

FILED
IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y.

★   OCT 1 5 2019   ★

BROOKLYN OFFICE

787 Seventh Avenue
New York, NY 10019-6099
Tel: 212 728 8000
Fax: 212 728 8111

October 14, 2019

**BY FEDEX AND ECF**

The Honorable William F. Kuntz, II
United States District Court for the
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

Re:   *United States v. Jean Boustani, et al. (Case No. 18-cr-681 (S-1) (WFK))*

Dear Judge Kuntz:

We represent Defendant Jean Boustani in the above-captioned matter and write in

connection with the Government's expressed intention to "batch admit" approximately 1,300

exhibits—totaling more than one million pages—after opening statements, without any witness having

taken the stand, and without having established any foundation to establish the relevancy or meaning

of these exhibits. Instead, as we understand it, the Government intends to ask the Court to issue a

blanket ruling that (i) all of these documents are relevant; (ii) that any such relevance is not

outweighed by the risk of juror confusion, or by the prejudicial nature of the evidence; (iii) that

admission of these exhibits will be helpful to the jury and that review of these exhibits would not

constitute a waste of the jury's time; and, finally (iv) that the evidentiary value of these exhibits is not

merely cumulative of other exhibits. The Government also appears to believe that the Court can make

these findings, regarding 1,300 separate exhibits, *without being given an opportunity to first review the*

*exhibits*. We object, as explained in more detail below. Moreover, we intend to object to the admission

NEW YORK   WASHINGTON   HOUSTON   PALO ALTO   SAN FRANCISCO   PARIS   LONDON   FRANKFURT   BRUSSELS   MILAN   ROME

October 14, 2019
Page 2

of this evidence at trial on any additionally applicable grounds, including potential issues under Rules

403 and 702.

I.      **Mr. Boustani—Strictly for the Purpose of Narrowing the Issues for the Court—Would Be Willing to Consent to the Admission of Certain Exhibits By the Government After Opening Statements.**

We wish to make clear that we do not raise our concerns about "batch admission"

directly following opening statements on October 16th we think there is value to requiring unnecessary

witnesses, or because we want to prolong what all parties agree is going to be a lengthy trial.  Indeed,

in an effort to demonstrate that we are not raising frivolous objections, we wish to let the Court know

that we anticipate that there are between 400 and 500 exhibits on the Government's list that Mr.

Boustani would not object to the admission of at the start of trial, notwithstanding the lack of a

foundation for these exhibits.  We are double-checking our work and will provide the Government and

the Court with a list, including the exhibit descriptions provided by the Government for these exhibits,

no later than 6pm on October 15.

Although we will not take up space in this brief individually describing the documents

for which we do not oppose admission at the start of trial, they include the equipment orders to

Privinvest and subsequent change orders in connection with all three of the Mozambican Infrastructure

Projects; the Loan Agreements between the Mozambican Companies and Credit Suisse Europe and

VTB (together, the "Investment Banks") and some of the emails among the Mozambican Companies

and the Investment Banks, or among certain of the alleged members of the conspiracies and the

Investment Banks; and some of the Investment Banks' due diligence materials in connection with the

Loans.  Our list also includes the associated paperwork that accompanied the Loan Agreements, such

October 14, 2019
Page 3

as the agreements concerning the fees to be paid to the Investment Banks, the subsidy payments to be paid by Privinvest, the Government Guarantees, interest payment schedules and the like; materials relevant to the Investment Banks' securitization/resale of the debt owed by the Mozambican Companies, including transfer certificates to the institutions who participated in the syndication of the Proindicus loan, the confidential information memoranda and offering circulars associated with the Investment Banks' sale of the debt incurred by the Mozambican Companies, the paperwork transferring the EMATUM debt to the Dutch SPV that would issue the LPNs, announcements by the Investment Banks of these debt products, and so forth.

