3312

1              UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF NEW YORK
2  - - - - - - - - - - - - - - X
    UNITED STATES OF AMERICA,    :   18-CR-00681(WFK)
3                               :
                                :
4                               :   United States Courthouse
        -against-               :   Brooklyn, New York
5                               :
                                :
6                               :   November 12, 2019
                                :   11:00 a.m.
7    JEAN BOUSTANI,             :
                                :
8        Defendant.             :
  - - - - - - - - - - - - - - X
9
            TRANSCRIPT OF CRIMINAL CAUSE FOR TRIAL
10      BEFORE THE HONORABLE WILLIAM F. KUNTZ, II
              UNITED STATES DISTRICT JUDGE
11
                A P P E A R A N C E S :
12
For the Government:       RICHARD P. DONOGHUE, ESQ.
13                        United States Attorney
                          Eastern District of New York
14                        271 Cadman Plaza East
                          Brooklyn, New York 11201
15                  BY:   MARK E. BINI, ESQ.
                          HIRAL D. MEHTA, ESQ.
16                        Assistant United States Attorneys

17                        DEPARTMENT OF JUSTICE
                          CRIMINAL DIVISION
18                        1400 New York Avenue
                          Washington, D.C. 20001
19                  BY:   MARGARET MOESER, ESQ.
                          KATHERINE NIELSEN, ESQ.
20
For the Defendant:        WILLKIE FAR & GALLAGHER LLP
21                        787 Seventh Avenue
                          New York, New York 10019
22                  BY:   RANDALL W. JACKSON, ESQ.
                          MICHAEL S. SCHACHTER, ESQ.
23                        CASEY E. DONNELLY, ESQ.
                          PHILIP F. DISANTO, ESQ.
24                        RAYMOND MCLEOD, ESQ.
  Proceedings recorded by computerized stenography.  Transcript
25 produced by Computer-aided Transcription.

Proceedings                                          3313

1          (In open court; jury not present.)

2          (Defendant enters the courtroom.)

3          THE COURTROOM DEPUTY:  All rise.  The Honorable

4   William F. Kuntz, II is now presiding.

5          Criminal cause for a charging conference, Docket No.

6   18-CR-681, USA versus Boustani.

7          Counsel, please state your appearances for the

8   record.

9          MR. BINI:  Mark Bini; Hiral Mehta; Margaret Moeser;

10   Lillian DiNardo; Katherine Nielsen; and Special Agent Angela

11   Tissone, who will be on her way in, for the United States.

12          Good morning, Your Honor.

13          THE COURT:  Good morning.  You may be seated.

14          Ladies and gentlemen of the public, you may be

15   seated as well.

16          MR. JACKSON:  Good morning, Your Honor.

17          Randall Jackson on behalf of Mr. Boustani.

18          THE COURT:  Yes.  Good morning.

19          MS. DONNELLY:  Good morning, Your Honor.

20          Casey Donnelly on behalf of Mr. Boustani.

21          THE COURT:  Good morning.

22          MR. SCHACHTER:  Good morning, Your Honor.

23          Michael Schachter on behalf of Mr. Boustani.

24          THE COURT:  Good morning.

25          Good morning, Mr. Boustani.

Proceedings                                    3314

1          THE DEFENDANT:  Good morning, Your Honor.

2          THE COURT:  Nice to see you.

3          THE DEFENDANT:  Thank you.

4          THE COURT:  Please be seated.

5          MR. DISANTO:  Good morning, Your Honor.

6          Philip Disanto on behalf of Mr. Boustani.

7          THE COURT:  Good morning.

8          Please be seated.

9          MR. MCLEOD:  Good morning, Your Honor.

10          Ray McLeod on behalf of Mr. Boustani.

11          THE COURT:  Good morning.

12          Please be seated.

13          I hope everyone had a nice three-day relaxing

14   weekend and you didn't think about this case at all and didn't

15   submit any additional papers.

16          On the other hand, since I know that is not the

17   case, let me tell you how we're going to proceed.

18          As I stated at the end of last week, I encouraged

19   counsel to discuss areas where they might be in agreement with

20   respect to the proposed jury charge.  I'm pleased you did have

21   areas of agreement.  They will be incorporated in the final

22   version of the jury charge.  I realize there are also

23   contested issues and we will address those as we go through

24   the jury charge.

25          And, as I said to you before, to the extent that a

Proceedings                                3315

1   position of a party is not accepted, your objection is noted

2   and preserved for the record, so you don't have to say anymore

3   than you've already said in the writings other than to note

4   your objection to the ruling that I make.

5           We will proceed -- I know it's boring and old

6   school, but my friends on the 17th floor like it, so we will

7   proceed page by page, even though I know both of you said with

8   the exception of certain areas you don't have any

9   disagreements.  I just like to do belt and suspenders for my

10  friends on the 17th floor.

11          After we do the charge conference, I think it would

12  be appropriate to then bring the jury in to hopefully finish

13  up the witnesses, either right before lunch or right after

14  lunch, we'll see how that works.  I know we have the banker on

15  cross.  There will be, I assume, a brief redirect.

16          And I gather there's one more witness after that; is

17  that correct?

18          MR. BINI:  We have two more witnesses.

19          THE COURT:  Two more witnesses, okay.  Two more

20  witnesses after that, that's fine, we'll do those witnesses,

21  then we'll either -- either at the lunch break or during the

22  afternoon break, when we excuse the jury once the Government

23  rests, I will take any motions, and then at that point, I will

24  hear any arguments that you wish to make with respect to the

25  motions in limine and the objections to the motions and

Proceedings                                          3316

1   cross-motions, if you will, that were submitted as well.  I

2   will rule at that time.  But I think given the importance of

3   the issues and the learning from my fellow judges in this area

4   that I will author an opinion, a decision, an order with

5   respect to the motions in limine.  So I will rule so you know

6   where I come out, but I will give you the opportunity to see

7   what the actual written decision is after the arguments and

8   after I decide.

9           I think what we'll do today, in light of everything

10  we've got packed in, is if we get to the middle of the

11  afternoon and it's appropriate to start the defense case, we

12  will probably start the defense case first thing tomorrow

13  morning rather than trying to force you folks to start at 3:30

14  or 4:00 in the afternoon.  I know judges used to do that to me

15  and I still have their voodoo dolls at home, but they're not

16  the way I bought them.

17          So, bottom line, we'll see.

18          Now, if we only have five minutes of testimony from

19  each of the witnesses, then sure, you'll start today, but why

20  do I have a feeling that probably is not going to be the case.

21          All right.  So that's the order of the day.

22          Now, let's start -- we will go page by page with the

23  draft that you have before you.  It's Court Exhibit Roman I.

24  And, again, I remind you that we've had Court Exhibits Arabic

25  1 before, so that's why we have the "I" jury charge.

```
                         Charge Conference                    3317

  1          Any objections to page 1?

  2          Government?

  3          MR. BINI:  No, Your Honor.

  4          THE COURT:  Defense?

  5          MS. DONNELLY:  No, Your Honor.

  6          THE COURT:  Page 2.

  7          Government?

  8          MR. BINI:  No, Your Honor.

  9          THE COURT:  Defense?

 10          MS. DONNELLY:  No, Your Honor.

 11          THE COURT:  Page 3.

 12          Government?

 13          MR. BINI:  No, Your Honor.

 14          THE COURT:  Defense?

 15          MS. DONNELLY:  No, Your Honor.

 16          THE COURT:  Page 4.

 17          Government?

 18          MR. BINI:  No, Your Honor.

 19          THE COURT:  Defense?

 20          MS. DONNELLY:  No, Your Honor.

 21          THE COURT:  Page 5.

 22          Government?

 23          MR. BINI:  No.

 24          THE COURT:  Defense?

 25          MS. DONNELLY:  No.
```

Charge Conference                                    3318

```
 1            THE COURT:  Page 6.

 2       Government?

 3            MR. BINI:  No, Your Honor.

 4            THE COURT:  Defense?

 5            MS. DONNELLY:  No.

 6            THE COURT:  Page 7.

 7       Government?

 8            MR. BINI:  No.

 9            THE COURT:  Defense?

10            MS. DONNELLY:  No.

11            THE COURT:  Page 8.

12       Government?

13            MR. BINI:  No, Your Honor.

14            THE COURT:  Defense?

15            MS. DONNELLY:  No.

16            THE COURT:  Page 9?

17       Government?

18            MR. BINI:  No, Your Honor.

19            THE COURT:  Defense?

20            MS. DONNELLY:  No.

21            THE COURT:  Page 10.

22       Government?

23            MR. BINI:  No, Your Honor.

24            THE COURT:  Defense?

25            MS. DONNELLY:  No, Your Honor.
```

Charge Conference                                3319

1          THE COURT:  Page 11.

2          Government?

3          MR. BINI:  No, Your Honor.

4          THE COURT:  Defense?

5          MS. DONNELLY:  No, Your Honor.

6          THE COURT:  Page 12.

7          Government?

8          MR. BINI:  No, Your Honor.

9          THE COURT:  Defense?

10          MS. DONNELLY:  No, Your Honor.

11          THE COURT:  Page 13.

12          Government?

13          MR. BINI:  No, Your Honor.

14          THE COURT:  Defense?

15          MS. DONNELLY:  No, Your Honor.

16          THE COURT:  Page 14.

17          Government?

18          MR. BINI:  No, Your Honor.

19          THE COURT:  Defense?

20          MS. DONNELLY:  No, Your Honor.

21          THE COURT:  Page 15.

22          Government?

23          MR. BINI:  No, Your Honor.

24          THE COURT:  Defense?

25          MS. DONNELLY:  No, Your Honor.

Charge Conference                                    3320

1          THE COURT:  Page 16.

2      Government?

3      MR. BINI:  No, Your Honor.

4      THE COURT:  Defense?

5      MS. DONNELLY:  No, Your Honor.

6      THE COURT:  Page 17.

7      Government?

8      MR. BINI:  No, Your Honor.

9      THE COURT:  Defense?

10     MS. DONNELLY:  No, Your Honor.

11     THE COURT:  Page 18.

12     Government?

13     MR. BINI:  No, Your Honor.

14     THE COURT:  Defense?

15     MS. DONNELLY:  No, Your Honor.

16     THE COURT:  Page 19.

17     Government?

18     MR. BINI:  No, Your Honor.

19     THE COURT:  Defense?

20     MS. DONNELLY:  No, Your Honor.

21     THE COURT:  Page 20.

22     Government?

23     MR. BINI:  No, Your Honor.

24     THE COURT:  Defense?

25     MR. JACKSON:  No, Your Honor.

Charge Conference                                         3321

1          THE COURT:  Page 21.

2          Government?

3          MR. BINI:  No, Your Honor.

4          THE COURT:  Defense?

5          MS. DONNELLY:  No, Your Honor.

6          THE COURT:  Page 22.

7          Government?

8          MR. BINI:  No, Your Honor.

9          THE COURT:  Defense?

10         MS. DONNELLY:  No, Your Honor.

11         THE COURT:  Page 23.

12         Government?

13         MR. BINI:  No, Your Honor.

14         THE COURT:  Defense?

15         MS. DONNELLY:  No, Your Honor.

16         THE COURT:  Page 24.

17         Government?

18         MR. BINI:  No, Your Honor.

19         THE COURT:  Defense?

20         MS. DONNELLY:  No, Your Honor.

21         THE COURT:  Page 25.

22         Government?

23         MR. BINI:  No, Your Honor.

24         THE COURT:  Defense?

25         MS. DONNELLY:  No, Your Honor.

Charge Conference                                    3322

1          THE COURT:  Page 26.

2          Government?

3          MR. BINI:  No, Your Honor.

4          THE COURT:  Defense?

5          MS. DONNELLY:  No, Your Honor.

6          THE COURT:  Page 27.

7          Government?

8          MR. BINI:  No, Your Honor.

9          THE COURT:  Defense?

10         MS. DONNELLY:  No, Your Honor.

11         THE COURT:  Page 28.

12         Government?

13         MR. BINI:  No, Your Honor.

14         THE COURT:  Defense?

15         MS. DONNELLY:  No, Your Honor.

16         THE COURT:  Page 29.

17         Government?

18         MR. BINI:  No, Your Honor.

19         THE COURT:  Defense?

20         MS. DONNELLY:  No, Your Honor.

21         THE COURT:  Page 30.

22         Government?

23         MR. BINI:  No, Your Honor.

24         THE COURT:  Defense?

25         MS. DONNELLY:  No, Your Honor.

Charge Conference                                    3323

1            THE COURT:  Page 31.

2       Government?

3            MR. BINI:  No, Your Honor.

4            THE COURT:  Defense?

5            MS. DONNELLY:  No, Your Honor.

6            THE COURT:  Page 32.

7       Government?

8            MR. BINI:  No, Your Honor.

9            THE COURT:  Defense?

10           MS. DONNELLY:  No, Your Honor.

11           THE COURT:  Page 33.

12      Government?

13           MR. BINI:  No, Your Honor.

14           THE COURT:  Defense?

15           MS. DONNELLY:  No, Your Honor.

16           THE COURT:  Page 34.

17      Government?

18           MR. BINI:  No, Your Honor.

19           THE COURT:  Defense?

20           MS. DONNELLY:  No, Your Honor.

21           THE COURT:  Page 35.

22      Government?

23           MR. BINI:  No, Your Honor.

24           THE COURT:  Defense?

25           MS. DONNELLY:  No, Your Honor.

1          THE COURT:  Page 36.

2          Government?

3          MR. BINI:  No, Your Honor.

4          THE COURT:  Defense?

5          MS. DONNELLY:  No, Your Honor.

6          THE COURT:  Page 37.

7          Government?

8          MR. BINI:  No, Your Honor.

9          THE COURT:  Defense?

10         MS. DONNELLY:  No, Your Honor.

11         THE COURT:  Page 38.

12         Government?

13         MR. BINI:  No, Your Honor.

14         THE COURT:  Defense?

15         MS. DONNELLY:  No, Your Honor.

16         THE COURT:  Page 39.

17         Government?

18         MR. BINI:  No, Your Honor.

19         THE COURT:  Defense?

20         MS. DONNELLY:  No, Your Honor.

21         THE COURT:  Page 40.

22         Government?

23         MR. BINI:  Yes, Your Honor.

24         Our objection is the --

25         THE COURT:  I'm going to ask you, Mr. Bini, to pull

1    the microphone --

2              MR. BINI:  Yes, Your Honor.

3              THE COURT:  -- close to you and keep your voice up.

4    And, again, everyone, including yours truly, needs to be Vader

5    rather than Chris Rock, Woody Allen, Annie Hall.

6              Go ahead.

7              MR. BINI:  Thank you, Your Honor.

8              For the reasons stated in our letter ECF 346 of last

9    night, the Government asks that after the definition of

10   "willfully" on page --

11             THE COURT:  I'm sorry, your microphone either isn't

12   on or it's tilted away from you.

13             MR. BINI:  Okay.

14             THE COURT:  Just a little bit louder.

15             MR. BINI:  Yes, Your Honor.

16             THE COURT:  Much better.

17             MR. BINI:  So after the sentence that ends "that is

18   to say with the bad purpose to disobey or to disregard the

19   law" --

20             THE COURT:  That's at the top of the page, right?

21             MR. BINI:  Yes, Your Honor.

22             The Government requests the additional instruction

23   that the Government is not required to prove that a defendant

24   is aware of the law that actually forbids his conduct.

25             THE COURT:  This is the gravamen of your point that

1   ignorance of the law is not a defense.

2          MR. BINI:  Yes, Your Honor.

3          THE COURT:  Okay.  And you explained that at some

4   length in your submission.

5          Let me hear from the defense your response to the

6   Government's suggested change.  Why do you oppose that?

7          MS. DONNELLY:  We object to that language for the

8   reasons that we stated in our letter this morning.  There's a

9   Second Circuit case, *United States v. Golitshcek* --

10         THE COURT:  Would you spell that for the reporter?

11         MS. DONNELLY:  Yes.

12         THE COURT:  And, again, keep your voice up, too,

13  please.

14         MS. DONNELLY:  It is *United States v.*

15  G-O-L-I-T-S-H-C-E-K, and it is 808 F3d. 195 pincite 202,

16  Second Circuit, 1986.

17         THE COURT:  Well, I don't want to say it was a long

18  time ago in a galaxy far, far away, but is that your most

19  recent and best authority for that proposition?

20         MS. DONNELLY:  Yes, Your Honor.

21         THE COURT:  All right.

22         What's your response?

23         MR. BINI:  Your Honor, as we noted in our objection

24  in ECF 243 at page 4, note 5, *United States vs. Golitshcek* is

25  wholly --

Charge Conference                              3327

1          THE COURT:  Would you spell that again?

2          MR. BINI:  Golitshcek is G-O-L-I-T-S-C-H-E-K, is

3   wholly inapplicable because that case involved a complex

4   export scheme, and the Court, even in that decision, at

5   pages 198 to 199, they -- I believe the pincite for that would

6   be 808 F.2d at 198 to 199, and later at 203 -- explained that

7   under most statutory regimes, ignorance of the law is not a

8   defense.  This case, as we cited the case law that we cited

9   from Judge Oetken from the Southern District of New York --

10         THE COURT:  Oetken.

11         MR. BINI:  Oetken.  I'm sorry, Your Honor.

12         THE COURT:  I was in baby judge school with Paul, so

13  I now how he pronounces his name.  Go ahead.

14         MR. BINI:  Thank you, Your Honor.

15         -- Judge Oetken and -- also based upon the *Chief vs.*

16  *United States* from the Supreme Court, also Judge's Cogan's

17  instruction in the *Petrossi* case, which was affirmed by the

18  Second Circuit --

19         THE COURT:  Would you spell that for the reporter,

20  please?

21         MR. BINI:  *United States vs. Petrossi*,

22  P-E-T-R-O-S-S-I -- make clear that ignorance of the law is not

23  a defense in wire fraud and securities fraud cases.

24         THE COURT:  All right.

25         Any response to what you've just heard, Counsel?

1          MS. DONNELLY:  No further response.

2          THE COURT:  Okay.  I appreciate that.

3          I'm going to overrule the defense objection and we

4    will insert the language that's suggested by the Government

5    here.  Your objection is preserved for the record, of course.

6          All right.  Anything else on -- I believe we are up

7    to page 40.  Anything else on page 40 from the Government?

8          MR. BINI:  Not from the Government.

9          THE COURT:  From defense?

10          MS. DONNELLY:  No, Your Honor.

11          THE COURT:  All right.

12          Page 41 from the Government?

13          MR. BINI:  No, objection, Your Honor.

14          THE COURT:  Defense?

15          MS. DONNELLY:  Yes.

16          THE COURT:  All right.  Tell me what your objection

17    is and where on the page.

18          MS. DONNELLY:  We object to the paragraph that

19    begins, "Congress has deemed it appropriate," and the entirety

20    of that paragraph.  We would ask that it be struck.

21          THE COURT:  What is the basis for asking its being

22    deleted?

23          MS. DONNELLY:  We think it's unnecessary and we

24    think it's prejudicial to describe what Congress's intent

25    or -- what Congress's intention was concerning conspiracy law.

Charge Conference                           3329

1          THE COURT:  Do you take a position that it, in fact,

2     does not flow from modern federal jury instructions --

3     criminal instructions 19-2, 19-3, and is also consistent with

4     the *United States vs. Petrossi*, P-E-T-R-O-S-S-I, decided by

5     brother, Judge Cogan, 16-CR-234, the *Petrossi* jury charge and

6     trial transcript at 1119-23.

7          MS. DONNELLY:  We don't disagree that this

8     instruction was given in that case, but we don't think it's

9     appropriate here.

10          THE COURT:  Okay.

11          I'm going to overrule the objection and the record

12     is preserved.  I think there's ample authority for including

13     it.

14          Anything else on page 41?

15          MS. DONNELLY:  Yes.

16          On page 41, the charge reads:  "To prove the crime

17     of conspiracy, the Government must prove two elements beyond a

18     reasonable doubt"; and then the second element is described as

19     "the defendant knowingly and willfully became a member of the

20     conspiracy."

21          It's our view that under Supreme Court precedent,

22     the defendant has to have, in addition to "acting knowingly

23     and willfully," the mens rea associated with the underlying

24     substantive crime.

25          THE COURT:  You don't think mens rea is reflected in

1    the phrase "knowingly and willfully."

2              MS. DONNELLY:  No, Your Honor.

3              THE COURT:  What authority do you have for that

4    position?  My Latin is a little rusty, but I'm a Jesuit

5    trained boy, and mens rea would seem to involve knowing and

6    willful activity.

7              Let me hear from the Government.

8              What's your view with respect to the objection?

9              MR. BINI:  That it should be overruled.  This is a

10   standard instruction that Your Honor has given.

11             THE COURT:  Despite that fact, I know the lawyer

12   citing Judge Kuntz, but there's something about *Sand* and my

13   Brother Cogan, although we are friendly rivals about some of

14   these things.  There's a lot of authority that uses this

15   charge and has been upheld by the Circuit in numerous

16   instances.  I'm not aware of any instance where the Circuit

17   had a problem with this language.

18             Are you?

19             MR. BINI:  The Government agrees and would just note

20   that this language is consistent with Judge Cogan in *Petrossi*

21   and the *Shkreli* charge by Judge Matsumoto.

22             THE COURT:  Which was just affirmed, as I recall, by

23   the Second Circuit?

24             MR. BINI:  Yes, Your Honor.

25             THE COURT:  Any response to those observations,

Charge Conference                                    3331

1    Counsel?

2            MS. DONNELLY:  Only to note that I now have the

3    cite.

4            THE COURT:  I'm sorry?

5            MS. DONNELLY:  I now have the Supreme Court cite,

6    which I'm happy to provide to the Court.

7            THE COURT:  Yes, please.

8            MS. CONNELLY:  It's *Ingram*, which is I-N-G-R-A-M,

9    *vs. United States,* 360 U.S. 672 at pincite 678, 1959.

10           THE COURT:  I was nine years old.  I'm 69 now.

11   Doesn't mean that it's wrong, just means that it's memorable,

12   and I'm going to overrule the objection.

13           Anything else on 41?

14           MS. DONNELLY:  Not from the defense, Your Honor.

15           THE COURT:  Anything else from the Government on 41?

16           MR. BINI:  No, Your Honor.

17           THE COURT:  42.

18           Anything from the Government?

19           MR. BINI:  No, Your Honor.

20           THE COURT:  From defense?

21           MS. DONNELLY:  No, Your Honor.

22           THE COURT:  43.

23           Government?

24           MR. BINI:  No, Your Honor.

25           THE COURT:  Defense?

Charge Conference                                    3332

1          MS. DONNELLY:  No, Your Honor.

2          THE COURT:  44.

3          Government?

4          MR. BINI:  No, Your Honor, other than what the

5     parties jointly recommended.  I know Your Honor has already

6     taken those into account.

7          THE COURT:  What we will do with respect to the

8     joint recommendation is unless there's any objection from the

9     defendant, and I just want to make sure that you've had an

10    opportunity -- I know we had the long weekend -- to consult

11    with your client with respect to your accepting these changes.

12         Mr. Boustani, I take it you've had an opportunity to

13    review the changes that your counsel have agreed to.  I just

14    want to make sure that I'm adopting this in your presence and

15    on the record, so if you have a problem or if you need more

16    time to talk with them about these proposed changes, you can

17    have that opportunity now, but I just want to make sure that

18    you're onboard with it.

19         Counsel, are you comfortable that you've had enough

20    time to speak with your client about the agreed-upon changes?

21         MS. DONNELLY:  Yes.

22         THE COURT:  So we will make those changes and we

23    will deem them made and you will see them in the final version

24    that we circulate.

25         Is there anything else -- with that in mind,

1   anything else on 44?

2           MR. BINI:  No, Your Honor.

3           THE COURT:  Defense, anything else on 44, mindful of

4   the fact we are going to make the changes you agreed to?

5           MS. DONNELLY:  No, Your Honor.

6           THE COURT:  45?

7           MR. BINI:  No, Your Honor.

8           THE COURT:  Defense?

9           MS. DONNELLY:  One objection, Your Honor.

10          THE COURT:  Yes.

11          Could you point me on the page, please?

12          MS. DONNELLY:  Sure.

13          It's the second line.  The sentence reads:  "The key

14  question therefore is whether the defendant joined the

15  conspiracy with an awareness of at least some of the basic

16  aims and purposes of the unlawful agreement," and we would ask

17  that Your Honor add the word "with at least some of the

18  unlawful basic aims and purposes" to make clear that the

19  defendants -- when he joined the conspiracy, had to know and

20  had to intend to join in an unlawful action.

21          THE COURT:  All right.  Again, I've taken this

22  language from the -- follow my own advice -- I have I've taken

23  this language from *Sand* and from approved Second Circuit

24  authority.

25          Do you have any authority that would point to this

1   being an improper instruction?

2           MS. DONNELLY:  No, Your Honor.

3           THE COURT:  All right.

4           I'm going to overrule the objection, but your

5   position is noted.

6           Anything else on 45 from the Government?

7           MR. BINI:  No, Your Honor.

8           THE COURT:  From defense?

9           MS. DONNELLY:  No, Your Honor.

10          THE COURT:  46.

11          From the Government?

12          MR. BINI:  No, Your Honor.

13          THE COURT:  Defense?

14          MS. DONNELLY:  No, Your Honor.

15          THE COURT:  47.

16          Government?

17          MR. BINI:  No, Your Honor.

18          THE COURT:  Defense?

19          MS. DONNELLY:  Yes.  It's the same -- substantively

20   the same objection that I just made.