To be clear, we do not agree that all of this material will assist the jury in deciding whether Mr. Boustani engaged in the alleged wire fraud, securities fraud, and money laundering conspiracies. In fact, we think the vast majority of it will be meaningless to the jury. For example, we don't think any juror needs to review the "Trust Deed" associated with the Proindicus loan in order to understand this case. Likewise, there are many identical copies of the Proindicus Confidential Information Memorandum on this list, and, because this evidence will not come in through a witness who could explain that that all are identical, the jury may waste its time trying to review the copies for differences. Similarly, we see no evidentiary value to the admission of emails sent among Investment Bank personnel which contain no content other than a brief explanation from the sender that he/she is attaching documents, like the Loan Agreements and related paperwork, which are included elsewhere on the Government's list. In our view, exhibits along these lines add nothing but paper to this case. But—strictly for the purpose of trying to narrow the issues for the Court—we are willing to agree to the admission of such materials after opening statements.

October 14, 2019
Page 4

**II.      Mr. Boustani Objects to the Admission, After Opening Statements, of the Remainder of the Government's Exhibits Because No Foundation Will Have Been Laid to Explain What the Exhibits Are and Why They Are Relevant.**

According to the Government, as long as an exhibit is offered pursuant to a business records certification, it must be admitted, and the Government has no obligation to lay a foundation that explains what the document is and why it is relevant. The Government's contention is squarely contradicted by the law. *See United States v. Southard*, 700 F.2d 1, 23 (1st Cir. 1983) (it is error to "equate self-authentication with admissibility. They are two separate matters. Self-authentication merely eliminates the requirement of testimony by a public official that a document is authentic. It does not eliminate the requirement of relevancy. The problem with [the] evidence is that no foundation for relevancy was laid."); *United States v. Browne*, 834 F.3d 403, 434 (3rd Cir. 2016) (holding that it was error for the court to have admitted Facebook messages pursuant to a business record certification, where records certification attested that messages had been sent through a certain Facebook account, but where the certification did not (and could not) establish that it was the defendant who had authored the messages and explaining that "accepting the Government's contention that it fulfilled its authentication obligation simply by submitting [a business records certification] would amount to holding that social media evidence need not be subjected to a 'relevance' assessment prior to admission" and therefore the Government's "theory of self-authentication...fails."); *United States v. Ferreira*, 821 F.2d 1, 7 (1st Cir. 1987) (reversible error for the court to have admitted evidence of defendant's guns where there was "no foundational testimony in the record showing that [the defendant] had actually carried a gun at the time of the robbery.").

As the law makes clear—and notwithstanding Mr. Boustani's efforts to brief this issue for the Court—it is the *Government*'s burden to establish relevance before admitting an exhibit into

October 14, 2019
Page 5

evidence, *not* Mr. Boustani's burden to disprove relevance.  J. WIGMORE, EVIDENCE IN TRIALS

AT COMMON LAW, § 18 at 347 (3d ed. 1940 & Supp. 1981) (the "burden of establishing the

preliminary facts essential to satisfy any rule of evidence is upon the party offering it. The opponent

merely invokes the law; if it is applicable to the evidence, the proponent must make the evidence

satisfy the law.").

      Given the sheer number of documents that the Government intends to "batch admit"—

and the fact that it is not Mr. Boustani's burden—we cannot realistically provide the Court with an

item-by-item description of why the relevance of the exhibits on the Government's list will not be

immediate apparent to the jury and requires the Government to lay a foundation.  Rather, below, we

have identified a few representative examples from the "batch" that illustrate why "batch admission"

on the first day of trial would be deeply prejudicial to Mr. Boustani. *See* Weinstein's Federal

Evidence, at 401.07 ("The determination of whether a particular item of evidence is relevant to a

consequential fact is made on a case-by-case basis.").  We fully expect that if offered at an *appropriate*

time, through a witness, or after the jury has heard evidence that would make the meaning and

relevance of these exhibits clear, we will consent to the admission of many of the documents on the

Government's list.  Likewise, we expect that if the Court requires the Government to lay a foundation

for the admission of these exhibits, the Government would suddenly determine that many—if not

most—of the exhibits on its list are actually irrelevant, or cumulative, or a waste of the jury's time.