21          THE COURT:  Same ruling, and your objection is

22   preserved for the record on 47.

23          Anything else on 47?

24          MS. DONNELLY:  Not from the defense.

25          THE COURT:  48.

Charge Conference                            3335

1           Anything from the Government?

2           MR. BINI:  No, Your Honor.

3           THE COURT:  Defense?

4           MS. DONNELLY:  No, Your Honor.

5           THE COURT:  49.

6           Government?

7           MR. BINI:  No, Your Honor.

8           THE COURT:  Defense?

9           MS. DONNELLY:  Yes.  We would object, and this is an

10    objection that will apply throughout, to the reading of the

11    statute --

12          THE COURT:  I can't take an objection that applies

13    throughout.  That's why we go page by page.  I'm sorry.

14          So tell me what you object to on 49 and where it is,

15    and what you object to and why.

16          MS. DONNELLY:  We object to the paragraph beginning,

17    "the relevant portion of the wire fraud conspiracy statute"

18    all the way through on to the next page.

19          THE COURT:  What is the basis of the objection?  Is

20    there a case that --

21          MS. DONNELLY:  I'm sorry, Your Honor.  I apologize.

22    I'm ahead of myself.  We don't have an objection on this

23    particular section.

24          THE COURT:  49, fine.

25          Anything else on 49 from the Government?

1          MR. BINI:  No, Your Honor.

2          THE COURT:  Page 50.

3          Anything from the Government?

4          MR. BINI:  No, Your Honor.

5          THE COURT:  Defense?

6          MS. DONNELLY:  Yes.  We object under Section A

7   conspiracy to commit wire fraud under the mens rea section, so

8   the second element.

9          THE COURT:  Yes.

10          MS. DONNELLY:  It currently says, "The defendant

11   knowingly and willfully became a member of the conspiracy."

12          THE COURT:  Vader, Vader.

13          MS. DONNELLY:  Sorry.

14          We would request that the Court add "and with the

15   intent to defraud," which is the mens rea associated with the

16   underlying substantive crime of wire fraud.

17          THE COURT:  What is the response of the Government?

18          MR. BINI:  The Government disagrees based upon Judge

19   Matsumoto's charge in *United States vs. Shkreli.*

20          THE COURT:  That was just affirmed by the Second

21   Circuit within the last month?

22          MR. BINI:  Yes, Your Honor.

23          THE COURT:  Any response to the fact that Circuit

24   has affirmed this charge within the last month?

25          MS. DONNELLY:  No further response.

Charge Conference                                    3337

```
 1              THE COURT:  Okay.

 2              I'm overruling the objection, but the record is

 3    preserved.

 4              Anything else from the Government on 50?

 5              MR. BINI:  No, Your Honor.

 6              THE COURT:  From the defense on 50?

 7              MS. DONNELLY:  No, Your Honor.

 8              THE COURT:  51.

 9              Anything from the Government?

10              MR. BINI:  No, Your Honor.

11              THE COURT:  Any objection from the defense?

12              MS. DONNELLY:  Yes, Your Honor.

13              We object to the reading of the statutory language

14    and we would propose that the language beginning on the first

15    line, the relevant statute, all the way through the actual

16    text of the statute be removed.

17              THE COURT:  What is the basis of that request?  Has

18    that ever been granted by the Second Circuit to strike the

19    language of the statute in a jury charge?

20              MS. DONNELLY:  I'm not sure if there's a Second

21    Circuit case that has addressed this point, but --

22              THE COURT:  Is there any federal decision you have

23    in the United States of America where a district court has

24    been told it has to strike the statute that the defendant is

25    being prosecuted under?  Any case at all in the United States
```

1    that you can cite me to?

2          MS. DONNELLY:  I cannot cite Your Honor to such a

3    case --

4          THE COURT:  That's because it hasn't happened.

5    Judges get in trouble when they start getting creative and

6    re-characterizing the statutes and then counsel can say,

7    that's not what the statute said.  So one of the reasons you

8    don't have that authority is that district court judges have

9    learned their lesson when they try to be creative.  It's like

10   taking a Blumberg form for a real estate deal and typing it up

11   on a blank sheet of paper and handing it to your adversary at

12   a closing and they say, well, I don't know where these

13   wherefores and from the beginning of time runneth not to the

14   contrary.  Give it to them on a Blumberg form, and they say,

15   oh, sure, it's a Blumberg form.

16         I'm not going to rewrite, as bright as I am,

17   statutes in this area because I'm bright enough to not rewrite

18   the statutes.

19         So I hear your objection, there's no authority that

20   you can cite me to; and trust me, I do not want to be the

21   judge who tries to rewrite a wire fraud statute in a

22   multibillion dollar case and have the Circuit judges say,

23   really?  Really?

24         So no, overruled, but noted for the record.

25         Anything else on 51?

1      MS. DONNELLY:  The only other objection is the one

2   that the parties already mutually agreed to, which is that in

3   the -- under the line beginning with "first," which is

4   underlined --

5      THE COURT:  Yes.

6      MS. DONNELLY:  -- the modified language, at least

7   that the parties agreed to, was that there was a scheme or

8   orifice to defraud in order to obtain money or property.

9      THE COURT:  All right.  Well, the agreed-upon

10  language, as I said before my intrepid law clerks and I have

11  agreed to -- they are intrepid, I'm just the judge -- we are

12  going to put those changes through, so you don't have to worry

13  about that.

14     MS. DONNELLY:  Thank you, Your Honor.

15     THE COURT:  Anything else on 51 from the defense?

16     MS. DONNELLY:  No.

17     THE COURT:  Prosecution?

18     MR. BINI:  No, Your Honor.

19     THE COURT:  52.

20     Prosecution?

21     MR. BINI:  No, Your Honor.

22     THE COURT:  Defense?

23     MS. DONNELLY:  No, Your Honor.

24     THE COURT:  53.

25     Government?

1          MR. BINI:  No, Your Honor.

2          THE COURT:  Defense?

3          MS. DONNELLY:  Yes, Your Honor.

4          We object to the language at the very top of 53 that

5    says, "a scheme to defraud as any plan or devise to obtain

6    money or property," and so on and so forth, reasonably --

7          THE COURT:  -- "course of action to obtain money,"

8    that language?

9          MS. DONNELLY:  Correct.  But the part that we

10   actually object to is the language that follows the word

11   "deceive" on the fourth line, "persons of average prudence."

12   It is our view that under *Neder vs. The United States*, which

13   is a Supreme Court case --

14         THE COURT:  Could you give us the cite to that,

15   please?

16         MS. DONNELLY:  Yes.  527 U.S. 1, pincite 16, 1999.

17         THE COURT:  Go ahead.

18         MS. DONNELLY:  That the standard is "false

19   statements reasonably calculated to deceive the

20   decision-makers to whom they were addressed."

21         In other words, it's a subjective, not objective

22   standard.

23         THE COURT:  All right.

24         Let me ask the Government, what's your response to

25   that?

1         MR. BINI:  Your Honor, this is standard language

2    that comes right out of both the *Shkreli* and *Petrossi*

3    decisions that were affirmed by the Second Circuit.

4         THE COURT:  What's the defense response to the fact

5    that the Circuit has recently approved the "deceive persons of

6    average prudence" language?

7         MS. DONNELLY:  I'm not familiar with the fact that

8    that was actually challenged in those cases -- I'm not sure

9    that that was what the Circuit was weighing in on -- but other

10   than the fact that we're citing a Supreme Court, we don't have

11   a further objection.

12        THE COURT:  Okay.

13        MS. DONNELLY:  Or further response, rather.

14        THE COURT:  The 20-year old Supreme Court decision;

15   is that right?  30-year old --

16        MR. BINI:  Your Honor, can I take one moment,

17   because I'm looking here; I want to look at our instructions.

18   I don't want to over state the "average prudence" part; I want

19   to make sure that that's in the instructions I've cited.

20        THE COURT:  Right.  Just make sure.

21        MR. BINI:  Hold on one second.

22        (Pause.)

23        MS. DONNELLY:  Your Honor?

24        THE COURT:  Yes.

25        MS. DONNELLY:  I'm reminded that the *United States*

Charge Conference                    3342

1    *v. Litvak* cited approvingly to the Supreme Court's language in

2    *Neder* in 2015, it's a Second Circuit case.

3              THE COURT:  Okay.

4              Mr. Bini, what say you?

5              MR. BINI:  Your Honor, I checked in the language

6    that has been used and that we cited was, "concern to a

7    reasonable and prudent person in relying upon the

8    representation or statement in making a decision," and so that

9    is the language that we would request; that is the language

10   from the *Shkreli* case.

11             THE COURT:  The language again was calculated to

12   deceive a reasonable and prudent person; was that it?  What

13   was the language?

14             MR. BINI:  Would be "of concern to a reasonable and

15   prudent person in relying upon the representation or statement

16   in making a decision."

17             THE COURT:  So your suggestion is that we strike

18   "persons of average prudence," and it would read, "reasonably

19   calculated to deceive" -- give me the language again.  "A

20   person of reason" --

21             MR. BINI:  "A reasonable and prudent person in" --

22             THE COURT:  You're saying "a reasonable" --

23             MR. BINI:  "A reasonable and prudent person" --

24             THE COURT:  -- "and prudent person" --

25             MR. BINI:  -- "in relying upon the

1    representation" --

2              THE COURT:  Hang on.

3              -- "in relying upon" -- go ahead.

4              MR. BINI:  -- "the representation or statement in

5    making a decision."

6              THE COURT:  I was going to write down "reps and

7    warranties," but I won't do that.

8              -- "reps and statements," go ahead.

9              MR. BINI:  -- "in making a decision."

10             THE COURT:  -- "in making a decision."

11             What is your response to that proposed language?

12             MS. DONNELLY:  That does not -- we don't believe

13   that addresses our concern because that still speaks to an

14   objective standard and it's our view that the Supreme Court

15   and the Second Circuit said that in wire fraud cases, it's a

16   subjective standard.  Although, it would actually be our

17   proposal that we just put a period at the end of "deceive,"

18   and the question of whom is being -- who is being deceived and

19   whether they are -- it's an objective person or the subjective

20   decision-maker is something that is addressed later on in the

21   instructions.

22             THE COURT:  I will adopt that approach.  Period

23   after "deceive" and strike the words "persons of average

24   prudence."  "Calculated to deceive" I think is sufficient to

25   give the jury its head on that issue.

1           So that's my ruling and your objection is preserved.

2           Okay.  Anything else on 53 from the Government?

3           MR. BINI:  No, Your Honor.

4           THE COURT:  From defense?

5           MS. DONNELLY:  No, Your Honor.  Oh, sorry.  Yes,

6    Your Honor.

7           THE COURT:  Okay.

8           MS. DONNELLY:  In the middle of the page, the

9    definition of "fraud," at the very end of that sentence, it

10   says, "or suppression of the truth or deliberate disregard for

11   the truth."

12          THE COURT:  Yes.

13          MS. DONNELLY:  And it's our view that in this

14   case -- this isn't an omissions case and so the -- this is not

15   a omissions case, and that the jury should only be instructed

16   about false representations or false suggestions.

17          THE COURT:  Why do you say this is not an omissions

18   case?

19          MS. DONNELLY:  There's a number of reasons.

20   First --

21          THE COURT:  I'm eager to hear them.

22          MS. DONNELLY:  First, the Supreme Court has made

23   clear that there is -- that it --

24          THE COURT:  No, no.  I'm talking about this case.

25   Why is this case not a case about material omissions made with

1   respect to the payment of bribes and kickbacks as financial

2   institutions were deciding whether or not to invest in loan

3   purchase notes?

4           MS. DONNELLY:  Because Mr. Boustani had no fiduciary

5   duty to those investors; and under *Chiarella*, the only time

6   that an omission, even of a material fact, is fraudulent is

7   when there is a duty.

8           THE COURT:  What's the response of the Government?

9           MR. BINI:  Your Honor, we have consistently argued

10  that there are both false statements and half-truth statements

11  that are false by omission, and this -- the language that you

12  have follows the language of Judge Matsumoto in the *Shkreli*

13  case, follows the language of Judge Cogan in the *Petrossi*

14  case; and, in fact, defense counsel in the *Petrossi* case made

15  the same *Chiarella* argument because the defendant in that case

16  also did not have a duty -- did not have a fiduciary duty to

17  disclose; however, Judge Cogan found that the omissions that

18  were charged were appropriate because they fit as essentially

19  half truths, and the Government believes that is the case here

20  as well.  And I would note that the Second Circuit affirmed

21  Judge Cogan's decision -- the jury's verdict and Judge Cogan's

22  decision in the *Petrossi* case earlier this year.

23          THE COURT:  I'm going to overrule the objection.

24  Your position is noted, for the record.

25          Anything else on 53 from the Government?

Charge Conference                                           3346

1          MR. BINI:  No, Your Honor.

2          THE COURT:  Defense?

3          MS. DONNELLY:  No, Your Honor.

4          THE COURT:  54.

5     Government?

6          MR. BINI:  No, Your Honor.

7          THE COURT:  Defense?

8          MS. DONNELLY:  Yes, Your Honor.

9          We object to, in the second paragraph, it says

10    "deceitful statements of half truths," and that's fine with

11    us.  And then there's a comma, and it says, "or the

12    concealment of material facts," comma, and we would ask that

13    the phrase in between those two commas be removed for the same

14    reasons that I just described; namely, that this is not an

15    omissions case.

16         THE COURT:  Same ruling.  Overruled.  Position

17    preserved for appellate purposes.

18         Anything else from the defense on 54?

19         MS. DONNELLY:  Your Honor, the only thing that I

20    note is that the Government has represented to this Court that

21    this is not on omissions case and they are not proceeding on

22    an omissions theory.

23         THE COURT:  I read your papers on that, that's

24    preserved, but it's overruled.

25         Anything else on 54?

Charge Conference                    3347

1          MS. DONNELLY:  Yes, Your Honor.  Same objection

2    and --

3          THE COURT:  Same ruling.

4          Anything other than the same objection on 54?

5          MS. DONNELLY:  Yes, Your Honor.

6          The very last paragraph on 54 speaks about to whom

7    the representation must have been material, and Your Honor

8    cites a reasonable and prudent person, and under *United States*

9    *v. Litvak*, we believe that the jury should be instructed that

10   a statement is material to a sophisticated emerging market

11   bond investor for the same reasons that the Circuit described

12   in *United States v. Litvak*.

13         THE COURT:  What's the response?

14         MR. BINI:  Your Honor, and here I would cite our

15   submission, ECF 243 at page 6 where we explain that the *Litvak*

16   language is not applicable here because that case involved

17   alleged misrepresentations regarding the value of residential

18   mortgage-backed securities between very sophisticated trading

19   parties to manipulate the prices at which transactions were

20   set.

21         And while the parties who were purchasing the EMATUM

22   securities were admittedly sophisticated investors, the

23   misrepresentations and fraudulent conduct alleged is neither

24   sophisticated nor hard to understand; they lied about the

25   central -- the central purpose of the proceeds and about

1    whether they would pay bribes or kickbacks.

2         And the Government also noted in our submission that

3    the defendants proposed change to the instruction is not

4    consistent with the jury instructions given in this strict in

5    other cases, like the *Shkreli* case, which also involved very

6    sophisticated victims and therefore should not be given here.

7         THE COURT:  The response?

8         MS. DONNELLY:  To the last point, I'm not sure that

9    the defendant in *Shkreli* asked for an instruction based on

10   *Litvak*.  We are asking for that here.  We don't think there's

11   any difference between the sophistication of the bond traders

12   at Wall Street asset --

13        THE COURT:  Vader.  Vader.

14        MS. DONNELLY:  We do not think there's any

15   difference between the sophisticated bond traders that were at

16   issue in *Litvak* and the sophisticated bond traders that are at

17   issue here.

18        THE COURT:  Okay.  I'm going to overrule the

19   objection.  The record is preserved and you stated your

20   reasons.

21        Anything else on 54 from the Government?

22        MR. BINI:  No, Your Honor.

23        THE COURT:  From defense?

24        MS. DONNELLY:  No, Your Honor.

25        THE COURT:  55.

Charge Conference                          3349

1              Government?

2              MR. BINI:  No, Your Honor.

3              THE COURT:  Defense?

4              MS. DONNELLY:  Yes, Your Honor.

5              The top paragraph, the same objection, based on

6     *Litvak* to the language concerning a reasonable person or

7     investor.

8              THE COURT:  Same ruling.

9              Anything else on 55?

10             MS. DONNELLY:  No, Your Honor.

11             THE COURT:  56.

12             Government?

13             MR. BINI:  No, Your Honor.

14             THE COURT:  Defense?

15             MS. DONNELLY:  No, Your Honor.

16             THE COURT:  57.

17             Government?

18             MR. BINI:  No, Your Honor.

19             THE COURT:  Defense?

20             MS. DONNELLY:  No, Your Honor.

21             THE COURT:  58.

22             Government?

23             MR. BINI:  No, Your Honor.

24             THE COURT:  Defense?

25             MS. DONNELLY:  Yes, Your Honor.

1          It's our position that the instruction on -- the

2    instruction given in the second paragraph on page 58, which we

3    understand to be --

4          THE COURT:  The paragraph that begins "there is

5    another consideration"?

6          MS. DONNELLY:  Correct, Your Honor.

7          THE COURT:  Go ahead.

8          MS. DONNELLY:  Which we understand is a

9    no-ultimate-harm instruction based on the Second Circuit's

10   decision in *United States v. Rossomando*.

11         THE COURT:  Would you spell that?

12         MS. DONNELLY:  R-O-S-S-O-M-A-N-D-O.

13         THE COURT:  Yes?

14         MS. DONNELLY:  What *Rossomando* says is that no

15   amount of honest belief on the part of the defendant that the

16   scheme would ultimately make a profit for investors will

17   excuse unintention [sic] on his part to cause an initial

18   immediate loss to investors, and we think that's the proper

19   language.  This instruction suggests that as long as the

20   defendant makes a false representation in order to obtain

21   money or property, the fact that he also thinks that the

22   investors will make a profit is not a defense and we think it

23   is a defense.

24         THE COURT:  What's the basis for saying it is a

25   defense?  What authority do you have for that proposition?

1          MS. DONNELLY:  In *Rossomando*, the second Second

2    Circuit said, "If defendant" -- and I'm quoting here.  Quote,

3    "If defendant was aware that he was withholding information

4    from" -- and the Second Circuit meant the victim -- "but

5    believed that the victim would not lose any money as a result,

6    his defense that he lacked the requisite intent for mail fraud

7    would have been legitimate," period, end quote.

8          THE COURT:  What's the response of the Government to

9    that?

10          MR. BINI:  Your Honor, the instruction that we

11    requested is the instruction given by Judge Matsumoto in

12    *Shkreli* and also follows the language of Judge Cogan in the

13    *Petrossi* case.

14          THE COURT:  What's the response of the defense to

15    that observation?

16          MS. DONNELLY:  No further response, Your Honor.

17          THE COURT:  All right.

18          The objection is overruled.  You have it preserved.

19          Anything else from the defense on 58?

20          MS. DONNELLY:  No, Your Honor.

21          THE COURT:  59.

22          Government?

23          MR. BINI:  No, Your Honor.

24          THE COURT:  Defense?

25          MS. DONNELLY:  No, Your Honor.

1          THE COURT:  60.

2          Government?

3          MR. BINI:  No, Your Honor.

4          THE COURT:  Defense?

5          MS. DONNELLY:  No, Your Honor.

6          THE COURT:  61.

7          Government?

8          MR. BINI:  No further objection, Your Honor.

9          THE COURT:  Defense?

10          MS. DONNELLY:  No, Your Honor.

11          THE COURT:  62.

12          Government?

13          MR. BINI:  No, Your Honor.

14          THE COURT:  Defense?

15          MS. DONNELLY:  Yes, Your Honor.

16          Our objection is not to anything on this page, but

17     we --

18          THE COURT:  I'm asking if you have any objection to

19     anything on the page.

20          MS. DONNELLY:  We would ask that an additional

21     instruction be given before Your Honor gives an instruction on

22     venue.

23          THE COURT:  What do you recommend?

24          MS. DONNELLY:  We would ask for the instruction that

25     says that under the *United States v. Bascunan*.

Charge Conference                              3353

1          THE COURT:  Would you spell that for the reporter?

2          MS. DONNELLY:  Yes, Your Honor.

3          B-A-S-C-U-N-A-N v. E-L-S-A-C-A, 927 F.3d 108 122,

4   Second Circuit, 2019.

5          THE COURT:  Go ahead.

6          MS. DONNELLY:  *Bascunan* holds that in order to

7   satisfy the extra territoriality issues associated with the

8   wire fraud statute, the Government must prove that the conduct

9   that is the focus of the statute happened in the United

10  States.  It's our view that the focus of 1939 is the

11  conspiratorial agreement and so we would ask for an

12  instruction that says that if the jury does not find that the

13  conspiratorial agreement was reached in the United States,

14  they most acquit.

15         THE COURT:  What's the Government response to that?

16         MR. BINI:  Your Honor, this was litigated heavily

17  with respect to the motion to dismiss where defense counsel

18  argued repeatedly that the conspiracy had to be on U.S. soil

19  but cited no cases for that actual proposition, and the

20  Government cited Second Circuit case law that made clear that

21  there is no such requirement, and Supreme Court case law.

22         THE COURT:  I seem to recall there was recently an

23  argument before my brother, Judge Bianco, taking the lead up

24  at the Second Circuit on precisely this issue.  I'm going to

25  overrule the defense objection and going to decline to insert

1    the language that was suggested, but your record is preserved

2    with respect to that issue.

3              Anything else on 62?

4              MR. BINI:  No, Your Honor.

5              MS. DONNELLY:  No, Your Honor.

6              THE COURT:  63.

7              Government?

8              MR. BINI:  No, Your Honor.

9              THE COURT:  Defense?

10             MS. DONNELLY:  Yes, Your Honor.

11             We would ask for an instruction based on *United*

12   *States v. Reed -- Reed* is R-E-E-D -- 773 F.2d 477, Second

13   Circuit, and I appear to not have the year, but in that case,

14   the Circuit describes venue as appropriate where the defendant

15   formed substantial conduct in the district, and so we would

16   ask for a substantial context instruction like the one that we

17   proposed in our proposed instructions.

18             THE COURT:  Any response from the Government?

19             MR. BINI:  Your Honor, the Government relied upon

20   Judge Chen in *United States vs. Napout*.

21             THE COURT:  Would you spell that?  And slow it down

22   a bit for the reporter, please.

23             MR. BINI:  Yes, Your Honor.

24             N-A-P-O-U-T, 15-CR-252; and we also relied upon the

25   Honorable Theodore D. Chuang in *United States vs.* --

1            THE COURT:  Spell that, please, for the reporter.

2            MR. BINI:  C-H-U-A-N-G.

3            THE COURT:  Thank you.  Go ahead.

4            MR. BINI:  And that's a case out of the District of

5   Maryland from earlier this year in *United States vs. Elbaz*,

6   18-CR-157, and we think that for the reasons -- or the

7   instructions given by Judge Chen, that the instruction's

8   appropriate.

9            THE COURT:  Any response?

10           MS. DONNELLY:  No further response, Your Honor.

11           THE COURT:  The objection is overruled.  The record

12  is preserved.

13           Anything else on 63 from the defense?

14           MS. DONNELLY:  No, Your Honor.

15           THE COURT:  64.

16           Government?

17           MR. BINI:  No, Your Honor.

18           THE COURT:  Defense?

19           MS. DONNELLY:  No, Your Honor.

20           THE COURT:  65.

21           Government?

22           MR. BINI:  No, Your Honor.

23           THE COURT:  Defense?

24           MS. DONNELLY:  No, Your Honor.

25           THE COURT:  66.

1          Government?

2          MR. BINI:  No, Your Honor.

3          THE COURT:  Defense?

4          MS. DONNELLY:  Yes, Your Honor.

5          Same objection that we made previously with respect

6    to the mens rea element.  This time it's securities fraud

7    conspiracy.  Under the Supreme Court's decision in *Ingram*, we

8    think that the instruction should be that "the defendant

9    knowingly and willfully became" -- "knowingly, willfully, and

10   with the specific intent to deceive became a member of the

11   conspiracy."

12         "Specific intent to deceive" is the mens rea

13   associated with the underlying substantive offense of

14   securities fraud.

15         THE COURT:  Objection is overruled.

16         Anything else on 66?

17         MS. DONNELLY:  No, Your Honor.

18         THE COURT:  67.

19         Government?

20         MR. BINI:  No, Your Honor.

21         THE COURT:  Defense?

22         MS. DONNELLY:  No, Your Honor.

23         THE COURT:  68.

24         Government?

25         MR. BINI:  No, Your Honor.

1           THE COURT:  Defense?

2           MS. DONNELLY:  No, Your Honor.

3           THE COURT:  69.

4           Government?

5           MR. BINI:  No, Your Honor.

6           THE COURT:  Defense?

7           MS. DONNELLY:  No, Your Honor.

8           THE COURT:  70.

9           Government?

10          MR. BINI:  No, Your Honor.

11          THE COURT:  Defense?

12          MS. DONNELLY:  No, Your Honor.

13          THE COURT:  71.

14          Government?

15          MR. BINI:  No, Your Honor.

16          THE COURT:  Defense?

17          MS. DONNELLY:  No, Your Honor.

18          THE COURT:  72.

19          Government?

20          MR. BINI:  No, Your Honor.

21          THE COURT:  Defense?

22          MS. DONNELLY:  No, Your Honor.

23          THE COURT:  73.

24          Government?

25          MR. BINI:  No, Your Honor.

Charge Conference                                   3358

1           THE COURT:  Defense?

2           MS. DONNELLY:  No, Your Honor.

3           THE COURT:  74.

4           Government?

5           MR. BINI:  Can I have one moment to confer with my

6    colleagues?