### A. Correspondent Banking Materials.

      In its October 11, 2019 letter to the Court, *see* Dkt. 271, the Government informed the

Court that it did not need to establish what the hundreds of "wire records" on its list are, nor required

October 14, 2019
Page 6

to establish a foundation as to their relevance to this case. The Government told the Court: "the wire records are not confusing. They provide the basic information for any transaction: the date, the amount, the sender and receiver. No witness is required to explain their relevance." (Dkt. 271 at 3.) The Government did not offer to make the "wire records" available to the Court, so that Your Honor could assess the credibility of the Government's assertions. As the below examples make clear, the actual exhibits belie the Government's claim.

### 1. GX28

GX28 is a representative example of what many of the "wire records" on the Government's list look like. GX28 is attached as **Ex. A.**



GX28 has a section called "Message Text" which looks like this:

October 14, 2019
Page 7



Especially attentive jurors might notice that the fifth line of this section contains the word "PROINDICUS," but, without a witness on the stand to explain the meaning of this document, any such juror would be left to speculate as to the meaning of this reference: it could mean that "Proindicus," the Mozambican Company, was one of the participants in this transaction, or it could mean that two unrelated entities were simply referencing "Proindicus" in a transaction that did not involve the Mozambican Company, or it could mean something else altogether. Likewise, no ordinary juror would be able to identify from GX28, without assistance from a witness, what monetary amount is being transferred or the purpose of the transfer. Certainly, no juror could understand from looking at GX28 what this exhibit has to do with Mr. Boustani, because neither Mr. Boustani's name, or the name of his employer, Privinvest, is contained anywhere on this document.

In an ideal world, the jurors would disregard GX28 if they did not understand it. Far more likely, however, is the disturbing possibility that the jury will incorrectly assume that the Government moved GX28—and all the exhibits that look just like it—into evidence because it

October 14, 2019
Page 8

constitutes "proof" of some nefarious transaction involving Mr. Boustani, perhaps one in which he

used "code words" like "▮▮▮▮▮▮▮▮" or "▮▮▮▮▮▮▮▮" to engage in criminal behavior.

The reason courts do not allow evidence to be admitted without a foundation is because of the very real

likelihood of this kind of erroneous speculation by jurors who have not been provided with enough

information to understand the evidence admitted.

In actuality, our best understanding of GX28 is that it records an internal transfer from

one Credit Suisse entity to another Credit Suisse entity, involving Credit Suisse's correspondent bank,

Bank of New York Mellon, of money that had previously been *repaid* by Proindicus on its loan. In

other words, GX28, once explained, refers to a transaction that is the *opposite* of nefarious and which

does not remotely involve Mr. Boustani or further any of the alleged conspiracies. Thus, GX28 is a

good representative example of why it is so important that the wire records in this case be admitted

through a witness who can explain for the jury what they represent.

### 2. GX72

Many other "wire records" on the Government's list are similar in form to GX72,

which is attached as **Ex. B**. No ordinary juror could be expected to understand the relevance of GX72

by looking at it. It has no title, just a column that says "Field" and a column that says "Value." One of

the "fields" is called "Related Reference" and a juror might look to such a field to see what this

document references and how it is related to this case. If a juror did so, he or she would read:

0N0Z0B020L030603, which would be of no assistance.

The document identifies the "Ordering Customer" as "▮▮▮▮▮▮; Credit Suisse

International" and its Receiver as "▮▮▮▮▮▮; BANK OF NEW YORK." GX72 then sets forth

October 14, 2019
Page 9

information for something called an "Intermediary," identified as "███████████; Deutsche Bank

Trust Companies Americans" and, following this information, GX72 includes information as to the

"Account with Institution" identified as "SBICMUMU; Standard Bank Mauritius Limited

███████." GX72 then includes yet a *further* line of information that reads "Beneficiary Customer"

which is identified as "SANLAM AFRICA FLOATING RATE CREDIT FUND;

███████████████████████." Although GX72 contains a field for the "details of

charges," those "details" are described as "OUR." The "service" of the record is "LNMRV."