7           THE COURT:  Yes, of course.

8           (Pause.)

9           MR. BINI:  Your Honor, the Government would ask to

10   strike "overt act Q."  There was an email on this; however, it

11   did not come into evidence during the trial, so no evidence

12   has been presented regarding the email.  There was testimony

13   regarding the events here that the Government will seek to use

14   in argument; however, since the email itself didn't come in,

15   we would ask that "overt act Q" be deleted.

16          THE COURT:  Any objection to striking "overt act Q"?

17          MS. DONNELLY:  No, Your Honor.

18          THE COURT:  All right.  Q is out.

19          Apologies to Mr. Bond.

20          Okay.  R becomes the new Q; is that right?

21          MR. BINI:  Yes, Your Honor.

22          THE COURT:  So we will make that change throughout.

23          Anything else on 74 from the Government?

24          MR. BINI:  No, Your Honor.

25          THE COURT:  From defense?

Charge Conference                              3359

1          MS. DONNELLY:  No, Your Honor.

2          THE COURT:  Now we are on 75.

3          Anything from the Government on 75?

4          MR. BINI:  No, Your Honor.

5          THE COURT:  Defense?

6          MS. DONNELLY:  No, Your Honor.

7          THE COURT:  76.

8          Government?

9          MR. BINI:  No, Your Honor.

10          THE COURT:  Defense?

11          MS. DONNELLY:  No, Your Honor.

12          THE COURT:  77.

13          Government?

14          MR. BINI:  No, Your Honor.

15          THE COURT:  Defense?

16          MS. DONNELLY:  No, Your Honor.

17          THE COURT:  78.

18          Government?

19          MR. BINI:  No, Your Honor.

20          THE COURT:  Defense?

21          MS. DONNELLY:  No, Your Honor.

22          THE COURT:  79.

23          Government?

24          MR. BINI:  No, Your Honor.

25          THE COURT:  Defense?

Charge Conference                               3360

1           MS. DONNELLY:  Yes.

2           Same objection to the reading of the statutory

3    language.

4           THE COURT:  Same ruling.  The position is preserved.

5           Anything else on 79?

6           MS. DONNELLY:  No, Your Honor.

7           THE COURT:  80.

8           Government?

9           MR. BINI:  No, Your Honor.

10          THE COURT:  Defense?

11          MS. DONNELLY:  No, Your Honor.

12          THE COURT:  81.

13          Government?

14          MR. BINI:  No, Your Honor.

15          THE COURT:  Defense?

16          MS. DONNELLY:  Yes, Your Honor.

17          We object to instructions concerning subsection A

18   and C of Section 10B which here are described as 1 and 3.  We

19   think this case has been alleged and has been tried as a

20   subsection B -- material misstatements or material half-truth

21   case -- and so we would ask that the Court remove all

22   instructions that relate to scheme liability under subsections

23   A and C.

24          THE COURT:  The response of the Government?

25          MR. BINI:  The Government has charged this -- all

1   this language in the indictment and, in addition, has -- the

2   Government believes put forward a great deal of evidence of an

3   overall scheme to defraud and we think the language should

4   remain.

5           THE COURT:  Any response from defense?

6           MS. DONNELLY:  No further response, Your Honor.

7           THE COURT:  The objection is overruled.  The

8   language remains.  You have your objection for the record.

9           Anything else on 81 from the defense?

10          MS. DONNELLY:  No, Your Honor.

11          THE COURT:  82.

12          Government?

13          MR. BINI:  No, Your Honor.

14          THE COURT:  Defense?

15          MS. DONNELLY:  Yes, Your Honor.

16          We object to the inclusion of the instructions

17  relating to scheme liability, which is the first bullet point

18  at the very bottom of the page, for the same reasons that I

19  just discussed.

20          THE COURT:  All right.  Same ruling.  Record

21  preserved.  Overruled.

22          Anything else on 82?

23          MS. DONNELLY:  No, Your Honor.

24          THE COURT:  83.

25          Government?

1          MR. BINI:  No, Your Honor.

2          THE COURT:  Defense?

3          MS. DONNELLY:  Yes, Your Honor.

4          We object to this definition of "in connection

5    with."  It's our view that the definition of "in connection

6    with" is not simply when the conduct touched upon the

7    securities transaction but rather that the securities traction

8    was an integral component of the intended fraud and that the

9    subject of the misrepresentation pertained to the fundamental

10   characteristics of the LPN or the Eurobond, and we have cited

11   a number of cases which can be found at pages 32 and 33 of ECF

12   216, and it's probably not worth me reading all of those into

13   the record.  That's the basis for our objection.

14         THE COURT:  Response from the Government?

15         MR. BINI:  Your Honor, we responded in ECF 243 at

16   page 6, and without going into all of our cases and our

17   distinguishing of their cases, I would note that the language

18   that the Government asked for and the Court has seemed fit to

19   give tracks the language given by Judge Matsumoto in the

20   *Shkreli* jury charge.

21         THE COURT:  The objection is overruled, preserved

22   for the record.

23         Anything else on 83?

24         MS. DONNELLY:  No, Your Honor.

25         THE COURT:  84.

1          Government?

2          MR. BINI:  No, Your Honor.

3          THE COURT:  Defense?

4          MS. DONNELLY:  Yes, Your Honor.

5          We object to the definition of "a domestic purchase

6    or sale of securities."  We laid out a number of those -- what

7    we believe is the correct law at ECF 216, pages 34, 35, 36,

8    and 37.

9          In addition, under the -- excuse me -- under the

10   Second Circuit's decision in *Park Central*, which is 763 F.3d

11   216, 204 to 216, Second Circuit 2014, we would ask for an

12   instruction that would require the jury to determine whether

13   Mr. Boustani's conduct was predominately foreign.

14         THE COURT:  Anything else?

15         MS. DONNELLY:  I'm sorry.  No, Your Honor.

16         THE COURT:  All right.

17         In *Absolute Activist Value Master Fund, Ltd. vs.*

18   *Ficeto*, F-I-C-E-T-O, 677 F.3d 60 at page 67 in 2012, the

19   Second Circuit held the transactions involving securities that

20   are not traded on a domestic exchange are domestic if

21   irrevocable liability is incurred or title passes within the

22   United States.  This Court also points you to *United States*

23   *vs. Vilar*, V-I-L-A-R, 729 F.3d 6276, Second Circuit decision

24   at 213 which provides that a domestic transaction has occurred

25   when the purchaser has incurred irrevocable liability within

1    the United States to take and to pay for a security or the

2    seller has incurred irrevocable liability within the United

3    States to deliver a security.

4          The Court also notes the decision in *Schentag*,

5    S-C-H-E-N, T as in "Thomas," A-G, *vs.* N, as in "Nancy," E, B

6    as in "boy," G-E-N, 17-CV-8734, 2018, Westlaw 3104092,

7    Southern District of New York on June 21st of 2018 with Judge

8    Woods noting that irrevocable liability attaches when the

9    parties to the transaction are committed to one another, thus

10   to determine whether the exchange act reaches a transaction

11   not involving securities traded on a United States exchange.

12   The relevant inquiry is the location of the securities

13   transaction which falls within the United States when a

14   purchaser agrees to take and to pay for a security in the

15   United States or the seller agrees to deliver a security in

16   this country.

17         The objection is overruled, but preserved for the

18   record.

19         Anything else on 84?

20         MS. DONNELLY:  Not from the defense.

21         THE COURT:  85.

22         From the Government?

23         MR. BINI:  No, Your Honor.

24         THE COURT:  Defense?

25         MS. DONNELLY:  Yes, Your Honor.

1        In the second sentence, the one that begins "by the

2   same token, the Government need not prove the defendant

3   personally made the representation" --

4        THE COURT:  Misrepresentation.

5        MS. DONNELLY:  Excuse me.

6        -- misrepresentation or omitted the material fact."

7        We would request that after the word "fact," we add

8   the phrase "that made what was said under the circumstances

9   misleading," which is consistent with the statutory language.

10       THE COURT:  What's the response of the Government?

11       MR. BINI:  No objection.

12       THE COURT:  All right.

13       So after the word "fact" -- "material fact," we

14  insert -- give it to me, please, defense counsel, slowly.

15       MS. DONNELLY:  "That made what" --

16       THE COURT:  "That made what" --

17       MS. DONNELLY:  -- "was said under the" --

18       THE COURT:  Hang on, hang on, hang on.

19       -- "what was said" --

20       MS. DONNELLY:  -- "under the circumstances" --

21       THE COURT:  -- "under the circumstances" --

22       MS. DONNELLY:  -- "misleading."

23       THE COURT:  I will insert that language.

24       MS. DONNELLY:  Thank you, Your Honor.

25       THE COURT:  You're welcome.

1           Anything else on 85?

2           MS. DONNELLY:  Yes.

3           In the second -- yes, the second paragraph in the

4    middle, it, again, speaks to a reasonable investor's

5    investment decision, and we would object on the same basis

6    that we objected earlier, which is that we think that *United*

7    *States v. Litvak* speaks to a question of sophisticated

8    investors in the emerging market bond space and not a

9    reasonable investor, period.

10           THE COURT:  Okay.  Overruled.  Same basis.

11           Anything else on 85?

12           MS. DONNELLY:  No, Your Honor, not from the defense.

13           THE COURT:  86.

14           From the Government?

15           MR. BINI:  No, Your Honor.

16           THE COURT:  Defense?

17           MS. DONNELLY:  Same objection.  The *Litvak*

18    objection.

19           THE COURT:  Same ruling.

20           Anything else on 86?

21           MS. DONNELLY:  No, Your Honor.

22           THE COURT:  87.

23           Government?

24           MR. BINI:  No, Your Honor.

25           THE COURT:  Defense?

Charge Conference                                   3367

1         MS. DONNELLY:  No, Your Honor.

2         THE COURT:  88.

3         Government?

4         MR. BINI:  No, Your Honor.

5         THE COURT:  Defense?

6         MS. DONNELLY:  No, Your Honor.

7         THE COURT:  89.

8         Government?

9         MR. BINI:  No, Your Honor.

10         THE COURT:  Defense?

11         MS. DONNELLY:  No, Your Honor -- yes.

12         Your Honor, the same objection that I made earlier

13  with respect to United States v. *Rossomando* and the

14  no-ultimate-harm instruction.

15         THE COURT:  Same ruling on that basis.

16         MS. DONNELLY:  Thank you, Your Honor.

17         THE COURT:  Anything else on 89?

18         MS. DONNELLY:  No, Your Honor.

19         THE COURT:  90.

20         Government?

21         MR. BINI:  No, Your Honor.

22         THE COURT:  Defense?

23         MS. DONNELLY:  Yes, Your Honor.

24         We would object to the instruction that begins at

25  the very bottom of page 90.  "Alternatively the defendant's

1    knowledge may be established by," and then it continues for

2    the first paragraph on the top of 91 through the first

3    sentence of the second paragraph, and it speaks to knowledge

4    and how the defendant's knowledge may be proven.  We would

5    object to that language.

6             THE COURT:  What is the basis of the objection?

7             MS. DONNELLY:  We don't think that in a criminal

8    case the question of whether -- we don't think it's

9    appropriate that the jury be instructed that knowledge be

10   found from circumstances that would convince an average

11   ordinarily person.  It's our view that the Government has to

12   prove this defendant's knowledge and not knowledge that an

13   average ordinary person would have.

14            THE COURT:  What is the response of the Government

15   to that objection?

16            MR. BINI:  Your Honor, the Government believes the

17   language is appropriate, and for the same reasons that we

18   discussed earlier today regarding a reasonable and prudent --

19   a person of reasonable prudence.

20            THE COURT:  I'm going to overrule the objection on

21   the same basis, but it's preserved for the record.

22            Anything else on 90, defense counsel?

23            MS. DONNELLY:  No, Your Honor.

24            THE COURT:  91.

25            Government?

Charge Conference                          3369

1          MR. BINI:  No, Your Honor.

2          THE COURT:  Defense?

3          MS. DONNELLY:  None other than what we just

4    discussed.

5          THE COURT:  Same ruling on 91.

6          Anything else on 91 from defense?

7          MS. DONNELLY:  No, Your Honor.

8          THE COURT:  92.

9          Government?

10          MR. BINI:  No, Your Honor.

11          THE COURT:  Defense?

12          MS. DONNELLY:  No, Your Honor.

13          THE COURT:  93.

14          Government?

15          MR. BINI:  No, Your Honor.

16          THE COURT:  Defense?

17          MS. DONNELLY:  No, Your Honor.

18          THE COURT:  94.

19          Government?

20          MR. BINI:  No, Your Honor.

21          THE COURT:  Defense?

22          MS. DONNELLY:  No, Your Honor.

23          THE COURT:  95.

24          Government?

25          MR. BINI:  No, Your Honor.

Charge Conference                                              3370

1           THE COURT:  Defense?

2           MS. DONNELLY:  No, Your Honor.

3           THE COURT:  96.

4           Government?

5           MR. BINI:  No, Your Honor.

6           THE COURT:  Defense?

7           MS. DONNELLY:  No, Your Honor.

8           THE COURT: 97.

9           Government?

10          MR. BINI:  No, Your Honor.

11          THE COURT:  Defense?

12          MS. DONNELLY:  I spoke too quickly.  We actually do

13  object --

14          THE COURT:  Do you want to go back to 96 or are you

15  on 97?

16          MS. DONNELLY:  Go back to 96, if you would.

17          THE COURT:  96.

18          MS. DONNELLY:  We object to an instruction regarding

19  the Foreign Practices Act.

20          (Continued on the following page.)

21

22

23

24

25

1          THE COURT:  I'm sorry, point me to where?

2          MS. DONNELLY:  Sure.

3          In describing the specified unlawful activity, the

4   very bottom of the page that are at issue here, the first one

5   is a violation of the Foreign Corrupt Practices Act, and it is

6   our view that there has not been evidence presented in this

7   case to justify an instruction on that offense.

8          What's the government's response to that?

9          MR. BINI:  Your Honor, first with respect to

10  circumvention of internal controls, I think there's been a

11  great deal of evidence with that.

12         With respect to anti-bribery, the government has

13  shown that there is a great deal of evidence of bribery, and

14  that the Credit Suisse bankers, who were complicit in this

15  conspiracy, either closed their eyes to it or knew that it was

16  going on since they knew at the outset of this transaction

17  that Credit Suisse had -- or senior management at Credit

18  Suisse, did not want to do a transaction with Safa and

19  Mozambique because of corruption risks and they nonetheless

20  did.

21         As Andrew Pearse testified, he knew he was getting

22  paid, so it's -- the government would argue that it was not a

23  surprise to them that other people were also receiving

24  improper payments and kickbacks and, in fact, Pearse testified

25  that he learned, during the course of his involvement in the

1   conspiracy, that the son of the president of Mozambique had

2   received at least $50 million from the defendant and

3   Privinvest, and he also testified regarding seeing information

4   regarding large salaries to other of the individuals, the

5   government officials, that were much larger.

6           Finally, the government would argue that Jean

7   Boustani was an agent for Credit Suisse and a joint venturer

8   with the bankers for Credit Suisse.  As the evidence has come

9   forward that, in fact, he was the person who was primarily, if

10  not exclusively, responsible for negotiating the loan

11  agreements on behalf of the Mozambican coconspirators and,

12  therefore, acting as an agent of Credit Suisse, his actions

13  are imputed to the Credit Suisse bankers who are part of the

14  conspiracy, and, therefore, the anti-bribery he certainly had

15  direct knowledge of the bribe payments since he and Privinvest

16  were making them to the Mozambican officials that, therefore,

17  there's enough evidence for this specified unlawful activity

18  to be considered by the jury.

19          THE COURT:  What is the response of the defense?

20          MS. DONNELLY:  We disagree with that recitation of

21  the evidence in this case.

22          But as Your Honor suggested, there will probably be

23  motions at end of the government's case to discuss what has

24  and hasn't been proven.

25          I would offer one more legal argument for why it's

1   inappropriate to give an FCPA instruction here, which is that

2   in *United States v Hoskins*, the Second Circuit --

3                THE COURT:  Can you spell that for the reporter?

4                MS. DONNELLY:  Yes.

5                *United States v Hoskins,* is H-O-S-K-I-N-S, and the

6   cite is 902 F.3d 69, 85, 96, Second Circuit 2018.  And the

7   Circuit says very plainly, quote:

8                The FCPA does not impose liability on a foreign

9   national who is not an agent, employee, officer, director, or

10  shareholder of an American issuer, unless that person commits

11  a crime within the territory of the United States.

12               And it's our viewed, and the U.S. Attorney's Office

13  for the Eastern District has agreed in *United States v Innes*,

14  I-N-N-E-S, that given *Hoskins*, it's inappropriate to proceed

15  on a derivative theory of FCPA liability by charging the

16  defendant with money laundering, and then having one of the

17  SUAs be an FCPA violation.

18               THE COURT:  What is the government's response to

19  what you just heard?

20               MR. BINI:  Your Honor, the *Hoskins* decision only

21  applies to a conspiracy to violate the Foreign Corrupt

22  Practices Act.  The government has not charged the defendant

23  in Count Three of the indictment.  Here, this is money

24  laundering with proceeds from that specified unlawful

25  activity.

1          So we think that it is appropriately charged, and I

2     would note that *Hoskins* was tried again recently and was

3     convicted for FCPA charges.

4          THE COURT:  What's your response to that, defense

5     counsel?

6          MS. DONNELLY:  Our understanding is that the holding

7     in *Hoskins* is that if you cannot be directly liable for an

8     FCPA violation, you cannot be liable under alternative

9     theories, such as conspiracy.  And in our view that would

10    include a derivative FCPA violation, such as the one here,

11    where Mr. Boustani is being responsible for an FCPA violation

12    as an SUA.

13         THE COURT:  What is your response?

14         MR. BINI:  Your Honor, to charge, or rather to prove

15    money laundering, the government does not have to prove that

16    the individual defendant in the money laundering conspiracy

17    committed the specified unlawful activity.

18         The government just has to prove that the proceeds

19    involved that specified unlawful activity and the defendant

20    knew that they were criminal proceeds.  The government has

21    more than met that.

22         I would also note that in the retrial of the *Hoskins*

23    case, the defendant Hoskins was convicted of an FCPA violation

24    for being an agent of the issuer.

25         And that was, what I had stated as our second basis

1   here that, in fact, the defendant may, in fact, be seen as an

2   agent of the issuer Credit Suisse by virtue of his doing all

3   of the negotiating on behalf of the Mozambican officials in

4   these loan agreements.

5              THE COURT:  Any further response from defense

6   counsel?

7              MS. DONNELLY:  We don't think there's any evidence

8   that Mr. Boustani was ever acting as an agent of Credit

9   Suisse, even under the government's view of things.  He would

10  be an agent of the folks in Mozambique, not Credit Suisse.

11             But no further objections other than the ones I've

12  already stated.

13             THE COURT:  The objection is overruled.  And it's

14  certainly preserved for the record.

15             97.

16             The government?

17             MR. BINI:  No objection.

18             THE COURT:  Defense?

19             MS. DONNELLY:  Yes, Your Honor.

20             We object to an instruction given regarding offenses

21  against a foreign nation involving the bribery of a public

22  official in violation of Mozambican law.  Because it is our

23  view, based on -- it's our view that the Mozambican bribery

24  statutes are not offenses against Mozambique, as understood

25  under Mozambique's criminal code.

1          THE COURT:  I'm going to overrule that objection.

2          Anything else on 97 from defense counsel?

3          MS. DONNELLY:  No, Your Honor.

4          THE COURT:  98?

5          The government?

6          MR. BINI:  No, Your Honor.

7          THE COURT:  Defense counsel?

8          MS. DONNELLY:  No, Your Honor.

9          THE COURT:  99?

10         The government?

11         MR. BINI:  No, Your Honor.

12         THE COURT:  Defense counsel?

13         MS. DONNELLY:  No further objections, other than,

14    again, we object to the -- any instruction being given on the

15    FCPA or Mozambican law.

16         THE COURT:  All right.  Same ruling.  The record is

17    preserved.

18         100.

19         The Government?

20         MR. BINI:  No, Your Honor.

21         THE COURT:  Defense?

22         MS. DONNELLY:  No, Your Honor.

23         THE COURT:  101.

24         The government?

25         MR. BINI:  No, Your Honor.

1             THE COURT:  Defense?

2             MS. DONNELLY:  No, Your Honor.  Well, except for,

3    under specified unlawful activity, again, the references to

4    the FCPA Mozambican law.

5             THE COURT:  All right.  Same ruling.

6             102.

7             The government?

8             MR. BINI:  No, Your Honor.

9             THE COURT:  Defense?

10            MS. DONNELLY:  No further objection, other than our

11   general objection to reading the statutory language.

12            THE COURT:  Same ruling.

13            103.

14            The government?

15            MR. BINI:  No, Your Honor.

16            THE COURT:  Defense?

17            MS. DONNELLY:  I'm going to ask -- yes, Your Honor.

18            We would ask for an additional instruction that

19   makes clear that the defendant's purpose must be to intend or

20   promote the carrying out of a specified unlawful activity, and

21   that the transfer cannot just have the effect of promoting a

22   specified unlawful activity.

23            And our basis for that is -- excuse me, I apologize.

24            THE COURT:  What language do you object to on 103?

25            MS. DONNELLY:  We don't object to any of the

1  language.  We would ask for one additional sentence.

2          THE COURT:  Tell me the language you would suggest,

3  the sentence.

4          MS. DONNELLY:  The government must prove beyond a

5  reasonable doubt that the purpose behind the transfer of the

6  money was to promote the specified unlawful activity, not just

7  that the transfer had the effect of promoting the specified

8  unlawful activity.

9          THE COURT:  I take the last sentence in the

10  carryover paragraph, 103, that's captioned "second", the last

11  sentence which reads:

12          To act intentionally means to act deliberately and

13  purposefully, not by mistake or accident with the purpose of

14  promoting, facilitating, or assisting the carrying on of the

15  specified unlawful activities is consistent with what you

16  requested.

17          I think it's already there.  It's consistent.  I see

18  no reason to modify the language.  I'll overrule your

19  objection, but it's noted for the record.

20          104.

21          Anything from the government?

22          MR. BINI:  No, Your Honor.

23          THE COURT:  Defense?

24          MS. DONNELLY:  No, Your Honor.

25          THE COURT:  105.

1            The government?

2            MR. BINI:  No, Your Honor.

3            THE COURT:  Defense?

4            MS. DONNELLY:  No, Your Honor.

5            THE COURT:  106.

6            The government?

7            MR. BINI:  No, Your Honor.

8            THE COURT:  Defense?

9            MS. DONNELLY:  The only objection -- or, excuse me,

10   the only objection that we would have is that we would request

11   a sentence just like the one I gave, in the paragraph that

12   begins with "third", that makes clear that the defendant had

13   to -- that the transfer had to be designed for the purpose of

14   concealing or disguising the nature, location, and so on, not

15   just that it had the effect of doing so.

16           THE COURT:  I'm going to overrule the objection.  I

17   think the language is consistent with what you just stated.

18   It doesn't need to be modified.

19           But your objection is noted and preserved for the

20   record.

21           107.

22           The government?

23           MR. BINI:  No, Your Honor.

24           THE COURT:  Defense?

25           MS. DONNELLY:  Only to the same objection to the

1    FCPA anti-bribery.

2            THE COURT:  Same ruling.

3            108.

4            The government?

5            MR. BINI:  No, Your Honor.

6            THE COURT:  Defense?

7            MS. DONNELLY:  We object to an instruction on the

8    FCPA.

9            THE COURT:  Same ruling.  Overruled.

10           109.

11           The government?

12           MR. BINI:  No, Your Honor.

13           THE COURT:  Defense?

14           MS. DONNELLY:  No further objection.

15           THE COURT:  Same ruling.

16           110.

17           The government?

18           MR. BINI:  No, Your Honor.

19           THE COURT:  Defense?

20           MS. DONNELLY:  No further objection.

21           THE COURT:  111.

22           The government?

23           MR. BINI:  No objection, Your Honor.

24           THE COURT:  Defense?

25           MS. DONNELLY:  No further objection.

*Charge Conference*                                            3381

1          THE COURT:  112.

2          The government?

3          MR. BINI:  No, Your Honor.

4          THE COURT:  Defense?

5          MS. DONNELLY:  No further objection.

6          THE COURT:  113.

7          The government?

8          MR. BINI:  No, Your Honor.

9          THE COURT:  Defense?

10         MS. DONNELLY:  No further objection.

11         THE COURT:  Same ruling.

12         114.

13         The government?

14         MR. BINI:  No.

15         THE COURT:  Defense?

16         MS. DONNELLY:  No further objection.

17         THE COURT:  Same ruling.

18         115.

19         The government?

20         MR. BINI:  No, Your Honor.

21         THE COURT:  Defense?

22         MS. DONNELLY:  No further objection.

23         THE COURT:  Same ruling.

24         116.