       The Government contends that the jurors can understand the wire transfer documented

in GX72 by simply reading the document. This is absurd; GX72 will be incomprehensible to the jurors

without further information and education from a witness. Permitting the Government to admit "wire

records" like these, without any foundation, is especially dangerous if the Government tries to describe

the "wire records" in this case in the same way in which it described them in its October 11, 2019 letter

to the Court, namely, as falling into one of four categories: (1) wires transferring "loan money from

Proindicus, EMATUM and MAM" to Privinvest; (2) wires showing "money sent from Privinvest to

[Mr. Boustani] and co-defendants and co-conspirators through U.S. banks;" (3) wires showing "money

sent from Privinvest to Mozambican individuals and officials (including under various alias and shell

companies) through U.S. banks;" and (4) wires showing "investor transfers to, from, or through the

United States to fund the loans." *See* Dkt. 271. Because the jury will have no information about the

transfer recorded in GX72, the jurors may very well just guess what category GX72 likely falls within.

And because, to an uninformed juror, GX72 appears to involve a number of cryptic references,

including to something called "SANLAM AFRICA FLOATING RATE CREDIT FUND," a

reasonable jury that has not been given enough information may conclude that this *must be* one of

October 14, 2019
Page 10

"various alias and shell companies" that the Government claims Mozambican officials received money
through.

As noted above, courts do not allow evidence to be admitted without a foundation
*because* they know how likely it is the jurors will resort to speculation and reach conclusions that are
entirely false.  GX72 is a perfect example:  this record has nothing to do with Privinvest, Mr. Boustani,
Mozambican individuals or officials or anything problematic.  Sanlam Africa Floating Rate Credit
Fund is not an "alias" or a "shell company," but rather one of the African financial institutions that
participated in Credit Suisse's syndication of the debt incurred by Proindicus.  In this document, Credit
Suisse sends an interest payment to Sanlam Africa Floating Rate Credit Fund's account at Standard
Bank Mauritius Ltd. and, because the interest payment is in dollars, Credit Suisse and Standard Bank
Mauritius utilized Bank of New York and Deutsche Bank Trust Company Americas, their respective
correspondent banks.  Admission of this document—and all of the "wire records" on the Government's
list—without a witness to explain what the record is *actually* documenting would be deeply prejudicial
to Mr. Boustani.


### 3. **GX1302.**

GX1302 is another representative example of a "wire record" that the Government
wishes to admit without laying any foundation for its relevance.  GX1302 is a 1,041 page PDF
produced by JP Morgan Chase of what appears to be every transaction for which it acted as a
"correspondent bank" in New York for Moza Banco SA, a private bank in Mozambique, over a mult-
year period.  Because ECF does not allow us to easily file a PDF that is 1,041 pages long, we have
instead filed the first 150 pages of GX1302 as **Ex. C**.  Unfortunately, we cannot engage in the type of

October 14, 2019
Page 11

close description of GX1302 that we provided above, in connection with GX28 and GX72, because
there are *approximately 6,000 different wire transactions included on GX1302*. Certainly, not all of
them—or even most of them—are relevant but, under the Government's proposed method, all will
have been admitted as relevant evidence—meaning evidence that "tend[s] to prove" a material fact of
consequence—against Mr. Boustani. Without any information or education about what the 6,000 wire
transfers included on GX1302 are, the jury may very well assume that all 6,000 constitute evidence of
the Count One wire fraud conspiracy against the investors who purchased the Mozambican Debt
Instrument or the Count Four money laundering conspiracy.

    **4.  GX1305**

        GX1305 is an another representative example of the type of wire records on the
Government's list. It is attached as **Ex. D** and is a spreadsheet of approximately 1,250 different wire
transactions in U.S. dollars. Both GX1305 and GX1302 (discussed immediately above) are indicative
of the many "wire record" spreadsheets on the Government's list, in that they are wholly unspecific. It
will be impossible for a jury to understand the relevance of GX1305 and the other wire record
spreadsheets without assistance from a witness. For example, GX1305 records U.S. dollar wire
transfers by entities such as Timber Africa, Ltd., Catholic Travel, Inc, Nector Coal Handling, Meridian
Commodities, Moz Foods, S.A., Arabian Oryx Travel Tourism, Ireland Blyth Limited, Multisoftware
Asia, and *hundreds* of other corporate entities and individuals.