25         The government?

*Charge Conference* 3382

| | |
|---|---|
| 1 | MR. BINI:  No, Your Honor. |
| 2 | THE COURT:  Defense? |
| 3 | MS. DONNELLY:  No further objection. |
| 4 | THE COURT:  Same ruling. |
| 5 | 117. |
| 6 | The government? |
| 7 | MR. BINI:  No, Your Honor. |
| 8 | THE COURT:  Defense? |
| 9 | MS. DONNELLY:  No further objection. |
| 10 | THE COURT:  Same ruling. |
| 11 | 118. |
| 12 | The government? |
| 13 | MR. BINI:  No, Your Honor. |
| 14 | THE COURT:  Defense? |
| 15 | MS. DONNELLY:  No further objection. |
| 16 | THE COURT:  119. |
| 17 | The government? |
| 18 | MR. BINI:  No, Your Honor. |
| 19 | THE COURT:  Defense? |
| 20 | MS. DONNELLY:  No further objection. |
| 21 | THE COURT:  Same ruling. |
| 22 | 120? |
| 23 | Government? |
| 24 | MR. BINI:  No, Your Honor. |
| 25 | THE COURT:  Defense? |

*Charge Conference*                                                3383

```
 1              MS. DONNELLY:  No further objection.

 2              THE COURT:  Same ruling.

 3              121.

 4              Government?

 5              MR. BINI:  No, Your Honor.

 6              THE COURT:  Defense?

 7              MS. DONNELLY:  No further objection.

 8              THE COURT:  122.

 9              Government?

10              MR. BINI:  No, Your Honor.

11              THE COURT:  Defense?

12              MS. DONNELLY:  No further objection.

13              THE COURT:  Same ruling.

14              123.

15              Government?

16              MR. BINI:  No, Your Honor.

17              THE COURT:  Defense?

18              MS. DONNELLY:  No further objection.

19              THE COURT:  124.

20              Government?

21              MR. BINI:  No, Your Honor.

22              THE COURT:  Defense?

23              MS. DONNELLY:  No further objection.

24              THE COURT:  Same ruling.

25              125.
```

*Charge Conference* 3384

1        Government?

2            MR. BINI:  No, Your Honor.

3            THE COURT:  Defense?

4            MS. DONNELLY:  Yes, Your Honor.

5        I understand that Your Honor is planning to accept

6    the parties' proposal that the 2015 Penal Code be removed, the

7    instructions on that law.

8            THE COURT:  Yes.  As I said, any agreed-upon

9    submission, that will be reflected in the final version, so

10   that's already been agreed to and will be reflected in the

11   final version.

12           MS. DONNELLY:  No further -- no objections beyond

13   that, then.

14           THE COURT:  126.

15           The government?

16           MR. BINI:  No, Your Honor.

17           THE COURT:  Defense?

18           MS. DONNELLY:  No, Your Honor.

19           THE COURT:  127.

20           The government?

21           MR. BINI:  No, Your Honor.

22           THE COURT:  Defense?

23           MS. DONNELLY:  No, Your Honor.

24           THE COURT:  128.

25           The government?

1            MR. BINI:  No, Your Honor.

2            THE COURT:  Defense.

3            MS. DONNELLY:  Yes, Your Honor.

4            We object to an instruction on Article 321 of the

5     1886 penal code because we don't think it's applicable.

6            THE COURT:  Government, what's the response?

7            MR. BINI:  We filed multiple filings on this.  This

8     was very well briefed before Your Honor, and we rest on that

9     briefing.

10           THE COURT:  All right.  I'm going to overrule the

11    objection, but the objection is preserved for the record.

12           129.

13           The government?

14           MR. BINI:  No objection.

15           THE COURT:  Defense?

16           MS. DONNELLY:  Yes, Your Honor.

17           We think the only instruction on Mozambican law

18    should be the instruction on Article 7 of the 2004

19    anti-corruption law, and so we would object to this language

20    as well.

21           THE COURT:  Overruled.  Your objection is preserved.

22           129.

23           Anything else?

24           MS. DONNELLY:  No, Your Honor.

25           THE COURT:  130?

1           The government?

2           MR. BINI:  No, Your Honor.

3           THE COURT:  Defense?

4           MS. DONNELLY:  Same objection, which is that we

5   believe that only -- that Article 7 of the 2004 instruction

6   should be given -- 2004 law should be given to the jury.

7           THE COURT:  Same ruling.

8           131.

9           The government?

10          MR. BINI:  No objection.

11          THE COURT:  Defense?

12          MS. DONNELLY:  Same objection.

13          THE COURT:  Same ruling.

14          MS. DONNELLY:  We would also note that Article 40 is

15  not a criminal statute, it's a civil statute, so we object on

16  that basis as well.

17          THE COURT:  What is the response to that objection

18  from the government.  Is Article 40 civil or criminal?

19          MR. BINI:  Your Honor, that statute has both civil

20  and criminal portions.

21          THE COURT:  What are the criminal portions?

22          MR. BINI:  It includes the language that the

23  government has requested here, and we have briefed this and

24  the filings regarding Mozambican law before Your Honor.

25          THE COURT:  Okay, let me ask defense counsel.

1        Do you stand by your representation to the Court

2   that it's just civil and not criminal, or do you accept that

3   the government has given you an amendment on that issue?

4        MS. DONNELLY:  We stand by our position.

5        THE COURT:  Well, it should be clear that it's

6   either civil, criminal, or both.

7        Can either side articulate the basis for your

8   position that it's -- turn to the government first, since you

9   have the burden to prove beyond a reasonable doubt.

10       MR. BINI:  Yes.

11       THE COURT:  Hang on.  What is the basis of your

12  statement that it is involves criminal and not just civil?

13       MR. BINI:  Your Honor, if I can defer to my

14  colleague, Kate Nielsen, who is our Mozambican --

15       THE COURT:  Absolutely, yes.

16       MR. BINI:  Thank you, Your Honor.

17       MS. NIELSEN:  Your Honor, so this is not a matter

18  that was briefed, except for the fact that the government

19  pointed out in its briefing to the Court that this is an

20  instruction that identifies or that it intends --

21       THE COURT:  I'm going to stop you.

22       Do you remember my question?  My question is:  What

23  makes this statute criminal, in the language or can someone,

24  you know, going to jail or pays a fine that's identified as

25  criminal?

1          Here in the United States we have civil and criminal

2     penalties for securities laws violations, so I just want to

3     know the basis under which you say this statute involves

4     criminal as well as civil exposure, because the defense says

5     it's just civil.

6          So convince me that it's criminal?

7          MS. NIELSEN:  Of course, Your Honor.

8          So there are several portions that our expert

9     pointed out to us have criminal applications.  It may take me

10    a moment to find those.

11         THE COURT:  Do you have a statute?  Do you have a

12    case in which someone is convicted or found liable under this

13    statute and is subjected to criminal punishment?

14         MS. NIELSEN:  Your Honor, there is no case law on

15    that.  However, a portion of the statute itself --

16         THE COURT:  Okay, find the statute --

17         MS. NIELSEN:  Yes, Your Honor.

18         THE COURT:  -- and read the criminal portion of the

19    statute; cite it, read it out loud into the record, and then

20    I'm going to ask the defense what their response is to the

21    criminal portion that you are now about to enlighten the Court

22    and your adversary with respect to.

23         MS. NIELSEN:  And, Your Honor, I apologize, it may

24    take me a moment.

25         THE COURT:  I have all the time that an Article III

1  judge has, Which is good behavior, and if you see what's going

2  on in Washington, it's a pretty low bar. I have plenty of

3  time.

4          (Pause.)

5          MS. NIELSEN: Your Honor, if I might make a

6  suggestion. If the Court would like to move on, I can find

7  it.

8          THE COURT: Well, perhaps the defense can point to

9  the language that shows that it's exclusively civil. Or would

10 you like to move on to another point as well and we'll move

11 back to this this afternoon?

12         MS. DONNELLY: Yes, Your Honor, I don't have the

13 statute in front of me.

14         THE COURT: Okay. Well, all right. We'll come back

15 to this point about whether it's civil or whether it's

16 criminal later on.

17         So we will reserve on that. If it's criminal, I'll

18 leave it in; if it's civil, I may or may not leave it in. I

19 probably won't leave it in.

20         Okay, so that's 131.

21         132.

22         Anything from the government on 132?

23         MR. BINI: No, Your Honor.

24         THE COURT: Defense on 132?

25         MS. DONNELLY: No, Your Honor.

1          THE COURT:  133.

2          The government?

3          MR. BINI:  No, Your Honor.

4          THE COURT:  Defense?

5          MS. DONNELLY:  Yes, Your Honor.

6          We would ask that the venue instruction that we

7     proposed at ECF 216, page 57, which we think is closer to the

8     language of the statute.

9          THE COURT:  What is the government's response?

10          MR. BINI:  Your Honor, as we stated earlier, we

11     looked to the venue instructions of Judge Chen in *United*

12     *States versus Napout.*

13          We also looked to *United States versus Elbaz.*  And

14     we briefed this as well on ECF 243, and we think that Your

15     Honor's venue instruction is appropriate.

16          THE COURT:  I'm going to overrule the objection, but

17     the record is preserved.

18          Anything else on 133?

19          MR. BINI:  No, Your Honor.

20          MS. DONNELLY:  No, Your Honor.

21          THE COURT:  134.

22          The government?

23          MR. BINI:  No objection.

24          THE COURT:  Defense?

25          MS. DONNELLY:  No objection.

*Charge Conference*                                                3391

1          THE COURT:  135.

2          The government?

3          MR. BINI:  No, Your Honor.

4          THE COURT:  Defense?

5          MS. DONNELLY:  No objection.

6          THE COURT:  136.

7          The government?

8          MR. BINI:  No objection, Your Honor.

9          THE COURT:  Defense?

10         MS. DONNELLY:  No objection.

11         THE COURT:  137.

12         The government?

13         MR. BINI:  No, Your Honor.

14         THE COURT:  Defense?

15         MS. DONNELLY:  No objection.

16         THE COURT:  138.

17         The government?

18         MR. BINI:  No, Your Honor.

19         THE COURT:  Defense.

20         MS. DONNELLY:  No objection.

21         THE COURT:  139.

22         The government?

23         MR. BINI:  No, Your Honor.

24         THE COURT:  Defense?

25         MS. DONNELLY:  No objection.

1    THE COURT:  All right.  What I suggest you do is if
2  we take a 15-minute comfort break, and I don't know whether
3  that will be enough time or not enough time to address the
4  civil/criminal point, but we're not charging the jury today,
5  so we have some time on that, certainly you can get that to me
6  tomorrow.
7          I think -- and I'll be guided by you after the
8  break.  It's 12:30, I can either send the jury directly to
9  lunch and get them back here a little bit earlier then we
10  typically do, or depending upon how much time you've got on
11  continued cross and redirect, the next witness we can have the
12  jury come out and start in 15 minutes, if you think we can get
13  it done basically in time for them to get their lunch at
14  around 2.
15          But having send them out now early by our standards
16  to lunch now, if that's would be preferable, so what do you
17  think?
18          MR. JACKSON:  Your Honor, our preference would be to
19  get started.  I think we have about probably 40, 45 minutes
20  left in the cross, so we could get a good chunk of it done
21  before the lunch break.
22          THE COURT:  Do you think you can get all this
23  witness done, both cross and redirect?  How long do you think
24  the redirect is going to be, based on what you've seen so far?
25          I'm not locking you into that.  I just want to get a

1    sense, because I'm happy to let the jury go to lunch now and

2    tell them to be back here at quarter to 2, if that makes more

3    sense.

4              MR. MEHTA:  Your Honor, whatever the Court prefers.

5              As to redirect, I don't expect it to be more than

6    ten minutes.

7              THE COURT:  All right, why don't we take a

8    ten-minute comfort break, then we'll get the jury in and we

9    will continue with the banker witness on cross and the

10   redirect, and then we'll send the jury to lunch, okay?

11             We will take about ten minutes.

12             MR. BINI:  Your Honor, if I can put one more thing

13   on before we take our ten minutes.

14             THE COURT:  Sure.

15             MR. BINI:  I apologize.  On the money laundering

16   venue, I said that it was in our instruction.  It was not.  We

17   did not give a jury instruction in money laundering in our

18   proposed instruction.

19             However, I wanted to make clear that the government

20   believes that the venue instruction that you have given is

21   consistent with those other cases that we cited, and so we

22   think it's appropriate.

23             THE COURT:  All right.  I'm going to, as I said, I

24   will take the civil/criminal issue up, and I'm going to stick

25   with the rulings that I've made with respect to the jury

1    charge.

2              MR. BINI:  Thank you, Your Honor.

3              THE COURT:  All right.  Ten minutes.

4              (A recess was taken at 12:35 p.m.)

5              THE COURTROOM DEPUTY:  All rise.

6              Judge Kuntz presiding.

7              THE COURT:  You may be seated.  We have the

8    appearances.

9              (Defendant enters the courtroom.)

10             THE COURT:  Do we have any issues that we need to

11   discuss before we bring the jury in?

12             MR. JACKSON:  No, Your Honor.

13             THE COURT:  Why don't we have the witness restored

14   to the witness stand.

15             MS. NIELSEN:  I wasn't able to find those

16   provisions.

17             THE COURT:  You can be seated.  Thank you.

18             Keep your voice up, counsel.

19             MS. NIELSEN:  Yes, Your Honor, so Article 74 --

20             THE COURT:  A little louder, please.

21             MS. NIELSEN:  Article 74 and Article 80 of Law 1512,

22   2012, that we've just been discussing, provides for punishment

23   of the -- well, let's start with Article 74.  If you like, I

24   can read it to you.

25             THE COURT:  Sure.

1          MS. NIELSEN:  The title "Malfeasance" and says:  Any

2    government official acting against legal in its position,

3    while in the performance of his or her duties, carries out or

4    intervenes with intent to harm or prevent another person,

5    shall be punished for six months to two years imprisonment.

6          THE COURT:  All right, stop right there.

7          Sounds criminal to me.  How about to you, defense

8    counsel?

9          MR. JACKSON:  Your Honor, unfortunately we don't

10   have it in front of us.  We thought we were going to address

11   this after.

12         THE COURT:  All right, do we have a copy of the

13   statute, my law clerks, to give to the defense counsel?

14         MS. NIELSEN:  No, Your Honor.  So this is a

15   translation that I don't think we provided to the Court, but

16   we'll be happy --

17         THE COURT:  As I said before, we'll try to get this

18   done by 2, both the direct and cross and redirect.  Let's --

19   we'll deal with that later.  All right?

20         MS. NIELSEN:  Thank you, Your Honor.

21         MR. BINI:  Thank you, Your Honor.

22         THE COURT:  Anything else?

23         MR. SCHACHTER:  No, Your Honor.

24         THE COURT:  Why don't we have the witness come back

25   to the stand, and we'll bring I the jury in.

1              MR. SCHACHTER:  Your Honor, may I return...

2              THE COURT:  Yes, of course.

3              And there was a binder you had in front of the

4    witness, as I recall, at the end of -- did you need to have

5    the documents in front of the witness?

6              MR. SCHACHTER:  No, Your Honor.

7              THE COURT:  Okay.

8              MR. SCHACHTER:  That was the government's binder.

9              THE COURT:  You don't need to work with it?

10             MR. SCHACHTER:  No, Your Honor.

11             THE COURT:  Let's try to get this done, both the

12   cross completion and the redirect by 2.  If we're not done by

13   2, I'm going to adjourn at that point so the jury can get

14   their lunch.  Be guided by that.

15             MR. SCHACHTER:  Yes, Your Honor.

16             THE COURT:  Thanks.

17             (The witness resumes the stand.)

18             MR. SCHACHTER:  And, Your Honor, at the beginning of

19   the examination, I'll introduce three exhibits, which I've

20   already discussed with Mr. Bini, and I believe he has no

21   objection.

22             THE COURT:  Thank you.

23             (Pause.)

24             (Jury enters the courtroom.)

25             THE COURT:  Good afternoon, ladies and gentlemen of

1    the jury.  I'm delighted to see you again.  I hope you had an

2    enjoyable Veteran's Day weekend.

3            I can assure you that I was here checking to make

4    sure that none of you came in yesterday.  I'm glad that I was

5    the only one here.  So I thank you for that.

6            And please be seated.  We've been having some

7    business to do with the lawyers and then the lawyers having 20

8    sidebars while you had to sit and listen to the white noise

9    machine.  I take it it's a little more comfortable in the jury

10   room than here.

11           So we're going to continue with the

12   cross-examination of the witness.  It will be a very brief

13   redirect.  I told the lawyers that come 2:00 you're going to

14   go for your lunch break.

15           So they know what the time constraints are with this

16   witness.  If they don't get there by 2:00, you'll be back

17   after lunch, but 2:00 we're going to break for lunch.

18           And I know they are going to be expeditious.  Okay.

19   Thank you.

20           Sir, as I said, I would ask you when you return:

21   Have you discussed your testimony with anyone since leaving

22   the witness chair?

23           THE WITNESS:  I have not.

24           THE COURT:  Thank you.  Please continue.

25           MR. SCHACHTER:  Thank you, Your Honor.

1          THE COURT:  Of course.

2          MR. SCHACHTER:  Good afternoon, ladies and

3   gentlemen.

4   CROSS-EXAMINATION (Continued)

5   BY MR. SCHACHTER:

6   Q    Good afternoon, Mr. Santamaria.

7   A    Thank you.

8   Q    Welcome back.

9          MR. SCHACHTER:  Your Honor, I'd like to start by

10  offering three exhibits.  Defense Exhibit 10606, 10607, and

11  10668.

12         THE COURT:  Any objection?

13         MR. MEHTA:  No objection, Your Honor.

14         THE COURT:  Admitted.

15         You may publish.

16         MR. SCHACHTER:  Your Honor, I don't intend to

17  publish them at this moment.

18         THE COURT:  Well, whenever.

19         MR. SCHACHTER:  Thank you.

20         (Defense Exhibit 10606, 10607, and 10668, was

21  received in evidence.)

22         MR. SCHACHTER:  But I would like to publish, Your

23  Honor, with the Court's permission, Government Exhibit 2478 in

24  evidence.

25         THE COURT:  Yes, you may.

1               (Exhibit published.)

2    Q    So, Mr. Santamaria, do you recall that Mr. Mehta asked

3    you a number of questions about the language that's contained

4    that this document, the offering circular for the loan

5    participation notes?

6               Do you remember that?

7    A    Yes, I do.

8    Q    He pointed you to quite a number of provisions in this

9    document; is that correct?

10   A    Yes.

11   Q    Now, to your knowledge, no part of this document was

12   drafted by a man named Jean Boustani; was it?  As far as you

13   know?

14   A    Not to my knowledge.

15   Q    And prior to -- you talked about your investment decision

16   to purchase these LPNs on behalf of AllianceBernstein.

17              You never spoke to a man named Jean Boustani before

18   making that investment decision; did you?

19   A    I did not.

20   Q    In effect, you've never spoken to a man named Jean

21   Boustani at all; have you?

22   A    I have not.

23   Q    Now, Mr. Mehta asked you to take a look at the loan

24   agreement, which is attached to this offing circular.

25              Do you recall that?

1    A    Yes.

2         MR. SCHACHTER:  And, Mr. McLeod, that's on page 49

3    of the offering circular PDF.

4         (Exhibit published.)

5    Q    And this is an agreement between a company in Mozambique

6    called EMATUM and a company called Credit Suisse; is that

7    correct?

8    A    Yes.

9    Q    And this is not an agreement -- withdrawn.

10        There's no -- a company called Privinvest is not a

11   party to this agreement; is it?

12   A    Not to my knowledge.

13        MR. SCHACHTER:  And Mr. Mehta showed you a provision

14   of this loan agreement that he asked you to read over.  It was

15   paragraph 19.2 on page 83 of the PDF.

16        (Exhibit published.)

17        MR. SCHACHTER:  Right there.  Can you highlight from

18   general undertakings to the bottom -- the middle of the page

19   to the bottom, Mr. McLeod?

20   Q    Do you recall that Mr. Mehta asked you what a general

21   undertaking is and whether it's important to your review of

22   the offering circular before making an investment decision?

23   A    I do.

24   Q    Now, this general undertaking, this is an undertaking --

25   these are undertakings by the borrowers.

1              Do you see that?

2    A    Yes.

3    Q    And the borrower in this circumstance, that's that

4    Mozambican company, EMATUM; is that right?

5    A    Correct.

6    Q    And the provision that Mr. Mehta was pointing you to

7    talks about the borrower shall comply in all respects with

8    certain provisions.

9              Do you see that?

10   A    Yes.

11   Q    To be clear, this is not a representation by a company

12   called Privinvest, and it's not a representation by a man

13   named Jean Boustani; is it?

14   A    It is, as you mentioned, between the borrower and the

15   lender.

16   Q    It's a representation by that Mozambican company?

17   A    Correct.

18   Q    And to your knowledge, this document wasn't signed by

19   Mr. Boustani?

20   A    Not to my knowledge.

21   Q    In fact, you had no knowledge that Mr. Boustani ever had

22   occasion to even read this provision on paragraph -- on

23   page 32 of a loan agreement between two companies that he did

24   not work for?

25   A    I couldn't speculate whether he read it or not.

1    Q     The prosecutor also directed your attention to a

2    provision on use of proceeds in the offering circular.

3          Do you remember that?

4    A     I do.

5          MR. SCHACHTER:  I'd like to show you the same

6    language that Mr. Mehta showed you.  And that's on -- I

7    believe it's on page 15 of the PDF, Mr. McLeod, Government

8    Exhibit 2478.

9          (Exhibit published.)

10   Q     Again, do you recall a lot of questions that Mr. Mehta

11   asked you about the importance of this language in this

12   offering circular that you reviewed before making your

13   investment decision.

14         Do you remember that?

15   A     I do.

16   Q     You have no knowledge that a man named Jean Boustani had

17   anything to do with writing this language that was in the

18   offering circular that you reviewed; do you?

19   A     I have no knowledge of that, no.

20   Q     Now, last Friday when I was asking you questions, we

21   talked about how you would try your best to do your homework

22   about the factors that are important to your investment

23   decision.

24         Do you recall that?

25   A     Yes, I do.

1  Q    And I believe you told the jury that one of the things

2  that you did --

3         MR. SCHACHTER:  Can we put that up?

4  Q    -- one of the things that you did your homework on when

5  you were making your investment decision was the gas reserves

6  of the country of Mozambique?

7  A    Yes.

8  Q    You viewed the future financial prospects of the country

9  as being important to your investment decision, and so it was

10 something you wanted to know more about; is that correct?

11 A    That is true.

12 Q    However, this language that Mr. Mehta showed you so much

13 time on, this is not a provision that you took a whole lot of

14 time doing any homework on; is that fair to say?

15 A    There was not much to do homework on as this was a new

16 investment, a new startup operation and was nothing to really

17 inspect at the time.

18 Q    Right.  In fact, you had no basis to judge the validity

19 of this fishing project, correct?

20 A    I had nothing substantial to look at, other than the

21 promises made in this document.

22 Q    Now, there are questions that you could have asked, if

23 they were important to you, before making your investment

24 decision about the fishing project; isn't that correct?

25 A    I probably did, yes.

1   Q    Well, could have was my question.

2        Mr. Mehta asked you questions about whether you

3   would have liked to have known about a valuation that Credit

4   Suisse performed on these fishing vessels.

5        Do you remember those questions?

6   A    I do remember those.

7   Q    And whatever valuations, by the way, Credit Suisse had,

8   they didn't prevent Credit Suisse from going forward with the

9   exchange offer; did it?

10  A    It did not.

11  Q    Credit Suisse proceeded with the valuation after

12  reviewing whatever valuations it had received; is that

13  correct?

14  A    That is correct.

15  Q    At no time prior to making this purchase of these LPNs,

16  you didn't ask Credit Suisse do you have any valuations of

17  these vessels, right?

18  A    My understanding was that the vessels had not been

19  purchased at the time of the original issuance, so there was

20  nothing to value at that point.

21  Q    I'd like to go to just some questions that you didn't ask

22  before making -- before feeling comfortable with moving

23  forward with the LPN purchase decision.

24        You didn't ask for a description of the 27 vessels;

25  is that right?

1   A    They were described as fishing vessels.  That's all I

2   needed to know at the time, yes.

3   Q    That was sufficient for you?

4   A    Yes.

5   Q    You didn't ask what kind of fishing vessels?

6   A    They were described as tuna fishing vessels, if that

7   matters, yes.

8   Q    But beyond that, that was all that mattered to you.  That

9   was sufficient information for you; is that correct?

10  A    Correct.

11  Q    You didn't feel it was necessary for you to do an

12  evaluation of the particular fishing vessels at issue in this

13  case, right?

14  A    No.

15  Q    So that wasn't important to your investment decision?

16  A    It wasn't central, correct.

17  Q    You didn't ask how much in particular EMATUM was being

18  charged for these 27 vessels; is that correct?

19  A    That is correct, I did not ask them.

20  Q    You didn't ask for the name of the contractor who would

21  be handling the project that was being financed, correct?

22  A    I did not ask.

23  Q    Because you didn't feel that was important information to

24  your investment decision?

25  A    Correct.

1  Q    You didn't ask how much profit the contractor would be

2  making from the sale of these fishing vessels, right?

3  A    I did not.

4  Q    You didn't ask -- well, withdrawn.

5         The offering circular actually would tell investors,

6  such as yourself, that the amounts that are being borrowed and

7  spent towards the financing of fishing infrastructure of these

8  27 vessels, but also an operation center, related training and

9  the general corporate purposes of the borrower.

10        Do you see that?

11 A    I do.

12 Q    Fair to say that if it was important to you to what

13 portion of this money was spent on operations centered, you

14 could have asked?

15 A    Yes.

16 Q    You didn't ask?

17 A    I did not.

18 Q    You could have asked what kind of training is being

19 provided, or how much does it cost to provide that training,

20 correct?