        If these are the "various alias and shell companies" for Mozambican Government
officials that the Government referred to in its letter of October 11, 2019, *see* Dkt. 271, the
Government must first present evidence demonstrating that these companies are "aliases" for

October 14, 2019
Page 12

Mozambican Government officials.  To our knowledge, no evidence tying these companies to any

Mozambican Government officials appears on the Government's trial exhibit list of 7,000 items, nor

have we seen any references to these companies in the 3500 material.  However, assuming the

Government has such evidence, it should present it.   In doing so, it may establish a foundation to

demonstrate why, for example, wire transfers in U.S. dollars involving a South African company called

"Moz. Foods" constitute admissible evidence against Mr. Boustani.  But, it is wholly improper for the

Government to admit into evidence, on the first day of its case, records of thousands of transactions

that just happen to involve random African companies who utilize USD wire transfers, without

establishing what these records have to do with the crimes for which Mr. Boustani is standing trial.

   B. *Trader Messages/Trade Confirmations.*

        The Government has informed the defense of its plan to call salespersons from the

Investment Banks who sold the Mozambican Debt Instruments—*e.g.,* Daniel Jurkowicz (Credit Suisse)

and Pavel Lvov (VTB)—to various investors.  Likewise, the Government intends to call at least nine

traders who worked for various asset managers, including NWI, Stone Harbor, Ice Canyon, Pharro,

Alliance Bernstein, and Morgan Stanley.  When these witnesses take the stand, it is appropriate for the

Government to introduce, through them, documents related to their sales and/or purchases of the

Mozambican Debt Instruments.  These witnesses will be able to explain what their emails, bloombergs,

and trade confirmations mean, so that the jury will have a basis to understand the evidence admitted.

   1. <u>GX2477.</u>

        For example, <u>GX2477,</u> which is attached as **Ex. E,** is an email between Pavel Lvov of

VTB and Marco Santamaria, a trader at Alliance Bernstein.  The Government has informed us that

October 14, 2019
Page 13

they expect to call both men as trial witnesses.  In GX2477, which is dated September 23, 2013, Mr.

Lvov writes to Mr. Santamaria:

> Hi Marco—this OC was for the 500MM, we still need to update it once we
> retap…Timing is closing Friday morning…so I need firm orders by COB
> tomorrow.  Please let me know if you have any questions, Pavel.

(*See* Ex. E (ellipses in original).)  Attached to GX2477 are the Offering Circular for the LPNs, a

"Teaser" prepared by VTB, and two releases by Moody's concerning Mozambique.  At this time, we

do not understand how this email advances the Government case's against Mr. Boustani, but the

defense would likely not object to its admission if offered during the testimony of Mr. Lvov or Mr.

Santamaria, either of whom could explain to the jury what an "OC" is, what the reference to a "retap"

means, and what transpired after this email:  did Mr. Santamaria place an order with Mr. Lvov and if

he did so, what fund advised by Alliance Bernstein was he buying on behalf of?  There is no reason for

the Government to admit this document *now*, without laying any foundation as to who these

individuals are or what they are discussing.  Were it to do so and then decide, as is the Government's

right, not to call Mr. Lvov or Mr. Santamaria, the jury would be left in the jury room with absolutely

no idea what to do with GX2477 or who the people identified in the exhibit even are.  As explained

above, the jury cannot be counted on to simply disregard evidence that it does not understand—the

Rules of Evidence are in place to make sure that no evidence is admitted until the jury understands

what they are looking at and why the Government believes such document are evidence of Mr.

Boustani's guilt.  Although we have identified GX2477 as a representative example, these same

concerns extend to many of the emails and messages on the Government's list.

    **2.  <u>GX401</u>**

October 14, 2019
Page 14

GX401 is an even more egregious example of putting the cart before the horse.