21 A    Correct.

22 Q    But that wasn't something that was important to your

23 investment decision?

24 A    That is correct.

25 Q    And the terms, general corporate purposes of the

1   borrower, I take it you didn't have a particular handle on

2   exactly what that means; fair to say?

3   A    No.

4   Q    And it wasn't important to you what portion of the

5   amounts borrowed were used for, you know, quote/unquote

6   general corporate purposes, whatever that might mean; is that

7   correct?

8   A    That is correct.

9   Q    Because you were focused on the factors that were really

10  important to your investment decision in deciding how you

11  would deploy your investor's capital?

12  A    Correct, I was focused on the guarantee and the ability

13  of the sovereign to make good on that guarantee.

14  Q    Some of these details that I just asked you about, about

15  the use of proceeds, these are matters that were not as

16  important to you as the matters that you described, the

17  sovereign guarantee, and the economic prospects of the country

18  of Mozambique; fair to say?

19  A    That is fair to say.

20  Q    Now, Mr. Mehta asked you questions about whether you

21  would have invested had you known that money was paid to

22  officials in Mozambique.

23       Do you remember that?

24  A    Yes.

25  Q    Now, fair to say that you have made a lot of investments

1    in the debt of a lot of countries that have reputations for

2    significant corruption; is that fair to say?

3    A    Yes.

4    Q    Countries like Iraq, Azerbaijan, and Venezuela; is that

5    correct?

6    A    Yes.

7    Q    And it's fair to say that you are the not blind to the

8    idea that those governments may be using some of those funds

9    for corrupt purposes?

10   A    I'm aware that some funds go to illicit purposes.

11   Q    And, in fact, there's a section in the offering circular

12   that you were provided entitled "Risks".

13           Do you recall that?

14   A    I do.

15   Q    And would you agree with me that a risk is something that

16   can happen?

17   A    I will disagree that it can.  The question of should is a

18   different one.

19   Q    Understood.  My only question, though, is when investors

20   such as yourself is disclosed specifically risks in a

21   disclosure document like this, you have an understanding that

22   the risks that you're being told about are things that can

23   happen?

24   A    Indeed.

25   Q    And one of the specific risks that you were told about

1   before investing in these LPNs, was --

2          MR. SCHACHTER:  If we can highlight the bottom of

3   the page.

4   Q    -- corruption by government officials and misuse of

5   public funds.

6          Do you see that at the very bottom?

7   A    I do.

8   Q    And so you were buying these LPNs knowing that that was

9   something that was a risk that could happen, correct?

10  A    It was a risk.

11  Q    And, in fact, you were also told -- this carries on to

12  the very next page --

13         MR. SCHACHTER:  And can we highlight just that last

14  provision and the very first paragraph on the top of page,

15  Mr. McLeod.

16         No, I'm sorry, going back to the page before this.

17  Right there.  And then also the first paragraph.  Thank you.

18         (Exhibit published.)

19  Q    One of the things that investors, such as yourself, were

20  particularly told is that a factor like corruption by

21  government officials, and misuse of public funds, could affect

22  the ability of governments to meet their obligations in

23  connection with issued securities for the underlining assets

24  in respect thereafter.

25         That's part of what you're told is something that

1   could happen?

2   A    That's what it says, yes.

3   Q    And, in fact, you recall that even after this offering

4   circular -- after you received this offering circular and you

5   reviewed and you made your initial investment decision, do you

6   have a recollection that there were media articles that came

7   out after this happened about EMATUM misusing loan proceeds.

8          Do you have a memory of that?

9   A    I don't recall the exact timing, but I do recall the

10  press eventually reporting things of this nature, yes.

11         MR. SCHACHTER:  Your Honor, may I publish Defense

12  Exhibit 3545 in evidence.

13         THE COURT:  Yes.

14         (Exhibit published.)

15  Q    Do you see this article dated November 13th of 2013,

16  entitled:  "Mozambique Tuna Bond Funding Anti- pirate Fleet

17  and Bank Surprise"?

18         Do you see that?

19  A    I see it.

20  Q    And does that refresh your recollection that there were

21  media articles that came out shortly after the LPN issuance

22  that talked by the misuse of loan proceeds?

23  A    Yes.

24  Q    Now, that's November of 2013.

25         Do you happen to recall that you, on behalf of

1  AllianceBernstein, bought more LPNs on January the 30th of

2  2014, so just like about two months after this article?

3  A    I don't have a specific recollection, but it is

4  conceivable.

5           MR. SCHACHTER:  Mr. McLeod, can we try to show

6  Defense Exhibit 10 -- I'm sorry, yes, Defense Exhibit 10606 in

7  evidence and see if we can highlight the January 30th, 2014

8  purchase.

9  Q    Do you see that?

10 A    I see it.

11 Q    So just shortly after the article came out about the

12 misuse of loan proceeds, does this help you recall that you

13 actually bought more of the LPNs?

14 A    Yes.

15 Q    And you made that purchase, presumably, because you

16 thought, given the weighing the risks and the rewards, that

17 this would be a good investment for your investors?

18 A    Yes.

19 Q    Now, in addition to that article, you also received an

20 exchange offer memorandum that I think Mr. Mehta asked you

21 about.

22           Do you remember that?

23 A    I do.

24 Q    And that memorandum that Mr. Mehta showed you provided

25 you even more information about corruption in the country of

*Santamaria - cross - Mr. Schachter*                         3412

1    Mozambique.

2            Do you remember that?

3    A    I thought there was more, but it did reference the issue.

4            MR. SCHACHTER:   Well, why don't I just show it to

5    you.

6            Your Honor, may we publish Government Exhibit 241 in

7    evidence?

8            THE COURT:   Yes.

9            (Exhibit published.)

10   Q    Do you recall that this exchange offering memorandum

11   provided additional information under the category of what are

12   called "risks"?

13   A    Yes.

14   Q    And do you remember that the very first risk factor, it

15   told you that investing in securities involving emerging

16   markets, such as Mozambique, generally involved a high degree

17   of risk.

18            That's something you probably knew without reading

19   it?

20   A    Yes, that is boilerplate for a lot of transactions,

21   correct.

22   Q    And it's boilerplate because it's something that you

23   know?

24   A    Indeed.

25   Q    And it also talked about -- one of the risk factors that

*Santamaria - cross - Mr. Schachter*                            3413

 1   you were told about, stated in bold --

 2            MR. SCHACHTER:  If we can go to the next one,

 3   Mr. McLeod.

 4   Q     -- one of the risk factors was that failure to address

 5   actual and perceived risks of corruption and money laundering

 6   may adversely affect Mozambique's economy and ability to

 7   attract foreign and direct investors.

 8            Do you see that?

 9   A     I do.

10   Q     And this is something that probably before you even saw

11   it was something that you knew and something that could happen

12   before you made your decision?

13   A     Yes.

14   Q     It went on to say --

15            MR. SCHACHTER:  If we can look at page 75 of the PDF

16   below that.

17            (Exhibit published.)

18   Q     It goes on to say -- actually, this one says, and maybe

19   you'll remember it -- corruption is prevalent in Mozambique.

20            Oh, there it is.  Sorry.

21            That's something that you're told before you agreed

22   to exchange your LPNs for eurobonds, right?

23   A     Yes.

24   Q     And you're also specifically told about public opinion

25   surveys on corruption in Mozambique.

1              Do you remember that?

2     A     I do.

3     Q     And do you recall --

4              MR. SCHACHTER:  If we can go down just a little bit

5     further, Mr. McLeod.

6     Q     Do you recall that one of the pieces of information that

7     you're specifically told in this offering memorandum is that

8     transparency in international survey of public opinion on

9     corruption in Southern Africa showed that Mozambicans reported

10    the highest incidence of bribery in the region.

11             Do you remember that?

12    A     Yes.

13    Q     And that's -- it actually says that 68 percent of people

14    surveyed reported having paid a bribe in the previous year.

15             Do you see that?

16    A     Yes.

17    Q     So you knew at the time that you're making this exchange

18    that you're investing in the debt of a country in which

19    68 percent of the population reported having paid a bribe in

20    the previous year.

21             And, in fact, this disclosure document specifically

22    talked about news articles in which it was reported that the

23    proceeds of the EMATUM loan were used to buy defense equipment

24    instead of fishing vessels.

25             MR. SCHACHTER:  Can we show that it's on page 75 of

1    the PDF, Mr. McLeod?  Starting with paragraph "In 2015".

2    Q    Do you remember that, that there was actually a specific

3    disclosure to you about news articles about misusing the

4    EMATUM loan proceeds?

5    A    Yes.  It was explained that those -- that defense

6    equipment was meant to protect the fishing vessels, yes.

7    Q    And it actually went on to tell investors that:

8    Continued corruption in the public sector, and deficiencies in

9    the systems for addressing money laundering activities could

10   have a material adverse effect on the Mozambican economy?

11   A    Yes.

12                   (Continued on next page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1    CROSS-EXAMINATION

2    BY MR. SCHACHTER: (Continuing.)

3    Q    And notwithstanding your receipt of this information,

4    which maybe you knew already even without being told, you made

5    a decision to vote in favor of the exchange; is that correct?

6    A    Already being a lender, exchanging into a new security

7    that provided more protections, as we saw it, was something

8    that we agreed to do, yes.

9    Q    And, in fact, though, you did more than just -- after

10   receiving these risk disclosures, you did more than just agree

11   to exchange your LPNs for Eurobonds; isn't that correct?

12   A    Please elaborate.

13   Q    Sure.  I'm sorry.

14        Do you recall that actually AllianceBernstein bought

15   more than $11 million worth of additional Eurobonds in the

16   open market in October of 2016?

17   A    I don't recall specifically, but it is possible.

18        MR. SCHACHTER:  Can we just go back to Defense

19   Exhibit 10606.

20   Q    Do you see these purchases that AllianceBernstein made in

21   October of 2016?

22   A    Yes.

23   Q    So this is AllianceBernstein making these purchases of

24   additional Eurobonds issued by Mozambique after knowing all

25   about the risks of corruption, the corruption that can -- you

1    are being told can happen in Mozambique; is that correct?

2    A     Correct.

3    Q     And you made these decisions, notwithstanding those

4    disclosures, because you thought weighing the risks against

5    the potential significant rewards of the Eurobonds you thought

6    that's a good way to spend your investors' money.

7    A     Yes.

8    Q     Now, getting back briefly to this exchange offer,

9    Mr. Mehta asked you a question about specifically whether you

10   were committed to the exchange once your instructions to

11   participate in the exchange were provided.

12         Do you remember that?

13   A     Yes.

14   Q     And I believe you said the words "once the instructions

15   were provided, they were irrevocable."

16         Do you remember that?

17   A     That is my understanding from the documentation, correct.

18   Q     Is it possible that you're wrong about that?

19   A     It's possible.

20   Q     I'm going to show you Government's Exhibit 241 at

21   page 14.

22         THE COURT:  In evidence, yes?

23         MR. SCHACHTER:  Yes, Your Honor, in evidence.  I

24   apologize.

25         THE COURT:  Go ahead.

*Santamaria - cross - Schachter*                                      3418

1    BY MR. SCHACHTER:

2    Q    Do you see the section on irrevocability at the very top

3    of the exchange offer?

4    A    Yes, I see that.

5    Q    Do you see where it says -- it talks about the

6    instructions submitted and received by the exchange and

7    information agent.

8              Do you see that?

9    A    Yes.

10   Q    So it's not just the submitting, but it also references

11   the irrevocability at the moment of receipt by the exchange

12   and information agent.  Do you see that?

13   A    Yes.

14   Q    Do you happen to recall that the exchange and information

15   agent was a company called Lucid, which is in the United

16   Kingdom?

17   A    I -- no, I don't know that.

18             MR. SCHACHTER:  You can take that down.  Thank you,

19   Mr. McLeod.

20   Q    Now, Mr. Mehta asked you a number of questions about the

21   road show.

22             Do you remember that?

23   A    Yes.

24   Q    And you attended meetings as part of this road show; is

25   that correct?

*Santamaria - cross - Schachter*                                     3419

1   A     That's correct.

2   Q     And you specifically said that the minister of finance of

3   Mozambique attended the road show.

4            Do you remember that?

5   A     Yes.

6   Q     To be clear, that minister of finance was not a man named

7   Manuel Chang; isn't that correct?

8   A     It was not.

9   Q     In fact, there had been elections in Mozambique in late

10  2015.

11           Do you remember that?

12  A     Yes.

13  Q     And so this was a completely different minister of

14  finance of Mozambique that attended the road show.

15  A     That is correct.

16  Q     That was a man named Mr. Maleiane?

17  A     Yes, it is.

18           THE COURT:  Could you spell it for the reporter,

19  please?

20           MR. SCHACHTER:  M-A-L-I-E-N-E, I think.

21  BY MR. SCHACHTER:

22  Q     Does that sound right, Mr. Santamaria?

23  A     Your guess is as good as mine.

24  Q     Fair enough.

25           You didn't meet with a man named Manuel Chang as

1   part of this road show, did you?

2   A    I did not.

3   Q    And to your knowledge -- well, let me ask it this way.

4   Do you have any knowledge that a man named Manuel Chang had

5   anything to do with the statements that were made to you at

6   this road show?

7   A    They were made by other people.

8   Q    And also Jean Boustani, he was not at this road show that

9   Mr. Mehta asked you so much about.

10  A    He was not.

11  Q    And you have no knowledge that a man named Jean Boustani

12  drafted any of the information that was communicated to you as

13  part of this road show; fair to say?

14  A    I have no knowledge of that.

15  Q    Now, Mr. Mehta also showed you --

16           MR. SCHACHTER:  Your Honor, may I publish

17  Government's Exhibit 3215 in evidence?

18           THE COURT:  Yes.

19           (The above-referred to exhibit was published.)

20  BY MR. SCHACHTER:

21  Q    This is an e-mail from someone -- somebody who works at a

22  hedge fund called Manguard Advisors.

23           Do you see that?

24  A    I do.

25  Q    And so this person at this hedge fund, Mr. Mehta asked

1    you about statements that this guy at this hedge fund made to

2    you in this e-mail.

3    A    Yes.

4    Q    And it talked about this hedge fund guy said that EMATUM

5    was a complete failure.

6              Do you see that?

7    A    As a stand-alone business, yes.

8    Q    And that -- and also this person at this hedge fund also

9    said words about how the funds -- not all of the funds were

10   accounted for.

11             Do you remember that?

12   A    Yes.

13   Q    This e-mail was March 16th of 2016.

14             Do you see that?

15   A    Yes.

16   Q    To be clear, notwithstanding whatever information you

17   received in this e-mail, you bought more loan participation

18   notes in October, which would be about six or seven months

19   after this.

20             I'm sorry, more Eurobonds.  I'm sorry.

21             THE COURT:  Why don't you put the question again so

22   the record is clear.

23             MR. SCHACHTER:  Thank you, Your Honor.

24   BY MR. SCHACHTER:

25   Q    Notwithstanding whatever this person at this hedge fund

1   wrote to you in this e-mail in March of 2016, you bought more

2   Eurobonds because you thought they would be a good investment

3   in October of 2016, correct?

4   A    There may have been or there were small portfolio

5   adjustments that were -- that may have entailed purchases,

6   yes.

7   Q    Well, do you recall that the amount of Eurobonds that you

8   bought in October of 2016 was $15.4 million worth of Eurobonds

9   in October?

10  A    It is -- it is possible as part of large portfolio

11  adjustments, yes.

12  Q    Sitting here today, you don't recall particularly whether

13  the $15.4 million worth of purchases that you made in October

14  was due to portfolio adjustments or based on what you thought

15  would be a good investment for your investors?

16  A    I do not recall, no.

17         MR. SCHACHTER:  You can take that down, Mr. McLeod.

18  BY MR. SCHACHTER:

19  Q    Now, you also testified -- Mr. Mehta asked you about

20  whether you knew about the Proindicus loan when you voted in

21  favor of the Eurobond exchange.

22         Do you remember those questions?

23  A    I do.

24  Q    And I believe that you said that knowing about the

25  Proindicus loan would have been important for you to know

1  before you participated in the exchange.

2          Do you remember that?

3  A    Yes.

4  Q    I want to talk to you about the decision not to

5  specifically disclose the Proindicus loan in that exchange

6  offer memorandum, okay?

7          Are you aware, sir -- well, withdrawn.

8          MR. SCHACHTER:  May I publish, Your Honor, Defense

9  Exhibit 4013 in evidence?

10          THE COURT:  You may.

11          MR. SCHACHTER:  Can we publish from the top to the

12  bottom just so we can see the whole language there?

13          Thank you.

14  BY MR. SCHACHTER:

15  Q    I would like you to focus first on the bottom part.

16          Do you see where it says that the debt figures

17  disclosed in IMF reports is inclusive of all guaranteed debt?

18  And it then goes on to say, Given that the gross figures are

19  all-inclusive, there will be no itemized disclosure on the

20  guarantees.

21          Do you see that?

22  A    I see it.

23  Q    You see that this e-mail includes people from Credit

24  Suisse and a law firm called Latham & Watkins and also a law

25  firm called Linklaters?

*Santamaria - cross - Schachter*                                           3424

1   A    I see.

2   Q    Did you know that the decision to not specifically

3   disclose the Proindicus loan in the exchange offer memorandum

4   was made by Credit Suisse and lawyers at Linklaters and

5   Latham & Watkins?

6   A    I'm not a party to this e-mail, so I was not informed,

7   no.

8   Q    Fair to say you don't have any information whatsoever

9   that a man named Jean Boustani had anything to do with the

10  decision that Credit Suisse made as to how and whether to

11  disclose the Proindicus loan in this exchange offer memorandum

12  that you saw and that Mr. Mehta asked you all about?

13  A    I don't know of his involvement in this particular

14  decision.

15          MR. SCHACHTER:  We can put that down.

16  Q    And in fact, there was some disclosure about an

17  additional loan in the Credit Suisse -- I'm sorry -- in the

18  exchange offer memorandum.

19          Do you remember that?

20  A    I don't remember specifically the reference, but it is

21  possible that -- well, the document references all of

22  Mozambique's debt in some form or another --

23          THE COURT:  The question you were asked -- not to

24  interrupt your response -- was simple.

25          Why don't you put the question again or -- Madam

1    Reporter, read it back out loud and just try to respond to

2    that question rather than chat about it.

3             Go ahead.

4             (Record read.)

5             THE COURT:  Do you remember the -- hang on.  Do you

6    remember that there was no disclosure?  That's what you are

7    being asked.  Do you remember one way or the other?  Do you

8    remember?

9             THE WITNESS:  I don't.

10            THE COURT:  Next question.

11            MR. SCHACHTER:  Your Honor, may we publish

12   Government's Exhibit 241 at page 124?

13            THE COURT:  In evidence.  You may publish.

14            MR. SCHACHTER:  Yes, Your Honor.

15            THE COURT:  Counsel, rather than asking him if he

16   remembers these events, if you've got the document, why don't

17   you show him the document and then move ahead that way because

18   he may or may not remember independently of it, but we are

19   trying to get this done, so go ahead.

20            MR. SCHACHTER:  Yes, Your Honor.  I apologize.

21   BY MR. SCHACHTER:

22   Q    There's a section called, *Joint Dealer Managers*

23   *Transacting With the Issuer*.  It would be on page -- page

24   numbered 124.  There it is.

25            Do you see the section called, *Joint Dealer Managers*

1    *Transacting With the Issuer*?

2    A     I do.

3    Q     There's a sentence in this disclosure that says an

4    affiliate of Credit Suisse -- it's in the middle -- it says,

5    In particular, an affiliate of Credit Suisse Europe Limited

6    has a lending relationship with a wholly-owned state entity

7    whose obligations have the benefit of a guarantee from

8    Mozambique.

9              Do you see that?

10   A     Yes.

11   Q     Now, do you understand that Credit Suisse International

12   is an affiliate of Credit Suisse Securities Europe?

13   A     I do.

14   Q     Do you understand that this -- that Proindicus is a

15   wholly-owned state entity whose obligations have the benefit

16   of a guarantee from Mozambique?

17   A     I do now, yes.

18   Q     So this is some disclosure of a loan that a Credit Suisse

19   affiliate had with a state-owned entity in Mozambique?

20   A     Yes.

21   Q     Now, whether this disclosure is a sufficient disclosure

22   of the Proindicus loan or too opaque, you are not aware that a

23   man named Jean Boustani played any role in Credit Suisse's

24   decision as to how, in particular, it would disclose its loan

25   to Proindicus, do you?

1    A    I have no knowledge of his role.

2    Q    And, in fact, do you recall that you actually did receive

3    information in particular about the Proindicus loan?

4    A    I may have received --

5             THE COURT:  Don't speculate what you may have.  Do

6    you remember one way or the other?

7             THE WITNESS:  I don't, but it is possible --

8             THE COURT:  No, no.  If you don't remember, you

9    don't remember.  Anything's possible.  Answer his questions.

10            Okay.  We are at that point in the trial, it's

11   cross-examination, he's asking you questions, answer them.

12            Put another question.

13            MR. SCHACHTER:  Yes, Your Honor.  I'm actually not

14   sure if it's in evidence.  I think it is Government's

15   Exhibit 2336C.

16            THE COURT:  Is 2336 in evidence?

17            MR. SCHACHTER:  2336C in evidence.

18            THE COURT:  Is that in evidence?

19            Why don't you offer it, show it to your adversary

20   and to the Court, and see if there's any objection.

21            MR. MEHTA:  No objection, Your Honor.

22            THE COURT:  It's admitted.

23            You may publish.

24            (Government's Exhibit 2336C received in evidence.)

25            (The above-referred to exhibit was published.)

*Santamaria - cross - Schachter*                                    3428

1   BY MR. SCHACHTER:

2   Q    Looking at 2336C, do you see an e-mail from a man named

3   Daniel Jurkowicz at Credit Suisse to you dated May 9th, 2013?

4   A    I do.

5   Q    And Mr. Jurkowicz mentions -- what he's doing is he's

6   soliciting you to see if you would like to participate in a

7   loan financing for Mozambique.

8            Do you see that?

9   A    Yes.

10  Q    Do you recall any -- it describes the size of the loan,

11  $372 million.

12  A    Yes.

13  Q    And on the second page, further down, it says the

14  borrower is a special purpose vehicle owned by the Republic of

15  Mozambique.

16  A    Yes.

17  Q    Does this help you remember that, in fact, you did have

18  information about the Proindicus loan because you had been

19  solicited specifically to see if you wanted to participate in

20  it?

21  A    It does not label this as Proindicus and as -- it could

22  have been the same loan that I ultimately purchased and that's

23  the connection that I made at the time of my purchase of the

24  EMATUM loan was that this was the same security.

25  Q    You are thinking, sitting here today, maybe this is the

1    EMATUM loan?

2    A    Well, at the time.  I mean, back when I was shown the

3    EMATUM loan, I speculated that it was the same one that I had

4    been shown earlier.

5    Q    Do you remember that the EMATUM loan was an $850 million

6    loan?

7    A    Yes, but it could have been increased in size.

8    Q    Do you know whether the Proindicus loan was a

9    $372 million loan?

10   A    I believe it ended up being larger than that, but I don't

11   know.  I don't remember.

12   Q    Okay.

13   A    I never got the details of this loan.

14   Q    Okay.  In any event, you had been solicited to

15   participate in the syndication of a loan back in May of 2013?

16   A    Yes.

17   Q    And perhaps that's the same loan that Credit Suisse was

18   referencing on that page 124 or perhaps not, you just don't

19   know.

20   A    Yes, correct.

21   Q    All right.

22           Now, getting back to the exchange, do you recall

23   that there was a credit downgrade that came out after the

24   exchange was disclosed -- the exchange offer was made?

25   A    Yes, I do.

*Santamaria - cross - Schachter*                    3430

1  Q    And do you remember, in fact, that the credit downgrade

2  came out on the very day of the road show?

3  A    Potentially.  I don't remember specifically.

4        MR. SCHACHTER:  Your Honor, may I briefly show

5  Defendant's Exhibit 1962 in evidence?

6        THE COURT:  You may.

7        (The above-referred to exhibit was published.)

8  BY MR. SCHACHTER:

9  Q    Does this help you remember that there had been a credit

10  downgrade of the loan the day of the road show?

11  A    Yes.

12  Q    And I take it you were -- whatever credit downgrade came

13  out on the day that you were considering the exchange, you

14  were well aware of that, fair to say?

15  A    Yes, I was.

16  Q    And, in fact, do you recall that there was an explicit

17  disclosure to investors to make sure that they didn't miss the

18  fact that before they voted to exchange that they knew that

19  the rating had gone down of the loan?

20        Do you remember that?

21  A    Yes.

22  Q    And do you also remember that investors were given more

23  time, that the deadline to exercise what's called early

24  exchange was actually extended so that investors had more time

25  to think about the impact of this credit downgrade?

*Santamaria - cross - Schachter*                3431

1    A    Yes.  Among other reasons, but yes.

2    Q    Among other reasons.

3              Do you recall also --

4              MR. SCHACHTER:  And, Your Honor, may I publish

5    Defense Exhibit 4019A in evidence?

6              THE COURT:  Yes.

7              (The above-referred to exhibit was published.)

8    BY MR. SCHACHTER:

9    Q    And this is an additional notice that went to investors

10   on March 24th, 2016.

11             Do you see that?

12   A    Yes.

13             MR. SCHACHTER:  And if we can look to the second

14   page, please, Mr. McLeod.

15   Q    And is it correct that investors were specifically told

16   about -- that Mozambique had payment obligations under certain

17   facility agreements?