GX401 is a 2,392 page PDF made up of *2,392 separate and distinct* Bloomberg messages among

*hundreds of different individuals, from scores of different firms*. The Bates stamps demonstrate that

the Government pulled out hundreds of pages, from any number of productions, made by separate

entities, and jammed them all into *one* PDF, such that, in reality, the Government is looking to admit

2,392 *different* exhibits as *one* exhibit and to do so before establishing why *any* of the 2,392 exhibits

are relevant. Because ECF does not permit us to file a PDF that is 2,392 pages long, we have attached,

as **Ex. F**, the first 150 pages of GX401.

Like the wire records discussed above, each one of these Bloombergs will be

incomprehensible to the jury without a witness to explain how to read them. We have embedded an

example from the first page of GX401 into this brief, for the convenience of the Court:

October 14, 2019
Page 15



The Government contends that the jury does not need any assistance to understand the

relevance of this information to the Government's case against Mr. Boustani. That is clearly false: no

ordinary juror can be expected to know, without any witness testimony, what "MEMATU 6.305

09/11/20 SEP" is. Even if the jury could understand that whatever security had been sold did so at a

"price" of "92.051," they won't know what the information in the fields marked "yield" or "yield to"

or "issuer" or "settlement" or "accrued (30 days)" means. They may be familiar with the word

"principal" but are almost certainly going to find it confusing that the amount of the "principal" that

appears to have been sold is not the same as the amount in the "sells" field, which indicates an

$8,000,000 transaction, which is a different amount from the "principal" or the "total." And, perhaps

October 14, 2019
Page 16

most importantly, the jury will have no idea from looking at this document who the parties to the trade

were:  from its face, this "trade ticket" appears to involve only "James Bonfils" (and the jury will not

know who he is either).  Most of these same concerns apply to every one of the 2,392 messages

contained in GX401.

The prejudice to Mr. Boustani of admitting GX401 without laying a foundation is even

more clear with respect to Bloombergs like the one found on page 13 of the PDF, which references a

trade between someone named Joseph Puerner of Citigroup Global Markets and Michael Wilson of

Federated Investment.

October 14, 2019
Page 17



To our knowledge, neither Joseph Puerner of Citigroup Global Markets or Michael
Wilson of Federated Investment will be called to testify at Mr. Boustani's trial nor has the Government
ever interviewed either individual.  This Bloomberg captures an LPN trade on the "secondary market,"
on August 26, 2015, between these two market participants, neither of whom participated in the initial
offering and thus, may never have received the LPN Offering Circular.  It's *possible* that these traders
got ahold of the Offering Circular two years later, in 2015, read it, and were induced to engage in this

October 14, 2019
Page 18

trade because of the representations in Section 19.2 and 19.7, but, as we understand it, the Government has no intention of demonstrating that such a circumstance took place.

It is wholly inappropriate for the Government to charge Mr. Boustani with attempting to fraudulently induce, through misrepresentations in the LPN Offering Circular, the purchase or sale of LPNs and then introduce as "proof" of Mr. Boustani's guilt on that point, trades for which the Government has no idea if the participants even received—much less reviewed—the misrepresentations at issue and where the trade participants will not be called at trial, so that Mr. Boustani can cross-examine them as to the reasons for their trading decisions. The bare fact that someone named Joseph Puerner, and someone named Michael Wilson, once engaged in an LPN trade, does not make it more likely that a reasonable investor in the market for emerging market debt would find the alleged misrepresentations in Sections 19.2 and 19.7 of the LPN Offering Circuit "material," without additional evidence regarding what information these two individuals considered before engaging in their trade. Thus, not only will admission of GX401 after opening statements, without any foundation, necessarily confuse the jury, but it would also be misleading, since the very fact that the Government is entering these trade confirmations "into evidence" insinuates that all of these Bloomberg participants were Mr. Boustani's "victims." *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 313-14 (2009) ("The text of the [Sixth] Amendment contemplates two classes of witnesses— those against the defendant and those in his favor. The prosecution *must* produce the former; the defendant *may* call the latter. Contrary to [the Government's] assertion, there is not a third category of witnesses, helpful to the prosecution, but somehow immune from confrontation.").