18             Do you see that?

19   A    Yes.

20   Q    And is that a disclosure by Mozambique that there are

21   other loans that it has that may be affected by that

22   downgrade?

23   A    Yes.  This is the Republic now we are talking about, yes.

24   Q    Right.

25             You see where it says that, in fact, the size of

*Santamaria - cross - Schachter*                    3432

1   those additional loans was $707 million of additional loans

2   that investors were told about at the time of this exchange?

3   A    Yes.

4   Q    And even -- this is in March 2016, you made a decision to

5   buy more Eurobonds in October several -- some number of months

6   after this.

7   A    Correct.

8   Q    All right.  Now --

9        MR. SCHACHTER:  You can take that down, Mr. McLeod.

10  BY MR. SCHACHTER:

11  Q    During the course of your research about the LPNs and

12  about the Eurobonds, one of the things that you reviewed is

13  reports from the IMF; is that correct?

14  A    Yes.

15  Q    And I'm going to --

16       MR. SCHACHTER:  Your Honor, we will offer Defense

17  Exhibit 10676.

18       THE COURT:  Any objection?

19       MR. MEHTA:  Objection.

20       THE COURT:  We'll have a sidebar.

21       (Sidebar.)

22       (Continued on next page.)

23

24

25

*Sidebar*                                                                    3433

1            (Sidebar conference held on the record out of the

2     hearing of the jury.)

3            THE COURT:  May I have the document, please?

4            Thank you.

5            All right.  This is a press release dated

6     October 30, 2013.  There's production number DOJVTB6028 and

7     6487.

8            What is the objection?

9            MR. MEHTA:  Is there a cover e-mail, Your Honor, to

10    show that he received this document?

11           THE COURT:  Is there a cover e-mail to show that he

12    received this document, which refers to VTB Capital?

13           MR. SCHACHTER:  No, Your Honor.

14           THE COURT:  Do we have any reason to believe that he

15    has ever seen this document or that it was sent to him or his

16    colleagues at his bank?

17           MR. SCHACHTER:  Well, his testimony is that he

18    reviewed IMF reports and this is an IMF report.

19           THE COURT:  This refers VTB Capital.  Did this come

20    from the files of VTB?

21           MR. MEHTA:  Yes, it did, Your Honor.

22           THE COURT:  Any reason to believe that he has seen

23    this file or this document?

24           MR. SCHACHTER:  The documents entitled *IMF Report*.

25           THE COURT:  I understand that.  Is there any reason

*Sidebar*                                                                      3434

1    to believe that this witness has seen this document?

2              MR. SCHACHTER:  This is what I was going to ask him

3    about.

4              THE COURT:  No, then I'm not going to allow it.

5              MR. SCHACHTER:  Yes, Your Honor.

6              (Sidebar end.)

7              (Continued on following page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Santamaria - cross - Schachter*                                    3435

1           (In open court.)

2           THE COURT:  The objection is sustained.

3    BY MR. SCHACHTER:

4    Q    Do you happen to recall in your review of -- the IMF

5    reports that you saw that there was a -- the leader of the

6    IMF's Mozambique team was someone named Doris Ross.  Does that

7    name ring a bell to you?

8    A    It does not.

9    Q    Now, Mr. Mehta asked you if after the -- the specific

10   question he asked you was, after the exchange you learned

11   information about whether Mozambique had disclosed the

12   Proindicus loan to the IMF.

13          Do you remember him asking you questions about

14   information that you may have received?

15   A    Yes.

16   Q    And he asked you about the impact on Mozambique from the

17   IMF learning that the Proindicus loan had not been disclosed

18   to the IMF.

19          Do you remember that?

20   A    Yes.

21   Q    And, sir, isn't it correct that the IMF was, in fact,

22   completely aware of the Proindicus loan?

23   A    I don't know.

24          MR. SCHACHTER:  Your Honor, we will offer Defense

25   Exhibit 10666, as well as we will present to counsel the

*Santamaria - cross - Schachter*                                    3436

1    business records certification accompanying that, which is

2    Defense Exhibit 10683.

3               THE COURT:  Any objection to DX10666?

4               MR. MEHTA:  Just a second, Your Honor.

5               (Pause.)

6               MR. MEHTA:  Objection, Your Honor.

7               THE COURT:  To 10666, I'm going to sustain that

8    objection.

9               And with respect to the next document, 10683, any

10   objection to that document?

11              MR. MEHTA:  Yes, Your Honor.  Same objection.

12              THE COURT:  All right.  Sustained.  They are not

13   coming in.

14              Next.

15   BY MR. SCHACHTER:

16   Q    Fair to say, sir, whatever the country of Mozambique

17   disclosed or didn't disclose to the IMF, you are not aware of

18   a man named Jean Boustani having anything to do with that

19   disclosure?

20   A    I am not aware, no.

21   Q    All right.

22              You testified about AllianceBernstein losing money

23   on investments in the LPNs --

24              THE COURT:  Counsel, it's ten to two, how much

25   longer do you have with this witness?

*Proceedings*                                                           3437

 1              MR. SCHACHTER:  Your Honor, I'll have about five

 2     minutes.

 3              THE COURT:  All right.

 4              Tell you what, ladies and gentlemen, we are going to

 5     take our lunch break now.  Come back here, if you wouldn't

 6     mind, at three o'clock, we will finish up the cross, then we

 7     will have a brief redirect, and then I understand there are

 8     two more witnesses the Government will have to complete its

 9     case.  Thank you.

10              Don't talk about the case.  Don't talk about the

11     case.  Have a nice lunch.  We'll see you at three o'clock.

12     Thanks.

13              (Jury exits.)

14              THE COURT:  Thank you.

15              (Witness excused.)

16              THE COURT:  The jury has left the courtroom, the

17     witness has left the witness stand and is leaving the

18     courtroom.  You may be seated, ladies and gentlemen.  You may

19     sit down, sir.

20              MR. SCHACHTER:  Yes, Your Honor.

21              THE COURT:  I would just observe that, at this point

22     in the trial, and I'm an old school litigator, I like to give

23     both sides ample opportunity to examine witnesses, but I

24     really think that when you start showing witnesses documents

25     that you have absolutely no reason to believe that they have

Proceedings                                                    3438

1    seen before, that aren't addressed to them, that you really

2    are pushing the envelope of going beyond the scope of the

3    direct, and I just want to caution both sides that we really

4    are going to get this case to the jury and decided, as I

5    promised them, before November 22nd.  So, if I were you, I

6    would engage in a lot of self restraint.  This goes to both

7    sides, with respect to direct and cross and redirect because

8    the clock is ticking, as I told you it would be when we picked

9    this jury.  I allowed enormous latitude with respect to

10   witnesses such as Pearse, for the obvious reasons, but we are

11   not going to engage in the kinds of examinations that really

12   do not advance the ball of justice.  You're experienced

13   lawyers, you know what I'm telling you.  I haven't had to make

14   a lot of rulings in this area because so far I've given you a

15   lot of latitude, but you are starting to push it and I'm not

16   going to have it.  So we are going to get this case to them on

17   the schedule that I announced to you ahead of time.

18   Prosecutors said they could get this case done in three weeks,

19   defense said they could get it down in six weeks.  We are

20   talking about six weeks, because that's what it's going to be,

21   so be mindful of that.  I will see you folks at three o'clock.

22            We are adjourned.

23            MR. BINI:  Thank you, Your Honor.

24            (A recess in the proceedings was taken.)

25

*Proceedings*                                                  3439

1                    **A F T E R N O O N   S E S S I O N**

2          (Time noted:  3:13 p.m.)

3          (In open court; jury not present.)

4          THE COURTROOM DEPUTY:  All rise.

5          Judge Kuntz presiding.

6          THE COURT:  We have the appearances.  We have the

7    defendant produced.

8          You may be seated, ladies and gentlemen.

9          (Defendant enters the courtroom.)

10         THE COURT:  All right, let's bring the jury in for

11   the last five minutes of cross, and then a brief redirect.

12         Yes?

13         MR. MEHTA:  Yes, Your Honor.

14         MR. JACKSON:  Yes, Your Honor.

15         (The witness resumes the stand.)

16         THE COURT:  Please come forward, sir.  We'll get the

17   jury in.

18         (Jury enters the courtroom.)

19         THE COURT:  Welcome back, ladies and gentlemen of

20   the jury.  Good afternoon.

21         Please be seated, and we're going to continue with a

22   very brief cross-examination, and an even briefer redirect.

23         MR. SCHACHTER:  May I proceed, Your Honor?

24         THE COURT:  You may.

25         MR. SCHACHTER:  Thank you.

1    CROSS-EXAMINATION

2    BY MR. SCHACHTER:

3    Q     Mr. Santamaria, before the break, I was showing you

4    Government Exhibit 2336C in evidence.

5              MR. SCHACHTER:  Your Honor, may I publish that?

6              THE COURT:  Yes.

7              (Exhibit published.)

8    Q     This was the email that you received from Mr. Jurkowicz

9    about that -- from Mr. Jurkowicz soliciting you to see if you

10   wanted to participate in this loan.

11             Do you recall that?

12   A     Yes.

13   Q     And you said that you weren't sure whether this was, in

14   fact, the Proindicus loan that you were being invited to

15   participate in, or perhaps it was the EMATUM loan.

16             Do you remember that?

17   A     Yes.

18   Q     And you see where what happens is Mr. Jurkowicz solicits

19   you on May 9th of 2013, and then he solicited you again on

20   July 3rd of 2013.

21             Do you see that?

22   A     Yes.

23   Q     And we talked about the amount being 372 million, but you

24   said it might be more than that.

25             And you see it says in the bottom email, it says:

1   Now working on an upsize of $250 million?

2   A    Yes.

3   Q    Do you see where there's an attachment for Mr. Jurkowicz

4   to the top solicitation email that he sent to you?

5   A    I do.

6         MR. SCHACTER:  And if we can -- Your Honor, we'll

7   offer the attachment to that email, which is Government

8   Exhibit 2336 -- I'm sorry, 2336D.

9         THE COURT:  Any objection?

10        MR. MEHTA:  No objection, Your Honor.

11        THE COURT:  Admitted.  You may publish.

12        (Government Exhibit 2336D, was received in

13  evidence.)

14        (Exhibit published.)

15  Q    This is the attachment to Mr. Jurkowicz's email to you.

16  You see where it references Proindicus?

17  A    I see it.

18  Q    It does appear, in fact, you had been advised of the

19  Proindicus loan back in 2013?

20  A    If I had opened the attachment at that time, I would have

21  seen it, yes.

22  Q    Okay.  All right.  So then we were talking about the --

23  Mr. Mehta asked you about the losses that AllianceBernstein

24  sustained on the Mozambican investments.

25        Do you remember that?

1  A    Yes.

2  Q    So to be clear, there's really sort of two investments;

3  there's the loan participation notes and then there's the

4  eurobonds; is that right?

5  A    One flowed into the other but, yes.

6  Q    So the loan participation notes, when you bought a loan

7  participation note, you were buying the right to be repaid

8  interest and principle; is that correct?

9  A    Yes.

10 Q    And during the life of those loan participation notes,

11 between 2013 and March of 2016, in fact EMATUM made all of the

12 loan -- all of the interest and principal payments on that

13 loan.

14         Do you recall that?

15 A    Yes.

16 Q    And then -- so when you talk about losses to the

17 investment, you're talking about losses with respect to the

18 eurobond that those LPNs were converted into in April of 2016;

19 is that correct?

20 A    I'm referring to the aggregate losses from inception to

21 the end of when they ultimately sold our position.

22 Q    And some of those losses, just to be clear, those would

23 be what's called "trading losses"; is that right?

24 A    Yes.

25 Q    Sometimes you buy at a certain price, and sometimes you

1    sold at a certain price?

2    A    Yes.

3    Q    And sometimes someone in your position tries to buy low

4    and sell high, right?

5    A    Hopefully, yes.

6    Q    But sometimes that doesn't work out that way?

7    A    Correct.

8    Q    Sometimes you buy high and sell low?

9    A    Yes.

10   Q    And in fact, that's what happened with respect to the

11   eurobonds.

12             Do you recall that?

13   A    I don't recall what happened after I sold.

14   Q    Do you recall that you sold out of your eurobond position

15   on November 30th, 2016 at a price of 63.65?

16   A    It's possible that that's the price, yes.  I don't recall

17   specifically.

18             MR. SCHACHTER:  Your Honor, may we publish Defense

19   Exhibit 10606?

20             THE COURT:  In evidence?

21             MR. SCHACHTER:  In evidence, yes, Your Honor.

22             THE COURT:  Yes, you may publish.

23             (Exhibit published.)

24   Q    And you see that your sales on November 30th of 2016 is

25   how you ultimately sell out of the position?

*Santamaria - cross - Mr. Schachter*                                    3444

1    A    Yes.

2    Q    And that sale, do you recall was a total of about

3    $35 million worth of eurobonds that you sold at that time?

4    A    That's what it shows.

5    Q    And do you recall that the time that you chose to sell

6    these eurobonds was at about the lowest price the eurobonds

7    ever traded?

8    A    I don't recall what happened thereafter.

9              MR. SCHACHTER:  Your Honor, we would publish Defense

10   Exhibit 10668.

11             THE COURT:  Any objection?

12             MR. SCHACHTER:  It's in evidence, Your Honor.

13             THE COURT:  Yes, you may publish.

14             (Exhibit published.)

15   Q    It's a little bit tough to see, but, Mr. Santamaria, this

16   is a price chart of the eurobonds.

17             Are you able to make that out?

18             Let me just direct you to a couple portion of this

19   price chart.

20             Do you recall, sir, that the date of the exchange --

21   the day after the exchange was April the 8th of 2016?

22   A    Yes.

23   Q    And do you know that on that day, the eurobonds were

24   trading at about 90 -- at about $90?

25   A    Yes.

*Santamaria - cross - Mr. Schachter*                                3445

1   Q     And so that's right up there.

2         But the time that you sold was November 30th of

3   2016.  That's when you sold about $35 million of the

4   eurobonds.

5         Do you see that?  Do you see how that's about the

6   lowest price that they ever traded?

7   A     Yes.

8   Q     Do you know, sir, that if you would have sold the day

9   after the exchange, AllianceBernstein would have made on its

10  investments about $9 million?

11  A     It's possible.

12  Q     And do you know that if you sold on December 19th, 2018,

13  which is the date of the indictment in this case, you would

14  have made about 13-and-a-half-million dollars on your total

15  investments?

16  A     I -- I can't vouch for the math.

17  Q     And you know that the eurobonds were actually just

18  restructured by Mozambique about a week ago?

19        Do you know that?

20  A     I have heard, yes.

21  Q     And do you know that if you would held those eurobonds

22  until they were restructured, you would have made --

23  AllianceBernstein would have made close to $30 million on its

24  investment?

25  A     If I had the power of seeing see into the future, that is

1    possible.

2    Q    Sir, fair to say Jean Boustani did not make

3    AllianceBernstein sell the eurobonds at the lowest price that

4    they ever traded; did he?

5    A    He did not.

6              MR. SCHACHTER:  May I have just a moment, Your

7    Honor.

8              THE COURT:  You may.

9              (Pause.)

10             MR. SCHACHTER:  I have no further questions.

11             Thank you very much, Mr. Santamaria.

12             THE COURT:  Redirect, please.

13             MR. MEHTA:  Yes, Your Honor.

14             THE COURT:  Bring the lights back up.

15   REDIRECT EXAMINATION

16   BY MR. MEHTA:

17   Q    Good afternoon, sir.

18   A    Good afternoon.

19   Q    You were just asked by defense counsel about losses.

20             Do you recall that just a second ago?

21   A    Yes.

22   Q    Mr. Santamaria, safe to say that if you knew at the time

23   of your investment in the EMATUM LPNs and your subsequent

24   purchase of the EMATUM LPNs and eurobonds, that Jean Boustani

25   had facilitated millions of dollars in payments to Mozambique

*Santamaria - redirect - Mr. Mehta*                                    3447

1   government officials, and bankers at Credit Suisse in

2   connection with the loan, you would have never invested at

3   all, right?

4   A    Correct.

5   Q    And safe to say, if you had never invested, you would

6   have suffered no losses, correct?

7   A    Correct.

8   Q    Now, you were asked certain questions about the risk of

9   corruption.

10           Do you recall that?

11  A    Yes.

12  Q    And the risks of corruption in the emerging market debt

13  industry, right?

14  A    Yes.

15  Q    And you were asked:  The risks are what could happen,

16  right?

17  A    Yes.

18  Q    You agree with me that there's a difference between what

19  could happen and what did happen?

20  A    I would agree.

21  Q    And you would agree with me there's a difference between

22  what could happen and what will happen?

23  A    Yes.

24  Q    And safe to say that at the time of these investments, no

25  one told you, and you did not know, that Jean Boustani had

1   agreed and negotiated millions of dollars in payments to

2   Mozambican government officials?

3   A    I did not know that.

4   Q    Safe to say, at the time of the investments, it involved

5   all the risks you looked at, all the due diligence you did,

6   none of it disclosed that Jean Boustani had facilitated,

7   negotiated millions of dollars in payments to Credit Suisse

8   bankers in connection with the loan?

9   A    It was not disclosed.

10            MR. MEHTA:  No further questions, Your Honor.

11            THE COURT:  Okay, you may step down, sir.

12            Thank you very much.

13            All right, please call your next witness.

14            MR. BINI:  The government calls Jason Kaplan.

15            (The witness steps down.)

16            THE COURT:  Please come forward, sir, to the front

17   of the courtroom.  My courtroom deputy will swear you in.

18   Step right up to the witness box and raise your right hand.

19            (Witness takes the witness stand.)

20   **J A S O N   K A P L A N, called as a witness, having been first**

21   **duly sworn/affirmed, was examined and testified as follows:**

22            THE COURTROOM DEPUTY:  You do solemnly swear or

23   affirm the answers you are about to give to the Court are the

24   truth, the whole truth and nothing but the truth, so help you

25   God.

*Kaplan - direct - Mr. Bini*                                   3449

1           THE WITNESS:  I do.

2           THE COURT:  Thank you, sir.  Please be seated.  I'm

3   going to ask you to make be sure the microphone is on.  I'd

4   like you just to twist so it's right in front of you.

5           State your name, spell it clearly, keep your voice

6   up, and counsel will inquire.

7           THE WITNESS:  Yes, my name is Jason Kaplan.

8   J-A-S-O-N.  K-A-P-L-A-N.

9           THE COURT:  Thank you.

10          Counsel, you may inquire.

11          MR. BINI:  Thank you, Your Honor.

12  DIRECT EXAMINATION

13  BY MR. BINI:

14  Q    Mr. Kaplan, where do you work?

15  A    I work at NWI Management.

16  Q    And where is NWI Management located?

17  A    New York City.

18  Q    How long have you worked at NWI?

19  A    Almost 14 years.

20  Q    What's your position there, sir?

21  A    I'm a portfolio manager.

22  Q    Where did you work before NWI?

23  A    Goldman Sachs.

24  Q    And before that?

25  A    Bear Stearns.

*Kaplan - direct - Mr. Bini*                          3450

1    Q     And where did you go to college?

2    A     I went to Dartmouth College.

3    Q     And following that, did there come a time you went into

4    the financial services industry?

5    A     Yes.

6    Q     How long have you been in the financial services industry

7    in total?

8    A     Just over 30 years.

9    Q     Can you tell the jury a little bit about what NWI Asset

10   Management does?

11   A     NWI Asset Management is an investment manager in a hedge

12   fund that invests in institutional money in different macro

13   strategies.

14         MR. BINI:  Your Honor, at this time the government

15   would seek to admit a series of exhibits.

16         THE COURT:  Call out the numbers, I'll see if

17   there's any objection.

18         MR. BINI:  Sure.

19         Government Exhibit 752.

20         THE COURT:  Any objection?

21         MR. SCHACHTER:  Your Honor, may I just have one

22   moment?

23         THE COURT:  Yes.

24         MR. SCHACHTER:  No objection.

25         THE COURT:  It's admitted.

*Kaplan - direct - Mr. Bini*                                    3451

1          (Government Exhibit 752, was received in evidence.)

2          MR. BINI:  761.

3          THE COURT:  Any objection?

4          MR. SCHACHTER:  May I just see it briefly on the

5    screen?

6          THE COURT:  Publish it to counsel, and to the Court.

7          MR. SCHACHTER:  No objection.

8          THE COURT:  It's admitted.

9          (Government Exhibit 761, was received in evidence.)

10         MR. BINI:  762.

11         THE COURT:  Any objection?

12         MR. SCHACHTER:  No objection.

13         THE COURT:  It's admitted.

14         (Government Exhibit 762, was received in evidence.)

15         MR. BINI:  763.

16         THE COURT:  Any objection?

17         MR. SCHACHTER:  No objection.

18         THE COURT:  It's admitted.

19         (Government Exhibit 763, was received in evidence.)

20         MR. BINI:  764.

21         MR. SCHACHTER:  May I see it on the screen briefly,

22   Your Honor?

23         THE COURT:  You may.  Counsel and the Court, please.

24         764?

25         MR. SCHACHTER:  No objection.

*Kaplan - direct - Mr. Bini*                                    3452

1           THE COURT:  It's admitted.

2           (Government Exhibit 764, was received in evidence.)

3           MR. BINI:  766.

4           THE COURT:  Counsel and the Court.

5           MR. SCHACHTER:  No objection.

6           THE COURT:  It's admitted.

7           (Government Exhibit 766, was received in evidence.)

8           MR. BINI:  753.

9           THE COURT:  Counsel and the Court.

10          MR. SCHACHTER:  No objection, Your Honor.

11          THE COURT:  It's admitted.

12          (Government Exhibit 753, was received in evidence.)

13          MR. BINI:  758.

14          THE COURT:  Counsel and the Court.

15          MR. SCHACHTER:  May I see that one briefly, Your

16  Honor?

17          No objection, Your Honor.

18          THE COURT:  It's admitted.

19          You may publish it.

20          (Government Exhibit 758, was received in evidence.)

21          MR. BINI:  Thank you, Your Honor.

22          (Exhibit published.)

23  Q    Mr. Kaplan, did there come a time that you became

24  interested in investing in loan participation notes in

25  Mozambique?

1    A    Yes.

2    Q    When approximately was that, sir?

3    A    The fall of 2013.

4    Q    What documents did you receive in connection with your

5    investment decision?

6    A    I looked at the offering memorandum.

7    Q    And did there come a time that you initially purchased

8    EMATUM loan participation notes?

9    A    Yes.

10   Q    Is that in the primary or secondary market, sir?

11   A    That was in the secondary market.

12   Q    Where were you when you first started purchasing the

13   EMATUM loan participation notes?

14   A    I was in Barcelona, Spain.

15   Q    For what period of time were you in Barcelona, Spain,

16   sir?

17   A    I was in Barcelona, Spain from late August 2013 to the

18   first week of January 2014.

19   Q    And were your other -- were you still working at NWI at

20   that time, sir?

21   A    Yes, I was.

22   Q    Were your other colleagues at NWI in New York City?

23   A    Yes, they were.

24   Q    Did there come a time you returned to New York City?

25   A    Yes.

*Kaplan - direct - Mr. Bini*                                  3454

1    Q    When?

2    A    The first week of 2014.

3    Q    January 2014, sir?

4    A    Yes, sir.

5    Q    And when you returned to New York City, did you continue

6    to purchase the EMATUM loan participation notes?

7    A    Yes, I did.

8              MR. BINI:  If we can now show Government

9    Exhibit 761.

10             THE COURT:  In evidence?

11             MR. BINI:  Yes, Your Honor.

12             THE COURT:  Yes.

13             (Exhibit published.)

14   Q    And is the first page of this document a profit and loss

15   and trading for NWI in the EMATUM loan participation notes and

16   the eurobond it was later exchanged for?

17   A    Yes, it is.

18   Q    And is that for the period from 2013 until you ultimately

19   sold out of the position closer to 2017?

20   A    Yes, it is.

21   Q    And looking to the second page, sir.

22             And we'll come back to that.  Actually, staying on

23   the first page for a moment.

24             Did NWI suffer losses based on its trading in these

25   securities?

1   A     Yes, we did.

2   Q     And taking into account the bond payments of principle

3   and interest that you received, what was NWI's trading loss?

4   A     Approximately $3.2 million.

5   Q     And after that first page --

6               MR. BINI:  If you can go to the second page of the

7   document.  We can blow little bit of that just to show the

8   jury.

9   Q     Mr. Kaplan, does this show trading by NWI in the EMATUM

10  securities?

11  A     Yes, it does.

12  Q     And were there numerous buys between October 2013 and

13  sometime in 2017?

14  A     Yes, there were.

15  Q     What kinds of funds from NWI invested in the EMATUM

16  securities?

17  A     We have several different funds that invested.  The

18  Blackstone NWI Asset Management Total Return Fund.

19               Another fund called Profiso (phonetic), which is a

20  fund-to-funds emerging market.

21               Fixed Income Master Trust, our main fund, which is

22  what managed a part of.

23               Some UCITS funds from Ireland.

24               And a -- I think the Blackstone NWI's Special

25  Opportunities Fund.

1    Q     Were the funds onshore funds or offshore funds?

2    A     They were offshore funds.

3    Q     Did the participants in the funds include U.S. citizens?

4    A     Yes, they did.

5    Q     Did you do all the purchasing on behalf of NWI?

6    A     No, I did not.

7    Q     Who else at NWI was purchasing these securities, if you

8    know?

9    A     Would you like me to give names or just -- other

10   portfolio managers were purchasing as well.  We had several

11   portfolio managers.  Each can act independently.