October 14, 2019
Page 19

*C.  The Communications and Opinions of the Government's Experts.*

The Government has informed the defense of its intention to call two "valuation" expert

witnesses at trial: Anthony English and Michael Formosa.  *See* Dkt. 135.  In 2016, at the request of

Credit Suisse Europe, Mr. English prepared a "valuation" of the 24 fishing vessels that were sold by

Privinvest to EMATUM.  Likewise, in 2016, and also at the request of Credit Suisse Europe, Mr.

Formosa prepared an "open source market valuation" of the Ocean Eagle 43 Trimaran Patrol Vessel,

which was also commissioned from Privinvest by EMATUM.  Rather than admitting Mr. English's

and Mr. Formosa's reports into evidence when they are on the witness stand, the Government seeks to

admit, as Credit Suisse business records, the communications between the experts and Credit Suisse, as

well as the experts' reports and all accompanying schedules.  (*See, e.g.,* **Ex. G** (GX1605); **Ex. H**

(GX1610); **Ex. I** (GX2996); **Ex. J** (GX2954-C).)

In other words, the Government is asking the Court to allow it a terrific opportunity for

gamesmanship, in which the Government will admit into evidence, *for its truth*, the opinions and work

product of Mr. English and Mr. Formosa and then to decline to call them as trial witness, so that Mr.

Boustani will be deprived of an opportunity to cross examine them and thereby demonstrate for the

jury how skimpy and unreliable their valuations actually are.  As the Government very well knows,

this tactic is unconstitutional under the Confrontation Clause of the Sixth Amendment of the U.S.

Constitution.  *See Crawford v. Washington*, 541 U.S. 36, 59 (2004) ("testimonial statements of

witnesses absent from trial have been admitted only where the declarant is unavailable, and only where

the defendant has had a prior opportunity to cross-examine… In this case, the State admitted [the

declarant's] testimonial statement against petitioner, despite the fact that he had no opportunity to

October 14, 2019
Page 20

cross-examine her. That alone is sufficient to make out a violation of the Sixth Amendment."); *see also*

*Melendez-Diaz*, 557 U.S. at 313-14 (reports prepared by analysts, even if "reliable" in terms of their

scientific principles, could not be introduced against the defendant unless the defendant was given an

opportunity to cross-examine the analyst).

### D. Hearsay Within Hearsay

The Court should not permit the Government to "batch admit" its business record

exhibits because the batch is riddled with hearsay. Even where an argument can be made that a given

document constitutes a business record, Rule 803(6) only provides an hearsay exception for the record

itself: where the record incorporates hearsay statements within it, all of those statements still constitute

inadmissible hearsay. *United States v. Cummings*, 858 F.3d 763, 773 (2d Cir. 2017) (a hearsay-within-

hearsay statement "involves two out-of-court statements, either or both of which poses hearsay

concerns."). While we appreciate that the Government has not provided Your Honor with an

opportunity to review the 1,300 "business records" it plans to "batch admit," many of these documents

have value *only* with respect to the inadmissible hearsay statements within them.

### 1. GX3003/GX3003-A.

GX3003 and GX3003-A, which we have attached together as **Ex. K**, is a good example

of the Government's inappropriate use of Rule 803(6). In GX3003, someone named "Adam

Bradbery"—who, to our knowledge will not be testifying at trial—sends an email to approximately 30

Credit Suisse employees in which he attaches and summarizes an April 8, 2016 "story" by online

Mozambican publisher, Zitamar, bearing the title, "Mozambique Donors Weigh Response to New

October 14, 2019
Page 21

Debt-For-Arms Scandal." The story, unsurprisingly, is completely inaccurate (and therefore inherently prejudicial). For instance, none of the loans taken out by the Mozambican Companies were used to buy "arms" and Privinvest did not provide Mozambique with any weapons. The story states, matter-of-factly, that in 2014, Mr. Boustani's co-defendant, Mr. Chang, "lied" to the IMF and told the IMF that the "EMATUM debt has been approved by Parliament." In fact, the EMATUM debt *was* approved by the Mozambican Parliament in 2014. In any event, an inaccurate online article is the epitome of inadmissible hearsay and the Government's efforts to introduce it, for its truth, by identifying it as a "business record" of Credit Suisse is entirely inappropriate. As noted above, GX3003/GX3003-A is just a representative example—and is far from an isolated occurrence.