12   Q     Were you a subject matter expert on the EMATUM loan

13   participation notes and the eurobond at NWI?

14   A     Yes, I was considered subject matter expert.

15   Q     And the other portfolio managers at NWI then looked to

16   you in part based on your positions?

17   A     In part they did look -- rely on my judgment, yes.

18   Q     Okay.  And approximately how large a position did you and

19   NWI build in the EMATUM securities?

20   A     I believe we build a position of approximately

21   $70 million.

22   Q     And in your practice, when are you permitted to purchase

23   a loan participation note or any other bond?

24   A     When you're in contact with a broker and you agree upon a

25   price and size and the word "done" is used is when the trade

1  is committed.

2  Q    And do you usually memorialize it, sir?

3  A    Yes, we do.

4  Q    How do you memorialize it?

5  A    We memorialize it with a Bloomberg trade ticket, which is

6  called a VCON.

7  Q    And, sir, when you entered into these trades, where were

8  you?

9  A    I was in New York City, and for some of the early trades,

10  I was in Barcelona.

11  Q    Other than those trades before January 2014, were you in

12  New York City?

13  A    Yes.

14       MR. BINI:  Okay, if we can go to Government

15  Exhibit 753 in evidence.

16       (Exhibit published.)

17  Q    Do you recognize this, sir?

18  A    Yes, I do.

19  Q    What is it?

20  A    This is the offering circular for the loan participation

21  notes by EMATUM.

22  Q    Did you look at this before you first started purchasing

23  the EMATUM loan participation notes?

24  A    Yes, I did.

25  Q    And why is that, sir?

1  A    I looked at it as part of our due diligence process of

2  researching the credit.

3            MR. BINI:  And if we look to page 12 of this

4  document.

5            (Exhibit published.)

6  Q    And the use of proceeds provision.

7  A    Yes.

8  Q    Do you look to the summary of offering portion of an

9  offering circular, sir?

10 A    Yes.

11 Q    And what did it indicate as the use of the proceeds?

12 A    The issuer will use the proceeds of the first issue of

13 notes for the sole purpose of financing the purchase of the

14 rights and obligations of the lender in respective --

15           THE COURT:  You don't have to read it out loud.  He

16 just wants to know, in sum and substance, what it says.

17           If you are going to read it out loud, use your Lord

18 Vader speech pattern, not your Woody Allen speech pattern.

19 You have to slow it down.

20           Go ahead.  If you can sum it up, do it; if you have

21 to read it, out loud --

22 A    The use of proceeds was to buy equipment for the fishing

23 industry.

24 Q    Is that reflected, if we go to page 15 on the summary of

25 the offering circular, the use of proceeds there?

*Kaplan - direct - Mr. Bini*                           3459

1   A     Yes, it is.

2   Q     Okay.  And if we go to page 44, did the offering

3   circular, attach a loan agreement?

4   A     Yes, it did.

5         MR. BINI:  If we go to the next page of that.

6   Q     Is that the loan agreement itself, sir?

7   A     Yes, it is.

8         MR. BINI:  And if we go beyond that to the first

9   page of loan agreement, to the table of contents, Ms. Dinardo.

10  If we can blow it up, and go to 19.

11  Q     Did the loan agreement appear to have standard provisions

12  for loan agreements of this type?

13  A     Yes.

14  Q     And are you used to seeing a compliance with laws

15  provisions in your loan agreements?

16  A     Yes.

17        MR. BINI:  If we continue further in the document,

18  to the guarantee, the loan guarantee, Ms. Dinardo.

19        (Exhibit published.)

20  Q     Is that the government guarantee, sir?

21  A     Yes, it is.

22  Q     Who's the guarantor for this loan?

23  A     The Republic of Mozambique.

24  Q     Did you look at this as part of your investment decision?

25  A     I did.

1   Q    Mr. Kaplan, would it have been important to your

2   investment decision in the EMATUM loan participation notes to

3   know that the proceeds would not be used exclusively for the

4   boats and fishing infrastructure as set out?

5   A    Yes, that would be important.

6   Q    Would it have been important to your investment decision

7   to know that millions of dollars from the loan proceeds will

8   be used by the contractor to make payments to Mozambican

9   government officials?

10            MR. SCHACHTER:  Objection.

11            THE COURT:  Overruled.

12            You may answer, sir.

13   A    Yes, that would be important to know.

14   Q    Would you have invested if you had known that?

15   A    We would not have invested.

16   Q    Why not, sir?

17   A    We would try to avoid any transaction that appeared

18   tainted by corruption, and in any way would have been

19   unethical and probably a violation of our fiduciary

20   responsibility.

21   Q    When you say "fiduciary responsibilities," do you mean to

22   your clients?

23   A    Yes, sir.

24   Q    And would it have been important to your investment

25   decision to know that several people on the Credit Suisse deal

1    team that put the loan and financing transaction together

2    would be paid millions of dollars by the contractor from the

3    loan of funds?

4              MR. SCHACHTER:  Objection.

5              THE COURT:  Overruled.

6    A    Yes, that would be important to know.

7    Q    You would you have invested if you had known that?

8    A    No, we would not have invested.

9    Q    Why not?

10   A    For the same reasons I explained earlier.  Because it

11   would indicate that this was a tainted, corruption tainted

12   transaction that could end up being problematic for us down

13   the road and it would have been unethical.

14             (Continued on next page.)

15

16

17

18

19

20

21

22

23

24

25

Kaplan - Direct - Bini                    3462

1  BY MR. BINI (Continuing):

2  Q    Looking to the government guaranty, would it have been

3  important for you to know that the contractor would pay

4  millions of dollars to the Finance Minister of Mozambique, who

5  signed the government guaranty?

6            MR. SCHACHTER:  Objection.

7            THE COURT:  Overruled.

8  A    Yes, that would be important to know.

9  Q    Would it have affected your investment decision?

10  A    Yes, it would have.

11  Q    Why is that, sir?

12  A    Again, something like that would have probably resulted

13  in this being a nonstarter for us.  When there's allegations

14  of corruption in a transaction, we would shy away from it.

15  Q    Did you learn any of that at the time that you were

16  investing in the loan participation notes?

17  A    No.

18  Q    Did there come a time that you heard that the EMATUM loan

19  participation note would be exchanged for a eurobond to extend

20  the maturity date?

21  A    Yes.

22  Q    And when approximately was that, sir?

23  A    It would be the first quarter of 2016, I believe.

24  Q    What was your and NWI's position in the loan

25  participation notes at that time frame?

LAM      OCR      RPR

Kaplan - Direct - Bini                    3463

1   A     I believe we held approximately 70 million.

2   Q     $70 million?

3   A     Yes.

4   Q     And looking to Government Exhibit 752 in evidence did

5   there come a time --

6               (Exhibit published to the jury.)

7               MR. BINI:  If we can scroll through, Ms. DiNardo, to

8   the second page and then the third page.  You can blow up the

9   top of the third page, Ms. DiNardo.

10  Q     Did there come a time that you received an offering

11  circular like this one for the exchange?

12  A     Yes.

13  Q     And what was the exchange offering, sir?

14  A     It was an offer to change the issuer from EMATUM to the

15  Republic of Mozambique to -- and to extend the maturities from

16  2020 to 2023.

17  Q     And in this offering circular, did it explain any of the

18  questions that I asked you regarding before?

19  A     Could you be more specific, which questions?

20  Q     Did the offering circular for the exchange state that the

21  contractor had paid millions of dollars to Mozambican public

22  officials?

23  A     No, it did not.

24  Q     Did it state that the contractor for the EMATUM loan had

25  paid millions of dollars to the Credit Suisse bankers who set

LAM      OCR      RPR

Kaplan - Direct - Bini                          3464

1   up the original transaction?

2   A     No, it did not.

3   Q     And did the offering circular mention the Proindicus loan

4   by name?

5   A     No, it did not.

6   Q     Did it indicate or state the MAM loan by name?

7   A     No, it did not.

8   Q     Anywhere in this offering circular did it indicate that

9   certain Mozambican officials were not disclosing the

10  Proindicus and MAM loans to the IMF?

11              MR. SCHACHTER:  Objection.

12              THE COURT:  Overruled.

13              You may answer.

14  A     No, it did not.

15  Q     Was there a road show, sir, in connection with this

16  exchange in or about March of 2016?

17  A     Yes, there was.

18  Q     Where?

19  A     We had the team from Mozambique into our offices in New

20  York City.

21  Q     And who did you meet with, sir?

22  A     I believe there were bankers from Credit Suisse and VTB

23  and government officials from Mozambique.

24  Q     And why were the government officials from Mozambique and

25  the Credit Suisse bankers meeting with you at your offices in

Kaplan - Direct - Bini                                    3465

1   in New York City?

2   A     It's customary for the issuer and its bankers to explain

3   the transaction to prospective investors.

4   Q     Why?

5   A     In order to answer any questions, in order to really sell

6   the transaction, to explain what they're doing.

7   Q     And do you recall which Mozambican officials you met with

8   or spoke to?

9   A     I believe there were officials from the Central Bank, the

10  Ministry of Economy, and the Finance Minister Mulyani was

11  there.

12  Q     What questions, if any, did you ask Finance Minister

13  Mulyani with the other officials present?

14  A     I asked him if this transaction was going to be okay

15  because I had been very surprised that they were not going to

16  pay the EMATUM participation notes.  So, I felt that I had a

17  very good sense of their ability to pay but I wasn't quite

18  sure about their willingness to pay, so I was trying to gauge

19  their willingness to pay by asking the Finance Minister

20  directly.

21  Q     What, if anything, did the Finance Minister tell you?

22  A     He suggested that the bonds would be paid and there were

23  no issues, no problems.

24  Q     Did anyone at the meeting state that the contractor for

25  EMATUM had made millions of dollars in payments to government

                    LAM      OCR      RPR

Kaplan - Direct - Bini                          3466

1   officials in Mozambique?

2   A    No, they did not.

3   Q    Did anyone at the meeting tell you that the contractor

4   had paid millions of dollars to Credit Suisse bankers?

5   A    No, they did not.

6   Q    Did anyone mention the Proindicus loan?

7   A    No.

8   Q    The MAM loan?

9   A    No.

10  Q    Did anyone tell you that Mozambique was not telling the

11  IMF about the Proindicus or MAM loans?

12            MR. SCHACHTER:  Objection.

13            THE COURT:  Overruled.

14  A    No, they did not.

15  Q    Did anyone tell you that Credit Suisse had received

16  valuations for the EMATUM boats that were hundreds of millions

17  of dollars lower than the loan amount?

18  A    No, they did not.

19  Q    Would that have been important for you to know?

20  A    Yes.

21  Q    Did you ultimately agree to the exchange of the

22  approximately $70 million in loan participation notes you held

23  for the eurobond?

24  A    Yes, we did.

25  Q    Did there come a time that you learned about the

Kaplan - Direct - Bini                        3467

1    Proindicus and MAM loans?

2    A    Yes.

3    Q    How did that occur, approximately, sir?

4    A    I learned from reading a newspaper article in the Wall

5    Street Journal.

6              MR. SCHACHTER:  Objection.

7              THE COURT:  Overruled.

8    Q    Was that before or after you had voted in favor of the

9    exchange?

10   A    This was after.

11   Q    Sir, would you have invested in the exchange if you had

12   known that Mozambique had about $1.1 billion owed for

13   Proindicus and the MAM loans?

14             MR. SCHACHTER:  Objection.

15             THE COURT:  Overruled.

16   A    No, we would not.

17   Q    Why not, sir?

18   A    The structure of those loans was that they were maturing

19   before the new bond that they were issuing.  So, in fact, this

20   would have resulted in our structural subordination to the

21   debt that was already outstanding.

22             Second of all, I don't think that -- I mean, we

23   would have asked about whether or not those loans had been

24   approved by Parliament.  And at the time, they were not, so

25   that would have raised the specter of some sort of corruption

Kaplan - Direct - Bini                          3468

1   and some problems.

2   Q    What do you mean that the Proindicus and MAM loans had

3   not been approved by Parliament?

4              MR. SCHACHTER:  Objection.

5              THE COURT:  Overruled.

6   A    That Proindicus and Mozambique Asset Management, my

7   understanding is that they were never approved by Parliament

8   or they were approved ex post much later on, several years

9   later.

10             THE COURT:  Approved by whom several years later?

11             THE WITNESS:  Approved by the Mozambique Parliament.

12             THE COURT:  Go ahead.

13  Q    But at the time, in 2016, it was your understanding they

14  had not been approved by the Mozambican Parliament?

15             MR. SCHACHTER:  Objection.

16             THE COURT:  Overruled.

17  A    That's correct; when I found out about them, yes.

18  Q    And, sir, did you find out about them based upon news

19  articles?

20  A    Yes.

21  Q    And you mentioned structurally subordinating your

22  position.

23             Can you explain what you mean by that to the jury,

24  please?

25  A    These loans, Proindicus and Mozambique Asset Management,

LAM      OCR      RPR

Kaplan - Direct - Bini                                    3469

1  I believe had maturities running concurrently from 2017

2  through 2020.  So, while we were essentially being asked to

3  postpone our repayment until 2023, those loans were being paid

4  first.

5  Q    And is that something that you were not aware of at the

6  time you agreed to the exchange?

7  A    That is correct.

8          MR. BINI:  And if we can go to Government Exhibit

9  762 in evidence?

10          THE COURT:  You may.

11          (Exhibit published to the jury.)

12 Q    What is the date of this document, sir?

13 A    Friday, March 25, 2016.

14 Q    And who is it from and who is it to?

15 A    I believe this is from our prime brokers at Credit Suisse

16 to our operations person Marc Weiden.

17 Q    Does Marc Weiden work for you at NWI?

18 A    He works for us at NWI, correct.

19 Q    What's his role there, sir?

20 A    He's part of the operations team, operations and

21 settlements.

22 Q    And what is the date of this?

23 A    March 25, 2016.

24 Q    And does this reflect NWI's vote in favor of making the

25 exchange?

Kaplan - Direct - Bini                              3470

1    A    Yes, it does.

2    Q    And approximately how much in loan participation notes

3    were you exchanging for eurobonds?

4    A    Approximately $70 million.

5    Q    Who made the investment decision on making this exchange

6    of $70 million worth of this bond?

7    A    The portfolio managers at NWI.

8    Q    Did that include you, sir?

9    A    Yes, it did.

10   Q    And where were you when you gave Marc Weiden instructions

11   to vote in favor of this along with the other portfolio

12   managers?

13   A    New York City.

14   Q    Where was Marc Weiden when he placed the vote on behalf

15   of NWI with your broker?

16   A    New York City.

17        MR. BINI:  Could we go to Government Exhibit 763 in

18   evidence?

19        THE COURT:  You may.

20        (Exhibit published to the jury.)

21        MR. BINI:  And if we could go down a little bit

22   further.

23   Q    What does this document reflect, sir?

24   A    These appear to be the exchange securities.

25   Q    And was this a notice the settlement had taken place,

Kaplan - Direct - Bini                                    3471

1   exchanging your 70 million for the loan participation note in

2   exchange for the eurobond?

3   A    Yes, it is.

4   Q    Did that come to Marc Weiden again at your firm, who is

5   the settlement person?

6   A    Yes.

7              MR. BINI:  And if we could look at Government

8   Exhibit 766 in evidence.

9              (Exhibit published to the jury.)

10             MR. BINI:  This is a little dark.

11             Your Honor, may I ask to turn off the lights?

12             THE COURT:  Can you see it, sir?

13             THE WITNESS:  Yes, I can.

14             THE COURT:  Go ahead, counsel.  He can see it.

15             MR. BINI:  Thank you, your Honor.

16  Q    What time period is shown -- well, first, what is this

17  price chart for, sir?

18  A    This is a price chart of the Mozambique ten and a half

19  percent of 2023 bonds.

20  Q    Is that the eurobond that was exchanged for the LPN.

21  A    Yes, it is.

22  Q    And is this for the time frame from approximately April

23  to December of 2016?

24  A    Yes, it is.

25  Q    Can you explain to the jury, looking from April 2016 on

Kaplan - Direct - Bini                    3472

1   the left and moving to the right, what happened to the bond

2   price and why?

3   A    The bond was trading at approximately 90 cents on the

4   dollar, so we would call that a "price of 90."  And after the

5   information came out about Proindicus and Mozambique Asset

6   Management in April, I guess late April -- I don't remember

7   the exact dates, but the IMF cut off funding donor support,

8   the World Bank cutoff donor support, the rating agencies

9   downgraded Mozambique, and the prices declined very rapidly to

10  approximately 70 cents on the dollar.

11  Q    Sir, are you aware of what happened in Mozambique as a

12  result of the IMF and donors cutting off support?

13               MR. SCHACHTER:  Objection.

14               THE COURT:  Overruled.

15  A    The credit quality declined significantly of the country.

16  Q    Did it cause a financial crisis for Mozambique?

17               MR. SCHACHTER:  Objection.

18               THE COURT:  Overruled.

19  A    Yes, I believe it did.

20  Q    What was the next news event that you were aware of that

21  impacted the price of the bond?

22               MR. SCHACHTER:  Objection.

23               THE COURT:  Overruled.

24  A    In October, late October 2016, Republic of Mozambique had

25  a conference call with their financial advisers, Lazard, and

Kaplan - Direct - Bini                                    3473

1    announced essentially that they would probably need to

2    restructure the bond.

3    Q    And was that surprising to you after you just voted in

4    favor of a restructuring?

5    A    Yes, it was.

6    Q    Did there come a time that you and the marketplace

7    learned that Mozambique was not going to make the very first

8    payment on the eurobond?

9    A    We learned officially in January 2017.

10   Q    Did the phone call that you described where Mozambican

11   officials indicated they were not going to be able to make the

12   payments in October 2016 have an impact on the bond price,

13   sir?

14   A    It had a very significant impact.  The price dropped from

15   approximately 82 to 57 in a matter of days.

16   Q    And did there come a time around and after this that you

17   began to sell off your position?

18   A    I traded the position back and forth.  I don't recall

19   exactly whether I increased the position, decreased the

20   position, I may have sold some, I may have then bought some,

21   but we actively traded it.

22   Q    Did you eventually get out of the position in or about

23   2017?

24   A    In late 2017, we exited the position.

25   Q    And what was the overall impact?

1    A    The overall impact on our profit and loss statements?

2    Q    Yes, sir.

3    A    Approximately a loss of 3.2 million.

4             MR. BINI:  No further questions, your Honor.

5             THE COURT:  Your witness.

6             MR. SCHACHTER:  Thank you, your Honor.

7             THE COURT:  You're welcome.

8    CROSS-EXAMINATION

9    BY MR. SCHACHTER:

10   Q    Good afternoon, Mr. Kaplan.

11   A    Good afternoon.

12   Q    Mr. Kaplan, NWI, you said, is focused on a global macro

13   strategy; is that right?

14   A    That's the main theme, yes.

15   Q    But you actually -- when you solicit investors, you

16   disclose that you have a primary emphasis on emerging markets;

17   is that correct?

18   A    Yes.

19   Q    And NWI has clients; is that correct?

20   A    Yes, we do.

21   Q    And those clients are institutions an what are called

22   "high net worth individuals;" is that correct?

23   A    That's correct.

24   Q    Now, one of the funds that -- and NWI is a money manager,

25   right?

Kaplan - Cross - Schachter                3475

1    A     That's correct.

2    Q     And that means that it invests certain funds which are

3    separate corporate entities?

4    A     That's correct.

5    Q     That hold money; is that right?

6    A     Yes.

7    Q     And one of the funds that you had a role in managing was

8    the Emerging Market Currency Fund; is that correct?

9    A     It's actually called the Emerging Market Fixed Income

10   Master Trust.

11   Q     Okay.  And that's an entity that bought the LPNs; is that

12   right?

13   A     Yes, one of the entities.

14   Q     And that's a Cayman Islands trust; is that correct?

15   A     Yes, it is.

16   Q     And when NWI is soliciting investors to invest in that

17   fund, you provide information to investors that discloses some

18   of the risks associated with investing in that particular

19   fund; is that correct?

20   A     I believe that we do, but I am not involved in the

21   marketing to investors.

22          MR. SCHACHTER:  We'll offer, your Honor, Defense

23   Exhibit 10638.

24          THE COURT:  Any objection?

25          MR. BINI:  No objection.

LAM      OCR      RPR

Kaplan - Cross - Schachter                3476

1          THE COURT:  Admitted.  You may publish.

2          (Defense Exhibit 10638 so marked.)

3          (Exhibit published to the jury.)

4    Q    Mr. Kaplan, I'm showing you the confidential memorandum

5    that's provided to the investors in the emerging market

6    currency fund; do you see that?

7    A    Yes, I do.

8    Q    First of all, I want to talk about who can invest in the

9    emerging market currency fund.

10          It's correct that the smallest investment that can

11   be made is $1 million; is that correct?

12   A    I don't know.

13   Q    I'm going to show you on Page 6, do you see where it says

14   that the minimum initial subscriptions for Class B units is

15   $1 million and the minimum initial subscriptions for Class C

16   units is $20 million?

17          Do you see that?

18   A    Yes.

19   Q    And a "subscription" is another word for an investment in

20   a fund like this; is that correct?

21   A    Yes.

22   Q    So, these investors that are purchasing in this fund are

23   sophisticated, wealthy investors; is that correct?

24   A    For the most part, yes.

25   Q    And they're also foreign investors; isn't that right,

LAM      OCR      RPR

Kaplan - Cross - Schachter                    3477

1    only?

2    A    That is not my understanding.

3    Q    I'm going to show you Page iii.  You see where it says --

4    it talks about the fund is offering Class B units and Class C

5    units and the units are being offered to persons who are not

6    U.S. persons; do you see that?

7    A    Yes.

8    Q    And to U.S. persons subject to a risk; do you see that?

9    A    Yes.

10             MR. SCHACHTER:  You can take that down.

11   Q    And then also, sir, there are certain disclosures of the

12   risks that are associated with -- the particular investments

13   that this fund is going to be focused on; is that correct?

14   A    There should be, yes.

15   Q    And I'd like to direct your attention to Page iv.  You

16   see where it discloses to investors who really this investment

17   is suitable for, in the all caps section on Page iv?

18   A    Yes.

19   Q    And it says -- and I'd like you to explain to us.  It

20   says that this is for people who do not require immediate

21   liquidity for their investments, for whom an investment in the

22   fund does not constitute a complete investment program, and

23   who fully understand and are willing to assume the risks

24   involved in the fund's investment program.

25             Can you just explain why is it that NWI would

Kaplan - Cross - Schachter                    3478

1    disclose to investors that this shouldn't be an investor's

2    complete investment program?

3    A    I would be speculating.  I am not involved in the

4    marketing.

5    Q    Okay.  Fair enough.

6         MR. SCHACHTER:  Can we turn to Page 14, please,

7    Mr. McLeod?

8    Q    See where it says under risk factors that an investment

9    in the fund involves a high degree of risk, including the risk

10   of loss of the entire amount invested; do you see that?

11   A    Yes, I do.

12   Q    And it would be the same answer, do you know why NWI

13   specifically makes clear to the people that are investing in

14   this fund that there is a risk that they can lose the entire

15   amount that they invest?

16   A    I would answer it the same way.  I'm not involved in the

17   marketing, but it seems fairly standard to me.

18   Q    And then it also says that the incentive fee to the

19   investment manager may create an incentive for the manager to

20   cause the fund to make investments that are riskier than it

21   would otherwise make; do you see that?

22   A    Yes.

23   Q    The "incentive fee," that's the money NWI makes from this

24   fund; is that correct?

25   A    Yes.

Kaplan - Cross - Schachter                    3479

1    Q    Could you just explain, if you know, what does that mean?

2         Why would the incentive fee cause NWI to make

3    extremely risky investments?

4    A    I don't know that it would cause us to make extremely

5    risky investments.  I don't see that there.

6    Q    I'll rephrase.

7         Do you have an understanding of what this language

8    means?

9    A    I have an understanding, yes, but I'm not involved in the

10   drafting of the language or the use of it.

11   Q    Do you feel comfortable explaining it?  If not --

12   A    No, I'm not particularly comfortable, no.

13   Q    Okay.  And I'll just direct your attention, and, if

14   you're able to, explain a couple provisions; if not, you can

15   just let us know.

16        I'd like to direct your attention to Page 35 of the

17   document under "sovereign debts," at the bottom.

18   A    Yes.

19        MR. SCHACHTER:  And then at the very top of the next

20   page also.

21   Q    Do you see here where NWI tells its investors that

22   securities issued by an emerging market government, its

23   agencies, instrumentalities, involve significant risks, and

24   that there are sovereign debt issued by many emerging markets

25   is considered to be below investment grade and should be

Kaplan - Cross - Schachter                    3480

1    viewed as speculative with respect to the issuing government's

2    ability to make payments of interest and principal; do you see

3    that?

4    A    Yes.

5    Q    Can you explain to us and tell us why NWI tells its

6    investors that?

7    A    Because emerging market and subinvestment grade emerging

8    markets historically have been very risky.

9    Q    Do you have a recollection that, in fact, Mozambique

10   falls within this category, that it's a below investment grade

11   emerging market?

12   A    Yes, it does.

13   Q    And then a little bit further down, at the bottom of that

14   paragraph --

15          MR. SCHACHTER:  Mr. McLeod can we highlight the

16   bottom of that paragraph?  There's a sentence that starts

17   "consequently."

18   Q    It says:  Consequently, governmental entities may default

19   on their sovereign debt.