### 2. **GX2988**

GX2988, which we have attached as **Ex. L**, is another example of why it would be inappropriate for the Court to "batch admit" the Government's business record exhibits. GX2988 is a string of emails authored by Credit Suisse employee Vera Savina, who is not on the Government's witness list. In GX2988, Ms. Savina summarizes (and perhaps directly quotes in some cases—the email is ambiguous) statements made by a multitude of LPN holders at the various "Roadshow" meetings in London and New York on March 14 and 15, 2016 concerning the 2016 Eurobond Exchange. As an initial matter, this summary does not constitute a Credit Suisse "business record" simply because it was transmitted over Credit Suisse email, and in fact, it is *not* a "record" of an "regularly conducted activity" at Credit Suisse, *see* Fed. R. of Evid. 803(6), but rather is a summary of a unique set of meetings attended by people who mostly did *not* work at Credit Suisse. Moreover, even if the email itself was a business record, 98% of its contents constitute inadmissible hearsay. If

October 14, 2019
Page 22

the Government is permitted to admit GX2988 as part of the batch, GX2988 will be in evidence *for its*

*truth*. The jury will be permitted to use it against Mr. Boustani without any limitation, even though

Mr. Boustani will have had no opportunity cross-examine Ms. Savino about the accuracy of her

summary, including what else was said at these meetings (but left out of her summary) or the fact, for

example, that Dr. Rosario—who is alleged, in Paragraph 99(v) and (w) of the Superseding Indictment,

to have traveled to New York City for Roadshow presentations at which he provided "false and

misleading information" to investors—was in fact completely *silent* and said nothing to any investor,

much less provided them with false and misleading information at these meetings. *Melendez-Diaz*,

557 U.S. at 324-25 ("The Confrontation Clause imposes a burden on the prosecution to *present its*

*witnesses*, not on the defendant to bring those adverse witnesses into court. Its value to the defendant is

not replaced by a system in which the prosecution presents its evidence via *ex parte* affidavits"—or

here, so-called business records that are not actually business records—"and waits for the defendant to

subpoena the affiants if he chooses.").

The Government's case will not be prejudiced by a ruling from the Court requiring the

Government to comport with Rules of Evidence and admit exhibits once a foundation for those

exhibits has been established and their relevance is clear. This basic proposition ensures that the

evidence admitted at Mr. Boustani's trial is relevant and that the jury understand it. It reduces the

probability that the jury will misunderstand the meaning of a Government exhibit and assign to it a

nefarious meaning that it does not possess. In other words, if the Court were to rule that the

Government must establish a foundation before admitting evidence into the record, and thus, may not

"batch admit" vast amounts of material after opening statements, the Government's case will not be

prejudiced in the least. On the other hand, if the Court were to permit the Government to go ahead

October 14, 2019
Page 23

with its "batch admission" plan, there is a strong likelihood of prejudice to Mr. Boustani's case,

because the jurors will not understand the admitted documents, may misinterpret them, and because

Mr. Boustani will be deprived of his constitutional rights of confrontation under the Sixth Amendment.

       Accordingly, we respectfully submit that the Court prevent the Government from "batch

admitting" exhibits after opening statements, prior to establishing a foundation for the exhibits'

meaning and relevance.

Respectfully submitted,

_____/s/_____

Randall W. Jackson
Michael S. Schachter

cc:  (by ECF)

AUSA Mark E. Bini
AUSA Hiral Mehta

The application is _____ granted.
SO ORDERED ~~denied.~~

s/WFK

William F. Kuntz, II, U.S.D.J.
Dated:  October — 15, 2019
       Brooklyn, New York