20          Do you see that?

21   A    Yes, I do.

22   Q    Why is it that NWI tells its investors that governmental

23   entities may default on their sovereign debt?

24   A    Again, I'm speculating, but, historically, some countries

25   have defaulted on their sovereign debt in emerging markets, as

Kaplan - Cross - Schachter                    3481

1  have some developed countries.

2  Q    And two more questions for you on this subject of the

3  disclosures.

4         MR. SCHACHTER:  There's a provision that says:  A

5  country whose exports are concentrated in a few commodities.

6         Are you able to find that, Mr. McLeod?

7  Q    See the second sentence there where NWI tells its

8  investors that a country whose exports are concentrated in a

9  few commodities could be vulnerable to a decline in the

10 international prices of one or more of such commodities; do

11 you see that?

12 A    Yes, I do.

13 Q    And why is it that NWI tells its investors that?

14 A    I, again, was not involved in preparing this language.

15 Q    You invested in the LPNs.  Do you recall that those LPNs

16 actually made all of the interest in principal payments that

17 were due from the time that they were issued in 2013 until

18 they were exchanged in 2016?

19 A    Yes, they did.

20 Q    So, that covers 2014 and 2015, and then I want to ask you

21 about what happened in 2015.

22        Do you happen to recall that one of the things that

23 put Mozambique in a difficult position were falling gas prices

24 in 2015, if you remember?

25 A    I don't remember specifically.

Kaplan - Cross - Schachter                3482

1   Q    You don't recall whether that's one of the things that

2   may have led to them needing to restructure their debt into

3   eurobonds in early 2016?

4   A    It could have been.

5   Q    And then, finally, on Page 37, there's specific

6   disclosure with respect to loan participations.

7            MR. SCHACHTER:  A little further down, Mr. McLeod,

8   under the heading "loan participations."

9   Q    Do you see where it specifically speaks of the -- it

10  warns investors about the risks associated with investments in

11  loan participations; do you see that?

12  A    Yes.

13  Q    And are you able to explain why NWI specifically warns

14  its investors about risks in loan participations?

15  A    Could you repeat that question?

16           THE COURT:  Read it back, please, Madam Reporter.

17           (Record read.)

18  A    Again, no, given that I'm not involved in drafting

19  disclaimers or marketing material.

20  Q    Fair enough.  Thank you.

21           I want to talk about the investment decision that

22  NWI made.

23           MR. SCHACHTER:  You can take that down, Mr. McLeod.

24  Thank you.

25  Q    About the investment decision that was made when you

LAM        OCR        RPR

Kaplan - Cross - Schachter                3483

1    purchased the loan participation notes.  And.

2              To be clear, did you say that all of your

3    investments were in the secondary market?

4    A    Yes, with the EMATUM notes, yes.

5    Q    Do you remember that Mr. Bini showed you a lot of --

6              MR. SCHACHTER:  Well, may I publish, your Honor,

7    Government Exhibit 753 in evidence?

8              THE COURT:  Yes.

9              (Exhibit published to the jury.)

10   Q    Remember Mr. Bini asked you a lot of questions about this

11   particular offering document that you received in advance of

12   your investment?

13   A    Yes.

14   Q    And I'd just like to direct your attention to Page 15 --

15   I'm sorry, Page ii, at the top, under "disclaimer."

16             Do you see where it specifically tells you that any

17   future prospective purchaser of the notes will be required to

18   acknowledge and, in purchasing the notes, will be deemed to

19   acknowledge, that it has not relied on or been induced to

20   enter such agreement by any representation or warranty by the

21   issuer, the joint lead managers, or the trustee with respect

22   to the borrower or Mozambique; do you see that?

23   A    Yes.

24   Q    And that's you, right?

25             You're not an initial purchaser of the LPNs, you're

LAM      OCR      RPR

Kaplan - Cross - Schachter                    3484

1   a future prospective purchaser of the notes; is that correct?

2   A    That's correct.

3   Q    But Mr. Bini asked you about provisions in this offering

4   circular, I'll just ask you about a couple of them, but before

5   I do, when you were making this decision, fair to say that the

6   thing you were most focused on was the sovereign guaranty of

7   Mozambique?

8   A    Yes.

9   Q    You were not betting NWI's investors' money on the belief

10  that this start-up fishing venture in Mozambique was going to

11  generate significant revenue; fair to say?

12  A    That's correct.

13  Q    If it were -- withdrawn.

14       What you -- you did your homework on the things that

15  you thought were important before purchasing the LPNs?

16  A    Yes.

17  Q    And what were you focused on were the macroeconomic

18  conditions of Mozambique as you saw them; is that right?

19  A    Those were some of the issues that I looked at, yes.

20  Q    You focused on the oil and natural gas in Mozambique?

21  A    Yes.

22  Q    As well as tourism?

23  A    Yes.

24  Q    But you did not ask a whole lot of questions about the

25  particular fishing project in Mozambique; is that correct?

LAM      OCR      RPR

Kaplan - Cross - Schachter                                3485

1    A    That's correct.

2    Q    There's a use of proceeds provision which I won't bother

3    showing you, but it talks about how the money is going to be

4    used for 27 fishing vessels --

5              THE COURT:  You might want to show it to him while

6    you're talking about it.

7              MR. SCHACHTER:  Fair enough.

8              THE COURT:  Evidence comes from the witness, not

9    from the lawyers.

10             Why don't you ask the question?

11             MR. SCHACHTER:  Yes, your Honor.

12   Q    I'm showing you the use of proceeds provision; do you see

13   that?

14   A    Yes, I do.

15   Q    You didn't ask a whole lot of questions about the

16   particular kind of vessels or the operations center or the

17   training or the general corporate purposes, right?

18   A    When you say "ask questions," do you mean -- I was not in

19   a road show, I was not speaking to anyone, I was not speaking

20   to the company or to its bankers.  I was reading the

21   prospectus.

22   Q    Fair enough.

23             I'm just asking you at no point during the course --

24   prior to making your investment decision, you didn't ask

25   Credit Suisse or anyone for more information about the

LAM       OCR       RPR

Kaplan - Cross - Schachter                 3486

1  particular vessels or the operations center or the general

2  corporate purposes.  I'm just asking if you asked that

3  question.

4  A    I don't recall.

5  Q    All right.  Now, Mr. Bini asked you questions about some

6  of the investment decisions that you made, and you said you

7  traded in and out of this position; is that correct?

8  A    That's correct.

9  Q    Do you have a recollection that the original offering

10 circular had a risk factor disclosure that specifically

11 addressed corruption in Mozambique as a risk factor?

12 A    All offering circulars, to my understanding, talk

13 about -- and emerging markets in particular, talk about the

14 risk of corruption.  That's fairly boilerplate.  So, I don't

15 remember anything unusually significant about corruption

16 language in the Mozambique prospectus relative to any other

17 prospectus I read for an emerging market country.

18 Q    Looking at the offering circular, do you see at the very

19 bottom it specifically contains a disclosure of corruption by

20 government officials and misuse of public funds as being a

21 risk?

22 A    Yes.

23 Q    Did you read the offering circular before you purchased

24 the LPNs?

25 A    I read a good portion of it, yes.

LAM      OCR      RPR

Kaplan - Cross - Schachter                    3487

1    Q    But you didn't read it entirely?

2    A    I usually don't read every word of it because a lot of

3    these are very, as I mentioned -- sorry to use the same

4    expression, but they're boilerplate.  So, they are very

5    standardized.  Once you've read the disclaimers for one, they

6    tend to be the same regardless of the country or the

7    situation.  This could easily have been for Malaysia or

8    Nigeria or anywhere else.

9    Q    And that's because corruption is a significant risk when

10   you're investing in a lot of emerging market debts; is that

11   correct?

12   A    That's correct.

13   Q    And Mr. Bini also asked you about exchange offer

14   memorandum; do you remember that?

15   A    Yes.

16   Q    Did you review that before you decided to vote in favor

17   of the exchange?

18   A    Yes.

19   Q    Do you happen to remember that there is a lengthy risk

20   disclosure on corruption there that even talks about what

21   percentage of Mozambicans have reported paying a bribe in the

22   prior year, if you remember?

23   A    I don't remember, but I imagine that there were things

24   written.

25   Q    Do you remember that the risk -- one of the risks also

LAM        OCR        RPR

Kaplan - Cross - Schachter                    3488

1  talked about news reports about the misuse of funds?

2  A    I don't remember.

3  Q    Now, the exchange offer memorandum would have been

4  received by you in March of 2016; is that correct?

5  A    That sounds correct, yes.

6  Q    And do you recall that the exchange occurred on or about

7  April the 7th of 2016?

8  A    Yes.

9  Q    And even after you had received both the offering

10 circular and the eurobond exchange offer memorandum with its

11 risk disclosures, you bought more eurobonds on behalf of NWI;

12 did you not?

13 A    I may have.

14 Q    I'm going to show you -- let's see, well, do you remember

15 between the end of April of 2016 and July of 2016 that NWI

16 purchased about $43 million worth of eurobonds?

17 A    That could be correct.  I don't recall exactly what we

18 purchased, but we were favorably disposed towards the road

19 show.  We liked what we heard.

20       MR. SCHACHTER:  Your Honor, may we show -- actually,

21 we'll offer Defense Exhibit 10647, which is the native version

22 of Government Exhibit 761.

23       THE COURT:  Any objection?

24       MR. BINI:  Could I just see it?

25       No objection.

Kaplan - Cross - Schachter                    3489

1          MR. SCHACHTER:  Mr. McLeod, if we could put up and

2     show the purchases between April 26, 2016 and July 19, 2016.

3          THE COURT:  Any objection?

4          Show it to counsel and the Court, please.

5          MR. SCHACHTER:  Your Honor, I believe it's now

6     evidence.  I just want to publish it.

7          THE COURT:  It's in evidence, you may publish.

8          (Defense Exhibit 10647 so marked.)

9          (Exhibit published to the jury.)

10    Q    Do you see the purchases that NWI made in the eurobonds

11    between the end of April and July of 2016?

12    A    I see several trades.  I see purchases and I see sells.

13    Q    And to be clear, NWI would have been purchasing these

14    eurobonds after it had received the exchange offer memorandum

15    with its disclosure of the risk of corruption in it; is that

16    correct?

17    A    I'm sorry, could you repeat that question.

18         THE COURT:  Read it back, please.

19         (Record read.)

20    A    That sounds correct.  I don't recall the exact sequencing

21    of when the prospectus was disseminated.  And we were also

22    actively trading throughout the period.

23    Q    All right.  I'll just briefly show you Government Exhibit

24    752 in evidence.

25         (Exhibit published to the jury.)

Kaplan - Cross - Schachter                    3490

1            MR. SCHACHTER:  And if we could go to the risk

2    factor section.

3    Q    First of all, do you recognize this to be what Mr. Bini

4    asked you about, the exchange offer memorandum?

5    A    Yes.

6    Q    And do you -- I'll just show you the risk factor section.

7            MR. SCHACHTER:  The page is, I believe, 74 to 75.

8    Q    See at the bottom of 74 to the top of 75 where it talks

9    about the risk of corruption?

10   A    Yes, I see that.

11   Q    And where it talks about the fact that corruption is

12   prevalent in Mozambique?

13   A    I see that.

14   Q    And then it goes on --

15           MR. SCHACHTER:  If we can show a little bit further

16   down, Mr. McLeod.

17   Q    You talked about this provision or sometimes corruption

18   risk being boilerplate; is that correct?

19   A    Yes.

20   Q    This particular corruption disclosure talks about reports

21   in the press in 2015 that Mozambique had misused the EMATUM

22   loan proceeds.

23           Is that boilerplate?

24   A    Well, by definition it's not boilerplate if it's speaking

25   specifically about Mozambique because other countries wouldn't

                    LAM      OCR      RPR

Kaplan - Cross - Schachter                     3491

1    be speaking about corruption in Mozambique.

2              But as far as I understand, it would not be uncommon

3    for other countries to disclose whether they've had actual

4    corruption issues.

5    Q    And do you see where it talks about the survey of public

6    opinion on corruption?

7              It showed that Mozambicans reported the highest

8    incidents of bribery in the region?

9              You received that disclosure in this document; is

10   that correct?

11   A    Yes.

12   Q    And then you voted for the exchange on or about -- the

13   exchange was completed on April the 8th of 2016; isn't that

14   correct?

15   A    I believe that -- that sounds correct.  I don't remember

16   the precise dates.

17   Q    And then starting -- as we just saw in that last exhibit,

18   starting just a couple weeks later through July, NWI bought

19   $43 million worth of eurobonds, notwithstanding this

20   disclosure; isn't that correct?

21   A    I don't know what our net purchases were because I think

22   there were also sales in there.

23             MR. SCHACHTER:  Can we go back to Government Exhibit

24   761?

25             (Exhibit published to the jury.)

LAM      OCR      RPR

Kaplan - Cross - Schachter                    3492

1   Q     Do you happen to recall, sir, that, in fact, between

2   April 26 of 2016 and July 19, of 2016, in fact, NWI did not

3   sell any eurobonds, it just purchased $42,688,000 worth of

4   eurobonds in the couple weeks after receiving the eurobond

5   exchange offer memorandum?

6   A     I would have to go through in detail.

7   Q     You don't remember?

8   A     I don't.

9   Q     Now, Mr. Bini specifically asked you about a call that

10  took place in December of 2016 in which Mozambique said that

11  they were not making further payments, or something like that.

12        Do you remember that testimony?

13  A     That was October 2016, I believe.

14  Q     October 2016?

15  A     Yes.

16  Q     Do you remember that in June of 2017, NWI purchased more

17  eurobonds, notwithstanding whatever you learned in that call?

18  A     We may have.

19  Q     Isn't it correct that NWI purchased more eurobonds as

20  recently as March 20 of 2018?

21  A     I don't recall.

22        MR. SCHACHTER:  Mr. McLeod, can we please put up

23  that purchase, Defense Exhibit 10647?

24        (Exhibit published to the jury.)

25  Q     Do you see the purchase at the bottom of that page,

LAM      OCR      RPR

Kaplan - Cross - Schachter                    3493

1    June 21, 2018?

2    A    I do not.

3    Q    Do you see the last purchase, June 21, 2018?

4    A    That was not for any of the funds that I'm managing.

5         MR. SCHACHTER:  Put that back up, though,

6    Mr. McLeod.

7    A    That could have been different portfolio managers.  Looks

8    like it could have been for the uses fund.

9    Q    I see.  But it's still NWI; isn't that correct.

10   A    Yes.

11   Q    So, NWI, that's your firm?

12   A    It is.

13   Q    So, even though you may not have individually made a

14   decision to purchase as recently as March 20, 2018, your firm

15   did; isn't that correct?

16   A    It appears that way.

17   Q    Now, you said, I believe, that NWI lost 3.2 --

18        By the way, you built up a position of about

19   $70 million; is that correct?

20   A    That's correct.

21   Q    And I believe that you said that NWI had a total loss of

22   about $3.2 million; is that correct?

23   A    Yes.

24   Q    Is it possible that you're incorrect about that?

25   A    It's possible.  It's always possible.  Those are from our

Kaplan - Cross - Schachter                          3494

1  firm's records, so I only have our firm's records to go by.

2  Q    I'm going to show you, sir, Government Exhibit --

3         MR. SCHACHTER:  May I have just a moment?

4  Q    I'd like to show you Defense Exhibit -- I'm sorry.  One

5  more thing.

6         Do you remember Mr. Bini showed you Government

7  Exhibit 766, which is a price chart?

8  A    Yes.

9         (Exhibit published to the jury.)

10        MR. SCHACHTER:  Your Honor, may we just dim the

11 lights for just a moment?

12        THE COURT:  You may.

13 Q    This is a price chart that Mr. Bini showed you that fell

14 by the end of 2016; is that correct?

15 A    Correct.

16 Q    I'd like to show you in evidence Defense Exhibit 10668,

17 which is a price chart that goes after the end of 2016.

18        (Exhibit published to the jury.)

19 Q    Do you see that, sir?

20 A    Yes.

21 Q    Do you see that although the price of the eurobonds fell

22 at the end of 2016, that it then subsequently climbed; do you

23 see that?

24 A    Yes.

25        THE COURT:  You have to let him finish, go ahead.

Kaplan - Cross - Schachter                          3495

1   Q    Yes, you do?

2   A    Yes, I do.

3   Q    Let's just return to the calculation of your loss or what

4   may be your profit.

5            I'd like to show you Defense Exhibit --

6            MR. SCHACHTER:  May we lift the lights again, your

7   Honor?

8            THE COURT:  Yes, of course.

9            Mr. Jackson.

10  Q    -- to show you Defense Exhibit 10647.

11           Do you see where the first tab is labeled "P&L"?

12  A    Yes.

13

14           (Continued on the following page.)

15

16

17

18

19

20

21

22

23

24

25

1   CROSS-EXAMINATION

2   BY MR. SCHACHTER: (Continuing.)

3   Q    And that's what you described as profit and loss; is that

4   correct?

5   A    Correct.

6   Q    And this shows the total loss of $3.2 million,

7   approximately; is that right?

8   A    Correct.

9   Q    Certain funds made money and certain funds lost money; is

10   that correct?

11   A    That's correct.

12   Q    And then the next tab is labeled *Trade Data*.

13        Do you see that?

14   A    Yes.

15   Q    And that's the one where we saw the last trade as

16   recently as June 21st of 2018; is that correct?

17   A    Yes.

18   Q    And if we look in Column C -- I'm sorry, Government -- do

19   you see where it lists the LPN purchases?

20   A    What you have highlighted are not LPN purchases.

21   Q    You see where it says MOZ23?  That's 2023?

22   A    Yeah, those are not the LPNs.

23   Q    I'm sorry, the Eurobonds.  I apologize.

24   A    Correct.

25   Q    And so both of those represent the -- the MOZ23, those

1    are the Eurobonds; is that correct?

2    A    Correct.

3    Q    And now, if we can look at the LPN interest payment.

4            Do you see where it says, Paid Interest?

5    A    Yes.

6            MR. SCHACHTER:  And, Mr. McLeod, can we just tally

7    in the spreadsheet the total amount of interest paid on the

8    Eurobonds?

9            MR. BINI:  Objection, Your Honor.

10           THE COURT:  Yes, sustained.

11   BY MR. SCHACHTER:

12   Q    Sir --

13           THE COURT:  You are not testifying, so...

14   Q    Sir, isn't it correct that the actual paid interest that

15   NWI received on the Eurobonds was a total of $4.3 million?

16   A    I don't.  I don't know.

17   Q    If it is --

18   A    When we --

19           THE COURT:  Have you completed your answer?  When

20   you said you don't know.

21           THE WITNESS:  I don't know.

22           THE COURT:  Good, next question.

23   BY MR. SCHACHTER:

24   Q    If the interest received was $4.3 million then NWI

25   ultimately made a little bit more than a million dollars on

1    its investment; it didn't have any losses, did it?

2    A    That sounds incorrect.

3              MR. SCHACHTER:  I have no further questions.

4              Thank you, Mr. Kaplan.

5              THE COURT:  Any redirect?

6              MR. BINI:  Just very briefly.

7    REDIRECT EXAMINATION

8    BY MR. BINI:

9    Q    Mr. Kaplan, defense counsel asked you some questions

10   regarding NWI's investors.

11             Do you remember that?

12   A    Yes.

13   Q    And he showed you some documents that you don't deal

14   with, right?

15   A    That's correct.

16   Q    But what you do deal with is investment decisions on

17   behalf of your clients; is that right, sir?

18   A    Yes.

19   Q    And you mentioned that NWI is a fiduciary for its

20   clients; is that right?

21   A    Yes, we are.

22   Q    Does that mean that you have discretion to make

23   investment decisions on behalf of your clients without

24   consulting with them, sir?

25   A    That's correct.

*Kaplan - redirect - Bini*                    3499

1   Q    And as a fiduciary, do you have an obligation to act in

2   the best interest of your clients?

3   A    We do.

4   Q    Is that important to you, sir?

5   A    Very important.

6   Q    Would you ever purposely invest your client's funds in a

7   bond where the contractor was paid millions of -- that were

8   paid millions of dollars to Mozambican officials and the

9   Credit Suisse bankers who put the bond together?

10  A    No, it would not.

11            MR. BINI:  No further questions.

12            THE COURT:  Thank you, sir, you may step down.

13            (Witness excused.)

14            THE COURT:  Ladies and gentlemen of the jury,

15  ordinarily we take our 15-minute break here, then you come

16  back and you have a hard stop at five, so I'm going to

17  exercise my judicial prerogative, excuse you for the day.  We

18  will see you tomorrow morning at 9:30.  We have one more, I

19  believe, one more Government witness and the Government will

20  conclude it's case, then we will have some business with the

21  lawyers and then the defense will begin to put on its case, so

22  do not talk about the case yet.  Getting close, we're almost

23  there, and I thank you for your patience.  See you tomorrow

24  morning at 9:30.

25            Thank you.

*Proceedings*                                                3500

1          (Jury exits.)

2          THE COURT:  Thank you.  You may be seated, ladies

3   and gentlemen.

4          The jury has left the courtroom, the witness has

5   completed testimony, and the defendant is still present.

6          Do we have any procedural issues we need to address

7   today before we resume tomorrow at 9:30 in the morning?

8          MR. JACKSON:  Your Honor, we have one that we would

9   like to bring up.

10          THE COURT:  Yes.

11          MR. JACKSON:  Your Honor, we understand that the

12   Government's final witness is going to be Agent Haque and we

13   have -- the Government has identified for us a number of

14   summary charts that it intends to introduce through Agent

15   Haque and we understand that the primary purpose of her

16   testimony is to introduce those summary charts and go through

17   those charts.  We don't expect to have any objection to the

18   introduction of those charts.

19          The Government has also identified certain

20   documents, like e-mails and text messages and such, that it

21   intends to read through Agent Haque's.  We would like to voice

22   an objection to that, Your Honor, because we think that, as

23   the Court has emphasized, the jury's time is valuable; they

24   have already spent three days with an agent reading through

25   messages.  We don't think that there's any reason for them to

*Proceedings*                                              3501

1   go through more reading of messages with this witness when

2   they can admit them, we won't object to them, they can use

3   them in their summation, and then we will be able to use

4   tomorrow efficiently to get through the witnesses that we have

5   prepared to begin testifying as soon as we finish our business

6   with the Court.

7           THE COURT:  What's your response?

8           MR. BINI:  Your Honor, other than some BBM messages

9   regarding the exchange, the Government doesn't plan to read

10  any of the e-mails that it's admitting.

11          THE COURT:  Good.  Anything else?

12          MR. BINI:  Your Honor, we would just note that we

13  provided defense counsel and the Court with Mozambican law

14  that we believe supports the instruction as given and

15  Ms. Nielson is ready to address that if you wish to hear

16  further --

17          THE COURT:  Why don't we address that tomorrow

18  morning.  Make sure you've given your adversary time to look

19  at the statute --

20          MR. BINI:  Yes, Your Honor.

21          THE COURT:  -- they haven't seen it, and perhaps

22  they will rethink their characterization of the statute as

23  civil in light of having an opportunity overnight to read it.

24  We can start tomorrow with that.

25          I also will rule tomorrow with respect to the

3502

1    motions in limine concerning the challenge of the testimony of

2    Pearse and same through the revisitation of discrepancies,

3    real or imagined, between their testimony and the 302

4    statements.  So I will address that and rule on that tomorrow

5    morning, as I indicated I would.

6              Anything else?

7              MR. BINI:  Your Honor, I would just note that we

8    have a couple of stipulations and a few exhibits that we will

9    seek to move in immediately before the agent's testimony, so

10   Ms. Moeser will do that along with Mr. Mehta, if that's okay

11   with the Court, tomorrow morning and then we will call the

12   agent and rest.

13             THE COURT:  That's fine with the Court.

14             Defense counsel?

15             MR. JACKSON:  No, no further issues, Your Honor.

16             THE COURT:  Okay.  Thank you, I will see you

17   tomorrow morning at 9:30, folks.

18             MR. BINI:  Thank you, Judge.

19             MR. JACKSON:  Thank you, Your Honor.

20             (Matter adjourned to November 13, 2019, 9:30 a.m.)

21                        ooo0ooo

22

23

24

25

3503

1                                INDEX

2

3    WITNESS:                                      PAGE:

4    **M A R C O   S A N T A M A R I A**

5    CROSS-EXAMINATION (Continued)

6    BY MR. SCHACHTER......................... 3398

7    REDIRECT EXAMINATION

8    BY MR. MEHTA............................. 3446

9    **J A S O N   K A P L A N**.................... 3448

10   DIRECT EXAMINATION

11   BY MR. BINI.............................. 3449

12   CROSS-EXAMINATION

13   BY MR. SCHACHTER......................... 3474

14   REDIRECT EXAMINATION

15   BY MR. BINI.............................. 3498

16

17                          * * * * *

18

19

20

21

22

23

24

25

3504

INDEX OF EXHIBITS

FOR THE GOVERNMENT:                                    PAGE:

Government's Exhibit 2336C.........................   3427

Government Exhibit 2336D...........................   3441

Government Exhibit 752.............................   3451

Government Exhibit 761.............................   3451

Government Exhibit 762.............................   3451

Government Exhibit 763.............................   3451

Government Exhibit 764.............................   3452

Government Exhibit 766.............................   3452

Government Exhibit 753.............................   3452

Government Exhibit 758.............................   3452


FOR THE DEFENSE:                                       PAGE:

Defense Exhibit 10638.............................   3476

Defense Exhibit 10647.............................   3489

 Defense Exhibit 10606, 10607, and 10668..........   3398

*****